UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UBS AG, STAMFORD BRANCH,　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiff,　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　Civil Action No. 07 CV 8490 (LAP)
　　　　- v -　　　　　　　　　　　　:　　ECF Case
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
HEALTHSOUTH CORP.,　　　　　　　　 :
　　　　　　　　　　　　　　　　　　:
　　　　　　Defendant.　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - x


## UBS'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT


Robert J. Giuffra, Jr. (RJ-9969)
Marc De Leeuw (MD-2166)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for UBS AG, Stamford Branch*


December 17, 2007

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................... 1

PROCEDURAL HISTORY ........................................................................... 3

THE UNDISPUTED FACTS ......................................................................... 3

    A.    The Parties ......................................................................... 3

    B.    The Credit Agreement and HealthSouth's
          "Absolute and Unconditional" Loan Guarantee ............................ 5

    C.    MedCenter's and HealthSouth's Defaults Under the Credit Agreement ............... 8

    D.    In Its SEC Filings, HealthSouth Repeatedly Admits the Validity
          of Its "Absolute and Unconditional" Loan Guarantee............................ 8

    E.    The Amounts HealthSouth Owes UBS ............................................ 9

    F.    The *Tucker* Derivative Action ................................................ 10

STANDARD ON THIS MOTION ...................................................................... 11

ARGUMENT ......................................................................................... 12

I.    HEALTHSOUTH'S "ABSOLUTE AND UNCONDITIONAL"
    LOAN GUARANTEE ESTABLISHES UBS'S *PRIMA FACIE* CASE........................... 12

II.    UNDER SETTLED NEW YORK LAW, HEALTHSOUTH
    CANNOT EVADE ENFORCEMENT OF ITS "ABSOLUTE AND
    UNCONDITIONAL" LOAN GUARANTEE............................................... 13

    A.    New York's *Plapinger* Rule Confirms the Enforceability of
          HealthSouth's "Absolute and Unconditional" Guarantee ....................... 14

    B.    *Liberty Mutual* Does Not Allow HealthSouth
          To Escape the *Plapinger* Rule ................................................ 16

    C.    HealthSouth's Allegations of Fraud Involving UBS Are Conclusory ................. 18

    D.    HealthSouth's SEC Filings Have Ratified the Guarantee ......................... 19

CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

*Page(s)*

## Federal Cases

*Compagnie Financiere de CIC et de L'Union Europeenne* v.
    *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31 (2d Cir. 1999)........................15

*Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986)..........................................................11, 12

*Citicorp Leasing, Inc.* v. *United Am. Funding, Inc.*,
    No. 03 Civ. 1586, 2005 WL 1847300 (S.D.N.Y. Aug. 5, 2005).........................12, 13, 16

*JPMorgan Chase Bank* v. *Liberty Mut. Ins. Co.*,
    189 F. Supp. 2d 24 (S.D.N.Y. 2002) ........................................................16, 17, 18

*Kulak* v. *City of New York*, 88 F.3d 63 (2d Cir. 1996) ................................................18

*Levin* v. *Tiber Holding Corp.*, 277 F.3d 243 (2d Cir. 2002) ......................................16

*Mfrs. Hanover Trust Co.* v. *Yanakas*, 7 F.3d 310 (2d Cir. 1993)................................16

*Nat'l Union Fire Ins. Co.* v. *Stroh Cos.*, 265 F.3d 97 (2d Cir. 2001)...........................18

*Orix Credit Alliance* v. *Bell Realty, Inc.*, No. 93 Civ. 4949 (LAP),
    1995 WL 505891 (S.D.N.Y. Aug. 23, 1995)............................................12, 13

*Valley Nat'l Bank* v. *Greenwich Ins. Co.*,
    254 F. Supp. 2d 448 (S.D.N.Y. 2003) ...............................................................18

*West* v. *Am. Tel. & Tel. Co.*, 311 U.S. 223 (1940) ...................................................16

## Alabama Cases

*Russell* v. *Birmingham Oxygen Serv., Inc.*, 408 So. 2d 90 (Ala. 1981)........................11

## New York Cases

*Banco do Estado de Sao Paolo* v. *Mendes Junior Int'l Co.*,
    249 A.D.2d 137, 672 N.Y.S.2d 28 (1st Dep't 1998)......................................15

*Citibank, N.A.* v. *Plapinger*,
    66 N.Y.2d 90, 485 N.E.2d 974 (1985) ......................................................*passim*

*Page(s)*

*Corvetti* v. *Hudson*, 252 A.D.2d 787, 676 N.Y.S.2d 263 (3d Dep't 1998) .................................. 13

*Diversified Investors Corp.* v. *DiversiFax, Inc.*,
    239 A.D.2d 231, 657 N.Y.S.2d 642 (1st Dep't 1997) ...................................................... 13

*European Am. Bank* v. *Syosset Autorama*, Inc.,
    204 A.D.2d 266, 611 N.Y.S.2d 585 (2d Dep't 1994) ....................................................... 18

*Gannett Co.* v. *Tesler*, 177 A.D.2d 353, 577 N.Y.S.2d 248 (1st Dep't 1991) ...................... 16, 19

*Gen. Trading Co.* v. *A & D Food Corp.*,
    292 A.D.2d 266, 738 N.Y.S.2d 845 (1st Dep't 2002) ...................................................... 15

*Graubard Mollen Dannet & Horowitz* v. *Edelstein*,
    173 A.D.2d 230, 569 N.Y.S.2d 639 (1st Dep't 1991) ...................................................... 20

*Kornfeld* v. *NRX Technologies, Inc.*,
    93 A.D.2d 772, 461 N.Y.S.2d 342 (1st Dep't 1983). ...................................................... 19

*Kornfeld* v. *NRX Technologies*, 62 N.Y.2d 686, 465 N.E.2d 30 (1984) .............................. 3, 19

*Mikor Realty & Development Corp.* v. *Fleet Bank*,
    210 A.D.2d 157, 620 N.Y.S.2d 354 (1st Dep't 1994) ................................................. 15, 16

*New York Life Ins. Co.* v. *Media/Communications Partners Ltd. P'ship*,
    204 A.D.2d 235, 612 N.Y.S.2d 144 (1st Dep't 1994) ................................................. 19, 20

*Red Tulip, LLC* v. *Neiva*,  44 A.D.3d 204, 842 N.Y.S.2d 1 (1st Dep't 2007) .............................. 15

## Statutes and Rules

Federal Rule of Civil Procedure 56 ....................................................................... 1, 3, 11, 18

New York Civil Practice and Rules § 3213 ...................................................................... 3

Plaintiff UBS AG, Stamford Branch ("UBS"), respectfully submits this memorandum in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56 against defendant HealthSouth Corporation ("HealthSouth").

## PRELIMINARY STATEMENT

Through this action, in reliance on settled New York law, UBS seeks to enforce HealthSouth's "absolute and unconditional" guarantee of a defaulted commercial loan. In 2001 and 2002, at HealthSouth's request, UBS loaned a total of $20 million to HealthSouth affiliate MedCenterDirect.com ("MedCenter"). In making this loan, UBS expressly relied on HealthSouth's grant of a "continuing absolute and unconditional guarantee of [MedCenter's] payment *without regard to the validity, regularity or enforceability* of the Agreement or any Note or guarantee thereof." (Emphasis added.)

Beyond waiving any defenses based on the validity or enforceability of its "absolute and unconditional" loan guarantee, HealthSouth expressly represented and warranted that HealthSouth had full corporate authority to execute this contract. HealthSouth's General Counsel specifically opined to UBS that HealthSouth had properly executed this contract. HealthSouth also provided a Secretary's Certificate to UBS evidencing that HealthSouth's nine-member Board of Directors had ratified this "absolute and unconditional" loan guarantee. Indeed, HealthSouth repeatedly disclosed the existence of the guarantee in its audited SEC filings — both before and after MedCenter defaulted on UBS's loan — without ever asserting that HealthSouth's guarantee was not a valid corporate action.

Although MedCenter never repaid UBS and is now defunct, HealthSouth simply ignored UBS's many requests that HealthSouth honor its "absolute and unconditional" guarantee. Now that UBS has been forced to bring suit, HealthSouth seeks to avoid its absolute and unconditional" guarantee by claiming in conclusory fashion that UBS defrauded or

conspired to defraud HealthSouth, and that "the agents who purported to bind HealthSouth . . . lacked actual and apparent authority to do so." (Notice of Removal, Docket No. 1, at ¶ 27.)

In seeking to avoid the prompt enforcement of its "absolute and unconditional" guarantee, HealthSouth urges this Court to defer to an Alabama derivative action in which the plaintiff has alleged a "massive, complex fraud perpetrated on HealthSouth by [HealthSouth officers] with the knowledge, assistance, and active participation of UBS." (Notice of Removal, ¶ 4.) Under settled New York law, such allegations — whether made specifically or, as here, conclusorily — are irrelevant to this action and cannot prevent UBS from promptly enforcing HealthSouth's "absolute and unconditional" guarantee, made "without regard to the validity, regularity or enforceability" of the loan agreement or the guarantee. *See generally Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 485 N.E.2d 974 (1985).

*Plapinger* and its progeny, as described in detail in Section II.A., *infra*, make clear that, in New York, allegations of fraud, however that defense is couched, do not prevent a lender from enforcing an "absolute and unconditional" loan guarantee where, as here, the contract expressly waives those defenses as a matter of law. Indeed, *Plapinger* granted *summary judgment* to the lender, notwithstanding the guarantor's admittedly proper evidence that the *guarantee itself* was directly procured by the lender's fraud. Thus, HealthSouth cannot avoid its guarantee by claiming that UBS and HealthSouth insiders "conspired" to defraud HealthSouth, or that the guarantee resulted from an invalid, irregular or unenforceable corporate action by HealthSouth. Otherwise, the *Plapinger* rule could be evaded by artful pleading, and an "absolute and unconditional" guarantee "without regard to the validity, regularity or enforceability" of such guarantee would be ineffective to achieve its intended purpose: the prompt award of payment on summary judgment without recourse to plenary proceedings.

HealthSouth also cannot avoid enforcement of its "absolute and unconditional" loan guarantee, because HealthSouth's SEC filings — both before and after the revelation of the HealthSouth accounting fraud — acknowledged and ratified the existence of this guarantee. As the New York Court of Appeals has made clear, "[a]llegations that the guarantees were completed and delivered without authorization [and other] conclusory assertions [do not] raise[] any issue of material fact," when, as in this case, a corporation's SEC filings "set[] forth the issuance of both the notes and [the] guarantees." *Kornfeld* v. *NRX Technologies, Inc.*, 62 N.Y.2d 686, 687, 465 N.E.2d 30, 31 (1984).

Because there is no need for any discovery to decide UBS's motion, this New York lawsuit to enforce a New York contract does not depend upon, and should not await, the resolution of the Alabama derivative litigation. This Court should grant UBS summary judgment and direct HealthSouth to pay all principal and accrued interest on the MedCenter loan, plus UBS's reasonable attorneys' fees, in accordance with the MedCenter loan agreement.

## PROCEDURAL HISTORY

On September 7, 2007, UBS filed a motion for summary judgment in lieu of complaint in the Supreme Court of the State of New York pursuant to C.P.L.R. § 3213 to enforce HealthSouth's "absolute and unconditional" loan guarantee. On October 1, 2007, HealthSouth removed UBS's action to federal court. Following a status conference before this Court, the parties stipulated (and the Court "so ordered") that UBS would file a motion for summary judgment under Fed. R. Civ. P. 56 and Local Rule 56.1. (See Stipulation, Docket No. 8.)

## THE UNDISPUTED FACTS

### A.    The Parties

Plaintiff UBS is a Connecticut state-licensed branch of UBS AG, a Swiss banking corporation, with its principal place of business in Stamford, Connecticut. UBS executed as

"Administrative Agent" a Credit Agreement dated March 30, 2001, among MedCenter, HealthSouth, and UBS (the "Credit Agreement").[1] (*See* Kalal Decl., Ex. A at 1, §§ 2.3-2.5 at 25-26, § 9.2 at 53, § 10.1-10.8 at 54-57.)  UBS extended the entire principal amount of the loan as the sole "Lender" to MedCenter. (*See id.* § 10.4 at 55; Kalal Decl. ¶ 5.)  As authorized by the Credit Agreement, UBS brings this action in its capacities as Administrative Agent and as Lender. (*See* Kalal Decl., Ex. A at §§ 9.2, 9.3 at 53.)

Defendant HealthSouth Corporation is a Delaware corporation with its principal place of business in Birmingham, Alabama.  HealthSouth executed the Credit Agreement as "Guarantor." (*See id.* at 1.)

Non-party MedCenter executed the Credit Agreement as "Borrower." (*See id.* at 1.)  MedCenter was founded in 1999 with the backing of HealthSouth as a Delaware corporation to develop and to implement an online business-to-business, e-commerce marketplace for medical supplies. (*See* Kalal Decl. ¶ 7.)  Both HealthSouth Corporation, and certain officers and directors of HealthSouth, purchased a significant amount of MedCenter preferred stock, which carried the right to elect 50% of MedCenter's Board.  (*See* HealthSouth 2001 SEC Form 10-K (Kalal Decl., Ex. D) at 64.)[2]  As of March 1, 2006, MedCenter was certified as "no longer in existence and good standing under the laws of the state of Delaware" and its corporate charter became "inoperative and void." (*See* Certification of Harriet Smith Windsor, Secretary of State of the State of Delaware, dated February 21, 2007 (Kalal Decl., Ex. U).)

---

[1]     A copy of the Credit Agreement is annexed as Exhibit A to the accompanying Declaration of David J. Kalal, dated December 17, 2007 ("Kalal Decl.").

[2]     As of December 31, 2002, HealthSouth, along with certain of its officers and directors, together owned 67% of MedCenter's stock.  HealthSouth itself owned 20.2% of the stock. (*See* HealthSouth 2002/2003 SEC Form 10-K (Kalal Decl. Ex. D) at 151.)

**B.    The Credit Agreement and HealthSouth's
"Absolute and Unconditional" Loan Guarantee**

On March 30, 2001, MedCenter, HealthSouth and UBS executed the Credit Agreement, pursuant to which Lenders would make available to MedCenter a term loan facility of $15,000,000.  (Credit Agreement (Kalal Decl., Ex. A) at 1.)  Full repayment of all amounts due under the loan — both principal and interest — was due on October 30, 2001.  (*Id.* § 2.4(b) at 25 (see pages 15 and 21 for definition of "Maturity Date").)  UBS loaned the entire $15 million to MedCenter on or about March 30, 2001.  (Kalal Decl. ¶ 5.)

In the Credit Agreement, HealthSouth represented and warranted to UBS, among other things, that each "Credit Party" (including HealthSouth) "has the power and authority to execute, deliver, and perform this Agreement" (Kalal Decl. Ex. A, at § 6.1(c)), that each loan document "will be the legal, valid and binding obligation or agreement . . . of such Credit Party in accordance with its terms" (*id.* at § 6.1(d)), that the "execution, delivery and performance by each Credit Party of each of the Loan Documents . . . have been duly authorized by all requisite corporate actions" (*id.* at § 6.2(a)), and that HealthSouth's audited financial statements for the year ended December 31, 2000 "present[ed] fairly" HealthSouth's financial condition "in conformity with GAAP" (*id.* at § 6.6(a)).

HealthSouth agreed in Section 11.1 of the Credit Agreement that "[t]o induce each Lender to execute and deliver this Agreement to make loans to the Borrower . . . , the Guarantor [HealthSouth] hereby ***unconditionally and irrevocably*** guarantees to each of the Administrative Agent, the Lenders and their successors, indorsees, transferees and assigns, the prompt and complete payment and performance when due . . . of the Obligations."  (Credit

Agreement (Kalal Decl., Ex. A) § 11.1 at 57 (emphasis added).)  This unconditional guarantee "shall remain in full force and effect until the Obligations are paid in full." (*Id.*)[3]

Under Section 11.4 of the Credit Agreement — entitled "<u>Waiver by the Guarantor;  Guarantee Absolute and Unconditional</u>" — HealthSouth expressly agreed that its guarantee of MedCenter's obligations was "absolute and unconditional":

> [T]he Obligations, and any of them, shall conclusively be deemed to have been created, contracted, continued or incurred in reliance upon the guarantee contained in this Article XI, and all dealings between the Guarantor and the Administrative Agent or the Lenders shall likewise be conclusively presumed to have been consummated in reliance upon the guarantee contained in Article XI. The Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or the Guarantor with respect to any Obligations. *This guarantee shall be construed as a continuing absolute and unconditional guaranty of payment without regard to the validity, regularity or enforceability of the Agreement or any Note or any guarantee thereof* or right of offset at any time or from time to time held by the Administrative Agent or the Lenders *and without regard to any defense, set-off or counterclaim which may at any time be available to or be asserted by the Borrower* against the Administrative Agent or the Lenders or any other Person, or by any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or the Guarantor) *which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower in respect of its Obligations, or of the Guarantor under the guarantee contained in this Article XI.*

(*Id.* § 11.4 at 58 (emphasis added).)

HealthSouth's General Counsel, William Horton — who has not been named as a defendant in the *Tucker* derivative action described below or in any government enforcement action — issued a written opinion that, among other things: (1) HealthSouth "has the corporate

---

[3]    HealthSouth further agreed in Section 11.1 to "pay the expenses which may be paid or incurred by the Administrative Agent or the Lenders in collecting any or all of the Obligations and/or enforcing any rights under this Article XI or under the Obligations in accordance with Section 12.6." (*Id.*)  Section 12.6 provides that "[t]he Borrower and the Guarantor, jointly and severally agree . . . to pay or reimburse the Administrative Agent and each Lender for all their reasonable costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, including without limitation, the reasonable fees and disbursements of their counsel." (*Id.* § 12.6 at 63.)

power and authority to execute, deliver and perform the Loan Documents"; (2) "the execution, delivery and performance of the Loan Documents by [HealthSouth] (a) have been duly authorized by all requisite corporate action . . ., and (b) will not violate any provision of law"; and (3) "[t]he Loan Documents have been duly executed and delivered by [HealthSouth], and such documents constitute the legal, valid and binding obligations of [HealthSouth] and are enforceable in accordance with their terms." (Kalal Decl., Ex. B, at 2-3.)

HealthSouth also delivered to UBS an executed Secretary's Certificate, dated March 30, 2001, attesting to the validity of annexed resolutions adopted by HealthSouth's Board of Directors authorizing the company to execute the Credit Agreement and to guarantee MedCenter's obligations thereunder. (Kalal Decl., Ex. C.) In its audited 2001 Form 10-K, HealthSouth expressly disclosed that HealthSouth provided a "guaranty of $15,000,000 of indebtedness from MedCenterDirect.com to an outside lender." (Kalal Decl., Ex. D at 64.)

MedCenter, HealthSouth and UBS subsequently amended the Credit Agreement to extend the loan's maturity date to March 30, 2002. (*See* Amendment No. 1, dated June 12, 2001 (Kalal Decl., Ex. F).) HealthSouth's General Counsel, Mr. Horton, again opined in a letter dated June 12, 2001, that the Credit Agreement, as amended, was properly executed and constituted a "legal, valid and binding obligation[]" of HealthSouth. (Kalal Decl., Ex. G.)

Thereafter, the parties agreed to a second amendment (i) increasing the amount loaned by $5,000,000 (to a total of $20,000,000), and (ii) extending the maturity date to March 28, 2003. (*See* Amendment No. 2, dated March 28, 2002 (Kalal Decl., Ex. H).) HealthSouth again delivered to UBS a duly executed Secretary's Certificate, dated March 28, 2002, attesting to the validity of annexed resolutions adopted by HealthSouth's Board of Directors that authorized the company to enter into the amendment and increase its unconditional guarantee from $15,000,000 to $20,000,000. (Kalal Decl., Ex. I.) General Counsel Horton

opined in a letter dated March 28, 2002, that the Credit Agreement, as amended, was properly executed and constituted a "legal, valid and binding obligation[]" of HealthSouth. (Kalal Decl., Ex. J.) In reliance on these HealthSouth agreements, certificates, and opinions, UBS provided, on March 28, 2002, the additional $5,000,000 to MedCenter. (Kalal Decl. ¶ 13.)

Both of the amendments were duly executed by HealthSouth "as Guarantor," and both provide that, "[e]xcept as expressly amended and waived hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms." (Kalal Decl., Ex. F at 3, 5; *Id.*, Ex. H at 4.)

### C.    MedCenter's and HealthSouth's Defaults Under the Credit Agreement

On March 31, 2003, three days after the stated maturity date of the amended Credit Agreement, UBS invoiced MedCenter in the amount of $20,190,914.86, representing the principal and interest then due under the Credit Agreement. (Kalal Decl. ¶ 15 & Ex. K.) MedCenter never responded in any way to that invoice. (Kalal Decl. ¶ 16.)

On April 27, 2004, July 2, 2004, October 12, 2004, January 5, 2005 and April 6, 2005, UBS invoiced both MedCenter and HealthSouth for the amounts then due under the Credit Agreement. (Kalal Decl. ¶ 19 & Exs. O-S.) Both MedCenter and HealthSouth ignored these invoices. (Kalal Decl. ¶ 20.) On July 12, 2005, UBS sent a letter to MedCenter and HealthSouth demanding prompt and complete payment of the total amounts due under the Credit Agreement, which by that time equaled $23,860,613.64. (Kalal Decl. ¶ 21 & Ex. T.) Neither MedCenter nor HealthSouth responded in any way. (Kalal Decl. ¶ 22.)

### D.    In Its SEC Filings, HealthSouth Repeatedly Admits the Validity of Its "Absolute and Unconditional" Loan Guarantee

Despite ignoring UBS's requests for payment under the Credit Agreement, HealthSouth has admitted repeatedly in its Form 10-K filings with the SEC — reviewed by

HealthSouth's auditors, signed by HealthSouth's directors and senior management, and prepared

under HealthSouth's legal duty to be truthful and accurate — that HealthSouth is obligated to

pay UBS the full amounts due from MedCenter under the Credit Agreement.  In its 2002/2003

SEC Form 10-K, HealthSouth stated:  "We also provided a guarantee for $20 million of MCD's

debt to UBS Warburg in 2001," and recognized a "liability under the terms of the guarantee as of

September 30, 2003."  (Kalal Decl. Ex. E at 152.)  In its 2004 SEC Form 10-K, HealthSouth

stated:

> In 2001, *we provided a guarantee* for $20 million of [MedCenter]'s debt to UBS
> Warburg . . . .  In September 2003, UBS Warburg called its loan to [MedCenter].[4]
> *We have recognized a liability under the terms of the guarantee* as of September
> 30, 2003, but, as of December 31, 2004, we have not paid the amounts due under
> the terms of the guarantee to UBS Warburg.

(Kalal Decl., Ex. L at 144 (emphasis added).)

Similarly, in its 2005 Form 10-K, HealthSouth advised its stockholders:

> During 2003, UBS called its loan to [MedCenter].  *We recognized a liability of
> approximately $20.0 million under the terms of the guarantee* as of December 31,
> 2003, but have not paid the amounts due under the terms of the guarantee to UBS
> Warburg as of December 31, 2005.

(Kalal Decl., Ex. M at F-40 (emphasis added).)  Each of these Forms 10-K was issued by

HealthSouth *after* HealthSouth's accounting fraud had been publicly disclosed, and after

HealthSouth-related securities and derivative litigation was well underway.

**E.    The Amounts HealthSouth Owes UBS**

HealthSouth unconditionally guaranteed full payment of the principal and interest

due under the Credit Agreement.  The principal amount due under the Credit Agreement, as of

---

[4]    HealthSouth's 2004 Form 10-K incorrectly states that "UBS Warburg" made the loan to
MedCenter; as the loan documents expressly state, UBS AG made the loan.  In addition, UBS
AG did not "call" its loan to MedCenter; the loan came due at its contractual maturity date in
March 2003.

March 28, 2003, was $20,000,000.   (Kalal Decl. ¶¶ 5, 13.)   As of March 28, 2003, the outstanding interest was $190,914.86.  (*See* Kalal Decl. ¶ 15 & Ex. K.)

From March 28, 2003 to date, interest has accrued under the Credit Agreement at the "Default Rate," which is calculated by adding the Base Rate,[5] the Applicable Margin[6] and 2%.  (Kalal Decl. ¶ 25 & Ex. A, § 2.3 at 25, § 1.1 at 9.)   Applying this rate to the outstanding principal and interest results in a total amount due as of December 17, 2007 of $29,348,336.04, with interest accruing (based on the current Prime Rate) at $6,029.23 per day.  (*See* Kalal Decl. ¶¶ 25, 26, 27.)   HealthSouth still has not repaid the nearly $30 million that HealthSouth now owes UBS.

F.       **The *Tucker* Derivative Action**

As described in a report issued by the Special Audit Review Committee of HealthSouth's Board of Directors ("SARC"), "[o]n March 18, 2003, a federal law enforcement task force executed a search warrant at the Birmingham, Alabama offices of HealthSouth Corporation . . . [t]he following day, the Securities and Exchange Commission . . . filed suit against HealthSouth and its Chairman, Chief Executive Officer and principal founder, Richard M. Scrushy, claiming that the Company had deliberately overstated its earnings by at least $1.4 billion since 1999."  (Kalal Decl., Ex. X at 1.)   After March 18, 2003, although HealthSouth dramatically restated its historical financial statements, HealthSouth did not cease doing

---

[5]       Under the Credit Agreement, "Base Rate" "means, for any day, the rate per annum equal to the higher of (i) the Prime Rate for such day or (ii) the Federal Funds Rate for such day plus one-half of one percent (½%)."  (Credit Agreement (Kalal Decl. Ex. A) § 1.1 at 3.)

[6]       Under the terms of the Credit Agreement, "Applicable Margin" was a "percent per annum" contingent on the higher of the Guarantor's S&P and Moody's credit ratings.  (*Id.*, §1.1 at 2.)   As the Guarantor's credit rating declined, the Applicable Margin increased.  (*Id.*)

business, enter bankruptcy, or generally stop paying on its obligations. (*See* HealthSouth 2002/2003 SEC Form 10-K (Kalal Decl. Ex. E) at 1-9.)

In *Tucker*, a derivative action now pending in Alabama state court, the derivative plaintiff alleges that UBS Securities LLC (a subsidiary of UBS AG) and certain of its employees knew of HealthSouth's precarious financial state, while "falsely" touting HealthSouth's stock (in research reports and otherwise) in exchange for receiving investment banking business. (*See* Third Amended Verified Complaint (Kalal Decl., Ex. V ¶ 84).) The plaintiff-shareholders further allege that UBS Securities LLC breached "an implied covenant to provide HealthSouth with investment banking services in a forthright and professional manner" and "an implied covenant of good faith and fair dealing." (*Id.* ¶ 89.)

The *Tucker* derivative action has no bearing on this contract litigation. UBS AG is not a party to the derivative action. The *Tucker* complaint contains no specific allegations — none — regarding the validity of HealthSouth's "absolute and unconditional" guarantee of UBS AG's loan to MedCenter, or any support for the notion that UBS AG or UBS Securities LLC "conspired" with or "defrauded" anyone in extending that loan. (Kalal Decl., ¶ 28 & Ex. V ¶¶ 83-90, 105-13.) And UBS Securities LLC has not sought to enforce the guarantee in *Tucker*; as a non-party to the Credit Agreement, UBS Securities LLC lacks standing under Alabama law to assert a counter-claim in the *Tucker* action for payment on behalf of UBS AG. *See Russell* v. *Birmingham Oxygen Serv., Inc.*, 408 So. 2d 90, 93 (Ala. 1981) (wholly owned subsidiary "has no standing to enforce" contract executed by parent corporation).

## STANDARD ON THIS MOTION

Summary judgment is appropriate where, as here, there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). The moving party "bears

the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once a plaintiff satisfies this burden, the burden then shifts to the nonmoving party, who must "make a sufficient showing on an essential element of [the] case with respect to which [it] has the burden of proof." *Id.*

As this Court has recognized, "[i]n an action based on notes and guaranties, a plaintiff establishes its *prima facie* entitlement to summary judgment by establishing the execution of the agreements at issue and nonpayment thereunder." *Orix Credit Alliance* v. *Bell Realty, Inc.*, No. 93 Civ. 4949 (LAP), 1995 WL 505891, at *3 (S.D.N.Y. Aug. 23, 1995) (citations omitted).[7] Once a *prima facie* case is established, the burden then shifts to the defendant, who must "assert a meritorious defense for which a genuine issue of material fact exists." *Citicorp Leasing, Inc.* v. *United Am. Funding, Inc.*, No. 03 Civ. 1586, 2005 WL 1847300, at *4 (S.D.N.Y. Aug. 5, 2005).

## ARGUMENT

### I. HEALTHSOUTH'S "ABSOLUTE AND UNCONDITIONAL" LOAN GUARANTEE ESTABLISHES UBS'S *PRIMA FACIE* CASE.

The Credit Agreement, as amended and including HealthSouth's "absolute and unconditional" guarantee of MedCenter's obligations to UBS, was executed by an officer of HealthSouth, ratified by HealthSouth's Board, reviewed by HealthSouth's General Counsel, recorded as a liability on HealthSouth's books, and disclosed in numerous HealthSouth Forms 10-K. (*See* pp. 5-8, *supra*.)

---

[7]     With respect to UBS's claim for attorneys' fees and costs, the Court may order further submissions or proceedings, including referral to a judicial hearing officer, for determination of those fees and costs. *See, e.g.*, *Citicorp Leasing*, 2005 WL 1847300, at *9 (referring issue of reasonable attorneys' fees and expenses under a guarantee to Magistrate Judge for an inquest).

The MedCenter loan indisputably became due and owing on March 28, 2003.  At that time, UBS invoiced MedCenter for the amount of $20,190,914.86, representing the principal of the loan and interest then due under the Credit Agreement.  (*See* Kalal Decl., Ex. K.)  No payment was made. (Kalal Decl. ¶ 16.)  Under the Credit Agreement, MedCenter's non-payment of principal due under the Credit Agreement was an "Event of Default."  (Credit Agreement (Kalal Decl., Ex. A) § 9.1(a).)  UBS subsequently demanded payment from HealthSouth in accordance with its "absolute and unconditional guaranty of payment." (*Id.* § 11.4; *see also* Kalal Decl. ¶ 19 & Exs. O-S.)

On these undisputed facts, UBS has established its *"prima facie* entitlement to summary judgment by establishing the execution of the agreements at issue and nonpayment thereunder." *Orix*, 1995 WL 505891, at *3; *see also, e.g., Corvetti* v. *Hudson*, 252 A.D.2d 787, 788, 676 N.Y.S.2d 263, 264 (3d Dep't 1998) (affirming grant of summary judgment where "the written guarantee, together with additional evidence of the . . . balance outstanding, satisfied plaintiff's burden of coming forward with *prima facie* evidence of the instrument and a default thereunder"); *Diversified Investors Corp.* v. *DiversiFax, Inc.*, 239 A.D.2d 231, 233, 657 N.Y.S.2d 642, 644 (1st Dep't 1997) (*prima facie* case established "by the terms of the debt instrument").

## II.    UNDER SETTLED NEW YORK LAW, HEALTHSOUTH CANNOT EVADE ENFORCEMENT OF ITS "ABSOLUTE AND UNCONDITIONAL" LOAN GUARANTEE.

Since UBS has established a *prima facie* entitlement to summary judgment, HealthSouth bears the burden of "assert[ing] a meritorious defense for which a genuine issue of material fact exists." *Citicorp Leasing*, 2005 WL 1847300, at *4.  But, under settled New York law, HealthSouth has no valid defenses to this action to enforce HealthSouth's "absolute and unconditional" guarantee of UBS's simple commercial loan to MedCenter.

**A.    New York's *Plapinger* Rule Confirms the Enforceability of HealthSouth's "Absolute and Unconditional" Guarantee.**

To the extent that any defenses might exist, HealthSouth waived them, along with any counterclaims, in Section 11.1 of the Credit Agreement.  That section was intended "[t]o induce [UBS] to execute and deliver this Agreement to make loans to [MedCenter]," by providing that HealthSouth "unconditionally and irrevocably guarantees to [UBS] . . . the prompt and complete payment and performance when due . . . of the Obligations."  (Kalal Decl., Ex. A § 11.1 at 57.)  Section 11.4 of the Credit Agreement contains similarly broad language:

> This guarantee shall be construed as a continuing ***absolute and unconditional guaranty of payment without regard to the validity, regularity or enforceability of the Agreement or any Note or guarantee thereof*** or right of offset at any time or from time to time held by [UBS] and ***without regard to any defense, set-off, or counterclaim*** which may at any time be available to or be asserted by [MedCenter] against [UBS] or any other Person or by any other circumstance whatsoever (with or without notice to or knowledge of [MedCenter] or [HealthSouth]) ***which constitutes, or might be construed to constitute, an equitable or legal discharge*** of [MedCenter] in respect of its Obligations, or of [HealthSouth] under the guarantee contained in this Article XI.

(Kalal Decl., Ex. A § 11.4 at 58 (emphasis added).)

The New York Court of Appeals has unanimously held that such language in a loan guarantee is "sufficiently specific to foreclose as a matter of law . . . defenses and counterclaims based on fraud, negligence or failure to perform a condition precedent." *Citibank, N.A.* v. *Plapinger*, 66 N.Y.2d 90, 93, 485 N.E.2d 974, 975 (1985).  "Fraud in the inducement of a guarantee . . . is not a defense to an action on the guarantee when the guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense available to a guarantor in respect of the guarantee." *Id.*, 66 N.Y.2d at 92, 485 N.E.2d at 974.

*Plapinger* makes clear that an absolute and unconditional guarantee is enforceable at *summary judgment*, *even if* the guarantor submits admissible evidence that the lender procured

the guarantee by fraud. In *Plapinger*, a bank and a corporation agreed to restructure an existing line of credit as a term loan, personally guaranteed by the corporation's officers and directors. These guarantees were premised on the bank's promise to provide a new line of credit, which was never funded. After the corporation later filed for bankruptcy, the bank sued to enforce the personal guarantees. The Court of Appeals found that guarantors' evidence that the bank failed to extend the promised line of credit was "sufficient to raise a triable issue concerning fraud in the inducement." 66 N.Y.2d at 93, 485 N.E.2d at 975. But *despite* this uncontroverted evidence of a fraudulent misrepresentation by the bank, the Court of Appeals held that the bank was entitled to summary judgment, because the "absolute and unconditional" guarantee barred the guarantors from claiming that they had relied upon any misrepresentation. 66 N.Y.2d at 95, 485 N.E.2d at 975.

Since *Plapinger*, "[a]bsolute and unconditional guaranties have in fact been found to preclude guarantors from asserting a broad range of defenses under New York law." *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 35-36 (2d Cir. 1999); *see also, e.g., Red Tulip, LLC* v. *Neiva*, 44 A.D.3d 204, 209-10, 842 N.Y.S.2d 1, 6 (1st Dep't 2007) (bad faith, unclean hands, equitable merger, waiver, and estoppel defenses barred); *Banco do Estado de Sao Paolo* v. *Mendes Junior Int'l Co.*, 249 A.D.2d 137, 138, 672 N.Y.S.2d 28, 29 (1st Dep't 1998) (duress and alter ego defenses barred); *Gen. Trading Co.* v. *A & D Food Corp.*, 292 A.D.2d 266, 267, 738 N.Y.S.2d 845, 845 (1st Dep't 2002) (failure of consideration defense barred). Most importantly, an absolute and unconditional guarantee prevents a guarantor from later arguing that it was fraudulently induced to execute the guarantee. *E.g., Plapinger*, 66 N.Y.2d at 92, 485 N.E.2d at 974; *Gen. Trading Co.*, 292 A.D.2d at 267, 738 N.Y.S.2d at 845; *Banco do Estado de Sao Paolo*, 249 A.D.2d at 138, 672 N.Y.S.2d at 29 (1st Dep't 1998); *Mikor Realty & Development Corp.* v. *Fleet Bank*,

210 A.D.2d 157, 158, 620 N.Y.S.2d 354, 354 (1st Dep't 1994); *Gannett Co.* v. *Tesler*, 177 A.D.2d 353, 353, 577 N.Y.S.2d 248, 249 (1st Dep't 1991).

"Where a guarantee recites that it is unconditional, certain defenses are automatically precluded and thus non-meritorious. . . . [A] defendant cannot rely on defenses that were waived by a guarantee to defeat summary judgment, even if the defendant establishes an issue of fact." *Citicorp Leasing*, 2005 WL 1847300 at *5. None of the limited exceptions to enforcement of an unconditional guarantee applies here: (1) use of a "preprinted form," (2) contractual language that does not "purport to waive any defenses to its own validity," or (3) an express contractual misrepresentation as to the mechanics of the transaction. *Mfrs. Hanover Trust Co.* v. *Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993) (collecting cases); *see also JPMorgan Chase Bank* v. *Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24 (S.D.N.Y. 2002). In an agreement negotiated among sophisticated parties, HealthSouth "absolutely," "unconditionally" and "irrevocably" guaranteed MedCenter's debt, waiving every defense as to the "validity, regularity, or enforceability of the Agreement or any Note or any guarantee thereof." (Kalal Decl. Ex. A, §§ 11.1, 11.4.) So "by the plain language of the guarantee, [HealthSouth is] precluded from raising any defenses or counterclaims relating to the underlying debt." *Gannett*, 177 A.D.2d at 353, 577 N.Y.S.2d at 249 (1st Dep't 1991) (citations omitted).

**B.      *Liberty Mutual* Does Not Allow HealthSouth To Escape the *Plapinger* Rule.**

*Plapinger*, like any decision of the New York Court of Appeals, "is to be accepted by federal courts as defining state law unless [that court] has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." *West* v. *Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940); *see also Levin* v. *Tiber Holding Corp.*, 277 F.3d 243, 253 (2d Cir. 2002) (federal courts sitting in diversity "must follow the holdings of the New York Court of Appeals"). But during the status conference before this Court, HealthSouth cited Judge Rakoff's

-16-

decision in *JPMorgan Chase Bank* v. *Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24 (S.D.N.Y. 2002), to argue that HealthSouth's unconditional guarantee is unenforceable here. Even if the New York Court of Appeals had adopted *Liberty Mutual* as a limitation or modification of the *Plapinger* rule — the Court of Appeals has not — the reasoning of *Liberty Mutual* still would not defeat summary judgment here.

In *Liberty Mutual*, JP Morgan sought to enforce defendant surety companies' guarantees of Enron's obligations under what *appeared* to be bilateral commodity forward contracts between Enron and entities controlled by JP Morgan, "Mahonia." *Id.* at 25. The sureties presented "some important evidence" showing that Enron's transactions with Mahonia were not in fact commodity forward contracts, but were part of a complex circular structure that was, in effect, a disguised loan from JP Morgan to Enron. *Id.* at 26-29.

Recognizing that "New York law does not permit a contracting party to lightly evade its contractual obligations simply by crying 'fraud,'" *id.* at 26, Judge Rakoff nonetheless allowed discovery to proceed. The guarantee documents were "expressly premised upon Mahonia's having entered into with Enron a [commodity forward contract] . . . . Plainly implicit in these representations is the assertion that the Sureties are being asked to insure the sale and future delivery of a commodity, rather than being asked to insure, *unlawfully*, a disguised loan transaction." *Id.* at 28 (emphasis added). The question reduced to whether JP Morgan and Mahonia had "induce[d] the Sureties to issue Bonds that would effectively guarantee repayment of the loans—*something the Sureties were otherwise forbidden to do under applicable New York law.*" *Id.* at 26 (emphasis added). Under those circumstances, the *Plapinger* rule was construed not to "exclude[] the defense . . . that the insured arrangements were a total sham whose reality was totally concealed from the Sureties" to lure the sureties into an illegal contract. *Id.* at 28.

This case bears no resemblance to *Liberty Mutual*. Unlike the *Liberty Mutual* contracts, which "themselves contained potentially material misrepresentations," *Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448, 460 (S.D.N.Y. 2003), the Credit Agreement here precisely documents the mechanics of a simple commercial loan by UBS to MedCenter, guaranteed by HealthSouth — there is no allegation that the transaction was anything but what it purported to be. And HealthSouth is not a disinterested third party like the *Liberty Mutual* sureties; HealthSouth was a MedCenter stockholder that asked UBS to loan $20 million to MedCenter and executed a guarantee *explicitly* designed "[t]o induce [UBS] . . . to make loans to" MedCenter. (Kalal Decl. A, § 11.1.) The MedCenter loan was not an *illegal* contract. And unlike *Liberty Mutual*, which involved a complex Enron structured-finance transaction, the contract here is "clear and unambiguous," so HealthSouth must "show something more than . . . unsubstantiated, conclusory allegations of fraud" to avoid summary judgment. *European Am. Bank v. Syosset Autorama, Inc.*, 204 A.D.2d 266, 267, 611 N.Y.S.2d 585, 586 (2d Dep't 1994).

## C. HealthSouth's Allegations of Fraud Involving UBS Are Conclusory.

HealthSouth baldly asserts that "the Credit Agreement's Guarantee [was] the product of [a] conspiracy" between HealthSouth agents and UBS, and that MedCenter "lies at the core of the allegations of wrongdoing by HealthSouth against UBS and the Company's former disloyal officers." (Notice of Removal, at ¶¶ 21, 27-28.) HealthSouth cannot avoid summary judgment using "conclusory statements, conjecture, or speculation." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); Fed. R. Civ. P. 56(e). In response to this motion, HealthSouth must submit affidavits identifying *specifically* "what facts are sought and how they are to be obtained." *Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001).

Yet the supposed "conspiracy" permeating the MedCenter loan has not been *alleged* with any particularity. The *Tucker* derivative complaint alleges no specific

"wrongdoing" by UBS as to the MedCenter loan. HealthSouth does not explain how UBS "conspired" with HealthSouth's *entire* former Board of Directors (who ratified the transaction and disclosed the guarantee in HealthSouth's 2001 Form 10-K) to "defraud" anyone. And General Counsel Horton, who signed all the opinions of counsel and the Secretary's Certificates provided to UBS, has not been civilly or criminally charged, including in the *Tucker* action.

### D.      HealthSouth's SEC Filings Have Ratified the Guarantee.

In any event, HealthSouth's *current* Board of Directors, management, and auditors have ratified HealthSouth's obligation to UBS. The New York Court of Appeals has held that "[a]llegations that the guarantees were completed and delivered without authorization [and other] conclusory assertions [do not] raise[] any issue of material fact," when, as here, a corporation's earlier SEC filings "set[] forth the issuance of both the notes and [the] guarantees." *Kornfeld* v. *NRX Technologies, Inc.*, 62 N.Y.2d 686, 687, 465 N.E.2d 30, 31 (1984).

HealthSouth acknowledged its guarantee to UBS in its 2002/2003, 2004, and 2005 SEC Form 10-K filings, and in 2003 recognized a "liability" on HealthSouth's books "under the terms of the guarantee." (Kalal Decl. Ex. E at 152; Kalal Decl., Ex. L at 144; Kalal Decl., Ex. M at F-40.) The fact that "[t]hese guarantees are admitted in reports to the Securities and Exchange Commission . . . dispel[s] the assertion that the guarantees were unauthorized." *Kornfeld* v. *NRX Technologies, Inc.*, 93 A.D.2d 772, 773, 461 N.Y.S.2d 342, 343 (1st Dep't 1983), *aff'd*, 62 N.Y.2d 686, 465 N.E.2d 30 (1984). Thus, notwithstanding HealthSouth's conclusory claim that the MedCenter guarantee was the product of fraud between UBS and HealthSouth's former officers and directors, HealthSouth's current management has "specifically waived [its] defenses by confirming the guarantee at a time when [it] was aware of [the] alleged fraud." *Gannett*, 177 A.D.2d at 353, 577 N.Y.S.2d at 249; *see also, e.g., New York Life Ins. Co.* v. *Media/Communications Partners Ltd. P'ship*, 204 A.D.2d 235, 235, 612 N.Y.S.2d 144, 145

(1st Dep't 1994) (same); *Graubard Mollen Dannet & Horowitz* v. *Edelstein*, 173 A.D.2d 230,

231, 569 N.Y.S.2d 639, 640 (1st Dep't 1991) (same).

## CONCLUSION

UBS is entitled to summary judgment, enforcing HealthSouth's unconditional

guarantee of MedCenter's debt as a matter of law.    Under settled New York law, even facts

raising "a triable issue concerning fraud in the inducement" cannot prevent the enforcement at

summary judgment of an "absolute and unconditional" loan guarantee. *Plapinger*, 66 N.Y.2d at

93, 485 N.E.2d at 975.    This Court should grant UBS's motion for summary judgment in lieu of

complaint and enter judgment in favor of UBS and against HealthSouth in the amount of

$29,348,336.04, plus $6,029.23 per day from December 17, 2007 through the entry of judgment,

and award to UBS its reasonable enforcement costs, including attorneys' fees.

Respectfully submitted,

Robert J. Giuffra, Jr. (RG-9969)
Marc De Leeuw (MD-2166)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for UBS AG, Stamford Branch*

December 17, 2007