UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
UBS AG, STAMFORD BRANCH,          :
                                  :
                    Plaintiff,    :
                                  :   Civil Action No. 07 CV 8490 (LAP)
        - v -                     :   ECF Case
                                  :
HEALTHSOUTH CORP.,                :
                                  :
                    Defendant.    :
----------------------------------x

## DECLARATION OF DAVID J. KALAL

David J. Kalal declares as follows:

1.  I am an Executive Director in the Impaired Loan Management group of UBS AG, Stamford Branch ("UBS"), the plaintiff in the above-captioned action. I have been employed by UBS since 1995. I submit this declaration in support of UBS's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Unless otherwise indicated, I have personal knowledge of the facts stated herein.

THE CREDIT AGREEMENT AND HEALTHSOUTH'S ABSOLUTE AND
UNCONDITIONAL GUARANTEE

2.  On March 30, 2001, UBS entered into a Credit Agreement with MedCenterDirect.com, Inc. ("MedCenter") and HealthSouth Corporation ("HealthSouth") dated as of March 30, 2001 (the "Credit Agreement"), pursuant to which a term loan facility of $15,000,000 was made available to MedCenter and HealthSouth provided an "absolute and unconditional" guarantee of repayment of this loan. A true and correct copy of the Credit Agreement is attached hereto as Exhibit A.

3.  In connection with the Credit Agreement, HealthSouth's General Counsel,

William Horton, issued a written opinion that, among other things: (1) HealthSouth "has the corporate power and authority to execute, deliver and perform the Loan Documents"; (2) "the execution, delivery and performance of the Loan Documents by [HealthSouth] (a) have been duly authorized by all requisite corporate action . . ., and (b) will not violate any provision of law"; and (3) "[t]he Loan Documents have been duly executed and delivered by [HealthSouth], and such documents constitute the legal, valid and binding obligations of [HealthSouth] and are enforceable in accordance with their terms." A true and correct copy of the opinion is attached hereto as Exhibit B.

4. Also in connection with the Credit Agreement, HealthSouth delivered to UBS an executed Secretary's Certificate, dated March 30, 2001, attesting to the validity of annexed resolutions adopted by HealthSouth's Board of Directors authorizing the company to enter into the Credit Agreement and to guarantee MedCenter's obligations thereunder, and appointed the signatory to the Credit Agreement to execute those documents on behalf of HealthSouth. A true and correct copy of the Secretary's Certificate and annexed Board resolutions is attached hereto as Exhibit C.

5. On or about March 30, 2001, in reliance on HealthSouth's "absolute and unconditional" guarantee, UBS provided MedCenter with the total $15,000,000 pursuant to the Credit Agreement.

6. HealthSouth disclosed on page 64 of its 2001 SEC Form 10-K, filed on March 27, 2002, that it had provided a "guaranty of $15,000,000 of indebtedness from MedCenterDirect.com to an outside lender." A true and correct copy of excerpts from HealthSouth's 2001 SEC Form 10-K is attached hereto as Exhibit D.

7. It is my understanding that MedCenter was founded in 1999 as a Delaware

corporation, with funding from HealthSouth, to develop and implement an online business-to-business, e-commerce marketplace for the purchase and sale of medical supplies to hospitals and other healthcare providers. As indicated on page 64 of HealthSouth's 2001 SEC Form 10-K (attached hereto as Exhibit D), HealthSouth and various affiliates and associates of HealthSouth owned substantial amounts of MedCenter stock and had the right, *inter alia*, to elect 50% of MedCenter's Board of Directors. As indicated on page 151 of HealthSouth's 2002/2003 SEC Form 10-K, filed on June 27, 2005, HealthSouth, along with its employees and associates, owned 67% percent of MedCenter's stock as of December 31, 2002. A true and correct copy of excerpts from HealthSouth's 2002/2003 SEC Form 10-K is attached hereto as Exhibit E.

8. On June 12, 2001, MedCenter, HealthSouth and UBS executed Amendment No. 1 to the Credit Agreement, pursuant to which the parties agreed to extend the maturity date of the loan to March 30, 2002. A true and correct copy of Amendment No. 1 is attached hereto as Exhibit F.

9. In a letter dated June 12, 2001, HealthSouth's General Counsel, William Horton, opined that the Credit Agreement, as amended, was "duly executed and delivered by" and "constituted the legal, valid and binding obligations" of HealthSouth. A true and correct copy of the June 12, 2001 letter is attached hereto as Exhibit G.

10. On March 28, 2002, MedCenter, HealthSouth and UBS executed Amendment No. 2 to the Credit Agreement, pursuant to which the parties agreed (i) to increase the amount loaned by $5,000,000 (resulting in a total loan amount of $20,000,000) and (ii) to extend the maturity date once again to March 28, 2003. A true and correct copy of Amendment No. 2 is attached hereto as Exhibit H.

11. In connection with Amendment No. 2, HealthSouth delivered to UBS an

executed Secretary's Certificate, dated March 28, 2002, attesting to the validity of annexed resolutions adopted by HealthSouth's Board of Directors authorizing the company to enter into Amendment No. 2 and increase its guarantee from $15,000,000 to $20,000,000. A true and correct copy of the Secretary's Certificate and annexed Board resolutions is attached as Exhibit I.

12.   In a letter dated March 28, 2002, HealthSouth's General Counsel, William Horton, opined that the Credit Agreement, as amended, was "duly executed and delivered by," and "constituted the legal, valid and binding obligations" of HealthSouth. A true and correct copy of the March 28, 2002 letter is attached hereto as Exhibit J.

13.   On or about March 28, 2002, UBS provided to MedCenter the additional $5,000,000 loan pursuant to the Credit Agreement, as amended by Amendment No. 2.

14.   MedCenter paid the applicable interest pursuant to the Credit Agreement through the term of the loans. On March 28, 2003, MedCenter's obligations under the Credit Agreement to pay the principal and outstanding interest became due.

## MEDCENTER'S AND HEALTHSOUTH'S DEFAULTS UNDER THE CREDIT AGREEMENT

15.   On March 31, 2003, UBS invoiced MedCenter in the amount of $20,190,914.86, representing the principal of the MedCenter loan and interest due under the Credit Agreement at the time. A true and correct copy of the March 31, 2003 invoice is attached hereto as Exhibit K.

16.   MedCenter did not pay any portion of the amount reflected in, or respond in any fashion to, the March 31, 2003 invoice.

## HEALTHSOUTH REPEATEDLY ADMITS THE VALIDITY OF THE UNCONDITIONAL GUARANTEE AND AMOUNTS DUE IN ITS SEC FILINGS

17.   In its 2002/2003 SEC Form 10-K (attached hereto as Exhibit E), 2004

SEC Form 10-K, filed on December 2, 2005, and 2005 SEC Form 10-K, filed on March 29, 2006, HealthSouth recognized its liability under the Credit Agreement. For example, in its 2005 SEC Form 10-K, HealthSouth admits that "[d]uring 2003, UBS called its loan to [MedCenter]. We recognized a liability of approximately $20.0 million under the terms of the guarantee as of December 31, 2003, but have not paid the amounts due under the terms of the guarantee to UBS Warburg as of December 31, 2005." True and correct copies of excerpts from HealthSouth's 2004 and 2005 SEC Form 10-K are attached hereto, respectively, as Exhibits L and M.

18. In its 2006 Form 10-K, filed on March 1, 2007, HealthSouth disclosed that it was "liable for indebtedness owed by third parties in the amount of $27.1 million . . . . We previously recognized these amounts as liabilities in our consolidated balance sheets because of existing defaults by the third parties under those agreements." A true and correct copy of excerpts from HealthSouth's 2006 SEC Form 10-K is attached hereto as Exhibits N.

19. On April 27, 2004, July 2, 2004, October 12, 2004, January 5, 2005 and April 6, 2005, UBS invoiced MedCenter and HealthSouth for the amounts due under the Credit Agreement on those dates. True and correct copies of those invoices are attached hereto, respectively, as Exhibits O, P, Q, R and S.

20. To my knowledge, neither MedCenter nor HealthSouth ever responded in any fashion to UBS's invoices seeking to enforce HealthSouth's "absolute and unconditional" guarantee.

THE AMOUNTS DUE FROM HEALTHSOUTH

21. On or about July 12, 2005, David Rizzo, an Executive Director and Counsel at UBS, sent a letter to MedCenter and HealthSouth demanding prompt and complete payment of the amount due under the Credit Agreement, then $23,860,613.64. A true and

correct copy of that July 12, 2005 letter is attached hereto as Exhibit T.

22. To my knowledge, neither MedCenter nor HealthSouth responded in any fashion to that July 12, 2005 letter.

23. As of March 1, 2006, according to the Delaware Secretary of State, MedCenter was certified as "no longer in existence and good standing under the laws of the state of Delaware" and became "inoperative and void." A true and correct copy of the Certification of Harriet Smith Windsor, Secretary of State of the State of Delaware, dated February 21, 2007, is attached hereto as Exhibit U.

24. Notwithstanding UBS's attempts to collect, and in breach of HealthSouth's "absolute and unconditional" guarantee, HealthSouth has failed to make any payment pursuant to the Credit Agreement. As of the date of this declaration, the sum owed by HealthSouth under the Credit Agreement is $29,348,336.04 calculated as set forth below.

25. The Credit Agreement provides (in Section 2.3, at page 25 and Article I at page 9) that, when the loan is in default, interest accrues at the "Default Rate," which is calculated by adding the "Base Rate" (the higher of the (i) Prime Rate and (ii) the Federal Funds Rate plus one-half of one percent) plus the "Applicable Margin" (a figure based on HealthSouth's credit rating) plus 2%.

26. As of March 28, 2003, as set forth in the March 31, 2003 invoice (attached hereto as Exhibit H), the entire principal of $20,000,000 and outstanding interest of $190,914.86 was due. After that date, interest accrued on the total outstanding amount ($20,190,914.86) at the Default Rate, which has been for the entire period to the present the Prime Rate plus 1.25% plus 2%.

27. Pursuant to the Credit Agreement, interest continues to accrue at the

Default Rate, which (because the Prime Rate is at 7.5%) is currently at 10.75%. Applying this rate to the outstanding amount due on March 28, 2003, ($20,190,914.86), interest accrues at $6,029.23 per day.

THE *TUCKER* DERIVATIVE ACTION

28. I understand that there is a pending derivative action in Alabama state court between certain shareholders of HealthSouth and UBS Securities LLC, a subsidiary of UBS AG. Neither UBS nor UBS AG is a party to that action. True and correct copies of the Third Amended Verified Complaint and the Supplemental Complaint and Fourth Amended Verified Complaint, which I understand are the operative complaints in the derivative action, are attached hereto as Exhibits V and W.

29. I understand that HealthSouth convened a Special Audit Review Committee of the Board of Directors, which issued a report dated May 28, 2004. A true and correct copy of excerpts from that report is attached hereto as Exhibit X.

I declare under penalty of perjury that the foregoing is true and correct.

David J. Kalal

Sworn to before me this
17th day of December 2007

Notary Public

DOROTHY EDWARDS
NOTARY PUBLIC OF CONNECTICUT
My Commission Expires Feb. 28, 2008