UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------- x
UBS AG, STAMFORD BRANCH,          :
                                  :
                    Plaintiff,    :
          v.                      :   No. 07-cv-08490 (LAP)
                                  :
HEALTHSOUTH CORPORATION           :
                                  :
                    Defendant.    :
------------------------------- x

## UBS'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, Plaintiff UBS AG, Stamford Branch ("UBS") submits the following statement of material facts to which there is no genuine issue to be tried.

### The Parties

1. Plaintiff UBS is a Connecticut state-licensed branch of UBS AG, a Swiss banking corporation, with its principal place of business in Stamford, Connecticut.

2. Defendant HealthSouth Corporation ("HealthSouth") is a Delaware corporation with its principal place of business in Birmingham, Alabama.

### MedCenterDirect.com

3. MedCenterDirect.com, Inc. was a Delaware corporation, which the Delaware Secretary of State has certified as "no longer in existence and good standing under the laws of the state of Delaware" and that its corporate charter is "inoperative and void." (*See* Certification of Harriet Smith Windsor, Secretary of State of the State of Delaware, dated February 21, 2007 (Kalal Decl., Ex. U).)

**The Credit Agreement**

4.      MedCenter, HealthSouth and UBS entered into a Credit Agreement on March 30, 2001. (*See* Kalal Decl., Ex. A.) Jason Brown, HealthSouth's Vice President of Finance, executed the Credit Agreement on HealthSouth's behalf. (Kalal Decl., Ex. A, at second signature page following page 66 of the Credit Agreement.)

5.      In connection with its execution of the Credit Agreement, HealthSouth delivered to UBS a duly executed Secretary's Certificate, dated March 30, 2001, attesting to the validity of annexed resolutions by HealthSouth's Board of Directors that authorized the company to enter into the Credit Agreement. (Kalal Decl., Ex. C.)

6.      Further, HealthSouth's General Counsel, William Horton, issued a written opinion, dated March 30, 2001, confirming HealthSouth's corporate power to enter into the Credit Agreement and the validity of HealthSouth's corporate action. (Kalal Decl., Ex. B.)

7.      Under the terms of the Credit Agreement, HealthSouth "*unconditionally and irrevocably*" guaranteed "the prompt and complete payment and performance when due" of MedCenter's obligations under the Credit Agreement. (Credit Agreement (Kalal Decl., Ex. A) § 11.1 at 57 (emphasis added).)

8.      The Credit Agreement also provides that HealthSouth's guarantee of MedCenter's obligations was "absolute and unconditional . . . without regard to the validity, regularity or enforceability of the Agreement or any Note or any guarantee thereof or right of offset at any time or from time to time held by the Administrative Agent or the Lenders and without regard to any defense, set-off, or counterclaim which may at any time be available to or be asserted." (*Id.* § 11.4 at 58.)

9.  The Credit Agreement provided that full repayment of all amounts due under the loan—both principal and interest—was due on October 30, 2001. (*Id.* § 2.4(b) at 25 (see pages 15 and 21 for definition of "Maturity Date").)

10. On or about March 30, 2001, UBS extended a $15,000,000 loan to MedCenter pursuant to the Credit Agreement. (Kalal Decl. ¶ 5.)

**Amendment No. 1**

11. On June 12, 2001, MedCenter, HealthSouth and UBS amended the Credit Agreement to extend the loan's maturity date to March 30, 2002. (*See* Amendment No. 1, dated June 12, 2001, (Kalal Decl., Ex. F).) Amendment No. 1 was executed by Mr. Brown on HealthSouth's behalf. *(Id.* at 5.)

12. In a letter dated June 12, 2001, Mr. Horton stated that the Credit Agreement, as amended, was "duly executed" and "constitute[d] the legal, valid and binding obligations of [HealthSouth]." (Kalal Decl., Ex. G.)

13. Amendment No. 1 provides that, "[e]xcept as expressly amended and waived hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms." (Kalal Decl., Ex. F at 3.)

**Amendment No. 2**

14. On March 28, 2002, MedCenter, HealthSouth and UBS agreed to a second amendment to the Credit Agreement (i) increasing the amount loaned by $5,000,000 (to a total loan amount of $20,000,000) and (ii) extending the maturity date to March 28, 2003. (*See* Amendment No. 2, dated March 28, 2002 (Kalal Decl., Ex. H).) Amendment No. 2 was executed by Mr. Brown on HealthSouth's behalf. *(Id.* at 6.)

15. HealthSouth delivered to UBS a duly executed Secretary's Certificate, dated March 28, 2002, attesting to the validity of annexed resolutions by HealthSouth's Board of Directors that authorized the company to enter into the amendment to increase its unconditional guarantee from $15,000,000 to $20,000,000. (Kalal Decl., Ex. I.)

16. Further, HealthSouth's General Counsel, William Horton, issued a written opinion, dated March 28, 2002, confirming HealthSouth's corporate power to enter into the Amendment No. 2 and the validity of HealthSouth's corporate action. (Kalal Decl., Ex. J.)

17. Amendment No. 2 provides that that "[e]xcept as expressly amended and waived hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms." (Kalal Decl., Ex. I at 4.)

18. Pursuant to Amendment No. 2, UBS provided, on March 28, 2002, an additional $5,000,000 to MedCenter. (Kalal Decl. ¶ 13.)

**MedCenter's and HealthSouth's Defaults Under the Credit Agreement**

19. On March 31, 2003, three days after the maturity date of the Credit Agreement, as amended, UBS invoiced MedCenter in the amount of $20,190,914.86, representing the principal of the MedCenter loan and interest due under the Credit Agreement as of that date. (Kalal Decl. ¶ 15 & Ex. K.)

20. MedCenter never responded to UBS in any way to, and did not pay, that invoice. (Kalal Decl. ¶ 16.)

21. On April 27, 2004, July 2, 2004, October 12, 2004, January 5, 2005 and April 6, 2005, UBS invoiced both MedCenter and HealthSouth for the amounts due under the Credit Agreement as of each of those dates. (Kalal Decl. ¶ 19 & Exs. O-S.)

22.     Neither MedCenter nor HealthSouth ever responded to UBS in any way to these invoices.  (Kalal Decl. ¶ 20.)

23.     On July 12, 2005, UBS sent a letter to MedCenter and HealthSouth demanding prompt and complete payment of the total amounts due under the Credit Agreement, which by that time equaled $23,860,613.64.  (Kalal Decl. ¶ 21 & Ex. T.)

24.     Neither MedCenter nor HealthSouth ever responded to UBS in any way to that letter.  (Kalal Decl. ¶ 22.)

**HealthSouth's Disclosures in Its SEC Forms 10-K**

25.     HealthSouth disclosed in its 2001 SEC Form 10-K that it had provided a "guaranty of $15,000,000 of indebtedness from MedCenterDirect.com to an outside lender."  (Kalal Decl., Ex. D at 64.)

26.     In HealthSouth's 2002 and 2003 SEC Form 10-K, HealthSouth stated:

> [HealthSouth] provided a guarantee for $20 million of [MedCenter's] debt to UBS Warburg in 2001 . . . In September 2003, UBS Warburg called its loan to [MedCenter].  We have recognized a liability under the terms of the guarantee as of September 30, 2003, but, as of December 31, 2004, we have not paid the amounts due under the terms of the guarantee to UBS Warburg . . . .  We reserved the full amount of the advance to [MedCenter] in September 2003.

(Kalal Decl., Ex. E at 152.)

27.     In HealthSouth's 2004 SEC Form 10-K filed less than six months after UBS's last demand for payment, HealthSouth stated:

> In 2001, we provided a guarantee for $20 million of [MedCenter]'s debt to UBS Warburg . . . .  In September 2003, UBS Warburg called its loan to [MedCenter].  We have recognized a liability under the terms of the guarantee as of September 30, 2003, but, as of December 31, 2004, we have not paid the amounts due under the terms of the guarantee to UBS Warburg . . . .  We reserved the full amount of the advance to [MedCenter] in September 2003

(Kalal Decl., Ex. L at 144.)

28. Similarly, in its 2005 SEC Form 10-K HealthSouth stated:

> During 2003, UBS called its loan to [MedCenter]. We recognized a liability of approximately $20.0 million under the terms of the guarantee as of December 31, 2003, but have not paid the amounts due under the terms of the guarantee to UBS Warburg as of December 31, 2005.

(Kalal Decl., Ex. M at F-40.)

29. HealthSouth's 2006 Form 10-K no longer mentions the MedCenter guarantee by name, but discloses that HealthSouth is "liable for indebtedness owed by third parties in the amount of $27.1 million . . . We previously recognized these amounts as liabilities in our consolidated balance sheets because of existing defaults by the third parties under those agreements." (Kalal Decl., Ex. N.)

**The Amounts Due From HealthSouth**

30. Neither MedCenter nor HealthSouth has paid to UBS the amounts due under the Credit Agreement. (Kalal Decl. ¶ 24.)

31. The terms of the Credit Agreement, as amended, provide that, as of December 17, 2007, the principal and amount of interest on the loan outstanding is $29,348,336.04, and interest is accruing (based on the current Prime Rate) at $6,029.23 per day. (*See* Kalal Decl. ¶¶ 24, 25, 26, 27.)

Dated: New York, New York
    December 17, 2007

_____
Robert J. Giuffra, Jr. (RG-9969)
Marc De Leeuw (MD-2166)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000