**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UBS AG, Stamford Branch, | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) Civil Action No. 07 CV 8490 (LAP) |
| -against- | ) ECF Case |
| | ) |
| HealthSouth Corporation, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## HEALTHSOUTH'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF MOTION TO DISMISS OR STAY

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph (GJ-1210) (gjoseph@josephnyc.com)
Peter R. Jerdee (PJ-1240) (pjerdee@josephnyc.com)
Sandra M. Lipsman (SL-1220) (slipsman@josephnyc.com))
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Fax: (212) 407-1280

*Attorneys for Defendant HealthSouth Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION ....................................................................................... 1

PROCEDURAL CONTEXT .......................................................................... 3

    The First-Filed Alabama Action ................................................................ 3

    The UBS Entities' Dodgy Litigation Tactics............................................. 7

GENUINE ISSUES OF MATERIAL FACT .................................................. 8

ARGUMENT ............................................................................................11

I.  THIS ACTION SHOULD BE DISMISSED OR STAYED
    IN FAVOR OF THE FIRST-FILED ALABAMA ACTION ............................11

    A.  Piecemeal Litigation ........................................................... 13

    B.  First-Filed Action.............................................................. 15

    C.  Substantive Law................................................................. 16

    D.  Other Factors, Including Reactive Nature of this Litigation...........................17

II.  HEALTHSOUTH IS ENTITLED TO DISCOVERY ON ITS DEFENSES ......18

    A.  The Guarantee Is Void Under New York Law ..............................................18

        i.  No Actual Authority ..........................................................19

        ii.  No Apparent Authority ......................................................20

        iii.  Material Factual Issues as to Agency and
            Fraud Preclude Summary Judgment .........................................22

    B.  *Plapinger* Does Not Support UBS AG's
        Position or Address HealthSouth's Defenses .................................................23

    C.  The Accrual of a Liability on HealthSouth's
        Balance Sheet Is Not An Admission of Legal Liability ...............................26

    D.  Summary Judgment Is Unsupportable on This Record .................................28

CONCLUSION....................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

Page

*Adam v. Jacobs*, 950 F.2d 89 (2d Cir. 1991) .................................................................. 11-12

*Alliance of American Insurers v. Cuomo*, 854 F.2d 591 (2d Cir. 1988) ............................ 13

*Anderson v. Docuport*, No. 06 Civ. 3769 (GEL),
    2007 U.S. Dist. LEXIS 10106 (S.D.N.Y. Feb. 13, 2007) ...................................... 18, 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 18

*Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545 (1983) ................................. 14

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of N.Y.*,
    762 F.2d 205 (2d Cir. 1985) ................................................................................. 14, 16

*Banco do Estado de Sao Paolo v. Mendes Junior Int'l Co.*,
    249 A.D.2d 137, 672 N.Y.S.2d 28 (1st Dep't 1998) ............................................. 24 n.2

*Bank of N.Y. Nat'l Banking Ass'n v. Am. Dock & Trust Co.*,
    143 N.Y. 559, 38 N.E. 713 (1894) ........................................................................ 19-20

*Bertran Packing, Inc. v. Transword Fabricators, Inc.*,
    50 A.D.2d 542, 375 N.Y.S.2d 335 (1st Dep't 1975) ................................................. 19

*Cassin v. Prudential Ins. Co. of Am.*, No. 04 Civ. 2913 (SAS),
    2004 U.S. Dist. LEXIS 20975 (S.D.N.Y. Oct. 19, 2004) ...................................... 8 n.1

*Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985) ....................... 18, 23

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ............................................................................................ *passim*

*Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch,
    Pierce, Fenner & Smith, Inc.*, 188 F.3d 31 (2d Cir. 1999) .................................. 24 n.2

*Congress Talcott Corp. v. Roslin*, No. 95 Civ. 7698 (LAP),
    1996 U.S. Dist. LEXIS 12827 (S.D.N.Y. August 27, 1996) ...................................... 14

*De Cisneros v. Younger*, 871 F.2d 305 (2d Cir. 1989) ............................................... *passim*

*Ernst Iron Works v. Duralith Corp.*, 270 N.Y. 165, 200 N.E. 683 (1936) ...................... 21

*Fidelity & Deposit Co. v. McCulloch*, 168 F.R.D. 516 (E.D. Pa. 1996)............................27

*First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76 (2d Cir. 1989) .................12

*Fustok v. Conticommodity Servs.,Inc.*, 577 F. Supp. 852 (S.D.N.Y. 1984).......................23

*Gannett Co. v. Tesler*, 177 A.D.2d 353, 577 N.Y.S.2d 248 (1st Dep't 1991).............28 n.3

*Garcia v. Tamir*, No. 99 Civ. 0298 (LAP),
    1999 U.S. Dist. LEXIS 11940 (S.D.N.Y. Aug. 2, 1999)....................................*passim*

*Gen. Reins. Corp. v. CIBA-GEIGY Corp.*, 853 F.2d 78 (2d Cir. 1988).....................13, 17

*Gen. Trading Co. v. A & D Food Corp.*,
    292 A.D.2d 266, 738 N.Y.S.2d 845 (1st Dep't 2002)...........................................24 n.2

*Graubard Mollen Dannet & Horowitz v. Edelstein*,
    173 A.D.2d 230, N.Y.S.2d 639 (1st Dep't 1991).................................................28 n.3

*Hatfield v. Control Sys. Int'l*, 21 F. Supp. 2d 546 (D.S.C. 1997),
    *aff'd*, 155 F.3d 558 (4th Cir. 1998) ..............................................................................21

*Heights at Issaquah Ridge Owners Ass'n v. Steadfast Ins. Co.*,
    No. 07 Civ. 1045 (RSM), 2007 WL 4410260 (W.D. Wash. Dec. 13, 2007)..............27

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000).....................3, 18

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*,
    241 F. Supp. 2d 246 (S.D.N.Y. 2002)....................................................................19, 23

*In re Adelphia Commc'ns Corp.*, 342 B.R. 142 (Bankr. S.D.N.Y. 2006) ..................27-28

*In re Nigeria Charter Flights Contract Litig.*, Nos. 04 MD 1613 (RJD)(MDG),
    04 CV 0304 (RJD)(MDG), 2007 WL 3124527 (E.D.N.Y. Oct. 25, 2007) ..........22-23

*Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57 (1st Cir. 2001)...........22

*JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.*,
    189 F. Supp. 2d 24 (S.D.N.Y. 2002)...........................................24, 25, 26, 29

*Johnson v. Nationwide Gen. Ins. Co.*, 971 F. Supp. 725 (N.D.N.Y. 1997) .......................22

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*,
    342 U.S. 180 (1952)....................................................................................................11

*Kornfeld v. NRX Techs., Inc.*,
    62 N.Y.2d 686, 476 N.Y.S.2d 523 (1984) ...............................................28 n.3

*L. Harbert, Inc. v. Aetna Cas. & Sur. Co.*, No. 96 Civ. 8924 (LAP),
    1997 U.S. Dist. LEXIS 13021 (S.D.N.Y. 1997)........................................13, 15, 16, 17

*Lorentzen v. Levolor Corp*, 754 F. Supp. 987 (S.D.N.Y. 1991) ......................................17

*Manhattan Life Ins. Co. v. Forty Second & G. St. Ferry R. Co.*,
    139 N.Y. 146, 34 N.E. 776 (1893)..............................................................19

*Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993) .....................25

*Marathon Enters. v. Scroter GMBH & Co. KG*, No. 01 Civ. 0595 (DC),
    2003 WL 355238 (S.D.N.Y. Feb. 18, 2003), *aff'd mem.*,
    95 Fed. App'x 364 (2d Cir. 2004) ...........................................................21, 22

*Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243 (2d Cir. 1996)............................................21

*Mikor Realty & Dev. Corp. v. Fleet Bank*, 210 A.D.2d 157,
    620 N.Y.S.2d 354 (1st Dep't 1994).............................................................24 n.2

*Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703 (2d Cir. 1996)..............22

*MLP U.S.A. Inc. v. Motheral*, 05 Civ. 10796 (LLS),
    2006 U.S. Dist. LEXIS 58589 (S.D.N.Y. Aug. 17, 2006) .............................................26

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)..............................................................................15, 17

*New York Life Ins. Co. v. Media/Commc'ns Partners Ltd. P'ship*,
    204 A.D.2d 235, 612 N.Y.S.2d 144 (1st Dep't 1994).............................................28 n.3

*OM Intercontinental v. Geminex Int'l, Inc.*, No. 03 Civ. 6471 (RCC),
    2006 WL 2707327 (S.D.N.Y. Sept. 18, 2006)...................................................23

*People's Westchester Sav. Bank v. GANC*, 705 F. Supp. 164 (S.D.N.Y. 1989) ................23

*Pike v. WSNCHS -E., Inc.*, No. 02 CIV. 3365 (GBD),
    2003 U.S. Dist. LEXIS 2678 (S.D.N.Y. Feb. 24, 2003)..............................................11

*Radioactive, J.V. v. Manson*, 153 F. Supp. 2d 462 (S.D.N.Y. 2001)................................11

*Red Tulip, LLC v. Neiva*, 44 A.D. 3d 204, 842 N.Y.S. 2d 1 (1st Dep't 2007) ............24 n.2

*Sipes v. Kinetra, LLC*, 137 F. Supp. 2d 901 (E.D. Mich. 2001),
    *aff'd mem.*, 55 Fed. App'x 322 (6th Cir. 2003) ............................................21

*Sundance Cruises Corp. v. Am. Bureau of Shipping*, No. 87 Civ. 0819 (WK),
    1992 WL 75097 (S.D.N.Y. Mar. 31,1992) ................................................27

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) .......................................... 25-26

*Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448 (S.D.N.Y. 2003) .............26

*Wagner v. Nichols*, 5 A.D.2d 191, 170 N.Y.S.2d 542 (1st Dep't 1958) ............................19

*Walsh v. Hartford Fire Ins. Co.*, 73 N.Y. 5, 1878 WL 12535 (1878) ................................21

*Weinstock v. Cleary, Gottlieb, Steen & Hamilton*,
    815 F. Supp. 127 (S.D.N.Y. 1993) ........................................................ *passim*

*Wen Kroy Realty Co. v. Pub. Nat'l Bank & Trust Co. of N.Y.*,
    260 N.Y. 84, 183 N.E. 73 (1932) ................................................................19

## OTHER AUTHORITIES

2A N.Y. JUR. AGENCY (2007) ...............................................................21, 23

2 WEINSTEIN'S FEDERAL EVIDENCE (2007) ................................................27

75 A.L.R. 1032 (1931) ......................................................................21

ALA. R. CIV. P. 9(b) .......................................................................29

RESTATEMENT (FIRST) OF AGENCY (1933) ..............................................21

RESTATEMENT (THIRD) OF AGENCY (2006) ......................................19, 20, 21, 22

TIFFANY ON AGENCY (2d ed. 1924) ......................................................21

Defendant HealthSouth Corp. ("HealthSouth" or the "Company") respectfully submits this memorandum (1) in opposition to the motion of plaintiff UBS AG, Stamford Branch ("UBS AG") for summary judgment on its claim that HealthSouth pay almost $30 million on a guarantee of loan obligations incurred by MedCenterDirect.com ("MCDC") (the "Guarantee"), and (2) in support of HealthSouth's motion to dismiss or stay this action in deference to a first-filed civil action that has been actively litigated in Alabama state court for the past five years, *Tucker v. Scrushy*, Civil Action No. CV-02-5212 (Circuit Ct. Jefferson Co. (the "Alabama Action")).

## INTRODUCTION

UBS AG is not entitled to summary judgment on the merits of its Guarantee claim because both the underlying loan obligation and the Guarantee were conceived in fraud and entered into by a faithless agent who had no actual or apparent authority to bind HealthSouth. This renders the Guarantee void *ab initio*. If a corrupt lawyer were to loan money to one of the Court's law clerks in exchange for a guarantee signed by the clerk but in the Court's name, no one would consider arguing that the Court was bound to honor the guarantee simply because it recited that all defenses to payment were waived. The signature on the guarantee having been conceived in fraud and without authority would bind no one. So, too, here, as the massive record being developed in the Alabama Action will demonstrate.

The Court need not reach the merits of the enforceability of the Guarantee, however, because this action should be dismissed or stayed in deference to the Alabama Action, which has been actively litigated for years, which is focused on UBS's involvement in the mammoth, complex fraud at HealthSouth, and in which the MCDC fraud plays a prominent role (it has been the subject of both documentary and deposition discovery). To avoid Alabama, UBS AG has premised its summary judgment motion on its representation that it was the lender to MCDC under the Credit Agreement that contains the Guarantee (*see* the December 17, 2007, Declaration of David J. Kalal (the "Kalal Declaration" or "Kalal Dec.") at ¶¶5, 10; UBS AG's Statement of Undisputed Facts ¶¶10, 18). This is a critical representation because, in Alabama, HealthSouth

has been litigating the fraudulent acts of other UBS entities, including UBS Securities LLC ("UBS Securities") (formerly known as UBS Warburg LLC), but not UBS AG. Hence, UBS AG seeks to distance itself, as purported lender, from its affiliates embroiled in the Alabama Action who are obligated to assert compulsory counterclaims there.

Tellingly, however, the Kalal Declaration submitted by UBS AG contradicts the assertion that UBS AG, rather than UBS Securities, was the lender to MCDC. Specifically, ¶17 of the Kalal Declaration and Exhibits E, L, M and N thereto all identify UBS Securities (then known as UBS Warburg), not UBS AG, as the lender. Until UBS AG commenced this litigation, UBS Securities maintained precisely that position in its pleadings in the Alabama Action. It was not until November 2007, following HealthSouth's Notice of Removal here pointing out this judicial admission in UBS Securities' Answer in the Alabama Action, that UBS Securities filed an amended Answer attempting to retract the admission and asserting that UBS AG was instead the lender to MCDC. The Credit Agreement containing the Guarantee submitted by UBS AG (*see* Kalal Dec. Exh. A) identifies UBS AG only as the "Administrative Agent."

It is apparent that UBS AG and its affiliates are obfuscating the roles of different UBS entities in the MCDC fraud for tactical advantage in the Alabama Action and in this proceeding. The Alabama Court has firmly rejected the UBS entities' attempt to assert New York forum selection clauses in other contracts relating to the HealthSouth fraud because, among other reasons, the contract issues are "inextricably intertwined with the other claims against UBS as well as other parties, being based on the same nucleus of operative facts," and because "[e]nforcing the outbound forum selection clauses would upset the carefully crafted co-ordination orders in effect in three jurisdictions regarding the case management of these complex derivative suits" (*see* Declaration of David G. Hymer dated January 17, 2008 ("Hymer Declaration" or "Hymer Dec."), at Ex. 24 ¶3(a), (c)). Moreover, UBS AG is at best a volunteer in bringing this action. Under § 10.1 of the Credit Agreement, the Administrative Agent "shall not be required to initiate or conduct any litigation or collection proceedings under any Loan Document" (Kalal Dec. Ex. A). Nor is UBS AG a necessary party. The Guarantee by its terms

2

runs to the lenders as well as the Administrative Agent (*id.* at §§ 11.1, 11.3-11.4). Tactical corporate obfuscation ought not be rewarded.

UBS AG's motion is a transparent attempt at an end run around the Alabama Court's orders, a move that should not be countenanced by this Court. To avoid piecemeal litigation, duplication of effort, and waste of judicial resources, this action should be dismissed or stayed in favor of the Alabama Action. *See, e.g., Garcia v. Tamir*, No. 99 Civ. 0298 (LAP), 1999 U.S. Dist. LEXIS 11940, at *29-30 (S.D.N.Y. Aug. 2, 1999).

At the very least, there are questions of fact as to the identity of the lender under the Credit Agreement, the authority of the faithless agent who signed that agreement on behalf of HealthSouth, and the scope and nature of the fraud giving rise to the Credit Agreement and Guarantee that preclude summary judgment. It ill behooves UBS AG to assert that HealthSouth has not alleged fraud with particularity given that the Alabama Court has denied the UBS defendants' Rule 9(b) motions and that UBS AG has prevented any pleading in the present action by filing a motion for summary judgment in lieu of complaint. (*See* Hymer Dec. ¶¶21-22 and Ex. 24 at ¶6.) If UBS AG is permitted to proceed in this Court, HealthSouth is entitled to an opportunity to make a record on its defenses. *See, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery.").

## PROCEDURAL CONTEXT

### The First-Filed Alabama Action

The Guarantee, and the Credit Agreement that contains it, are significant and inextricable elements of the massive fraud being litigated in the Alabama Action. The Alabama Action was commenced on August 28, 2002, alleging, among other things, that HealthSouth's former Chairman and Chief Executive Officer Richard M. Scrushy engaged in a fraudulent scheme to divert the Company's monies to himself and other executives. (*See* Kalal Dec. Ex. V (Third Amended Complaint ("TAC")) at ¶¶92, 106-108). MCDC was named as a defendant in the Alabama Action, as were other parties allegedly used to siphon money from the Company. (*See*

3

Hymer Dec. at ¶7). On March 18, 2003, an FBI raid on HealthSouth's corporate offices exposed one of the largest, longest-running accounting frauds in American corporate history. After the FBI raid, the complaint in the Alabama Action was amended to allege that HealthSouth had been the victim of a massive accounting fraud perpetrated by Scrushy, other corrupt and disloyal officers and directors, and by UBS entities and Ernst & Young. (*See* TAC at ¶¶1-2; Hymer Dec. at ¶3.)

The UBS defendants — including UBS Securities (sued as UBS Warburg) — are alleged to have conspired with the corrupt HealthSouth executives (some of whom have since been imprisoned) and others to siphon billions of dollars from HealthSouth. The Alabama Action alleges that HealthSouth executives overstated HealthSouth's financial health to inflate artificially the value of HealthSouth stock, allowing them to profit from stock sales, illicit bonuses, and off-the-books, self-dealing entities like MCDC. UBS Securities is charged with aiding and abetting the disloyal officers' breaches of fiduciary duty, conspiring with them, and helping to perpetuate their fraudulent accounting scheme. (Kalal Dec. Ex. V (TAC) at ¶¶1, 21, 83-90, 105-13, 130-34, 165-72, 195-200, 204-11.)

Although the Alabama Action commenced as a shareholder derivative action, HealthSouth is now actively participating in prosecution of the claims against the UBS entities. (Hymer Dec. at ¶4.) The Alabama Action has been pending for more than five years and is presently at a stage of intense and accelerated discovery. (*Id.* at ¶¶25-27.) The MCDC fraud, and UBS's role in it, have been and continue to be the subject of documentary and deposition discovery in Alabama. (*Id.* at ¶¶27-31.)

**MCDC's Role in the Fraud.** MCDC is one of several entities that the corrupt HealthSouth executives utilized to loot HealthSouth. MCDC was a development stage procurement company whose stock was artificially boosted when the corrupt executives awarded it an exclusive agreement with HealthSouth. The contract was highly unfavorable to HealthSouth but lucrative to the executives, who lined their pockets with large stakes in MCDC. (Kalal Dec. Ex. V (TAC) at ¶¶105-113.)

4

The Third Amended Complaint in the Alabama Action alleges that "MCDC ... is central to the allegations herein," that MCDC's board included a disloyal HealthSouth officer who did "many transactions with the UBS Parties," and that "UBS funded and raised investment capital for MCDC." (Kalal Dec. Ex. V (TAC) ¶134(e)). The TAC seeks, in its prayer for relief, the proceeds of the "loans made, and monies owed with respect to Defendants." (*Id.* at Prayer for Relief ¶VIII.)

**UBS's Awareness of, and Involvement in, the Fraud.** The record in the Alabama Action, while far from complete, already establishes that the Guarantee and the underlying loan to MCDC were formed in the course of the massive HealthSouth fraud, and that the UBS entities were well aware of this. Among other things, HealthSouth's former Chief Financial Officer — who, like 14 others, pled guilty to participating in the fraud — testified that he informed the Co-Head of UBS Securities' Global Healthcare Finance Group, William McGahan, about HealthSouth's fraudulent earnings scheme and specifically warned that, "if the fraud is revealed ... we are all going to jail." (*See* Hymer Dec., Ex. 16 at T. 7042 (excerpts of trial testimony of Michael Martin); *see also id.* at T. 6757, 7029.) A UBS Securities analyst famously touted HealthSouth to the public while privately writing to a favored client that HealthSouth was a "mess" and a "pig," and that he "would not own a share of this stock." *See* emails from Howard Capek to Susan Zeeb dated August 19, 1999 and September 10, 1999 (Hymer Dec. Ex. 19). Jason Brown, the HealthSouth officer who signed the Credit Agreement and the two Amendments to the Credit Agreement on behalf of HealthSouth, and who co-signed the two Secretary's Certificates authenticating it — all of which are relied on by UBS AG on its motion (Kalal Dec. Exs. A, C, F, H and I) — pled guilty and was imprisoned for his role in the fraud. (*See* Hymer Dec., Ex. 4 (Plea Agreement and Conditions), Ex. 3 (Transcript of Plea), Ex. 5 (Transcript of Sentencing Hearing).)

**UBS's Unsuccessful Attempt to Litigate Contract Claims in New York.** In 2004, UBS Securities sought to dismiss or stay the derivative action on the basis of a New York forum selection clause in UBS's HealthSouth engagement letters, among other grounds. (Hymer Dec.

Ex. 25 at 20 (UBS Securities' Memorandum of Law in Support of Motion to Dismiss or Alternatively Stay); Hymer Dec. Ex. 25 at 18 (UBS Securities' Reply Memorandum of Law).

The Alabama Court rejected UBS Securities' attempt to litigate contract claims in New York, ruling that (i) "the contract claims herein against UBS are inextricably intertwined with the other claims against UBS as well as other claims against other parties, being based on the same nucleus of operative facts;" (ii) "it would be seriously inconvenient and unreasonable to send off one smaller part of this case to New York while retaining most of it here;" (iii) "[t]here is a strong policy of the State of Alabama against splitting causes of action;" and (iv) "[e]nforcing the outbound forum selection clauses would upset the carefully crafted co-ordination orders in effect in three jurisdictions regarding the case management of these complex derivative suits ... and would result in duplicative discovery and trial." (Hymer Dec. Ex. 24 at ¶3(a)-(c) (July 13, 2005 Order)).

**Status of Discovery in Alabama.** Discovery in the lengthy and complex litigation in Alabama has to date included 34 depositions, including those of seven present or former UBS employees, and the production of millions of pages of documents. UBS entities and former UBS employees have produced more than 800,000 pages. More than 17,000 produced documents (not pages) pertain to MCDC, the Guarantee and the Credit Agreement; of those, 2,485 documents were produced by UBS. Numerous additional depositions, including those of at least nine more present or former UBS employees, are planned. There are pending interrogatories and document requests served by the plaintiff on UBS Securities that encompass MCDC and other similar UBS loans to shell entities created by corrupt HealthSouth officers. (Hymer Dec. at ¶¶28-32).

UBS Securities has argued in Alabama, as UBS AG has here, that the fraud claims asserted against it fail for lack of specificity, contending that all of the claims against UBS Securities sound in fraud because they arise from "falsely touting HealthSouth stock," conspiring with executives to "defraud HS into granting the UBS parties investment banking business," and inducing, aiding and abetting, and conspiring to commit "broad accounting misstatements." (Hymer Dec. Ex. 25 (Memorandum in Support of Motion to Dismiss Fourth Amended

Complaint) at 14-15.)  The Alabama Court denied UBS Securities' dismissal motion, holding that:  "UBS's motion to dismiss based on failure to plead causes of action depending on fraud with specificity under Rule 9(b) is DENIED.  This Court concludes plaintiff Tucker has pled all allegations of fraud and fraudulent acts with adequate specificity to meet the pleading requirements of Rule 9(b)."  (Hymer Dec. Ex. 24 (July 13, 2005 Order) at ¶6).

<b><u>The UBS Entities' Dodgy Litigation Tactics</u></b>

The UBS entities have played a corporate shell game in the Alabama Action, at various junctures asserting that one or another UBS entity was the proper party defendant in order to gain tactical advantage.  UBS AG's motion for summary judgment in this Court manifests the same gamesmanship.

The Alabama Action initially named UBS Group and UBS Investment Bank as defendants.  Those entities moved to dismiss on the ground that the "true and correct name" of the "[UBS] entities identified in the Third Amended Complaint … is UBS Securities LLC …, formerly known as UBS Warburg LLC."  (Hymer Dec. Ex. 21 (Motion to Dismiss or Stay) at 1.) As a result, UBS Securities was added as a defendant.  (Kalal Dec. Ex. W (Supplemental Complaint and Fourth Amended Verified Complaint) at ¶234) (confirming that the complaint was amended to include "UBS Securities LLC" because "Defendants UBS Group and UBS Investment Bank have advised the Court and the parties herein that the correct name of their affiliated party defendant is UBS Securities LLC").

After the Alabama Court dismissed UBS Group and UBS Investment Bank as defendants at UBS's request (Hymer Dec. Ex. 24 (July 13, 2005 Order) at ¶7), UBS Securities answered the Third and Fourth Amended Complaints, specifically admitting that UBS Securities made the loan to MCDC  (Hymer Dec. Ex. 26 (UBS Securities' Answer and Counterclaims) at ¶134(i) ("UBS [a defined term meaning UBS Securities only] … (i) admits that UBS provided a loan to MCDC")).  UBS Securities' internal documents support this admission.  Minutes of a UBS 2002 Finance Commitments Committee Meeting confirm that the purported predecessor to UBS Securities — UBS Warburg — made the $20 million MCDC loan.  (Hymer Dec. Ex. 33

7

(Plaintiff's 12/21/2007 motion to strike UBS Securities' Amended Answer ("Motion to Strike")),
Ex. 2.) *See also* Kalal Dec. Ex. K (Principal/Interest Bill from UBS Warburg to HealthSouth).

In November 2007, after this judicial admission was highlighted in HealthSouth's Notice
of Removal in the present action (at ¶¶13, 20), UBS Securities reversed course in Alabama.  It
filed an Amended Answer to the Third Amended Complaint and the Supplemental and Fourth
Amended Complaint, in which it seeks to retract the admission that UBS Securities made the
MCDC loan and assert that the lender was instead UBS AG.  On December 21, 2007, the
plaintiff in the Alabama Action filed a motion to strike UBS Securities' Amended Answer on the
grounds that (1) UBS Securities' representations caused the plaintiff to refrain from seeking and
suing a different UBS entity as lender (namely, UBS AG), and (2) UBS's proposed amendment
was simply an attempt to facilitate UBS AG's lawsuit in New York, which runs counter to the
Alabama Court's case management decision, including its refusal to enforce the New York
forum selection clause.

**GENUINE ISSUES OF MATERIAL FACT**

Genuine issues of material fact in dispute include the following:

**1. Identity of the Lender.**  HealthSouth disputes that UBS AG is the lender to MCDC
and maintains — as it consistently has in its filings with the Securities and Exchange
Commission ("SEC") — that UBS Securities, a principal defendant in the Alabama Action,
made the loan to MCDC.  The Credit Agreement attached to the Kalal Declaration as Exhibit A
identifies UBS AG as "Administrative Agent" only (*see* Kalal Dec. Ex. A (Credit Agreement) at
cover page and p. 1).  UBS Securities has billed MCDC for principal and interest (Kalal Dec.
Ex. K), and it has affirmatively pled in the Alabama Action, through the same law firm
representing UBS AG in the present action, that it is the lender (Hymer Dec. Ex. 26 at ¶134(i)).
While UBS Securities has submitted an amended Answer attempting to withdraw this judicial
admission, the prior pleading will in all events remains an evidentiary admission.[1]  Other

---

[1]    *See, e.g., Cassin v. Prudential Ins. Co. of Am.*, No. 04 Civ. 2913 (SAS), 2004 U.S. Dist.
LEXIS 20975, at *7 (S.D.N.Y. Oct. 19, 2004).

documents produced by UBS Securities in the Alabama Action also reflect that UBS Securities (then UBS Warburg) made the loan to MCDC. (*See, e.g.,* Hymer Dec. Ex. 33 (Motion to Strike) at Ex. 2 thereto.) The three SEC filings that UBS AG misconstrues as "ratifying" HealthSouth's liability under the Guarantee also identify "UBS Warburg" as the lender. (*See* Kalal Dec. Ex. E at 152; Ex. L at 144; Ex. M at 140.) The identity of the lender is critical, among other reasons, because the Guarantee claim represents a compulsory counterclaim in the Alabama Action.

    **2. Signatory Lacked Actual Authority.** HealthSouth disputes that the Credit Agreement was executed by an agent with authority to do so. The signatory, Jason Brown, Vice President of Finance for HealthSouth, was steeped in the fraud at HealthSouth, including the use of off-the-books entities like MCDC to siphon money that should have gone directly to HealthSouth over to corrupt executives through ownership interests in these entities. Brown did not divulge the fraud to his principal, HealthSouth, before he signed the Credit Agreement and both of its Amendments in the name of HealthSouth. Brown's involvement in the fraud was not revealed until the summer of 2003, when he pled guilty to one count of conspiracy. (*See* Hymer Dec. Ex. 4 (Plea Agreement and Conditions); *id.*, Ex. 3 (Transcript of Plea).) A principal is not be bound by the actions of an agent, like Brown, who is acting adversely to the principal's interests.

    **3. Signatory Lacked Apparent Authority.** HealthSouth maintains that UBS is in no position to claim that Brown had apparent authority, given the record on UBS's involvement in and knowledge of the HealthSouth fraud. Among other things:

- In early 1999, William McGahan, Co-Head of UBS Securities Global Healthcare Finance Group, was told by then HealthSouth CFO Michael Martin that HealthSouth was systematically falsifying its financial statements. From 1999 through at least the fall of 2002, Martin and McGahan had regular conversations about the potential civil and criminal ramifications of the ongoing fraud, including specific discussions regarding the statute of limitations applicable to potential civil claims, and the likelihood of criminal prosecution and the penalties likely to follow from such prosecution, including the possibility that McGahan and senior HealthSouth executives could go to prison. (Hymer Dec. Ex. 16 (excerpts of trial testimony of Michael Martin) at T. 7042, 6757, 7029, 7025-7026, 7039, 6576, 6757.)

- In Congressional testimony, McGahan stated that he kept Benjamin Lorello, the Head of Global Healthcare Finance Group for UBS, <u>well informed about</u> HealthSouth matters. (Hymer Dec. Ex. 17 (excerpt of congressional testimony) at 169). Emery Harris, a former assistant comptroller at HealthSouth, testified at his sentencing hearing that he and his accounting team listened to a voicemail from Mike Martin from Ben Lorello indicating that Lorello had full knowledge of the fraud. (Hymer Dec. Ex. 18 (excepts of trial testimony of Emery Harris) at 158.)

- Howard Capek was the Managing Director of UBS's Equity Research and HealthCare Group from May 1999 until July of 2003 and was responsible for covering HealthSouth. At Lorello and McGahan's suggestion, Scrushy handpicked Capek to be UBS's analyst for HealthSouth in May 1999. Capek promptly issued "Strong Buy" recommendations that continued until August 27, 2002, when the SEC's investigation into Scrushy's insider stock sales became public. Thereafter, Capek still maintained a "Buy" rating for HealthSouth, and he was the last analyst to drop a "Buy" rating on the Company. (Hymer Dec. Ex. 20 (appendix 6 created for securities class action). While publicly extolling HealthSouth, Capek privately wrote to a favored client that HealthSouth was a "mess" and a "pig" and he "would not own a share of this stock." (Hymer Dec. Ex. 19.)

**4. The Guarantee Is Void *Ab Initio* as Conceived in a Fraud in Which UBS**

**Participated.** HealthSouth disputes that it owes any amounts under the Guarantee, which was conceived in fraud and is void in its inception. The record being developed in the Alabama Action reflects that Lorello, McGahan and others at UBS sought to generate fees from HealthSouth by granting personal favors to Scrushy and other HealthSouth executives whom UBS knew to be corrupt. This coterie specifically included the HealthSouth executives who took ownership interests in MCDC. HealthSouth intends to prove in Alabama that the MCDC loan was one of these favors. The minutes of a March 28, 2001 meeting of UBS's Leveraged Finance Commitment Committee states that the MCDC loan "is purely a relationship concession to HealthSouth, with the full sponsorship of UBS's HealthCare CFD [Corporate Finance] team. HealthSouth is a key relationship for CFD and LFG [Leveraged Finance Group] having generated more than $[9] million in financing fees over the last 9 months. We expect that this flow of lead managed business will continue...." (Hymer Dec. Ex. 10.)

If this action is not dismissed or stayed in deference to the Alabama Action, HealthSouth is entitled to take discovery on these and related issues. *See generally* Hymer Dec. ¶¶33-37.

## **ARGUMENT**

I.  **THIS ACTION SHOULD BE DISMISSED OR STAYED
    IN FAVOR OF THE FIRST-FILED ALABAMA ACTION**

This action should be dismissed or stayed in deference to the Alabama Action, under the

first-filed rule or under the abstention doctrine articulated in *Colorado River Water Conservation*

*Dist. v. United States*, 424 U.S. 800, 817 (1976).  There is some uncertainty in the case law in

this District as to whether the first-filed rule, as such, applies when the prior pending action was

filed in state, as opposed to federal, court or whether the Court's consideration should instead be

guided by the principles of *Colorado River*, 424 U.S. at 817.  *Compare Pike v. WSNCHS E., Inc.*,

No. 02 CIV. 3365 (GBD), 2003 U.S. Dist. LEXIS 2678, at *4-*6 (S.D.N.Y. Feb. 24, 2003)

(applying first-filed rule) *with Radioactive, J.V. v. Manson*, 153 F.Supp.2d 462, 473-77

(S.D.N.Y. 2001) (applying *Colorado River*).  The result is the same under *Colorado River* as

under the common law first-filed rule.

The MCDC fraud lies at the core of the allegations of wrongdoing by HealthSouth

against UBS and the Company's former disloyal officers.  The Alabama Court has already

expressly ruled that:  (1) contract claims asserted <u>against</u> UBS in the Alabama Action are

"inextricably intertwined" with the claims against other parties and against UBS, and are based

on the "same nucleus of operative facts" as the other claims before the Alabama Court, and

(2) "it would be seriously inconvenient and unreasonable" to try some UBS claims in New York

while concurrently trying other UBS claims in Alabama, upsetting carefully crafted case

management coordination orders in effect in three jurisdictions.  (Hymer Dec. Ex. 24 (July 13,

2005 Order) at ¶3(a), (c).  Contract claims asserted <u>by</u> UBS stand in precisely the same posture.

Consequently, this Court should dismiss this action in deference to the first-filed Alabama

Action or, alternatively, stay this action during the pendency of the Alabama Action.

Whether to stay or dismiss a proceeding under the first-filed rule is a matter committed to

the sound discretion of the District Court.  *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991)

(citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84 (1952)).  In *Adam*,

the Second Circuit dismissed an action — like this one — seeking to enforce guarantees that had been executed incident to a merger, where the merger was the subject of an earlier filed action in Michigan federal court. The Second Circuit held that deference should be accorded the earlier action under the first-to-file rule, declaring: "Where there are two competing lawsuits, the first should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second." *Id.* at 92; *see also First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76, 79-80 (2d Cir. 1989) (dismissing action on promissory notes because of the first-to-file rule: "The first to file rule embodies considerations of judicial administration and conservation of resources").

Alternatively, abstention under *Colorado River* is appropriate here, where it would further "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River*, 424 U.S. at 817 (internal brackets, quotation and citation omitted). As this Court has noted:

> The Supreme Court has established six factors to consider when determining whether abstention based on concurrent jurisdiction in state and federal courts is appropriate. These are: 1) whether the jurisdiction is over any res or property; 2) the inconvenience of the federal forum; 3) the avoidance of piecemeal litigation; 4) the order in which jurisdiction was obtained; 5) whether federal or state law supplies the rule of decision; and 6) whether the state court proceeding will adequately protect the rights of the party seeking federal jurisdiction.

*Garcia*, 1999 U.S. Dist. LEXIS 11940 at *8 (citations omitted). "Since *Colorado River*, federal courts have time and time again followed the analysis set out by the Supreme Court and have declined to adjudicate disputes before them in deference to parallel state court proceedings." *Weinstock v. Cleary, Gottlieb, Steen & Hamilton*, 815 F. Supp. 127, 131 (S.D.N.Y. 1993) (citation omitted).

As this Court observed in *Garcia,* 1999 U.S. Dist. LEXIS 11940 at *8-9:

> "[N]o one factor is necessarily determinative." *Colorado River*, 424 U.S. at 818, 96 S. Ct. at 1247. The balancing of these factors 'does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case.' *Cone*, 460 U.S. at 16, 103 S. Ct. at 937. Therefore, 'the weight to be given to any one factor may vary greatly from case to case,' and a court must use its discretion in determining

the outcome based on the circumstances of the particular case. *Cone*, 460 U.S. at 16, 103 S. Ct. at 937; *see De Cisneros* [*v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989)], *Alliance of American Insurers* [*v. Cuomo*, 854 F.2d 591, 602 (2d Cir. 1988)].

Abstention frequently turns on three critical factors: whether abstention will avoid piecemeal litigation, the relative progress that has been made in the concurrent suits, and whether state or federal substantive law applies. *See, e.g., De Cisneros v. Younger*, 871 F.2d 305, 309 (2d Cir. 1989) ("the relevant factors and their underlying principles, <u>particularly the risk of piecemeal litigation and the fact that only ... issues governed entirely by state law are raised, strongly favors abstention</u>. Where such visible signs are present pointing so clearly towards abstention — even though the propriety of bringing suit in a federal forum cannot be faulted on jurisdictional grounds — it should come as no surprise to the bar that a district court declines to exercise its jurisdiction.") (emphasis added). Each of these critical factors favors abstention.

## A.    <u>Piecemeal Litigation</u>

"[T]he avoidance of piecemeal litigation weighs heavily in favor of abstention." *L. Harbert, Inc. v. Aetna Cas. & Sur. Co.*, No. 96 Civ. 8924 (LAP), 1997 U.S. Dist. LEXIS 13021, at *10-11 (S.D.N.Y. 1997). *Accord Garcia*, 1999 U.S. Dist. LEXIS 11940 at *17 ("If the actions are parallel, then the danger of piecemeal litigation becomes an important consideration"); *Weinstock*, 815 F. Supp. at 131 ("the desirability of avoiding piecemeal litigation, weighs heavily toward dismissing this action."). Notably, "even if different relief is sought in the two actions, or the claims are not exactly the same, they are parallel as long as the causes of action are comprised of the same essential issues." *Garcia,* 1999 U.S. Dist. LEXIS 11940 at *10 (citing *General Reins. Corp. v. CIBA-GEIGY Corp.*, 853 F.2d 78, 81 (2d Cir. 1988)). Similarly, a complete identity of parties is not required. *See Weinstock*, 815 F. Supp. at 132 ("To the extent that Cleary is not a party to the concurrent state proceedings, my evaluation of the Colorado River factors does not change. Essentially, the same claims are at issue in the state courts as are contained in the amended complaint.").

The question is whether "state and federal issues are 'inextricably linked'" such that "a potential exists for 'inconsistent and mutually contradictory determinations'" which "would

'cause friction between state and federal courts.'" *De Cisneros,* 871 F.2d at 308 (citations

omitted). As this Court explained in *Garcia*:

> [Where] the causes of action in the two proceedings arise from the same set of
> events, questions of issue preclusion will be likely to arise among the parties that
> are involved in both actions. This will result in additional litigation related to the
> preclusion issue itself, *see Arkwright*[-*Boston Mfrs. Mut. Ins. Co. v. City of N.Y.*],
> 762 F.2d [205] at 211 [(2d Cir. 1985)], and, as noted by the Supreme Court, will
> also create 'the serious potential for spawning an unseemly and destructive race to
> see which forum can resolve the same issues first [which would be] prejudicial, to
> say the least, to the possibility of reasoned decisionmaking by either forum.'
> *Arizona v. San Carlos Apache Tribe of Ariz.*, [463 U.S. 545, 567 (1983)]." ....
>
> The danger of inconsistent findings on defendants' obligations in this scenario is
> apparent. The result would be unfairness to defendants and a waste of judicial
> resources that is averse to the underlying objective of the abstention doctrine. *See
> Colorado River,* [424 U.S. at 817, 96]; *Arkwright,* 762 F.2d at 211.

*Garcia,* 1999 U.S. Dist. LEXIS 11940 at *17-18, 20. *See also Congress Talcott Corp. v. Roslin,*

No. 95 Civ. 7698 (LAP), 1996 U.S. Dist. LEXIS 12827, at *15-17 (S.D.N.Y. Aug. 27, 1996)

("As these actions presently stand, one [defendant] could be found liable by one court and the

other not liable by the other, based on the exact same agreement and the exact same set of events.

Such potentially inconsistent and contradictory holdings are the pitfall of piecemeal litigation,

causing unnecessary 'friction between state and federal courts.'"); *Weinstock,* 815 F. Supp. at

131 ("[I]f this Court allows the instant action to proceed, the possibility exists that it will reach a

determination as to Weinstock's ownership of Realty Corp. and Glenwood Estates conflicting

with the state courts having concurrent jurisdiction.").

The danger of piecemeal litigation in the present case is obvious. The MCDC fraud is

one of the principal transactions being litigated in the Alabama Action. HealthSouth is seeking

as relief the proceeds of the MCDC loan, which UBS AG seeks here to have the Court order

repaid. If this Court were to rule on HealthSouth's obligations to UBS AG it would necessarily

determine — or foreclose — a host of issues relating to UBS's participation in that fraud that

gave rise to the loan and that underlie numerous aspects of the Alabama Action that are not

before this Court. This Court's rulings will inescapably spawn further litigation on issue

14

preclusion grounds, among others.

The Alabama Action is significantly broader and more complex than the issue that UBS has sought to join in New York. It makes little sense to resolve a narrow, yet resonant, aspect of the conflict between HealthSouth and UBS in this Court, which under the circumstances is not as well placed as the Alabama Court to foresee and manage the repercussions of its decision. *See L. Harbert*, 1997 U.S. Dist. LEXIS 13021 at *10-11 ("Further indicating a threat of piecemeal litigation should the Federal Action go forward is the presence of a third party in the State Action. As the State Action now involves a broader scope of interested parties, I find that it is better suited to fully resolve the issues of this case."); *De Cisneros*, 871 F.2d at 308 ("The state proceedings are more comprehensive than the federal proceedings. … [T]he district court's stay of its jurisdiction lends support to the value of judicial economy that animates *Colorado River*. Thus 'reasons of wise judicial administration,' … favor abstention in this case in order to avoid duplicative simultaneous litigation"). *Cf. Garcia*, 1999 U.S. Dist. LEXIS 11940 at *20 n.3 ("[N]o matter which action proceeds first, there is the potential for a waste of judicial resources. This factor is weighty considering that if plaintiffs chose to bring this federal claim in state court, these problems would be avoided.").

**B.    First-Filed Action**

The fact that the Alabama Action has been actively litigated for five years is another factor that weighs heavily in favor of abstention. This is more than "a race to the courthouse" test. Rather, "the relative progress of the federal and state proceedings must be carefully examined." *De Cisneros*, 871 F.2d at 308 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983)). *Accord Garcia*, 1999 U.S. Dist. LEXIS 11940 at *23 ("Here, not only was the state complaint filed first, but considerably more progress has been made in the state action.... There has also been a significant amount of discovery conducted in the state proceeding.... In this proceeding, by contrast, the progress consists merely of the complaint and this motion to dismiss."); *L. Harbert*, 1997 U.S. Dist. LEXIS 13021 at *10-11 ("In this case, not only was the Federal Complaint filed seven months after the State Action, but

15

no progress has taken place in the Federal Action. Defendant has not even answered the complaint, filing the separate motion instead. In the State Action, however, defendants have answered, issue has been joined, … and defendant has made a request for discovery."); *Weinstock,* 815 F. Supp. at 132 ("Weinstock instituted the instant action years after the underlying factual disputes were already the subject of litigation in the [state] courts.… [T]his suit comes almost five years late.").

The Alabama Action has already reached the state of a fourth amended complaint; millions of documents have been produced; numerous depositions have been taken; and the Alabama Court has ruled on numerous motions, including substantive motions (UBS entities' motions to dismiss). A summary judgment motion filed by UBS Securities is now pending in the Alabama Action. UBS AG has not even filed a complaint in this action.

### C.    Substantive Law

The issues before this Court are exclusively the province of state law. "[A]lthough the absence of federal issues does not require the surrender of jurisdiction, it does favor abstention where 'the bulk of the litigation would necessarily revolve around the state-law . . . rights of [numerous] . . . parties.'" *De Cisneros*, 871 F.2d at 309 (citations omitted; brackets in original). As the Second Circuit has recognized, under these circumstances, "the interests of comity are best served by waiting for the state court to speak first;" "there is no federal interest that would be served by retaining jurisdiction;" and "all parties … will be better served by abstention because consolidation in state court could lead to 'more efficient factfinding and more reasoned decision-making' on these ordinary garden variety issues of state law." *De Cisneros*, 871 F.2d at 309 (quoting *Arkwright*, 762 F.2d at 211). *Accord, e.g., L. Harbert*, 1997 U.S. Dist. LEXIS 13021 at *12-13 ("Plaintiff's federal complaint is based solely on diversity jurisdiction. The substantive law to be applied is therefore state law. While the state law at issue here appears fairly well settled, and while abstention may not be granted solely because the applicable substantive law comes from the state, … a decision to abstain may be supported by the fact that

'the bulk of the litigation would necessarily revolve around the state-law . . . rights of . . . parties.'") (quoting *General Reins. Corp.*, 853 F.2d at 82).

### D.    Other Factors, Including Reactive Nature of this Litigation

None of the other *Colorado River* factors favors the exercise of this Court's jurisdiction. The case does not involve any res or property. UBS AG can hardly assert the convenience of federal court in an action that it brought initially in state court; and UBS will in all events be litigating the MCDC loan and fraud in the Alabama Action. Nor is there any reason to doubt that UBS's rights will be adequately protected in the Alabama Action. "[T]here is no reason to conclude that [state court] cannot satisfactorily adjudicate ... common law contract claims. 'To imply otherwise would violate every principle of comity.'" *L. Harbert*, 1997 U.S. Dist. LEXIS 13021 at \*15 (quoting *Lorentzen v. Levolor Corp*, 754 F. Supp. 987, 994 (S.D.N.Y. 1991)).

One *Colorado River* factor that favors abstention is the reactive nature of this lawsuit. "The Supreme Court has found 'considerable merit' in an additional factor, stating that 'the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River*.'" *Garcia*, 1999 U.S. Dist. LEXIS 11940 at \*25 (quoting *Moses H. Cone*, 460 U.S. at 17 n. 20).

There is at present, in the Alabama Action, heated motion practice over the propensity of UBS entities to assert that one or another of its entities is a proper party for the purpose of gaining tactical advantage. Tactical obfuscation for purposes of manipulating fora is highly frowned upon and militates strongly in favor of abstention. *See Garcia*, 1999 U.S. Dist. LEXIS 11940 at \*27-28 ("This blatant attempt to manipulate the concurrent system of jurisdiction is of great weight in this consideration of the vexatious or reactive nature of the action. When combined with the normal *Colorado River* factors, particularly the danger of piecemeal litigation, consideration of the vexatious and reactive nature of this action is more than sufficient to constitute the exceptional circumstances which tip the balance away from this court's exercise of jurisdiction in this matter."). *See also Weinstock,* 815 F. Supp. at 132 ("Moreover, by asserting here claims nearly identical to those asserted in the state forums after having received

17

several adverse rulings there, Weinstock appears to have instituted this action as much for tactical reasons as for a genuine interest in obtaining relief.").

No *Colorado River* factor favors jurisdiction in this Court. All relevant factors favor abstention. The Court should dismiss or stay this action in favor of the Alabama Action.

## II.    **HEALTHSOUTH IS ENTITLED TO DISCOVERY ON ITS DEFENSES**

Having filed this motion without a complaint or any discovery, UBS AG should not be permitted to railroad its way to summary judgment. Should this Court decide not to dismiss or stay in favor of the Alabama Action, HealthSouth is entitled to an opportunity to prove its defenses. "It is well-established ... that summary judgment motions prior to discovery are disfavored." *Anderson v. Docuport*, No. 06 Civ. 3769 (GEL), 2007 U.S. Dist. LEXIS 10106, at *24 (S.D.N.Y. Feb. 13, 2007) (removed CPLR §3213 case; *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (nonmoving party must have "had the opportunity to discover information that is essential to his opposition" to the motion for summary judgment)); *Hellstrom*, 201 F.3d at 97 ("Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery.").

UBS AG seeks to avoid discovery by arguing that HealthSouth has no defense to payment under the Guarantee. That is incorrect. The Guarantee is void in its inception under New York law, having been executed by a faithless agent who had no actual or apparent authority to sign it. The rule stated in *Citibank, N.A. v. Plapinger*, 66 N.Y. 2d 90, 495 N.Y.S.2d 309 (1985), by its terms does not apply because HealthSouth did not knowingly accede to transactions with shell entities for the purpose of siphoning funds, including loan proceeds, to faithless fiduciaries, and UBS was a knowing participant in this fraud.

### A.    **The Guarantee Is Void Under New York Law**

MCDC was one of several shell entities in which corrupt HealthSouth insiders invested heavily and which helped them to loot HealthSouth. (Kalal Dec. Ex. V (TAC) at ¶¶105-113.) UBS employees who had knowledge of the fraud at HealthSouth arranged and secured the

MCDC loan. (*See, e.g., id.* at ¶134(e)). MCDC's board included a corrupt HealthSouth officer who did "many transactions with the UBS Parties," including a transaction whereby "UBS funded and raised investment capital for MCDC." (*Id. See also id.* at ¶¶105-113 (alleging MCDC fraud)). Clearly, the MCDC loan and attendant Guarantee were conceived in fraud, and entered into by a faithless agent who had no actual or apparent authority to do so. This voids the Guarantee in its inception under New York law.

### i. No Actual Authority

In New York, it is black letter law that "[a]n agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself or to have an adverse interest." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F. Supp.2d 246, 262 (S.D.N.Y. 2002). *See Bertran Packing, Inc. v. Transword Fabricators, Inc.*, 50 A.D.2d 542, 543, 375 N.Y.S.2d 335, 337 (1st Dep't 1975) (quoting *Wagner v. Nichols*, 5 A.D.2d 191, 194, 170 N.Y.S.2d 542, 545 (1st Dep't 1958), and *Manhattan Life Ins. Co. v. Forty Second & G. St. Ferry R. Co.*, 139 N.Y. 146, 151, 34 N.E. 776, 777 (1893)).

A contract does not bind the principal if the agent acts adversely to the principal in the transaction and the third party who deals with the principal through the agent knows that the agent is acting adversely to the principal. The agent's knowledge is not imputed to the principal when the agent is acting adversely to the principal. As the RESTATEMENT (THIRD) OF AGENCY puts it:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.

RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006).

"'It is an acknowledged principle of the law of agency that a general power or authority given to the agent to do an act on behalf of the principal, does not extend to a case where it appears that the agent himself is the person interested on the other side.'" *Wen Kroy Realty Co. v. Pub. Nat'l Bank & Trust Co. of N.Y*, 260 N.Y. 84, 91, 183 N.E. 73, 75 (1932) (*quoting Bank of*

*N.Y. Nat'l Banking Ass'n v. Am. Dock & Trust Co.*, 143 N.Y. 559, 564, 38 N.E. 713, 714 (1894)).

The Guarantee on which UBS AG sues was fraudulently entered into on HealthSouth's behalf by Brown, who was convicted and imprisoned for his role in defrauding HealthSouth. (*See* Hymer Dec. Ex. 4 (Plea Agreement and Conditions) and Ex. 3 (Transcript of Plea).) The objects of the conspiracy to which he pled guilty were adverse to HealthSouth's interests and included making false SEC filings for HealthSouth, falsifying HealthSouth's books and records, and obtaining money and property by means of fraud. (*See* Hymer Dec. Ex. 3 [Transcript of Plea] at 24.) From his participation in the conspiracy, Brown obtained personal financial benefits and, as part of his plea, Brown agreed to forfeit all gains derived from this wrongdoing. (*See id.* at 32, 37.) Brown lacked actual authority to bind HealthSouth in transactions in which his interests were adverse to those of HealthSouth. RESTATEMENT (THIRD) OF AGENCY § 2.02 cmt. *e* (2006)("An agent does not have actual authority to do an act if the agent does not reasonably believe that the principal has consented to its commission"). His signing of the Guarantee was just such a transaction. It was intended to benefit the members of the conspiracy, including Brown himself, at the expense of HealthSouth. Because the fraud was perpetrated on the Company, its Board of Directors and other officers, the fact that it succeeded in obtaining the latter's defrauded assent does not render the Guarantee binding or effective.

As a conspirator, moreover, Brown was an agent for the other members of the conspiracy (*see* Hymer Dec. Ex. 3 (Transcript of Plea) at 25), including the many others who have been convicted. Brown had no authority to bind HealthSouth in a transaction in which he was acting for parties adverse to HealthSouth. "If an agent represents multiple principals in a transaction between or among them, any principal who does not know of the agent's divided loyalties may rescind the transaction." RESTATEMENT (THIRD) OF AGENCY § 8.03 cmt. *d*.

### ii. No Apparent Authority

Absent actual authority, a faithless agent's knowledge may be imputed to a principal "when necessary to protect the rights of a third party who dealt with the principal in good faith."

However, "[a] third party who deals with a principal through an agent, knowing or having reason to know that the agent acts adversely to the principal, does not deal in good faith for this purpose." RESTATEMENT (THIRD) OF AGENCY § 5.04. *See also id.* at § 2.03 ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."); *id.* at § 2.03 cmt. *d* ("A third party's knowledge that an agent lacks actual authority to bind the principal to a transaction defeats the reasonableness of believing the agent to be authorized. . . .").

Thus, HealthSouth would be bound by Brown's act only if the UBS entities believed, and had a right to believe, that Brown, as agent, was acting within the authority granted to him by his principal. 2A N.Y. JUR. AGENCY § 95 (2007); *Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243, 251 (2d Cir. 1996); *Marathon Enters. v. Scroter GMBH & Co. KG*, No. 01 Civ. 0595 (DC), 2003 WL 355238, at *8 (S.D.N.Y. Feb. 18, 2003), *aff'd mem.*, 95 Fed. App'x 364 (2d Cir. 2004); *Hatfield v. Control Sys. Int'l*, 21 F. Supp.2d 546, 550 (D.S.C. 1997) (third parties could not reasonably have relied on agent's representations when they had actual knowledge agent lacked any such authority), *aff'd*, 155 F.3d 558 (4th Cir. 1998); *Sipes v. Kinetra, LLC*, 137 F. Supp.2d 901, 907-08 (E.D. Mich. 2001) (LLC's CEO acted without apparent authority in granting equity to executive when executive had reviewed copy of LLC's formation agreement under which CEO clearly lacked unilateral authority to grant equity), *aff'd mem.*, 55 Fed.App'x 322 (6th Cir. 2003). *See also Ernst Iron Works v. Duralith Corp.*, 270 N.Y. 165, 170, 200 N.E. 683, 684 (1936) ("'If a third person has notice of a limitation of an agent's authority, he cannot subject the principal to liability upon a transaction with the agent in violation of such limitation'" (citing RESTATEMENT (FIRST) OF AGENCY, §§ 166, 167 (1933); TIFFANY ON AGENCY, § 19 (2d ed. 1924); 75 A.L.R. at 1047)); *accord Walsh v. Hartford Fire Ins. Co.*, 73 N.Y. 5, 1878 WL 12535 at *3 (1878).

Where the third party has in fact colluded with the putative agent — the precise issue being litigated in Alabama — the requisite good faith belief in the putative agent's actual authority is plainly absent. As summarized in the RESTATEMENT (THIRD) OF AGENCY:

> A third party who knows or has reason to know that an agent acts adversely to the principal, and who deals with the principal through the agent, has not dealt in good faith and may not rely on the adverse-interest exception. Thus, imputation protects innocent third parties but not those who know or have reason to know that an agent is not likely to transmit material information to the principal. . . . If the third party colludes with the agent against the principal, ... the third party should not expect that the agent will fulfill duties of disclosure owed to the principal.

RESTATEMENT (THIRD) OF AGENCY § 5.04 cmt. *b*. *See also Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 74 (1st Cir. 2001) ("In the majority of jurisdictions, the law has evolved towards a recognition that information given to even a fraudulent agent should normally be imputed to the principal, unless the third party providing the information has notice that the agent is acting adversely or otherwise colludes with the faithless agent.").

The record being developed in the Alabama Action undercuts any argument from UBS AG that it was ignorant of the fraud at HealthSouth and therefore reasonably relied on Brown's agency. Quite the contrary, the evidence demonstrates that UBS bankers Benjamin Lorello, William McGahan, and Howard Capek, were all knowing participants in the wrongdoing at HealthSouth.

### iii.    Material Factual Issues as to Agency and Fraud Preclude Summary Judgment

At a minimum, the role of the UBS entities in the fraud at HealthSouth and the attendant question whether UBS could reasonably rely on Brown's supposed authority as agent (or that of others defrauded into assent) raise genuine issues of material fact that preclude summary judgment. As Judge Chin has written:

> [A] determination of apparent authority is a question of fact that is not appropriate for summary judgment. *Minskoff [v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)]* ("The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment."); *Graffman v. Delecea*, No. 96 Civ. 7270 (SWK), 1997 WL 620833, at *4 (S.D.N.Y. Oct. 8, 1997) (same); *Johnson v. Nationwide Gen. Ins. Co.*, 971 F. Supp. 725, 730 n.6 (N.D.N.Y. 1997) ("Whether apparent authority exists is usually a question of fact for the jury.").

*Marathon Enters.*, 2003 WL 355238 at *8. *See also, e.g., In re Nigeria Charter Flights Contract*

*Litig.*, Nos. 04 MD 1613 (RJD)(MDG), 04 CV 0304 (RJD)(MDG), 2007 WL 3124527, at *13 (E.D.N.Y. Oct. 25, 2007) ("The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment.") (citation and quotation omitted); *OM Intercontinental v. Geminex Int'l, Inc.*, No. 03 Civ. 6471 (RCC), 2006 WL 2707327, at *5 (S.D.N.Y. Sept. 18, 2006) (noting the "general rule counseling against summary judgment on questions of apparent authority"); *Hidden Brook*, 241 F. Supp.2d at 264 ("The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution of a motion for summary judgment.") (citation and quotation omitted); *People's Westchester Sav. Bank v. GANC*, 705 F. Supp. 164, 169 (S.D.N.Y. 1989) ("The existence of apparent authority is a question of fact") (citations omitted); *Fustok v. Conticommodity Servs., Inc.*, 577 F. Supp. 852, 857 (S.D.N.Y. 1984) (denying summary judgment given question whether third party relying on apparent authority actually knew agent was acting beyond agent's authority); 2A N.Y. Jur.2d AGENCY § 95 ("Questions of apparent authority are questions of fact").

### B.    *Plapinger* Does Not Support UBS AG's Position or Address HealthSouth's Defenses

UBS AG relies on *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985), in which the New York Court of Appeals held that an absolute and unconditional guarantee precludes a defense of fraudulent inducement based on a risk of which the guarantor was fully aware when it executed the guarantee, yet for which it made no provision in the guarantee. *Plapinger* does not purport to address the enforceability of a guarantee signed by a faithless agent acting without authority in favor of another, knowing party to a fraud, and it does not sustain the viability of a guarantee that was itself procured by fraud.

*Plapinger* and its progeny preclude a party who enters into a guarantee in the face of known and assumed risks from asserting that it was fraudulently induced to execute the guarantee by an oral promise that those risks would be accommodated, even though the guarantee recites that it is absolute and unconditional. HealthSouth makes no such claim.

23

HealthSouth's defense is that the Guarantee was void *ab initio* because the faithless fiduciary who purported to bind the Company to the Guarantee — a since-convicted co-conspirator in the fraud of which this transaction was a part — lacked both actual and apparent authority and procured the Guarantee by fraud, and that UBS executives were well aware of this at the time.[2]

The limitations of *Plapinger* are explored in Judge Rakoff's opinion in *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.*, 189 F. Supp.2d 24 (S.D.N.Y. 2002), which declined to extend *Plapinger* where, "unbeknownst to the Sureties at the time they issued the Bonds, the Contracts [on which the surety bonds were issued] … were part of a fraudulent arrangement [having the] net effect" of creating illicit revenue to benefit corrupt corporate Enron executives, while ensuring repayment to the collusive banks — "[i]n short, [where] defendants allege that the Bonds were the product of fraudulent inducement and fraudulent concealment by the plaintiff." 189 F. Supp.2d at 26, 28.

In *Liberty Mutual*, sureties alleged they were duped into guaranteeing what they thought were bilateral commodity forward contracts between Enron and entities controlled by lender JP Morgan. In fact, the transactions were fraudulently disguised loans from JP Morgan to Enron. The surety bonds were thus procured by fraud. The Court held that:

> [N]either *Plapinger* nor its progeny … avails plaintiff here.... [A] full and fair reading of *Plapinger* makes plain that it does *not* stand for the extraordinary proposition — the logical extension of plaintiff's interpretation — that a general

---

[2]    In its discussion of *Plapinger* and its sequelae, UBS AG does not cite a single case in which the guarantee was entered into by a faithless agent in the course of perpetrating a fraud on the guarantor. *See Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 188 F. 3d 31, 35-36 (2d Cir. 1999) (guarantor argued that he was discharged by virtue of principal debtor's release); *Red Tulip, LLC v. Neiva*, 44 A.D. 3d 204, 209-10, 842 N.Y.S. 2d 1, 6 (1st Dep't 2007) (garden variety contract counterclaims); *Banco do Estado de Sao Paolo v. Mendes Junior Int'l Co.*, 249 A.D.2d 137, 138, 672 N.Y.S.2d 28, 29 (1st Dep't 1998) (defendants abandoned contention that obligation was vitiated by duress); *Gen. Trading Co. v. A & D Food Corp.*, 292 A.D.2d 266, 267, 738 N.Y.S.2d 845, 845 (1st Dep't 2002) (defendants alleged that sale of collateral given as security was not conducted in a commercially reasonable manner); *Mikor Realty & Dev. Corp. v. Fleet Bank*, 210 A.D. 2d 157, 158, 620 N.Y.S. 2d 354, 354-55 (1st Dep't 1994) (fraudulent inducement based on alleged promise to renew personal notes even though credit line was denied).

> sweeping disclaimer can serve to disclaim any and all extrinsic fraud between
> sophisticated parties.

*Id.* at 27. As in *Liberty Mutual*, the present Guarantee was itself the product of fraud and

fraudulent concealment — specifically, concealment of the scheme that has led to approximately

20 federal criminal convictions and is now the subject of the Alabama Action. Even more

egregious than in *Liberty Mutual*, where the sureties' agents who issued the bonds were victims

of the fraud, the HealthSouth agents who arranged the Guarantee orchestrated the fraud and

concealed it from HealthSouth and its shareholders, with the collusion of the party seeking to

enforce the Guarantee.

UBS AG's effort to distinguish *Liberty Mutual* as resting on the fact that the sureties'

obligations, given the reality of the Enron transactions, were illegal under New York statutes, is

unavailing. That fact was incidental to the Court's ruling that *Plapinger* is inapplicable where a

surety (and a guarantor is a form of surety) does not seek to evade risks that it should, as a

sophisticated party, have been aware that it was assuming, but does not apply where, as here, the

surety (guarantor) was hopelessly ignorant of the fraud that includes the guaranteed transaction:

> As the Second Circuit stated in *Manufacturers Hanover Trust Company v.
> Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993), "the mere general recitation that a
> guarantee is 'absolute and unconditional' is insufficient under *Plapinger* to bar a
> defense of fraudulent inducement...." Rather, the Court continued, "the
> touchstone is specificity," that is, a clear indication that the disclaiming party has
> knowingly disclaimed reliance on the specific representations that form the basis
> of the fraud claim. *Id.* Thus, in *Plapinger*, even though the disclaimer language
> may have been broad and general, it was negotiated as part of the same
> negotiations in which, the defendants later claimed, they were orally promised an
> additional line of credit, so that, in agreeing to the disclaimers, the corporate
> officers had to know that, at a minimum, the disclaimers precluded reliance on
> any specific oral promises made during the defendants' negotiations with the
> lenders.
>
> Here, by contrast, even if one assumes *arguendo* that the disclaimers in paragraph
> 7 of the Bonds preclude reliance on the representations in the underlying
> Contracts of which the Sureties knew or were on notice, there is no suggestion
> that the Sureties knew or were on notice of the allegedly circular arrangements
> between Mahonia, Enron, and other entities that transformed what purported to be
> insurable sales contracts into disguised loans that the Sureties were prohibited by
> law from insuring. *See generally Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir.

1994) ("It is well settled that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct.").

*Liberty Mutual*, 189 F. Supp.2d at 28.

Similarly, in *MLP U.S.A. Inc. v. Motheral*, 05 Civ. 10796 (LLS), 2006 U.S. Dist. LEXIS 58589, at *2 (S.D.N.Y. Aug. 17, 2006), Judge Stanton ruled that: "Deceit practiced to obtain the surety's commitment does not 'discharge' the surety's obligation; it nullifies the very existence of the obligation.... [G]uarantors have no liability under the guaranty itself, like any other parties to any contract, when the guaranty itself was procured by fraud." In *MLP*, "where the guarantee was procured by fraudulent concealment" of the defective nature of equipment that was the subject of the underlying contract, language that "'this Guaranty shall be valid and unconditionally binding upon Guarantor in any event and under all circumstances' ... does not prevent that defense ... [and] does not render immaterial the defense that those words — and the whole Guaranty itself — were procured by fraudulent concealment of plaintiff's knowledge of the defective nature of the equipment." *Id.* at 3-4. *Cf. Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp.2d 448, 461 (S.D.N.Y. 2003) (distinguishing *Liberty Mutual* as a case where JP Morgan, like UBS here, was "implicate[d] ... in the alleged fraud" and "clearly link[ed]" to the corporate perpetrator of the fraud.).

Neither *Plapinger* nor any other authority cited by UBS AG stands for the proposition that a guarantor is bound by the terms of a guarantee executed by a faithless agent in the course of defrauding the agent's principal. New York law is unequivocally to the contrary. Under the teachings of *Liberty Mutual* and *MLP*, where a party like HealthSouth executes a guarantee as a product of fraud, it is not bound to honor the guarantee in favor of one of the parties to the fraud.

## C.    The Accrual of a Liability on HealthSouth's Balance Sheet Is Not An Admission of Legal Liability

The fact that HealthSouth complied with its obligations under the securities laws and Generally Accepted Accounting Principles ("GAAP") to disclose the guarantee as a "liability" — that is, posted as a liability on its financial statements — has no bearing on HealthSouth's legal liability, *vel non*, under the Guarantee, and is fully consistent with HealthSouth's position

26

that the Guarantee was entered into by a faithless agent and is void.

Courts routinely recognize that neither the taking of a financial accounting reserve nor the accrual of a liability (in the accounting sense — *i.e.*, a liability as opposed to an asset) is admissible to prove legal liability. This bookkeeping is not relevant, let alone conclusive, on the issue. It reflects only an assessment of exposure, not a judgment, much less an admission, of legal liability. *See, e.g., Sundance Cruises Corp. v. Am. Bureau of Shipping,* No. 87 Civ. 0819 (WK), 1992 WL 75097, at *1 (S.D.N.Y. Mar. 31,1992) ("[T]hese reserves are, simply, not relevant. Defendant's assessment or its underwriter's assessment or its counsel's assessment of exposure to liability in this or prior cases has nothing to do with whether here there is liability."); *Fidelity & Deposit Co. v. McCulloch,* 168 F.R.D. 516, 525 (E.D. Pa. 1996) ("setting aside reserves does not amount to an admission of liability."); *Heights at Issaquah Ridge Owners Ass'n v. Steadfast Ins. Co.*, No. 07 Civ. 1045 (RSM), 2007 WL 4410260 (W.D. Wash. Dec. 13, 2007) ("The admission of reserves information should raise strong concerns, both with regard to the reliability and prejudicial effect of such evidence and with regard to the public policies that reserves are intended to promote."); 2 WEINSTEIN'S FEDERAL EVIDENCE § 411.03 (2007) ("a party may not introduce evidence of a fund that has been set aside by a corporation as a litigation reserve").

There are strong policy reasons to encourage the taking of reserves and accruals of liabilities, particularly by public companies, and this is emphatically the case when new management is seeking to remedy massive financial fraud, such as at HealthSouth. Thus, in *In re Adelphia Commc'ns Corp.*, 342 B.R. 142, 156 (Bankr. S.D.N.Y. 2006), the court stressed "that allowing the admission of financial accounting reserves to try to prove liability would pose a disincentive to responsible accounting." Judge Gerber reasoned that:

> It would seem particularly inappropriate to penalize the Debtors for careful and conservative accounting when their accounting personnel were leaning over backwards to avoid the concealment of actual and potential contractual liabilities that was the hallmark of the Rigas era. It would be even more inappropriate to consider those accounting measures as admissions when the accounting decision makers were not there at the time that the underlying contracts were drafted, and

27

were merely trying to assess (or address) how a court might rule as to the
contractual claims.... Second, at least in a case, like this one, where the
contractual documents are unambiguous, it is the content of the documents that
determines their meaning and effect, and not the views of the accounting
personnel at the Debtors or the bank lenders. The Court also believes, with due
respect, that it has greater expertise in analyzing contractual obligations than do
the Debtors' (or the bank lenders') accounting personnel.

*Id.* at 156 (emphasis added).[3]

UBS AG has proffered no evidence that either HealthSouth's accrual of a liability or its

statements in SEC filings regarding that accrual manifest any assessment by HealthSouth of its

legal liability or any intention to waive HealthSouth's defenses based on the Guarantee's

fraudulent inception. It has not sustained its burden. *See id.* at 149 (finding that "the Debtors'

taking of an accrual for liabilities ... was focused only on financial accounting obligations," and

finding "no evidence that the Debtors' accounting personnel intended to waive any defenses the

Debtors might have to [the] claims"). At a minimum, the import of the accounting for the

Guarantee raises unresolved questions of fact.

### D.    Summary Judgment Is Unsupportable on This Record

Because UBS AG has brought this motion for summary judgment in lieu of a complaint,

---

[3]    UBS AG cites *Kornfeld v. NRX Techs., Inc.*, 62 N.Y.2d 686, 687-688, 476 N.Y.S.2d 523, 524 (1984), for the proposition that HealthSouth's SEC filings "ratify" the loan. Not at all. In *Kornfeld*, corporate officers claimed that they had signed guarantees of corporate obligations in blank and had no knowledge of what happened to those documents later. SEC filings signed by the same individuals factually contradicted those assertions, disclosing the terms of the guarantees and the stock and stock options the officers received as inducements to enter into the guarantees. "These public reports strongly suggest that, even if incomplete when signed, the guarantees by NRX officers were completed and delivered in accordance with their authorization." *Id.* at 688. Unlike *Kornfeld*, UBS AG does not rely on SEC filings for specific contentions of fact, and nothing in HealthSouth's SEC filings gainsays its contention that the MCDC transaction, and attendant Guarantee, were conceived in fraud. Also inapt are *Graubard Mollen Dannet & Horowitz v. Edelstein*, 173 A.D.2d 230, 231, 569 N.Y.S.2d 639, 640 (1st Dep't 1991), in which guarantors executed an agreement with the plaintiff expressly acknowledging their indebtedness at a time when they were aware of plaintiff's alleged antecedent fraud; *New York Life Ins. Co. v. Media/Commc'ns Partners Ltd. P'ship*, 204 A.D.2d 235, 612 N.Y.S.2d 144 (1st Dep't 1994) (ratification by unspecified "conduct"), and *Gannett Co. v. Tesler*, 177 A.D.2d 353, 353 577 N.Y.S.2d 248, 249 (1st Dep't 1991) (waiver by unspecified "confirm[ation of] the guarantee").

it seeks to foreclose not only discovery but even pleadings. UBS AG urges that "HealthSouth cannot avoid summary judgment using conclusory statements, conjecture, or speculation." UBS AG Mem. at 18 (internal quotation omitted). The record being developed in the Alabama Action, including sworn testimony drawn from scores of witnesses and transcripts of criminal trials, is densely factual, not conclusory. Putting aside the irony of UBS AG's contention that HealthSouth has not alleged fraud with particularity in this action — HealthSouth has not been permitted to file any pleadings in this action — the Alabama Court has already ruled that HealthSouth's allegations against the UBS entity defendants there are sufficiently particularized to satisfy ALA. R. CIV. P. 9(b), which is identical to its federal counterpart.

In a similarly postured case, Judge Lynch denied summary judgment in lieu of complaint pending discovery into questions whether the loans (notes) underlying a guarantee "were properly issued by an officer of [the corporate guarantor] with actual or apparent authority" and whether the guarantor, like HealthSouth, had "counterclaims that would set off all or part of the indebtedness claimed by plaintiffs.... All of these matters require discovery and development of a record before the matter would be ripe for a proper summary judgment motion." *Anderson v. Docuport*, 2007 U.S. Dist. LEXIS 10106 at *25-26. The same considerations pertain here.

UBS AG's protestations as to particularity are particularly incongruous given its history of obfuscating the identity of the proper UBS entities in the Alabama Action and here. The *Liberty Mutual* Court rejected the plaintiffs' argument that the defendant sureties' "allegations of fraud [were] too speculative and unsupported by admissible evidence to rebut the solid showing plaintiff has made in support of plaintiff's motion for summary judgment" because the sureties demonstrated in their Rule 56(f) affidavits that, "even while plaintiff was moving with alacrity to obtain summary judgment, defendants were repeatedly rebuffed in their informal attempts to obtain the information regarding the underlying transactions needed to confirm (or refute) defendants' theory." *A fortiori*, a lack of candor in formal court proceedings accentuates the inaptness of summary adjudication in favor of UBS AG.

29

## CONCLUSION

For the foregoing reasons, UBS AG'S motion for summary judgment should be denied, and HealthSouth's motion to stay or dismiss this action in deference to the prior pending Alabama Action should be granted.

Dated:  New York, New York
        January 18, 2008

GREGORY P. JOSEPH LAW OFFICES LLC

By: _____
        Gregory P. Joseph (GJ 1210)
        (gjoseph@josephnyc.com)
        Peter R. Jerdee (PJ 1240) (pjerdee@josephnyc.com)
        Sandra M. Lipsman (SL 1220) (slipsman@josephnyc.com)
        485 Lexington Avenue, 30th Floor
        New York, New York 10017
        Telephone:  (212) 407-1200

*Attorneys for Defendant HealthSouth Corporation*

607136

30