**GREGORY P. JOSEPH LAW OFFICES LLC**
Gregory P. Joseph (GJ-1210) (gjoseph@josephnyc.com)
Peter R. Jerdee (PJ-1240) (pjerdee@josephnyc.com)
Sandra M. Lipsman (SL-1220) (slipsman@josephnyc.com))
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Fax: (212) 407-1280

*Attorneys for Defendant HealthSouth Corporation*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UBS AG, Stamford Branch, | )<br>)<br>) |
| *Plaintiff,* | )<br>) |
| -against- | ) Civil Action No. 07 CV 8490 (LAP)<br>) ECF Case<br>) |
| HealthSouth Corporation, | )<br>) |
| *Defendant.* | )<br>) |

## HEALTHSOUTH'S RESPONSE TO UBS'S STATEMENT OF UNDISPUTED FACTS

HealthSouth Corporation ("HealthSouth") respectfully submits this response to UBS's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("UBS's Rule 56.1 Statement"). For ease of reference, each numbered Statement of Undisputed Fact ("SUF") set forth in UBS's Rule 56.1 Statement is reproduced, and HealthSouth's response follows it. All admissions are made for purposes of the pending motion only. Evidentiary support for denials is described in HealthSouth's accompanying Memorandum of Law and the accompanying January 17, 2008 Declaration of David G. Hymer, which is also HealthSouth's Rule 56(f) Declaration.

**The Parties**

1.      Plaintiff UBS is a Connecticut state-licensed branch of UBS AG, a Swiss banking corporation, with its principal place of business in Stamford, Connecticut.

Admitted.

2.      Defendant HealthSouth Corporation ("HealthSouth") is a Delaware corporation with its principal place of business in Birmingham, Alabama.

Admitted.

**MedCenterDirect.com**

3.      MedCenterDirect.com, Inc. was a Delaware corporation, which the Delaware Secretary of State has certified as "no longer in existence and good standing under the laws of the state of Delaware" and that its corporate charter is "inoperative and void." (*See* Certification of Harriet Smith Windsor, Secretary of State of the State of Delaware, dated February 21, 2007 (Kalal Decl., Ex. U).)

Admitted.

**The Credit Agreement**

4.      MedCenter, HealthSouth and UBS entered into a Credit Agreement on March 30, 2001. (*See* Kalal Decl., Ex. A.) Jason Brown, HealthSouth's Vice President of Finance, executed the Credit Agreement on HealthSouth's behalf. (Kalal Decl., Ex. A, at second signature page following page 66 of the Credit Agreement.)

Admitted that Brown signed the Credit Agreement among these parties on or about the stated date but otherwise denied. Brown had no actual or apparent authority to execute the Credit Agreement "on HealthSouth's behalf." Nor is Brown, who was imprisoned in connection with his role in the HealthSouth accounting fraud, any longer Vice President of Finance at HealthSouth.

5.      In connection with its execution of the Credit Agreement, HealthSouth delivered to UBS a duly executed Secretary's Certificate, dated March 30, 2001, attesting to the validity of annexed resolutions by HealthSouth's Board of Directors that authorized the company to enter into the Credit Agreement. (Kalal Decl., Ex. C.)

Admits that a Secretary's Certificate was executed dated March 30, 2001, but denies that it was "duly executed" and denies that the annexed resolutions by HealthSouth's Board of Directors were valid. For reasons described in HealthSouth's Memorandum of Law and being litigated in *Tucker v. Scrushy*, Civil Action No. CV-02-5212 (Circuit Ct. Jefferson Co. (the "Alabama Action")), the Credit Agreement was void *ab initio* because both the underlying loan obligation and the Guarantee were conceived in fraud and entered into by a faithless agent (Brown) who lacked both actual and apparent authority. Board approval of the underlying loan obligation and the Guarantee was also invalid because all of the members of the Board of Directors that resolved to authorize HealthSouth to enter into the Credit Agreement had received founders' stock in MedCenterDirect.com ("MCDC") either individually, through family members, trusts, or some other capacity. All of the HealthSouth Board of Directors had previously obtained this MCDC stock pursuant to a private stock offering that was not available to the general public and, therefore, these board members were not disinterested.

      6.     Further, HealthSouth's General Counsel, William Horton, issued a written opinion, dated March 30, 2001, confirming HealthSouth's corporate power to enter into the Credit Agreement and the validity of HealthSouth's corporate action. (Kalal Decl., Ex. B.)

Admits that an opinion was rendered by Horton dated March 30, 2001, but denies that HealthSouth's corporate action was valid and states that at the time that he issued his written opinion, William Horton was either unaware of the fraudulent nature of the Credit Agreement and the Board of Director's complicity in that fraud, or was himself complicit, in either event invalidating his written opinion.

      7.     Under the terms of the Credit Agreement, HealthSouth "*unconditionally and irrevocably*" guaranteed "the prompt and complete payment and performance when due" of MedCenter's obligations under the Credit Agreement. (Credit Agreement (Kalal Decl., Ex. A) § 11.1 at 57 (emphasis added).)

Admits that SUF 7 accurately recites certain language contained in the Credit Agreement, but for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

8.  The Credit Agreement also provides that HealthSouth's guarantee of MedCenter's obligations was "absolute and unconditional ... without regard to the validity, regularity or enforceability of the Agreement or any Note or any guarantee thereof or right of offset at any time or from time to time held by the Administrative Agent or the Lenders and without regard to any defense, set-off, or counterclaim which may at any time be available to or be asserted." (*Id.* § 11.4 at 58.)

Admits that SUF 8 accurately recites certain language contained in the Credit Agreement, but for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

9.  The Credit Agreement provided that full repayment of all amounts due under the loan — both principal and interest — was due on October 30, 2001. (*Id.* § 2.4(b) at 25 (see pages 15 and 21 for definition of "Maturity Date").)

Admits that SUF 9 accurately recites the Maturity Date as stated in the Credit Agreement, but for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

10. On or about March 30, 2001, UBS extended a $15,000,000 loan to MedCenter pursuant to the Credit Agreement. (Kalal Decl. ¶ 5.)

Denies that UBS AG, Stamford Branch ("UBS AG") made the loan to MCDC because the evidence available to HealthSouth — including exhibits submitted by UBS AG on the pending motion for summary judgment in lieu of complaint (Kalal Declaration ¶17 and Exs. E, K, L and M thereto) — indicates that a different UBS entity (UBS Securities LLC, formerly UBS Warburg LLC) made the loan.

**Amendment No. 1**

11.  On June 12, 2001, MedCenter, HealthSouth and UBS amended the Credit Agreement to extend the loan's maturity date to March 30, 2002. (*See* Amendment No. 1, dated June 12, 2001, (Kalal Decl., Ex. F).) Amendment No. 1 was executed by Mr. Brown on HealthSouth's behalf. (*Id.* at 5.)

Admits that SUF 11 accurately recites that Brown signed a June 12, 2001 amendment to extend the maturity date of the Credit Agreement to March 30, 2002, but denies that this constitutes an agreement of, or binding on, HealthSouth. For reasons stated in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio* because both the underlying loan obligation and the Guarantee were conceived in fraud and entered into by a faithless agent (Brown) who lacked both actual and apparent authority.

12.  In a letter dated June 12, 2001, Mr. Horton stated that the Credit Agreement, as amended, was "duly executed" and "constitute[d] the legal, valid and binding obligations of [HealthSouth]." (Kalal Decl., Ex. G.)

Admits that an opinion was rendered by Horton dated June 12, 2001, but denies that HealthSouth's corporate action constituted the legal, valid and binding obligations of HealthSouth and states that at the time that he issued his written opinion, William Horton was either unaware of the fraudulent nature of the Credit Agreement and the Board of Director's complicity in that fraud, or was himself complicit, in either event invalidating his written opinion.

13.  Amendment No. 1 provides that, "[e]xcept as expressly amended and waived hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms." (Kalal Decl., Ex. F at 3.)

Admits that SUF 13 accurately recites the language of Amendment No. 1 but denies that the Credit Agreement had full force and effect because, for the reasons set forth in HealthSouth's

Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

**Amendment No. 2**

14. On March 28, 2002, MedCenter, HealthSouth and UBS agreed to a second amendment to the Credit Agreement (i) increasing the amount loaned by $5,000,000 (to a total loan amount of $20,000,000) and (ii) extending the maturity date to March 28, 2003. (*See* Amendment No. 2, dated March 28, 2002 (Kalal Decl., Ex. H).) Amendment No. 2 was executed by Mr. Brown on HealthSouth's behalf. (*Id*. at 6.)

Admits that SUF 14 accurately recites that Brown signed a March 28, 2002 amendment to increase the amount of the loan and extend the maturity date to March 28, 2003, but denies that this constitutes an agreement of, or binding on, HealthSouth. For reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio* because both the underlying loan obligation and the Guarantee were conceived in fraud and entered into by a faithless agent (Brown) who lacked both actual and apparent authority.

15. HealthSouth delivered to UBS a duly executed Secretary's Certificate, dated March 28, 2002, attesting to the validity of annexed resolutions by HealthSouth's Board of Directors that authorized the company to enter into the amendment to increase its unconditional guarantee from $15,000,000 to $20,000,000. (Kalal Decl., Ex I.)

Admits that a Secretary's Certificate was executed dated March 28, 2002, but denies that it was "duly executed" and denies that the annexed resolutions by HealthSouth's Board of Directors were valid. For reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio* because both the underlying loan obligation and the Guarantee were conceived in fraud and entered into by a faithless agent (Brown) who lacked both actual and apparent authority. Board approval of the underlying loan obligation and the Guarantee was also invalid because all of the members of the

Board of Directors that resolved to authorize HealthSouth to amend the Credit Agreement had received founders' stock in MCDC either individually, through family members, trusts, or some other capacity. All of the HealthSouth Board of Directors had previously obtained this MCDC stock pursuant to a private stock offering that was not available to the general public and, therefore, these board members were not disinterested.

16. Further, HealthSouth's General Counsel, William Horton, issued a written opinion, dated March 28, 2002, confirming HealthSouth's corporate power to enter into the Amendment No. 2 and the validity of HealthSouth's corporate action. (Kalal Decl., Ex. J.)

Admits that an opinion was rendered by Horton dated March 28, 2002, but denies that HealthSouth's corporate action constituted the legal, valid and binding obligations of HealthSouth and states that at the time that he issued his written opinion, William Horton was either unaware of the fraudulent nature of the Credit Agreement and the Board of Director's complicity in that fraud, or was himself complicit, in either event invalidating his written opinion.

17. Amendment No. 2 provides that that "[e]xcept as expressly amended and waived hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms," (Kalal Decl., Ex I at 4.)

Admits that SUF 17 accurately recites the language of Amendment No. 2 but denies that the Credit Agreement had full force and effect because, for the reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

18. Pursuant to Amendment No. 2, UBS provided, on March 28, 2002, an additional $5,000,000 to MedCenter. (Kalal Decl. ¶ 13.)

Denies that UBS AG made the loan to MCDC because the evidence available to HealthSouth — including exhibits submitted by UBS AG on the pending motion for summary

7

judgment in lieu of complaint — indicates that a different UBS entity (UBS Securities LLC, formerly UBS Warburg LLC) made the loan.

**MedCenter's and HealthSouth's Defaults Under the Credit Agreement**

19.  On March 31, 2003, three days after the maturity date of the Credit Agreement, as amended, UBS invoiced MedCenter in the amount of $20,190,914.86, representing the principal of the MedCenter loan and interest due under the Credit Agreement, as of that date. (Kalal Decl. ¶ 15 & Ex. K.)

Admits that an invoice was sent to MCDC on March 31, 2003 but denies that UBS (a defined term meaning UBS AG) was the invoicing party. Rather, Kalal Declaration Exhibit K reflects that UBS Warburg invoiced MCDC and the funds were simply being transmitted to an account at UBS AG (consistent with HealthSouth's SEC filings identifying UBS Warburg as the lender — Kalal Decl. Exs. E, L and M). Further denies that any amount was "due" because, for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

20.  MedCenter never responded to UBS in any way to, and did not pay, that invoice. (Kalal Decl. ¶ 16.)

Admitted.

21.  On April 27, 2004, July 2, 2004, October 12, 2004, January 5, 2005 and April 6, 2005, UBS invoiced both MedCenter and HealthSouth for the amounts due under the Credit Agreement as of each of those dates. (Kalal Decl. ¶ 19 & Exs. O-S.)

Admits that the referenced invoices were sent on or about the stated dates but denies that the amounts were "due" under the Credit Agreement because, for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

22.  Neither MedCenter nor HealthSouth ever responded to UBS in any way to these invoices. (Kalal Decl. ¶ 20.)

Admitted as to MCDC but denied as to HealthSouth to the extent that this loan is the subject of the Alabama Action, in which the MCDC fraud plays a prominent role and the MCDC loan proceeds are sought as relief.

23.     On July 12, 2005, UBS sent a letter to MedCenter and HealthSouth demanding prompt and complete payment of the total amounts due under the Credit Agreement, which by that time equaled $23,860,613.64. (Kalal Decl. ¶ 21 & Ex. T.)

Admits that the letter was sent but denies that the amounts were "due" under the Credit Agreement because, for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

24.     Neither MedCenter nor HealthSouth ever responded to UBS in any way to that letter. (Kalal Decl. ¶ 22.)

Admitted as to MCDC but denied as to HealthSouth to the extent that this loan is the subject of the Alabama Action, in which the MCDC fraud plays a prominent role and the MCDC loan proceeds are sought as relief.

**HealthSouth's Disclosures In Its SEC Forms 10-K**

25.     HealthSouth disclosed in its 2001 SEC Form 10-K that it had provided a "guaranty of $15,000,000 of indebtedness from MedCenterDirect.com to an outside lender." (Kalal Decl., Ex. D at 64.)

Admits that SUF 25 accurately recites language contained in HealthSouth's 2001 SEC Form 10-K.

26.     In HealthSouth's 2002 and 2003 SEC Form 10-K, HealthSouth stated:

[HealthSouth] provided a guarantee for $20 million of [MedCenter's debt] to UBS Warburg in 2001 ... In September 2003, UBS Warburg called its loan to [MedCenter]. We have recognized a liability under the terms of the guarantee as of September 30, 2003, but, as of December 31, 2004, we have not paid the amounts due under the terms of the guarantee to UBS Warburg.... We reserved the full amount of the advance to [MedCenter] in September 2003.

(Kalal Decl., Ex E at 152.)

Admits that SUF 26 accurately recites language contained in HealthSouth's 2002 and 2003 SEC Form 10-K.

27. In HealthSouth's 2004 SEC form 10-K filed less than six months after UBS's last demand for payment, HealthSouth stated:

> In 2001, we provided a guarantee for $20 million of [MedCenter]'s debt to UBS Warburg. . . . In September 2003, UBS Warburg called its loan to [MedCenter]. We have recognized a liability under the terms of the guarantee as of September 30, 2003, but, as of December 31, 2004, we have not paid the amounts due under the terms of the guarantee to UBS Warburg. . . . We reserved the full amount of the advance to [MedCenter] in September 2003

(Kalal Decl., Ex L at 144.)

Admits that SUF 27 accurately recites language contained in HealthSouth's 2004 SEC Form 10-K.

28. Similarly, in its 2005 SEC form 10-K HealthSouth stated:

> During 2003, UBS called its loan to [MedCenter]. We recognized a liability of approximately $20.0 million under the terms of the guarantee as of December 31, 2003, but have not paid the amounts due under the terms of the guarantee to UBS Warburg as of December 31, 2005.

(Kalal Decl., Ex. M at F-40.)

Admits that SUF 28 accurately recites language contained in HealthSouth's 2005 SEC Form 10-K.

29. HealthSouth's 2006 Form 10-K no longer mentions the MedCenter guarantee by name, but discloses that HealthSouth is "liable for indebtedness owed by third parties in the amount of $27.1 million.... We previously recognized these amounts as liabilities in our consolidated balance sheets because of existing defaults by the third parties under those agreements."

(Kalal Decl., Ex. N.)

The passage is slightly misquoted, and should read: "As of December 31, 2006 and 2005, we <u>were</u> liable <u>for guarantees</u> of indebtedness owed by third parties in the amount of $27.1 million and $30.8 million, respectively." (Emphasis added to indicate corrections). Admits that the remaining language in SUF 29 accurately recites language contained in HealthSouth's 2006 Form 10-K.

**The Amounts Due From HealthSouth**

30. Neither MedCenter nor HealthSouth has paid to UBS the amounts due under the Credit Agreement. (Kalal Decl., ¶ 24.)

Admits that the amounts are unpaid but denies that the amounts were or are "due" under the Credit because, for reasons described in HealthSouth's Memorandum of Law and being litigated in the Alabama Action, the Credit Agreement was void *ab initio*.

31. The Terms of the Credit Agreement, as amended, provide that, as of December 17, 2007, the principal and amount of interest on the loan outstanding is $29,348,336.04, and interest is accruing (based on the current Prime Rate) at $6,029.23 per day. (*See* Kalal Decl. ¶¶ 24, 25, 26, 27.)

Admitted.

Dated: New York, New York
January 18, 2008

                                             **GREGORY P. JOSEPH LAW OFFICES LLC**

                                             By: _____
                                                Gregory P. Joseph (GJ 1210)
                                                (gjoseph@josephnyc.com)
                                        Peter R. Jerdee (PJ 1240) (pjerdee@josephnyc.com)
                                        Sandra M. Lipsman (SL 1220) (slipsman@josephnyc.com)
                                        485 Lexington Avenue, 30th Floor
                                        New York, New York 10017
                                        Telephone: (212) 407-1200

                                     *Attorneys for Defendant HealthSouth Corporation*

607465v1