Gregory P. Joseph (GJ-1210)
Peter R. Jerdee (PJ-1240)
Sandra M. Lipsman (SL-1220)
GREGORY P. JOSEPH LAW OFFICES LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: 212-407-1200

*Attorneys for Defendant HealthSouth Corporation*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UBS AG, Stamford Branch,<br><br>       *Plaintiff,*<br><br>   -against-<br><br>HealthSouth Corporation,<br><br>       *Defendant.* | Index No. 07-CV-8490 (LAP)<br>ECF Case |

### DECLARATION OF DAVID G. HYMER

David G. Hymer declares pursuant to 28 U.S.C. § 1746:

1. I am a member of the Alabama bar and a partner in the firm of Bradley Arant Rose & White LLP, counsel for HealthSouth Corporation ("HealthSouth") in, among other matters, *Tucker v. Scrushy*, Civil Action No. CV-02-5212 (Circuit Ct. Jefferson Co. (the "Alabama Action")), in which UBS Securities, LLC ("UBS Securities") is a defendant. I submit this declaration (1) in opposition to the motion of plaintiff UBS AG, Stamford Branch ("UBS AG") for summary judgment on the guarantee (the "Guarantee") contained in the Credit Agreement, dated March 30, 2001 (the "Credit Agreement") between MedCenterDirect.com ("MCDC"), UBS AG, and others, (2) in support of HealthSouth's motion to dismiss or stay this action in deference to the Alabama Action, and (3) pursuant to Rule 56(f) of the Federal Rules of

Civil Procedure. This declaration is based on personal knowledge and on the documents attached hereto as exhibits (all of which are true and correct copies of the originals).

2.  The Alabama Action is a shareholder derivative action that was commenced on August 28, 2002, by Wade Tucker, a HealthSouth shareholder. The Guarantee is at issue in that action. A copy of the original Complaint in the Alabama Action is annexed as **Exhibit 1**. A copy of the operative Complaints in the Alabama Action, which are the Third Amended Verified Complaint ("TAC") and the Supplemental Complaint and Fourth Amended Verified Complaint, are attached as Exhibits V and W to the Declaration of David J. Kalal dated December 17, 2007 (the "Kalal Dec.").

3.  UBS entities were added as defendants in the TAC after a March 18, 2003 FBI raid on HealthSouth's corporate offices (Kalal Dec. Exs. V at ¶21 & E at 2).

4.  HealthSouth is a party to the Alabama Action and has actively participated in the prosecution of the claims brought on its behalf, including its claims against UBS entities.

5.  Among the fraudulent acts being litigated in the Alabama Action is the claim that disloyal executives of HealthSouth created entities to serve as suppliers to HealthSouth for the purpose of siphoning off money from the Company. *See, e.g.,* TAC (Kalal Dec. Ex. V) at ¶¶91-117.

6.  Several of these shell suppliers — including MCDC — were named as defendants in the Alabama Action. *Id.* at ¶¶ 22-25, 105-113.

7.  The Third Amended Complaint alleges that, in December 1999, former HealthSouth Chairman and Chief Executive Officer Richard M. Scrushy and other disloyal executives caused HealthSouth to loan or invest more than $2,000,000 in MCDC, a healthcare e-procurement company, and took founders' stock in MCDC for themselves. TAC (Kalal Dec. Ex. V) at ¶¶105-106; *see also* Kalal Dec. Exs. D at 64 & E at 151. The TAC further alleges that: (a) disloyal insiders caused HealthSouth to invest millions more in MCDC; (b) caused HealthSouth to enter into a 10-year agreement with MCDC; and (c) given the enormous premiums the market was then placing on dot-com companies, the disloyal executives stood to

make millions by their position as shareholders in MCDC as a result of this 10-year agreement. TAC (Kalal Dec. Ex. V) at ¶¶107-108.

8. **Jason M. Brown.** The Credit Agreement, and both amendments to it, were signed by HealthSouth's then-Vice President of Finance, Jason M. Brown. Kalal Dec. at Exs. A, F & H. The Indictment of Mr. Brown for his role in the fraud at HealthSouth is attached as **Exhibit 2**. The transcript of his Plea of Guilty is attached as **Exhibit 3**. The Plea Agreement is attached as **Exhibit 4**, and the transcript of Brown's Sentencing Hearing is attached as **Exhibit 5** (*see* pp. 86-88, at which United States District Court Judge Sharon Blackburn stated: "You are guilty of participating in a massive corporate fraud. . . . [T]he magnitude of it is mind boggling to me.").

9. **The UBS/HealthSouth Relationship.** I will not go into the extensive investment banking relationship between HealthSouth and UBS investment bankers Benjamin Lorello and William McGahan. Suffice it to say that I believe it is undisputed that: (a) the relationship dates back to the 1980s, when Lorello was the head of the healthcare group at what became Salomon Smith Barney ("SSB"); (b) Lorello advised HealthSouth on its initial public offering and many financial transactions thereafter; and (c) Lorello's colleague and subordinate, McGahan, became the chief coverage banker for HealthSouth prior to Lorello and McGahan's move to UBS in 1999, two years before the Credit Agreement was signed, and retained that capacity thereafter. *See* **Exhibit 6** (excerpts from the May 9, 2006 trial proceedings in the matter of the *United States v. Siegelman*, 2:05cr119-F (M.D. Ala.) at 136-140); **Exhibit 7** (February 25, 1987 letter from Lorello to Scrushy regarding a public offering of HealthSouth common stock or convertible debentures); **Exhibit 8** (excerpts from Martin's testimony at Scrushy's criminal trial, volume 23, at 6576).

10. According to HealthSouth's 2002-03 SEC 10-K, Lorello, McGahan and their investment banking colleagues arranged funding for other HealthSouth-related entities in which Scrushy and other HealthSouth executives took ownership positions, including First Cambridge HCI Acquisitions, LLC ("First Cambridge") and Source Medical Solutions, Inc. ("Source

Medical" or "SMS"). *See* **Exhibit 9** (excerpts from HealthSouth's 2002-03 SEC 10-K at 151 (MCDC), 153 (Source Medical), and 155 (First Cambridge)). According to a March 27, 2001 memorandum regarding a meeting of UBS's Leveraged Finance Commitment Committee (attached hereto as **Exhibit 10**), UBS provided, and HealthSouth guaranteed, loans to these entities as a result of the efforts of Lorello, McGahan, and their investment banking colleagues. The memorandum states that UBS's MCDC loan was "purely a relationship concession to HealthSouth, with the full sponsorship of UBS's HealthCare CFD [Corporate Finance] team. HealthSouth is a key relationship for CFD and LFG [Leveraged Finance Group] having generated more than $[9] million in financing fees over the last 9 months. We expect that this flow of lead managed business will continue …."

11.     According to HealthSouth's 2002-03 SEC 10-K, UBS ultimately loaned $82.5 million to First Cambridge and $20 million to MCDC, and HealthSouth guaranteed both loans. *See* **Exhibit 11** (excerpts from HealthSouth's 2002-03 SEC 10-K at 152 (MCDC) & 155 (First Cambridge)). In addition, according to documentation produced at a Congressional hearing on the financial collapse of HealthSouth, Scrushy was seeking a $24 million loan for Source Medical that McGahan was attempting to secure at UBS at the time of the 2003 FBI raid. *See* **Exhibit 12** (March 6, 2003 emails from McGahan to Roderick O'Neill, Michael Leder, and Lorello); **Exhibit 13** (February 26, 2003 Global Syndicated Finance Commitment Meeting Concerning Proposed Loan to Source Medical Solutions, Inc.).

12.     **UBS's Awareness of the Fraud.** According to former HealthSouth CFO Michael Martin's sworn testimony at Scrushy's criminal trial, William McGahan knew about the larger accounting fraud that was being perpetrated at HealthSouth. *See* **Exhibit 14** (excerpts from Martin's testimony at Scrushy's criminal trial, Volume 24, at 6755-6759). Martin testified that, in the context of a proposed merger between HealthSouth and HCR Manor Care, he became concerned that if the merger proceeded, the fraud would be uncovered either during the due diligence phase of the transaction or after the merger closed (when Manor Care's CEO, Paul Ormand, would be CEO of the merged entity). *See* **Exhibit 15** (excerpts from Martin's

4

testimony at Scrushy's criminal trial, Volume 24, at 6745-6752). Martin also testified that he told McGahan in the summer of 1999 that HealthSouth was missing its numbers by approximately $300 million and that, if HealthSouth went forward with the Manor Care deal, they would all go to jail for the fraudulent coverup. *See* **Exhibit 16** (excerpts from Martin's testimony at Scrushy's criminal trial, Volume 24 at 6755-59 and Volume 25 at 7024-7029, 7038-7039, 7042).

13. William McGahan also testified before Congress that he kept Benjamin Lorello, the Head of Global Healthcare Finance Group for UBS, informed about HealthSouth matters and that Lorello kept track of what was going on. *See* **Exhibit 17** (excerpt from November 5, 2003 Congressional Testimony). Emery Harris, a former assistant comptroller at HealthSouth also testified that he and his accounting team heard a voicemail to Mike Martin from Benjamin Lorello that would indicate that Lorello was aware of the fraud at HealthSouth. *See* **Exhibit 18** (excerpt of trial testimony of Emery Harris) at 158).

14. According to documentation produced at a Congressional hearing on the financial collapse of HealthSouth, Howard Capek, the UBS Securities analyst that covered HealthSouth, sent private emails to a client describing HealthSouth as a "mess," its stock as a "pig," and saying he "would not own a share of this stock." Capek's statements in these e-mails directly contradicted analyst reports published by Capek that rated HealthSouth stock as a "buy" or "strong buy." *See* **Exhibit 19** (emails from Howard Capek to Susan Zeeb dated August 19, 1999 and September 10, 1999); **Exhibit 20** (Appendix 6 from Securities Class Action Complaint, listing false statements made by Capek in UBS analyst reports).

15. **The UBS Defendants in the Alabama Action.** On August 8, 2003, two UBS entities — UBS Group and UBS Investment Bank — were named as defendants in the Alabama Action. *See* Third Amended Complaint at ¶21.

16. On October 17, 2003, the UBS defendants moved to dismiss the Third Amended Complaint. In UBS Securities LLC's Motion to Dismiss the Third Amended Complaint, or Alternatively, to Stay the Action (*see* **Exhibit 21** hereto (the "2003 Motion to Dismiss")), the

UBS defendants represented to the Alabama Court that the "true and correct name" of the UBS "entities identified in the Third Amended Complaint . . . is UBS Securities LLC ('UBS Securities'), formerly known as UBS Warburg LLC." *Id.* at 1. The UBS defendants also stated that "'UBS Group' and 'UBS Investment Bank' are non-existent legal entities and, as such, were not parties to any investment banking contract or relationship with HealthSouth . . . ." *Id.*

17. Based on these representations, UBS Securities LLC was named as a defendant in the Alabama Action on March 25, 2004 (Kalal Dec. Ex. W at ¶234).

18. The derivative plaintiff (Tucker), HealthSouth, and the Alabama Court devoted a substantial amount of time and energy towards resolving the issue of which UBS entity was the appropriate defendant in the Alabama Action. *See, e.g.,* UBS Securities LLC's Motion to Reconsider at ¶2 (a copy of which is attached as **Exhibit 22**); Plaintiff Tucker's Objections and Responses in Opposition to Defendant UBS Securities LLC's Motion to Reconsider Order of March 3, 2005 at 4-5 ("Tucker's Objections to UBS's Motion to Reconsider") (a copy of which is attached as **Exhibit 23**.) The Alabama Court eventually dismissed both UBS Group and UBS Investment Bank, making it clear that, in "the event discovery reveals that either UBS Group or UBS Investment Bank is a legal entity, . . . plaintiff's right to seek leave for their readdition as defendants is hereby reserved." *See* Modified Order Denying Motion to Dismiss Brought by UBS at ¶7 ("Modified Order") (a copy of which is attached as **Exhibit 24**).

19. **UBS Conduct at Issue in Alabama.** The Third Amended Complaint alleges, among other things, that UBS aided and abetted the disloyal HealthSouth executives' breaches of fiduciary duty, conspired with those executives, and helped perpetuate the disloyal executives' fraudulent accounting scheme. *See, e.g.*, Kalal Dec. Ex. V (TAC) at ¶¶1, 21, 83-90, 105-13, 130-34, 165-72, 195-200, 204-11, and Prayer for Relief; 2003 Motion to Dismiss (Exhibit 21 hereto) at 9 (recognizing that each of the "claims against the UBS Parties . . . sound in fraud").

20. The Third Amended Complaint alleges that the MCDC loan was arranged and secured by UBS employees who, with knowledge of the fraudulent accounting practices at HealthSouth, conspired with and aided and abetted HealthSouth's disloyal officers in breaching

6

their fiduciary duties and using MCDC for their own personal financial benefit. Kalal Dec. Ex. V (TAC) at ¶134(e) (alleging that MCDC was "central to the allegations herein[,]" that one of HealthSouth's disloyal corporate officers served on MCDC's board, and that that disloyal corporate officer did "many transactions with the UBS Parties," including a transaction whereby "UBS funded and raised investment capital for MCDC"); *see also id.* at ¶¶105-113 (alleging MCDC fraud); Prayer for Relief ¶VIII (seeking "[r]epayment of . . . other loans made, and monies owed with respect to Defendants").

21.    **UBS's Rule 9(b) Motion in Alabama.** In their Memorandum in Support of the Motion to Dismiss, in 2004, the UBS defendants challenged the sufficiency of the allegations of the Third and Fourth Amended Complaints under ALABAMA RULE OF CIVIL PROCEDURE 9(b). *See* **Exhibit 25** (2004 Motion to Dismiss) at 9. The Alabama Court denied the motion, ruling:

> [1] [Tucker] has adequately stated claims against UBS based on five legal theories, namely (a) aiding and abetting breaches of fiduciary duty by the director and officer defendants, a Delaware tort sometimes called 'civil conspiracy,' (b) direct breaches of fiduciary duty by UBS, (c) the tort of suppression, (d) unjust enrichment, and (e) breaches of contract. This Court finds that Tucker has stated these claims against UBS with adequate specificity as required by the Rules of Court, particularly Rule 12(b)(6); . . .
>
> [2] Tucker has pled all allegations of fraud and fraudulent acts with adequate specificity to meet the pleading requirements of Rule 9(b).

Modified Order at ¶¶ 5, 6 at Exhibit 24.

22.    After the Alabama Court rejected its Motion to Dismiss, UBS Securities filed its Answer to the Third Amended Complaint and the Supplemental and Fourth Amended Complaint and Counterclaims ("Answer") (a copy of which is attached as **Exhibit 26**). In its Answer, UBS Securities "admit[ted] that [it] provided a loan to MCDC. . . ." *Id.* at ¶134. UBS Securities also asserted several counterclaims against HealthSouth. *Id.* at 49-73. The answer and counterclaim was filed on behalf of UBS Securities by the same law firm that represents UBS AG in the present action.

23.     **Alabama Court Order Prohibiting UBS Defendants from Litigating in New York.**  In the Alabama Action, UBS Securities attempted to secure the right to litigate its contract-based claims in New York instead of Alabama on the basis of a New York forum selection clause in its engagement letters.  *See* Exhibit 25 (2004 Motion to Dismiss) at 20; *see also* **Exhibit 27** (UBS Securities' Reply Mem. of Law in Further Support of its Motion to Dismiss the Fourth Amended Complaint) at 16-18.

24.     The forum selection clause issue was a hotly contested one in Alabama and everyone — Tucker, HealthSouth, UBS, and the Alabama Court — devoted a substantial amount of time and energy towards its resolution.  *See, e.g.*, **Exhibit 28** (Plaintiff's Response to UBS Parties' Motion to Dismiss) at 7-10; **Exhibit 29** at 2-3 (November 5, 2004 letter from UBS's counsel to the Alabama Court); **Exhibit 30** at 47-65 (November 10, 2004 hearing on UBS's Motion to Dismiss).

25.     The Alabama Court denied UBS Securities' motion to enforce the New York forum selection clause, ruling, *inter alia*:  (1) that "the contract claims herein against UBS are inextricably intertwined with the other claims against UBS as well as other claims against other parties, being based on the same nucleus of operative facts;" (2) that "it would be seriously inconvenient and unreasonable to send off one smaller part of this case to New York while retaining most of it here"; and (3) that enforcing the New York forum selection clause "would upset the carefully crafted co-ordination orders in effect in three jurisdictions regarding the case management of these complex derivative suits, including the Co-ordination Order of July 14, 2003 herein, and would result in duplicative discovery and trial."  *See* Exhibit 24 (Modified Order) at ¶3(a)-(c).

26.     **UBS Reverses Position in Alabama.**  On November 16, 2007, years after filing its initial answer in the Alabama action and then only after HealthSouth's Notice of Removal in this action highlighted UBS Securities' admission in the Alabama Action that it was the UBS entity that had made the $20 million MCDC loan, UBS Securities filed an amended answer in the Alabama Action in which it attempted to retract its previous admission.  *See* UBS Securities

LLC's Amended Answer to the Third Complaint and the Supplemental and Fourth Amended Complaint (a correct copy of which is attached as **Exhibit 31**).

27. The plaintiff in the Alabama Action has moved to strike UBS Securities' Amended Answer. Should that motion be denied, an amended complaint will be filed in the Alabama Action adding UBS AG as a defendant in that action. See Plaintiff's Motion to Strike UBS Securities' Amended Answer to the Third Complaint and the Supplemental and Fourth Amended Complaint (**Exhibit 32** hereto), and Plaintiff's Brief in Support of that motion (excerpted with some exhibits attached at **Exhibit 33** hereto).

28. **UBS-Related Discovery in the Alabama Action.** Millions of pages of documents have been produced in the Alabama Action. Thirty-four depositions have been taken to date. A search of the document repository reveals that UBS has produced 692,286 pages, UBS employees have produced 11,526 pages, and HealthSouth has produced at least 20,844,527 pages. No fewer than 17,736 of the documents produced relate to MCDC. Of those, 2,485 documents (not pages) were produced by UBS.

29. On November 28, 2007, interrogatories and requests for the production of documents were served on UBS in the Alabama Action which relate to MCDC as well as to other issues in that action. See **Exhibit 34** (Plaintiff's First Set of Interrogatories and Request for Production of Documents) at ¶10(c) (requesting, among other things, that UBS itemize "each and every . . . loan or credit facility to or for HealthSouth, a HealthSouth-related entity, or an officer or director of HealthSouth or a HealthSouth-related entity"). UBS responded to those discovery requests on January 16, 2008. See **Exhibit 35** (Responses and Objections to Plaintiff's First Set of Interrogatories and Request for Production of Documents to UBS Warburg).

30. To date, the depositions of seven present or former UBS employees have already been taken and at least nine more are expected to be taken in the coming months. Several depositions of present or former UBS employees were scheduled to be taken in January 2008

before they were temporarily postponed by the Alabama Federal Court[1] to afford UBS time to review voluminous third-party documents recently produced in that litigation. *See* Discovery Order No. 5, attached hereto as **Exhibit 37**. As of the date of this Declaration, the depositions of former UBS employees Rod O'Neal and William McGahan are scheduled to be taken in New York, New York on March 5, 2008 and March 12, 2008 respectively.

31.     David Bawden, the chief credit officer for UBS Investment Bank, was recently deposed concerning various loans that UBS made — and which HealthSouth guaranteed — to the various entities (including MCDC) created by Scrushy and other former HealthSouth executives.

32.     Discovery in the Alabama Action is being conducted pursuant to a stipulated confidentiality agreement which precludes HealthSouth and its attorneys from disclosing to the Court in this action many of the documents that have been produced in the Alabama Action. *See* **Exhibit 38** (Stipulated Confidentiality Agreement). In an exercise of caution, I have not affixed to my declaration deposition transcripts or documentation that UBS has produced in the Alabama Action (regardless of whether the transcripts or documents were designated as confidential). Instead, I have attached documentation that was produced publicly in connection with a Congressional hearing on the financial collapse of HealthSouth.

33.     **UBS-Related Discovery Necessary To Defend This Action.** The discovery needed by HealthSouth to defend itself against the claims made by UBS AG in the instant action is already actively underway in Alabama. It would be inefficient and create significant

---

[1] In addition to the Alabama Action, a consolidated class action filed on behalf of HealthSouth's stockholders and bondholders is pending in the United States District Court for the Northern District of Alabama (the "Alabama Federal Court"). In that action, the stock and bondholders allege a massive, complex scheme to defraud HealthSouth's stockholders and bondholders by falsifying and manipulating HealthSouth's financial statements in order to artificially inflate the price of HealthSouth's securities to meet or exceed Wall Street's expectations. *See* Joint Am. Consolidated Class Action Compl. for Violations of the Federal Securities Laws [Factual Basis] at 1-29 (excerpts of which are attached as **Exhibit 36**). UBS entities, including UBS AG, are defendants in the stockholder and bondholder action as well. *Id.* at ¶122. A coordinated discovery schedule governs both the Alabama Action and the stockholder and bondholder class action.

unnecessary expense to require the parties to duplicate that discovery in the instant action. Should it be necessary to do so, HealthSouth is prepared to propound discovery and issue deposition notices in New York in order to develop its defenses and to respond to the arguments UBS has asserted in its motion for summary judgment.

34.     If this matter is not dismissed or stayed in deference to the Alabama Action, then in order for HealthSouth to defend itself in this matter, it is crucial that HealthSouth be permitted to conduct discovery aimed at determining, at the very least, (i) which UBS entity made the loans to MCDC; (ii) whether UBS was complicit in, or had knowledge of, the massive accounting fraud that was being perpetrated on HealthSouth at the time the loans were made; (iii) whether HealthSouth's disloyal former executives lacked the actual or apparent authority to bind the Corporation in connection with the guarantee associated with the MCDC loan; (iv) whether UBS, as an aider-and-abettor and co-conspirator, was aware that HealthSouth's disloyal executives were acting adversely to HealthSouth's interests at the time they caused HealthSouth to guarantee UBS's MCDC loan; and (v) the circumstances surrounding HealthSouth's posting of an accounting liability on its balance sheet with respect to that guarantee and disclosures regarding that posting to which UBS has pointed as a supposed admission of legal liability by HealthSouth.

35.     To discover evidence crucial to its defense in this matter, HealthSouth will need to depose several former and current employees of UBS and HealthSouth. The following is a list of those whom HealthSouth would seek to depose together with a brief description of some of the testimony HealthSouth would seek to elicit:

a. **Richard M. Scrushy** – HealthSouth's former Chairman and Chief Financial Officer; actively involved in the massive accounting fraud that was perpetrated on HealthSouth; involved in the creation of MCDC and procuring loans for MCDC from both UBS and HealthSouth.

b. **Michael Martin** – former HealthSouth Chief Financial Officer; actively involved in the massive accounting fraud that was perpetrated on HealthSouth; in regular contact with UBS's William McGahan; informed McGahan about the massive HealthSouth accounting fraud.

11

c. **William T. Owens** – a former HealthSouth officer, member of HealthSouth's Board of Directors, and HealthSouth's Chief Financial Officer, President, and Chief Operating Officer; actively involved in the massive accounting fraud that was perpetrated on HealthSouth.

d. **William Horton** – HealthSouth's former general counsel, executive Vice President, and Assistant Secretary; issued written statements wherein he opined that HealthSouth had the authority to guarantee the MCDC loan, among other things.

e. **Jason Brown** – HealthSouth's former Vice President of Finance; signed the Credit Agreement on which UBS AG sues (and both amendments to it) purportedly on HealthSouth's behalf; pled guilty to conspiracy and criminal forfeiture in connection with his role in the massive HealthSouth accounting fraud and was sentenced to a year and a day in prison.

f. **William McGahan** – one of UBS's senior officers; the coverage officer for HealthSouth; co-conspirator in the massive accounting fraud that was perpetrated on HealthSouth; aided and abetted disloyal HealthSouth insiders in breaching their fiduciary duties to the Company.

g. **Benjamin Lorello** – one of UBS's senior officers; responsible for taking HealthSouth public; co-conspirator in the massive accounting fraud that was perpetrated on HealthSouth; aided and abetted disloyal HealthSouth insiders in breaching their fiduciary duties to the Company.

h. **Daniel W. Ladd III** – an Executive Director at UBS; signed the Credit Agreement on behalf of UBS AG, Stamford Branch as Administrative Agent; signed the Credit Agreement's first amendment on behalf of UBS AG, Stamford Branch as Administrative Agent and Lender.

   i. Mr. Ladd may have co-authored a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's Leveraged Finance Commitment Committee ("LFCC") and the Credit Risk Management Americas ("CRM"); the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

i. **Dorothy L. McKinley** – Director of Banking Products Services, US at UBS; signed the Credit Agreement on behalf of UBS AG, Stamford Branch as Administrative Agent; signed the Credit Agreement's first amendment on behalf of UBS AG, Stamford Branch as Administrative Agent and Lender.

j. **Patricia O'Kicki** – Director of Banking Products Services at UBS; signed the Credit Agreement's second amendment on behalf of UBS AG, Stamford Branch as Administrative Agent and Lender.

k.  **Barbara Ezell-McMichael** – Associate Director of Banking Products Services at UBS; signed the Credit Agreement's second amendment on behalf of UBS AG, Stamford Branch as Administrative Agent and Lender.

l.  **David Barth** – works (or worked) at UBS; may have co-authored a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

m.  **Frank Hoener** – works (or worked) at UBS; may have co-authored a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

n.  **Alex Geier** – works at UBS; may have co-authored a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

o.  **Michael Leder** – works (or worked) at UBS; authored or co-authored a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

p.  **Roderick O'Neill** – worked at UBS; copied on a March 27, 2001 memorandum re: HealthSouth Corporation / MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

   i.  Was terminated by UBS for improprieties relating to his investment banking work on behalf of HealthSouth; orchestrated a cover-up of the improper disclosure of non-public information concerning HealthSouth to a UBS equity research analyst in violation of UBS policies and procedures

q.  **Phillip Pucciarelli** – works (or worked) at UBS; may have been copied on a March 27, 2001 memorandum re: HealthSouth Corporation /

      MedCenterDirect.Com, Inc. to UBS's LFCC and CRM; the purpose of the memorandum was "to obtain approval to provide [MCDC] . . . with a $15 million 7-months term loan facility"; the memorandum also states that the "financing is purely a relationship concession to HealthSouth, with the full sponsorship of UBSW's Healthcare CFD team."

  r. **Scott Wollard** – UBS's Associate Director (Global Healthcare Group); had knowledge of and exposed cover-up orchestrated by Rod O'Neal referenced above.

  s. **Howard Capek** – UBS's Former Managing Director (Equity Research and Healthcare Group); co-conspirator in the massive accounting fraud that was perpetrated on HealthSouth; aided and abetted disloyal HealthSouth insiders in breaching their fiduciary duties to the Company; a healthcare stock analyst that issued coverage reports on HealthSouth; publicly touted HealthSouth stock with ratings of "strong buy" and "buy" but privately wrote to a favored client that HealthSouth was a "mess" and a "pig" and that he "would not own a share of this stock."

  t. **Geoff Harris** – Howard Capek's predecessor as a healthcare stock analyst who covered HealthSouth's stock; published a negative research report in September 1998 which lowered UBS's earnings estimates for HealthSouth by ten cents per share; Capek issued a report in June 1999 which apologized for Harris' September 1998 report and stated that Harris' estimate had not been well executed.

  u. **David Bawden** – UBS's Chief Credit Officer; attended UBS's Finance Commitment Committee meetings and expressed reservations about loaning money to HealthSouth and HealthSouth's affiliated but unrelated entities (such as Source Medical, First Cambridge, and MCDC).

36.   HealthSouth will also need to issue requests for the production of documents to UBS and, potentially, to other third parties that HealthSouth cannot yet (absent discovery) identify.

37.   Without the requested discovery, evidentiary materials necessary to refute UBS's dispositive motion are unavailable and, accordingly, a ruling on UBS' Motion for Summary Judgment would be premature.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 17, 2008.

_____
David G. Hymer