IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-03-B-0338-S |
| | ) | |
| JASON BROWN | ) | |

## INFORMATION

The United States Attorney charges, that at all times material to this Information:

**Count 1**
**Conspiracy to Commit Securities Fraud; False Books and Records and Wire Fraud**
**Title 18, United States Code, Section 371**

### INTRODUCTION

1.  Defendant **JASON BROWN** was employed at HealthSouth Corporation ("HealthSouth") since 1994. Defendant **BROWN** worked in the accounting division from the beginning of his employment until mid-1996. From mid-1996 until the end of 1997, **BROWN** worked in the Corporate Development Department. He then moved to the Treasury Department. In May of 2000, defendant **BROWN** was promoted to the position of Vice President -- Finance.

2.  HealthSouth was a corporation organized under the laws of the State of Delaware with its headquarters in Birmingham, Alabama. HealthSouth claimed to be the nation's largest provider of outpatient surgery, diagnostic imaging and rehabilitative healthcare services with approximately 1800 locations in all 50 states, Puerto Rico, the United Kingdom, Australia, and

Canada. HealthSouth's common stock was listed on the New York Stock Exchange.

3. HealthSouth was an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934 ("the Act"). To sell securities to members of the public and maintain public trading of its securities in the United States, HealthSouth was required to comply with the provisions of the federal securities laws, including Section 13(a) of the Act (Title 15, United States Code, Sections 78m(a) and 78o(d)) and the regulations promulgated thereunder, that were designed to ensure that the company's financial information was accurately recorded and disclosed to the public.

4. Under provisions of the federal securities laws and the provisions promulgated thereunder, HealthSouth was required to, among other things (a) file with the SEC annual financial statements audited by an independent accountant; (b) file with the SEC quarterly updates of its financial statements that disclosed its financial condition and the results of its business operations for each three-month period; (c) make and keep books, records and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets; and (d) devise and maintain a system of internal accounting controls sufficient to provide – (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

5.  From 1986, when HealthSouth issued its initial public offering, it filed quarterly reports, called Forms 10-Q, and annual reports, called Forms 10-K, with the United States Securities and Exchange Commission ("SEC"), which is located in Washington, D.C. These reports were transmitted directly and indirectly from HealthSouth's offices in Birmingham, Alabama to the offices of RCI Group, Inc. in Washington, D.C., a filing agent that assists companies in electronically filing periodic reports with the SEC, and were thereafter transmitted electronically to and filed electronically with the SEC, where they were available to the investing public.

## CERTAIN RELEVANT ACCOUNTING PRINCIPLES

6.  Public companies, such as HealthSouth, typically report the financial results of their operations in financial statements that include both an Income Statement and a Balance Sheet. A company's Income Statement reports, among other things, revenue recognized, expenses incurred and income earned during a stated period of time – usually for a fiscal quarter or fiscal year. Within an Income Statement, expenses are generally subtracted from revenues to calculate net income. A company's Balance Sheet reports, among other things, the assets and liabilities of a company at a point in time, usually at the end of a fiscal quarter or the end of a fiscal year.

7.  Since GAAP generally require that any increase in revenue or decrease in expenses be matched with either an increase in assets or decrease in liabilities on the Balance Sheet, any manipulation resulting in an increase in income or revenues would require a corresponding entry on the Balance Sheet.

3

## HEALTHSOUTH'S COMMUNICATIONS WITH INVESTORS

8. The management of many public companies, including HealthSouth, provided "guidance" to the investing public regarding anticipated earnings per share for upcoming reporting periods. Relying in part on a company's "guidance," many professional securities analysts disseminated to the public their own estimates of the company's expected performance. These "earnings estimates" or "analyst expectations" were closely followed by investors. Often, if a company announces earnings that fail to either meet or exceed analyst expectations, the price of the company's securities will decline.

9. Numerous analysts of major Wall Street investment firms followed HealthSouth's performance and issued "guidance" estimates regarding its expected earnings. These analysts considered, among other things, HealthSouth management's "guidance" concerning estimated revenue, income and earnings per share, to gauge HealthSouth's performance, financial condition, and to predict HealthSouth's expected earnings. Similarly, market participants and members of the investing public considered and relied upon HealthSouth's periodic financial statements, including the reports filed with the SEC and guidance concerning actual operating results.

## HEALTHSOUTH'S EARNINGS SHORTFALLS

10. Beginning at least in or about 1996, a group of HealthSouth's senior officers, which included the then Chief Executive Officer (the "CEO"), (collectively, the "Senior Officers") and others, recognized that HealthSouth's financial results were failing to produce sufficient earnings per share to meet or exceed Wall Street "earning expectations" or "analyst expectations." The Senior Officers and others recognized that the earnings shortfall created a

4

substantial risk that, unless HealthSouth's earnings per share were artificially inflated, HealthSouth's earnings would fail to meet analyst expectations and the market price of HealthSouth's securities would likely decline. Defendant **BROWN** would and did become aware of the HealthSouth's earnings shortfalls and the potential adverse effect on HealthSouth's stock price if these shortfalls were disclosed to the public.

## THE CONSPIRACY

11. Between in or about the summer of 2002 and in or about 2003, in the Northern District of Alabama and elsewhere, the defendant,

## JASON BROWN

knowingly and willfully joined a conspiracy with other persons to commit offenses against the United States, that is, a conspiracy to:

(1) to willfully and knowingly make and cause to be made false and misleading statements of material fact in applications, reports and documents required to be filed under the Securities and Exchange Act of 1934 and the rules and regulations thereunder in violation of Title 15, United States Code, Sections 78m(a) and 78ff and Title 17, Code of Federal Regulations, Sections 240.13a-1; 13a-13 and 13b2-2;

(2) to willfully and knowingly falsify books, records and accounts of HealthSouth in violation of Title 15, United States Code, Sections 78m(b) (2) (A) & (B), 78m(b) (5) and 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-1; and

(3) to devise and attempt to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises and to knowingly transmit and cause to be transmitted, by means of wire

communication, in interstate and foreign commerce, writings, signs, signals and sounds for the purpose of executing such scheme and artifice in violation of Title 18, United States Code, Section 1343.

## THE PURPOSE OF THE CONSPIRACY

12. The purpose of the conspiracy was for the Senior Officers and others to fraudulently enrich themselves by inflating artificially HealthSouth's publicly reported earnings and earnings per share and by fraudulently enhancing its reported financial condition.

## THE MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and others sought to accomplish the conspiracy included, among other things, the following:

13. It was a part of the conspiracy that the Senior Officers of HealthSouth and others would and did engage in a scheme to artificially inflate HealthSouth's publicly reported earnings and the value of its assets.

14. It was further part of the conspiracy that false entries were made in HealthSouth's books and records for the purpose of artificially inflating HealthSouth's revenue and earnings.

15. It was further part of the conspiracy that corresponding false entries were made in HealthSouth's books and records for the purpose of artificially inflating the value of its assets, including, but not limited to, false entries made to (a) Property, Plant and Equipment ("PP&E") accounts; (b) cash accounts; (c) inventory accounts; (d) intangible asset (goodwill) accounts; and (e) HealthSouth's investment portfolio.

16. It was further part of the conspiracy that the Senior Officers and others caused HealthSouth to file publicly with the SEC annual reports and quarterly reports that materially

misstated, among other things, HealthSouth's net income, revenue, earnings per share, assets and liabilities from at least 1998 until the present. As a result of the scheme, HealthSouth's revenue, earnings and assets were inflated by hundreds of millions of dollars in publicly filed reports.

17.     It was further part of the conspiracy that in order to ensure that HealthSouth's balance sheets would have sufficient assets on its books to correspond to the fraudulently created income and revenue figures for a current period, the Senior Officers would fraudulently inflate the value of assets on HealthSouth's balance sheet by, among other ways, delaying the recording of certain asset sales until subsequent fiscal periods.

18.     It was further part of the conspiracy that in 2001, after HealthSouth sold approximately $27 million in the stock of another publicly traded company, the Senior Officers failed to, and did not, record the stock sale on HealthSouth's books. Thus, HealthSouth's books and records fraudulently represented that the stock was an asset in HealthSouth's investment portfolio, even though the stock had been sold.

19.     It was further part of the conspiracy that HealthSouth's Form 10-K for the year ended December 31, 2001, which was filed with the SEC in Washington, D.C., included in the line item for other assets more than $27 million in the stock of a publicly traded company, when, in truth and fact, HealthSouth had sold that stock in 2001.

20.     It was further part of the conspiracy that in 2002, several of the Senior Officers created and caused to be created false and fraudulent records showing HealthSouth's sale of the stock of a publicly traded company in stock in 2002, when, in truth and fact, the stock had been sold by HealthSouth for approximately $27 million in 2001.

21. It was further part of the conspiracy that defendant **BROWN** was instructed to, and did, create false and fraudulent records showing HealthSouth's sale of the stock of the publicly traded company in 2002, when, in truth and fact, the stock was sold by HealthSouth in 2001.

22. It was further part of the conspiracy that defendant **BROWN** provided the false and fraudulent stock sale document to others in HealthSouth's Treasury Department and accounting staff who provided the bogus spreadsheet to HealthSouth's auditors.

23. It was further part of the conspiracy that at the instruction of other Senior Officers, defendant **BROWN** and others falsified records concerning HealthSouth's "same-store volume" figures for the third quarter of 2002 and provided that false and fraudulent information directly and indirectly to Wall Street analysts who covered HealthSouth and to the public.

24. It was further part of the conspiracy that defendant **BROWN** and others, unlawfully, willfully, and knowingly, directly and indirectly, falsified and caused to be falsified, books, records and accounts which, in reasonable detail, accurately reflected the transactions and dispositions of the assets of HealthSouth including, but not limited to: (1) The records relating to HealthSouth's 2001 sale of approximately $27 million of stock in another publicly traded company; and (2) records purporting to show HealthSouth's "same-store volume" figures for the third quarter of 2002.

## OVERT ACTS

25. In furtherance of the conspiracy and to achieve the objects thereof, the conspirators committed and caused to be committed the following acts, among others, in the Northern District of Alabama and elsewhere:

(1) On or about March 3, 2002, the Senior Officers caused HealthSouth to send by wire from Birmingham, Alabama to Washington, D.C. for delivery to the SEC the company's Form 10-K for 2001 which falsely included as an asset more than $27 million in the stock of another publicly traded company.

(2) In or about the Summer of 2002, defendant **BROWN** prepared a spreadsheet falsely and fraudulently showing the disposition of shares of stock in a publicly traded company during 2002, when, in truth and fact, the stock had been sold by HealthSouth in 2001.

(3) In or about the Summer of 2002, defendant **BROWN** provided the bogus spreadsheet to another HealthSouth employee for delivery to HealthSouth's auditors.

(4) In or about late 2002, defendant **BROWN** altered the same-store volume figures for the third quarter of 2002 in HealthSouth's books and records.

(5) In or about late 2002, defendant **BROWN** caused false and fraudulent same-store volume information to be included in a press release which was sent via interstate wire to HealthSouth analysts and the public.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Forfeiture
### Title 18, United States Code, Section 981(a)(1)(C) &
### Title 28, United States Code, Section 2461(c)

The United States Attorney further charges:

1. That Count One of this Information is incorporated by reference herein for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. As a result of the foregoing offenses alleged in Count One of this Information, the defendant,

**JASON BROWN**

shall forfeit to the United States any property constituting or derived from proceeds traceable to said violation committed by him. Such forfeitable interests include, but are not limited to, any and all interest and proceeds derived therefrom.

3. If any of the property described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant,

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred to, sold to, or deposited with a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant, up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

*Alice H. Martin* by *Smith*
ALICE H. MARTIN
United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

*Mike Rasmussen*
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

by: *Richard C. Smith*
RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice

*George A. Martin Jr.*
GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

*Richard N. Wiedis* by *Smith*
RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

*J. Patton Meadows*
J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama

11