1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4

5

6  UNITED STATES OF AMERICA,      *    CR-03-B-338-S

7         V.                      *    December 21, 2005

8  JASON BROWN,                   *    Birmingham, Alabama

9         Defendant.              *    10:05 a.m.

10  * * * * * * * * * * * * * * * * * * * * * * * * * * *

11              REPORTER'S OFFICIAL TRANSCRIPT OF

12                   SENTENCING HEARING

13

     BEFORE THE HONORABLE SHARON LOVELACE BLACKBURN

14              UNITED STATES DISTRICT JUDGE

15

16

17

18

   COURT REPORTER:              Julie A. Martin, RMR, CRR

19                              Federal Official Court Reporter
                                1729 Fifth Avenue North, Ste 325

20                              Birmingham, Alabama  35203

21

22

23

24

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer

```
1                              * * * * *

2                      A P P E A R A N C E S

3                              * * * * *

4
     FOR THE UNITED STATES:          James Ingram
5                                    U.S. Attorney's Office
                                     1801 4th Avenue North
6                                    Birmingham, Alabama   35203

7

8

9
     FOR THE DEFENDANT:              Joseph C. Espy, III
10                                   C. Mark Bain
                                     MELTON ESPY & WILLIAMS
11                                   301 Adams Avenue
                                     PO Drawer 5130
12                                   Montgomery, AL 36103-5130

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          * * * * *

 2                    P R O C E E D I N G S

 3                          * * * * *

 4              THE COURT:  We're here this morning in the case

 5    of United States of America versus Jason Brown, CR-03-B-338-S.

 6    Mr. Espy, I see that you and your client have had thirty-five

 7    days in which to review the presentence report; correct?

 8              MR. ESPY:  Yes, ma'am.

 9              THE COURT:  Other than the filed objections, do you

10    have any other objections to the contents of the presentence

11    report?

12              MR. ESPY:  No, ma'am.

13              THE COURT:  If I'm looking at this correctly, all

14    your objections have been resolved except for the loss amount;

15    is that correct?

16              MR. ESPY:  That's correct, Your Honor.

17              THE COURT:  It's my understanding that the government

18    wishes to present some evidence in that regard; is that right?

19              MR. INGRAM:  That's correct, Your Honor.

20              THE COURT:  All right.  If you would call your first

21    witness, and then I will hear argument and let you present

22    evidence also.  The burden is on the government.

23              MR. ESPY:  Yes, ma'am.

24              MR. INGRAM:  The government calls Neal Seiden.

25              NEAL SEIDEN, GOVERNMENT'S WITNESS, SWORN.
```

1          THE CLERK:  State your name, please.

2          THE WITNESS:  Neal Seiden.

3          THE CLERK:  Spell your last name for the record.

4          THE WITNESS:  S-e-i-d-e-n.

5          THE CLERK:  In what city and state do you reside?

6          THE WITNESS:  Marietta, Georgia.

7          THE COURT:  Before you begin, I somehow came in here

8    without Mr. Seiden's affidavit.  Just one second.

9          (Brief pause)

10          THE COURT:  All right.  You may proceed.

11                          **DIRECT EXAMINATION**

12    **BY MR. INGRAM:**

13    Q.   Mr. Seiden, what is your current employment?

14    A.   I'm employed by the Securities and Exchange Commission,

15    and I'm also a part-time instructor at a university in Georgia.

16    Q.   The Securities and Exchange Commission is also known as

17    the SEC?

18    A.   Yes, it is.

19    Q.   How long have you been employed by the SEC?

20    A.   Since July 1984.

21    Q.   And tell the court what are the responsibilities of the

22    Securities and Exchange Commission.

23    A.   Our two prime missions, as it be, would be to protect

24    investors and to insure and maintain fair and honest stock and

25    bond markets.

1   Q.   And what is your position currently with the SEC?

2   A.   I'm a senior accountant in the division of enforcement.

3   Q.   What are your duties in that role?

4   A.   I investigate possible violations of federal security

5   laws.  I primarily focus on financial accounting fraud and

6   insider trading.  And I do my job by investigating, taking

7   testimony from individuals, looking at documents, books and

8   records of companies, their internal accounting controls.

9            I look at auditors and the auditor work papers and

10   interview to see if there's been any type of violation of the

11   law.  And if so, then I make a recommendation as to what, if

12   any, enforcement action is necessary.

13   Q.   And how long have you done that type work?

14   A.   Since June 1988.

15   Q.   Have you worked in any other areas of the SEC?

16   A.   Yes, I have.  I worked in the division of corporation

17   finance in Washington, D.C.

18   Q.   What were your responsibilities there?

19   A.   The division of corporation finance is responsible for

20   reviewing information provided by companies that's filed with

21   the SEC, which is ultimately distributed to investors and the

22   general public.

23            Our job up there is to review the annual reports on

24   Form 10-K; the quarterly reports on Form 10-Q; registration

25   statements, which are when a company wants to issue stocks,

1   bonds or any other type of securities; proxy statements, and to

2   make sure that the information is fair, full and disclosed on a

3   timely basis.

4   Q.   Now, were you employed elsewhere before you joined the

5   SEC?

6   A.   Yes, I was.

7   Q.   Where did you work?

8   A.   Right before the SEC, I worked for a publicly-held bank in

9   Washington, D.C.  I was an assistant controller.  My job was to

10  review and oversee the general ledger functions of the company,

11  the bank's internal accounting controls and external financial

12  reporting to the SEC and bank regulatory agencies.

13          And before that, I was an auditor with a

14  multi-national accounting firm in Baltimore.  I was a senior

15  accountant there doing audit work.

16  Q.   Could you state your educational background, please?

17  A.   I attended the University of Maryland.  I obtained a BS

18  degree in accounting.  And, subsequently, I obtained my CPA,

19  certified public accountant license.

20  Q.   When did you obtain your CPA license?

21  A.   Early 1983.

22  Q.   Now, Mr. Seiden, in regard to your duties with the SEC,

23  have you been involved in the investigation of HealthSouth

24  Corporation?

25  A.   Yes, I have.

1   Q.   And how did you first become involved in the
2   HealthSouth investigation?
3   A.   I was assigned -- I was given a newspaper article back in
4   August of 2002 by one of my supervisors, and it was an article
5   about -- negative information about HealthSouth Corporation.
6           And I basically followed procedure, which was to open
7   up a case, an investigation, and to start finding out if any
8   violations had occurred.
9   Q.   Now, with regard to those individuals who have pled
10  guilty in connection to their participation in the
11  accounting fraud conspiracy at HealthSouth, have you
12  conducted investigations to determine if any loss is
13  associated with those defendants' roles?
14  A.   Yes, I have.
15  Q.   Now, with regard to Jason Brown, the defendant here
16  today, did you conduct such an investigation?
17  A.   Yes, I did.
18  Q.   Now, tell me what you did in the way of determining
19  whether or not there was a loss associated with Mr. Brown's
20  participation in a conspiracy?
21  A.   What I did is I reviewed certain documents.  I looked at
22  Mr. Brown's plea agreement, his Information, his 11(f).  I also
23  looked at the FBI 302s for when he was interviewed, and then I
24  reviewed certain case law -- specifically, it would be the
25  Snyder case, the Backhit case and the Grabske case -- to

1  determine what the applicable case law is and what the courts

2  look for.

3        What I determined was that the courts were looking

4  for a reasonable estimation of loss based upon the best

5  available specific information that's out there at the time.

6        THE COURT:  I don't know if you looked at the Hunter

7  case.  Did you look at that case?  Do you recall USA versus

8  Hunter?  And I just want to read part of it into the record.

9        THE WITNESS:  Yes, I did, Your Honor.

10        THE COURT:  You did look at that case?

11        THE WITNESS:  Yes.

12        THE COURT:  Great.

13        THE WITNESS:  I looked at the Hedges case, the Jamie

14  Olis case, the Moskowitz case and the Eyman case as well.

15  Those are the ones --

16        THE COURT:  Just one second.

17        (Brief pause)

18        THE COURT:  Go ahead.

19  Q.  (By Mr. Ingram)  You have identified the items you have

20  looked at as part of your investigation.  Based on those

21  items that you reviewed, what factors were you able to glean

22  from those as they relate to whether or not this defendant

23  was responsible for any loss?

24  A.  Yeah.  I took a look and determined that he was part of

25  the conspiracy during a set period of time.  I believe it was

1  July 19th, 2002 to March 19th, 2003.

2          THE COURT:  How did you come up with those dates?

3          THE WITNESS:  Okay.  After reviewing all of the

4  information available to me, most of the information seemed to

5  indicate mid June of 2002 that the defendant entered into the

6  conspiracy.  I also saw -- and, actually, the other document I

7  saw, I believe it was called the presentencing memo written by

8  the defense.

9          However, what I did is I looked for the first time

10 that I could definitively tell the defendant made a specific

11 act in furtherance of the conspiracy.  I had obtained a work

12 paper from the Ernst and Young work papers that shows the

13 apparent Excel spreadsheet that Mr. Brown purportedly

14 constructed, and the first date on there was July -- I believe

15 it's July 19th, 2003, so I used that as --

16         THE COURT:  2002 you mean?

17         THE WITNESS:  Yes, ma'am.  I'm sorry.  Thank you.

18         THE COURT:  How did you determine the ending date of

19 his involvement?

20         THE WITNESS:  I know that he did not come forward or

21 leave the conspiracy until it was publicly disclosed.  I

22 confirmed that with the Assistant U.S. Attorney's Office and

23 the Department of Justice in Washington.

24         THE COURT:  All right.  Go ahead.

25 Q.   (By Mr. Ingram)  Now, based on the specifics that you

1    found in those documents, were you able to make a

2    determination as to whether or not this defendant's

3    participation in the HealthSouth accounting fraud conspiracy

4    resulted in a loss?

5    A.    Yes, I was able to do that.

6    Q.    Tell us how you went about determining exactly what

7    that loss was.

8    A.    Again, I determined the time period that he was in the

9    conspiracy and then figured out the amount of loss -- the total

10    amount of victims involved in the case and then tried to

11    determine the average loss per victim.

12          However, what I also had to do was come up with some

13    type of reasonable approach to this, because he was in for a

14    shorter period of time and a lot limited amount of type of

15    transactions.

16          My understanding is the scope that he was involved

17    with, that he was charged with, came down to two transactions.

18    One was the CareMark stock, and one was the same store sales.

19          But based on the information available to me, I had

20    to do what I did in previous sentencings, for example, the Bill

21    Owens sentencing, which was to find out the amount of loss by

22    figuring out the average price of the stock and the bonds

23    during the fraud and subtracting from that the average price of

24    the stock and the bonds after the fraud, taking each of those

25    numbers and multiplying it by the number of victims or harmed

1  shares for stockholders and the amount of bonds out there for

2  bondholders.

3       Again, I would also like to add, I think it's a

4  maximum amount, but I don't have any ability to guess what it

5  could be otherwise.  There's just no other information out

6  there.

7  Q.  If you would, walk through your --

8       THE COURT:  Well, you can cross-examine him on that.

9       MR. ESPY:  Okay.  And I would like to note when he

10 starts guessing, that's when I want to --

11      THE COURT:  He said that the loss he's projecting is

12 the maximum loss to shareholders and that it could be less, but

13 he would be guessing.  Did I say that right?

14      THE WITNESS:  Yes, ma'am.

15      THE COURT:  But you can cross him on that.

16 Q.  (By Mr. Ingram)  Mr. Seiden, if you would walk through

17 your calculation for us and how you reached your --

18      THE COURT:  Could you get me on the right page, so I

19 can follow in your affidavit?

20 Q.  In connection with your testimony, did you previously

21 submit an affidavit to the court concerning your

22 determination of the loss calculation?

23 A.  Yes, I did.  I guess I will start on Page 4, Your Honor.

24      THE COURT:  All right.

25 A.  What I did was I've broken it into two sections.  First,

1    the stockholders appears on Page 4.  And I figured out the

2    average stock price, average closing weekly stock price from

3    July 16th, 2002 through March 18th, 2003.

4           So I do want to correct that.  I think I said July

5    19th before.  It's actually July 16th.  I came up with the

6    average weekly closing price which was $5.06 a share.  Then I

7    figured out what was the weekly average closing stock price

8    once the fraud was disclosed.  And I used a time period March

9    19th, 2003 through July 3rd, 2003.  That came out to .34 a

10   share.

11          I took the difference, which was $4.72 a share,

12   multiplied it by the estimated number of innocent issued and

13   outstanding shares, and that came out to 395,824,403 shares.

14   And the result of that calculation comes out to a loss to

15   stockholders of $1,868,291,182.

16          I used a similar type calculation for the bonds that

17   were outstanding during the time period.  And that total amount

18   came out to a loss --

19          THE COURT:  Where are you reading from?

20          THE WITNESS:  Actually, I am reading on Page 4 also,

21   Paragraph 11, the very last sentence at Paragraph 11.  The loss

22   to bondholders is 968,102,456.  And the calculation in my

23   affidavit regarding the bondholders begins on Page 9.

24          THE COURT:  How about going through that on the

25   record, too?

1          THE WITNESS:  Sure.  What I did first was to find out

2    what bonds were issued and outstanding as of the last trading

3    date before the bond trading was halted, and that would have

4    been on March 18th, 2003.

5          In Paragraph 29, I've listed out the relevant

6    information for the bonds, the amount outstanding, the date it

7    was issued, and which issue each one was.

8          And then if you skip over to Page 10, Paragraph 32, I

9    basically -- I'm reporting that what I did was took the average

10   daily price of the bonds, which was a lot easier to obtain,

11   during the period of the fraud, and then I subtracted from it

12   the reported average daily price of each bond during a period

13   after the fraud.

14         And, again, for both the stock and the bonds, the

15   subsequent trading period extends from the first date that the

16   bonds and stocks resume trading until a material event

17   affects -- significantly and materially affects the price of

18   the stock and the bonds.  And in this case, it was July the

19   3rd, 2003.

20         The reason I stuck with that date is that was, I

21   believe, a Thursday.  The next trading day was Monday, July the

22   7th, 2003.  And on that day, HealthSouth, in an investor

23   conference in New York, had announced they would not be seeking

24   bankruptcy protection.  They didn't think they would have to.

25         And the stock and bond prices reacted extremely

1    positive on that.  It was the first indication, since the fraud

2    was publicly disclosed, that they would not be seeking

3    bankruptcy protection.

4         So once I got those numbers for the bonds, I

5    multiplied it by the amount of the bonds that were outstanding

6    to come up with the number.

7    Q.   Mr. Seiden, I believe you mentioned the Snyder case.

8    Is that an Eleventh Circuit opinion, United States versus

9    Snyder, that you're referring to?

10   A.   Yes, it is.

11   Q.   Now, do you have an opinion, Mr. Seiden, based on the

12   information available to you, whether or not the loss

13   calculation that you have testified to is a reasonable

14   calculation given all that's available?

15   A.   I believe it to be a reasonable method of calculating loss

16   in this case based on what's available out there.

17   Q.   Now, let me ask you, the defense has raised a number of

18   arguments in their sentencing memorandum concerning the

19   loss.  One, of course, questions whether or not that is a

20   reasonable way to calculate the loss.

21        Now, there are other methods to calculate the loss,

22   are there not?

23   A.   There are.  The law is general on it.  The alternative

24   method I'm familiar with is, for example, when a stock or a

25   bond becomes -- let me just say a security becomes completely

1  worthless, which we do not have in this case, you can go into

2  having economists give you different formulas and calculations

3  based on, for example, regression analysis.

4          But based on my reading of the case law, it appears

5  that the courts really don't want to get into that type of

6  calculation and having those type of witnesses testify.

7  They're looking for something more reasonable, more

8  economically realistic and simplistic, which is what I have

9  done in this case.

10 Q.   Now, the defense also argues that Mr. Brown's actions,

11 as part of this conspiracy, did not cause any loss to

12 investors.  Do you have a response to that?

13 A.   I disagree.

14 Q.   And why do you disagree?

15 A.   The fraud that he participated in was serious.  He knew

16 that he was doing something wrong.  He has a BS degree in

17 accounting.  It's very basic accounting that you only record

18 transactions and create backup documentation for that which is

19 true and accurate.

20          He was approached by senior management -- for

21 example, in the CareMark transaction, he was approached by the

22 then CFO of the company and also the senior vice-president, who

23 is also the treasurer of the company, which raises it to a more

24 serious level.  He was involving and dealing with other people,

25 other vice-presidents at the company, who were also engaged in

1    the transactions.

2          He prepared a document, in my opinion, a

3    sophisticated document, to further the fraud, which he knew

4    would be provided to the outside auditors.  He was asked to

5    conceal it from the outside auditors.

6          And, again, also during the time period, that then

7    current environment, we had other major frauds going on that

8    the public was reacting negatively to.  You had the MCI

9    Worldcom transaction fraud.  You had the Enron situation.  You

10   had the passing of the Sarbanes-Oxley Act, which some of his

11   entries into this transaction that he created on the

12   spreadsheet actually carried over post Sarbanes-Oxley.

13         Based on all that, it's my belief and opinion that if

14   the auditors had found out about that, they would have reacted

15   negatively.  They would have most likely withdrew their audit

16   opinion.  There would have been special forensic accountants to

17   come in to find out what was going on, why was there

18   misstatements going on, why were senior managers involved at

19   the company at the highest levels of the company.  It raises a

20   lot of questions that the auditors would have reacted

21   negatively to.

22         I think the banks, you know, they have debt covenants

23   with HealthSouth that indicate that the financial statements

24   need to conform with GAAP.  That would have been violated and

25   subject to being recalled or, you know, paid back early.  Banks

1    probably would have frozen the lines of credit.

2         Again, also, I do want to mention the second

3    transaction was the same store sales, and that one not only had

4    the CFO involved, but the then Chief Operating Officer, who was

5    also president and a director of the company.

6         So based on all the people involved and knowing that

7    this is being concealed from the auditors, I think it's

8    reasonable to say that he could have foresaw a negative

9    reaction in the stock and bond prices.

10   Q.   Now, Mr. Seiden, were any actions taken by Mr. Brown or

11   actions that Mr. Brown caused others to take that resulted

12   in false financial information that was ultimately made

13   available to the investing public?

14        THE COURT:  Let me hear that question again.

15        MR. INGRAM:  I'm sorry.  That perhaps was a bit

16   convoluted.  Let me rephrase that.

17   Q.   Mr. Seiden, based on your investigation of Mr. Brown's

18   participation in the conspiracy, were you able to identify

19   whether or not any of the actions that Mr. Brown took

20   resulted in false financial information being made

21   ultimately to the investing public?

22   A.   Yes.  Again, he created the spreadsheet to conceal the

23   true nature of the CareMark transaction of when it was actually

24   sold.

25        THE COURT:  Can you go through that in some detail

1   for me as to exactly what he did?

2           THE WITNESS:  Yes.

3           THE COURT:  I've read it, obviously, but I would like

4   you to explain it to me a little better.

5           THE WITNESS:  There is a work paper.  I don't know if

6   --

7           THE COURT:  I would like to see it, yes.

8           MR. INGRAM:  Your Honor, I guess we could mark this

9   as Government's Exhibit 1.

10          THE COURT:  All right.  It will be considered so

11  marked.  Go ahead.

12          THE WITNESS:  I think that would be helpful.

13  Q.   (By Mr. Ingram)  Mr. Seiden, I've shown you or handed

14  to you what I will have marked as Government's Exhibit

15  Number 1, and ask you if you recognize this document?

16  A.   Yes, I do.

17  Q.   And what is this document?

18  A.   It's from a spreadsheet that, it's my understanding, was

19  created by Mr. Brown to document and show the auditors that the

20  CareMark stock was sold in 2002, when, in fact, it was really

21  sold in 2001.  It came from the Ernst and Young work papers,

22  which I previously obtained during the course of my

23  investigation.

24  Q.   Based on your investigation, can you walk through the

25  steps of the CareMark transaction and how we get to this

1  document?

2  A.   Yes.  The CareMark stock was sold approximately June 2001,

3  and it was not removed from the books.  So if you looked at the

4  2001 10-K and the other assets line item on the balance sheet,

5  comprised in that total would have been, I believe it was 27

6  million dollars which related to the CareMark investment.

7       In 2002, Mr. Brown --

8       THE COURT:  When you say it wasn't removed from the

9  books, the stock itself remained on the books?

10       THE WITNESS:  Yeah.  It was actually taken off for

11  like a day or two and then put right back on.  So, in essence,

12  as far as the public --

13       THE COURT:  What was the reason for that?  Was that

14  to make it look as if there were more assets still there, and

15  they put the cash there, too?  What did they do in that year?

16       THE WITNESS:  Generally, what they were doing was

17  they were manipulating the income statement side of the books

18  and records to create more income, and they had to have an

19  offset somewhere.

20       So to hide, in this case, the contractual allowances

21  that they were reducing, which created more income, they had to

22  have an offsetting entry, a debit, as it be.  And they put that

23  into the investment account, so they could conceal that the

24  income was being falsified on the income statement.

25       So that's why they continued -- and they did this not

1   only for the CareMark, but the company itself had done it for

2   other investment transactions as well.

3           In 2002, when they wanted to try to show the auditors

4   that it had actually been sold in 2002, they had to create some

5   type of documentation to present to the auditors, so the

6   auditors would have some type of evidence that they could

7   satisfy themselves.

8           And what they did is Mr. Brown created this document

9   with the relevant information to show the auditors.  And you

10  will see at the top, it says beginning shares, and it says

11  approximately like 1.692 million shares.  And then what he had

12  to do was over ten different -- I'm sorry, I think this is

13  twenty-two different entries he made to show blocks of stock

14  being sold until it went down to zero.

15          And then, correspondingly, what he was doing and

16  others at the company were these wire transfer amounts on the

17  far right side.  And every so often, they would basically wire

18  money to their brokerage account, have the money wired back to

19  a HealthSouth account and then transfer it to another

20  HealthSouth account.

21          And they would show the auditors the transfer just

22  between the HealthSouth accounts, making it look like they had

23  sold the stock and the amounts matched up to this schedule.

24          They were very careful not to exceed the amount of

25  shares traded for any given day, because that would have been a

1    red flag to the auditors.  So, for example, if they would have

2    booked, you know, 1.6 million shares in one day, it would have

3    been a red flag, because probably that particular day

4    HealthSouth only traded 500,000 shares.  So they had to take

5    their time and devise a plan that wouldn't be a red flag and do

6    it overtime.

7            And, again, what they showed is that the wired amount

8    from the bank accounts matched up what was on the schedule.  So

9    to an auditor, at least at first glance, everything looks like

10   it's matching up and agreeing.

11   Q.  (By Mr. Ingram)  Mr. Seiden, a few times you mentioned

12   "they."  Now, specifically, did Mr. Brown play a role in

13   creating that document?

14   A.  Yes.  My understanding is he's the one who would each and

15   everyday keep track and calculate out the numbers on the

16   spreadsheet, and then he would provide the information to

17   Kathryn Fowler and/or Kay Morgan, so that they could do their

18   role, which was to do the wire transfers and to book the

19   entries.

20   Q.  And what was the end result of this action by creating

21   this false document?  Well, first let me ask you, just to

22   make certain, this is a false document, is it not?

23   A.  Yes, it is.

24   Q.  And how was this document used?

25   A.  It was used to the auditors to show that -- in order to

1  book the transaction and show they had a sale and a gain in

2  2002, this was the supporting documentation to the auditors.

3          The auditors are basically going in and doing a

4  testing of the books and records and the numbers and the

5  transactions of the company.  They can't do a hundred percent

6  testing, so they get various information.  This would be audit

7  evidence.

8          And then they trace and agree numbers sometimes, or

9  they just take it on face value and talk to people at the

10  company and say, now, based on your oral representations to us,

11  we believe this to be true and accurate, which is basically

12  what they did in this situation.

13  Q.   Now, with regard to the same store volume matter, can

14  you tell us exactly what was involved in that aspect of

15  Mr. Brown's participation in the conspiracy?

16  A.    Yeah.  In the third quarter of 2002, so this would have

17  affected, I believe it was in November of 2002, right around

18  the time they were going to disclose to the public their

19  financial statement numbers and other statistics, they issued a

20  press release which, among other things, included financial

21  statements and the so-called same store sales.

22          And, generally, what this is is financial analysts

23  and investors like to see lots of statistics and lots of

24  numbers.  One of them is the same store sales, which is

25  comparing which facilities of HealthSouth were opened in, say,

 1  the prior year, comparing it to the same stores that remained

 2  open during the current year, and try to get an analysis or --

 3          THE COURT:  Was it that or was it -- maybe I

 4  misunderstood.  I thought it was reporting patient volume in

 5  those stores.

 6          THE WITNESS:  It was, it was.  It's the patient

 7  volume from the facilities.

 8          THE COURT:  And it was my understanding that he was

 9  asked initially to -- maybe this is from the defendant's

10  sentencing memorandum -- to show it as a positive, so that the

11  numbers had increased.  They say he refused to do that.

12          And somewhere I've read that it wasn't that he

13  refused, but that he couldn't show it as a positive, so he

14  showed it as not as much of a negative as it really was.

15          And I'm not sure which is right, whether he actually

16  refused to show it as a positive or it was impossible to show

17  it as a positive.  Maybe you can clear that up for me.  Was

18  I clear on what I was asking?

19          MR. INGRAM:  Yes, Your Honor.

20          THE COURT:  Okay.

21  Q.   Mr. Seiden, based on your review of Mr. Brown's 302s as

22  part of the investigation, do you have any knowledge as to

23  whether or not Mr. Brown was asked to make it a positive

24  number or what action was taken at that point?

25  A.   Based on the 302s, he was asked to change a negative

1  number to a positive number.

2      THE COURT:  Was this for one facility or how many

3  facilities?

4      THE WITNESS:  According to the 302s, it was for all

5  facilities.  There was some other document that indicated

6  outpatient; but reviewing the 302s, it indicated all

7  facilities.

8      For whatever reason, I don't know why he didn't

9  change it to a positive, but he made it -- he changed it so it

10  wouldn't look as bad as it really was.  And --

11      THE COURT:  How much?  Do you know the degree of

12  that?  Do you have that information?  No?

13      THE WITNESS:  I don't -- I have a guess number that I

14  think I remember, but I don't remember positively.

15      THE COURT:  Does the defendant know?  Are you

16  planning to bring that up?  Do you know?  Go ahead.

17      MR. ESPY:  We can give you that, Judge.

18  Q.   And what was the significance of the same store volume

19  changes in the numbers?

20  A.   It tells the reader the trend of the business and how it's

21  doing, how the facilities that have been opened during that

22  same comparative period, if it's getting better or worse, how

23  the business is doing.

24  Q.   You said the reader.  How is this number used by

25  HealthSouth?

1    A.    Well, they use it internally for their own purposes, but

2    they would put it in and had put it into press releases.    Every

3    quarter that went out about the financial statements.

4            But within it, they disclosed the actual numbers for

5    the same store sales.    And in the narrative portion, the front

6    part of the press release, they also described it as well.

7    It's a key element that investors in the company were concerned

8    about.

9    Q.    Just so I will be clear, Mr. Seiden, the false numbers

10   that Mr. Brown helped create with the CareMark stock sale,

11   that information made its way to the investing public; is

12   that correct?

13   A.    Yes.

14   Q.    And in what manner did it reach the investing

15   public?

16   A.    It was presented in the -- it was included in the numbers

17   for the quarter ending September 30, 2002, and for the nine

18   month period ending September 30, 2002, which was included in a

19   press release and the actual Form 10-Q filed with the SEC.

20   Q.    Based on your investigation, did you review the press

21   releases of HealthSouth where that information was

22   reflected?

23   A.    Yes.

24   Q.    Let me show you what I will mark as Government's

25   Exhibit Number 2 for identification, and ask you if you

1   recognize that document, Mr. Seiden?

2   A.   Yes, I do.

3   Q.   What is that document?

4   A.   It's a press release, a copy of a press release, issued by

5   HealthSouth, that was issued on November the 5th, 2002.

6   Q.   Now, the copy you have in front of you actually shows a

7   GX number at the top, does it not?

8   A.   Yes, it does.

9        THE COURT:  I understand about that.  Go ahead.

10  Q.   So have you had reviewed that press release,

11  Mr. Seiden?

12  A.   Yes, I have.

13  Q.   In preparation for --

14       THE COURT:  Just for the record, this was an exhibit

15  in another case, and I understand that.  That was just an

16  exhibit label in the other case.  Go ahead.

17       MR. INGRAM:  Yes, ma'am.

18  Q.   And can you identify where the false numbers that

19  Mr. Brown was associated with are reflected in that press

20  release?

21  A.   If you turn to Page 8 of 9, which will be indicated at the

22  top right-hand corner of the document, and underneath where it

23  says quarterly statistics.

24       THE COURT:  I'm there.

25  A.   It's my understanding it's the same store volume growth

1    that you see listed for these facilities.

2    Q.   Now, that is just one of a number of different numbers

3    reflected in the press release; correct?

4    A.   Yes.

5    Q.   But that number is false; correct?

6    A.   Yes.

7    Q.   And that number was made available to the investing

8    public through the press release?

9    A.   Yes.

10   Q.   And just a couple of follow up questions.  With regard

11   to the CareMark stock transaction, Mr. Seiden, did

12   Mr. Brown, based on your investigation, work with other

13   individuals in creating those false numbers?

14   A.   Yes.

15   Q.   Did he manage or supervise any other individuals at

16   HealthSouth to produce those numbers?

17   A.   I believe, yes.  I believe -- it's my understanding he

18   supervised Kathryn Fowler, but I don't know that for a fact.

19   So I just want to make sure you know that.

20   Q.   And with regard to the same store volume --

21            THE COURT:  He supervised her, or he just gave her

22   these numbers?

23            THE WITNESS:  Well, he definitely gave her the

24   numbers.  I don't know if he supervised her or not.

25            THE COURT:  All right.

1  Q.   And with regard to the same store volume false numbers,

2  are you aware of Mr. Brown working with any other

3  individuals to produce those?

4  A.   Yes.  He had worked with Mr. Owens who, at the time, was

5  the COO, Chief Operating Officer, President and Director of the

6  company; and Tad McVay who, I believe at the time, had been

7  promoted from treasurer to CFO, at least those two gentlemen.

8            MR. INGRAM:  Pass the witness, Your Honor.

9            MR. ESPY:  Your Honor, may it please the court, I

10  would ask the court to somewhat bear with me.

11            THE COURT:  Sure.  Would you like a few minutes?

12            MR. ESPY:  No, ma'am.  I'm ready to go.  I think the

13  court is aware of this, but at about 3:00 o'clock yesterday

14  afternoon, we first received the affidavit and notification of

15  this witness.

16            I just want the court to be aware.  Once we got it,

17  we got on it and reviewed it, but --

18            THE COURT:  Are you ready to go forward today?

19            MR. ESPY:  Yes, ma'am.  We're not asking -- I just

20  may have to ask for --

21            THE COURT:  You're not asking for an extension of

22  this sentencing date, okay, but I will certainly bear with you.

23  Go ahead.

24            MR. ESPY:  Bear with me, Judge, if you would.  I'm

25  usually a little more prepared.

1          THE COURT:  That's no problem.  Go ahead.

2                    **CROSS—EXAMINATION**

3    **BY MR. ESPY:**

4    Q.   Let me make sure I understand your testimony in your

5    affidavit.  First of all, it is your testimony that the

6    conspiracy at HealthSouth and the fraud began on January --

7    at least by January 1, 1996?

8    A.   Yes.

9    Q.   And it is your testimony under oath that, based upon

10   your records and your review, Jason Brown committed no act

11   until July 19, 2002?

12   A.   No, that would not be correct.

13   Q.   When did he join the conspiracy?  You testified

14   earlier, I thought, July 19th, 2002.

15   A.   Maybe I misunderstood your question.  If you're asking

16   when, for my purposes, I said he joined the conspiracy, it

17   would be July the 16th, 2002.  However, in review of the 302s

18   and other interviews I was present in, I know that he had been

19   asked to and, in fact, did other acts that were improper to

20   conceal things from the auditors.

21          THE COURT:  Other than the two things you've

22   testified about?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Do you remember what those were?

25          THE WITNESS:  Yes.  It had to do with the G5 aircraft

1  and a lease, and what they were trying to do and Mr. Brown

2  participated in was try to hide the fact from the auditors that

3  HealthSouth did not own the airplane -- I'm sorry -- that they

4  owned the airplane when, in fact, they were just leasing it.

5  So they were showing an extra asset on their books.

6          THE COURT:  They were trying to show that they owned

7  it when they, in fact, only leased it?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  And he was involved in that?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Do you remember when that was?

12          THE WITNESS:  I know it covered at least late 2001

13  and might have been earlier than that.

14          THE COURT:  What other things, from your recollection

15  of reading the 302s, was he involved in?

16          THE WITNESS:  That's all I can remember right now.

17          THE COURT:  All right.  Go ahead.

18  Q.   (By Mr. Espy)  And the two instances that we're here

19  today on involve the period July 16, I believe you said July

20  16, 2002.  And, of course, the FBI raid took place in March

21  of 2003; is that correct?

22  A.   Yes.

23  Q.   Is that your understanding?

24  A.   Yes.

25  Q.   And I believe you have told the court the two instances

1  that you understand for which Jason Brown has pled guilty;

2  is that correct?

3  A.   Yes.

4  Q.   And am I correct --

5         THE COURT:  I'm sorry, I'm going to stop you, but if

6  possible -- I mean, if you can't put your hand on it easily,

7  then don't worry about it, but I would like to see the 302 with

8  regard to that aircraft, if you have it.  You have it?

9         THE WITNESS:  Yes.

10         THE COURT:  Okay, good.  Go ahead.

11  Q.   (By Mr. Espy)  As I understand your testimony, the

12  other people, at least two of the other people involved in

13  the CareMark matter were Kathryn Fowler and Kay Morgan; is

14  that correct?

15  A.   Yes.

16  Q.   Tell the court what Kathryn Fowler did.

17  A.   From what I recall, she was involved in doing the actual

18  wire transfers between the accounts.

19  Q.   Let me be sure, your testimony is Mr. Brown provided a

20  spreadsheet, which I believe has been marked as Prosecution

21  1.  He provided that spreadsheet to Kathryn Fowler; is that

22  your understanding?

23  A.   Yes.

24  Q.   And Kathryn Fowler --

25  A.   I'm sorry, and Kay Morgan.  It's my understanding it was

1  both of them.

2  Q.   And would you tell the court the position held by

3  Kathryn Fowler?

4           THE COURT:  I'm going to stop you one second.

5           MR. ESPY:  Ma'am?

6           THE COURT:  I'm going to stop you one second.

7           (Brief pause)

8           THE COURT:  Go ahead.

9  Q.   (By Mr. Espy)  Would you tell the court the position

10  that Kay (sic) Fowler had with HealthSouth at the time?

11  A.   I believe she was a vice-president in the treasury

12  department.

13  Q.   And Mr. Brown was a vice-president in finance; is that

14  correct?

15  A.   Treasury department.

16  Q.   So they both were vice presidents?

17  A.   That's my understanding, yes.

18  Q.   Tell the court what position Kay Morgan had.

19  A.   She was a vice-president as well.

20  Q.   In what department?

21  A.   I think -- I don't know what the official name was.  I

22  think it was the accounting department.

23  Q.   And who told these individuals or who above these

24  individuals, Brown, Fowler, Morgan, directed these things be

25  done or requested these things be done?

1   A.    For the CareMark transaction?

2   Q.    Yes, sir.

3   A.    It would have been Tad McVay, who was then the senior

4   vice-president and treasurer, and Weston Smith, who was then

5   the CFO.

6   Q.    Senior management?

7            THE COURT:  Tell me Mr. McVay's position at the time.

8            THE WITNESS:  Senior vice-president, you know, hyphen

9   treasurer.

10            THE COURT:  And then Weston Smith was the CFO?

11            THE WITNESS:  Yes.

12   Q.    (By Mr. Espy)  Is that the five people you understand,

13   it came -- would you agree that Weston Smith and Mr. McVay

14   were senior management?

15   A.    Yes.

16   Q.    And do you have any understanding what the family is?

17   A.    Yes, I do.

18   Q.    And were they family, members of the family?

19   A.    Were who members of the family?

20   Q.    Smith and McVay.

21   A.    Yes.

22   Q.    And then it came down to Jason Brown, Kathryn Fowler

23   and Kay Morgan; is that correct?

24   A.    In your example, yes.

25   Q.    And none of whom were in the family; correct?

1  A.    That's not my understanding.

2  Q.    Which one was in the family?

3  A.    I believe Kathryn Fowler and Kay Morgan were part of the

4  family.

5  Q.    You do believe that?

6  A.    I do believe that based on the information I had at one

7  point.

8  Q.    But Jason Brown wasn't a member of the family based

9  upon any information in the FBI files, was he?

10  A.    Not that I know of.

11  Q.    In terms of the CareMark stock, did that ever appear in

12  the Q -- the 10-K?

13  A.    I'm sorry, you just combined two financial statements.

14  Q.    In regards to the CareMark stock, that never appeared

15  in the 10-K; is that correct, that transaction?

16        THE COURT:  10-Q you mean?

17        MR. ESPY:  10-K.

18        THE COURT:  What's a --

19        THE WITNESS:  The 10-K would be the annual report

20  filed for the year, the entire financial reports, and the 10-Q

21  is for a specific quarter.

22        THE COURT:  So did it?  Was it in the 10-K?

23        THE WITNESS:  The numbers?

24        THE COURT:  Yes.

25        THE WITNESS:  Yes.

 1  Q.   (By Mr. Espy)  Was the 10-Q filed?

 2  A.   For 2001, yes.

 3  Q.   I guess I'm off base.  It's your testimony to the judge

 4  that CareMark that Mr. Brown was involved in, what Mr. Brown

 5  was involved in, are you telling the judge that appeared in

 6  any 10-K?

 7  A.   No.  It appeared in a press release and in the 10-Q.

 8  Q.   And when did that take place, in November of 2002?

 9  A.   What took place, sir?

10  Q.   The CareMark transaction for which you're testifying

11  about Mr. Brown, did that take place in November 2002?  Is

12  that when it was publicly put out, as you say?

13  A.   Yes, beginning then.

14  Q.   That's right.  Beginning then.  So the first time there

15  was any public dissemination of information concerning the

16  CareMark 2002 transaction was in November of 2002?

17  A.   Yes.

18  Q.   Now, I believe this is Prosecutor's Exhibit Number 2.

19  Do you know what I'm talking about?

20  A.   Yes, sir.

21  Q.   And what you're saying is in this nine-page document,

22  which you would agree has a tremendous amount of numbers,

23  would you not?

24  A.   Tremendous?  It depends who the audience is.  For the

25  people who really want to review this, the investors, the

1   people on Wall Street, no, I don't think it's tremendous.

2   Q.   The one item on Number 2 that you say or that we agree

3   that Mr. Brown was involved in, same store volume growth on

4   Page 8; is that correct?

5   A.   Yes.

6   Q.   And am I correct that Exhibit 2 shows what was reported

7   to the public was a negative 3.8 percent?

8   A.   Yes.

9   Q.   Explain to the court how many divisions there were of

10  HealthSouth in November 2002?

11  A.   I believe there were five.

12  Q.   Tell the court the five divisions of HealthSouth in

13  November 2002.

14  A.   I would have to go by what's in here because I know the

15  divisions changed over --

16  Q.   No, sir.  I want to know -- you're saying this is the

17  dissemination that Jason Brown caused a loss; is that

18  correct?

19  A.   Yes.

20  Q.   Tell the court how many divisions of HealthSouth were

21  involved in November 2002, if you know.  If you don't know,

22  tell the court you don't know.

23  A.   I don't know.

24        THE COURT:  What do you mean how many divisions,

25  you're saying this number applies to, what are you trying to

1    say?

2         MR. ESPY:  Your Honor, there's five divisions and the

3    number only applies to one of the five divisions.  That's the

4    facts.

5         THE COURT:  I would like to know the difference

6    between what he reported and what the true number was.  Is

7    there a way --

8         MR. ESPY:  I think I can tell you, and if you don't

9    mind, Mr. Brown will answer the question.  They've got it, I

10   believe.

11        THE COURT:  What's the answer?

12        MR. ESPY:  I believe the answer is, Judge, that the

13   same store volume applies to only one division, which is the

14   outpatient division.  It does not apply to the other four

15   divisions.  And I think the numbers -- what is wrong is about

16   70,000 visits out of about two million.

17        Now, I believe that to be accurate.  They have the

18   exact information.  We've given it to them.  We've gone over it

19   with them, so they will have the record, but that's my

20   recollection, Judge.

21        THE COURT:  What change in percentage would it have

22   been?  As opposed to a negative 3.8 --

23        MR. ESPY:  They've got it, but can I approach him and

24   ask him?

25        THE COURT:  I know this isn't really evidence.  I'm

1    just trying to --

2            MR. ESPY:  He believes, Your Honor, it was around a

3    negative nine, and this was about a negative four.  That's his

4    recollection as I've just approached and asked him.

5            THE COURT:  All right.  Go ahead.

6    Q.   (By Mr. Espy)  And tell the court what does total

7    volume growth mean?

8            THE COURT:  Where are you looking?

9            MR. ESPY:  It's on Page 8, Your Honor.

10           THE COURT:  The one right above it.  Okay.

11           MR. ESPY:  Yes, ma'am.

12   A.   I'm sorry, could you tell me where you're looking?

13   Q.   Sure.  I'm looking on Page 8, and I'm going down in the

14   HealthSouth outpatient rehab.  Maybe we ought to start with

15   explain to the judge again what you understand that same

16   store volume growth means.  I want you, if you would again,

17   to explain that.

18   A.   Yeah.  My understanding is it's the total visits.  It's a

19   patient statistic, how many patients have visited a HealthSouth

20   facility.  In this particular example, he's referring to the

21   outpatient rehab division.

22   Q.   And what does total volume growth mean, if you

23   understand?

24   A.   My understanding is that's the absolute total number of

25   patients from one year or, in this example, from one quarter to

1  another quarter or comparing year to year.

2        The same store volume would be, again, just comparing

3  those facilities that were open for the exact same period of

4  time on a comparative basis.

5  Q.   Are you aware of which of these numbers, be it total

6  volume patients, revenue per division, revenue per patient,

7  which of these factors are looked at primarily by investors?

8  A.   Primarily?

9  Q.   Yeah, if you know.  I mean, is the more important

10  number total volume, revenue per division, and revenue per

11  patient?  Isn't that the critical numbers that you're

12  looking at when you analyze this document?

13  A.   I think you would have to just ask the individual who is

14  reviewing it.

15        THE COURT:  Let me make sure, is there any dispute

16  that that's the only number, same store volume growth, or did

17  he falsify the total volume growth also?  What's the answer?

18        MR. ESPY:  I can answer from our standpoint.  That's

19  the only thing they've ever contended he did, and that's the

20  only thing he ever told him he did.  So we're dealing with one

21  number on that document, Judge.

22        THE WITNESS:  Well, if I can just interject, because

23  I just want to make sure I didn't misanswer something before.

24  When he keeps referring to this document, this document also

25  includes the September 30 numbers, which my testimony is it is

1    wrong.

2            THE COURT:  The September 30, where are you referring

3    to here?

4            THE WITNESS:  You can start on Page 3 of 9.

5            MR. ESPY:  I think he's talking about the CareMark;

6    am I correct?

7            THE WITNESS:  That is correct.

8            THE COURT:  So those numbers are in this document

9    also?

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  Where are they reflected here?

12           THE WITNESS:  They would be -- I believe it's in the

13   revenue number for September 30, 2002, so it would be on Page 3

14   of 9 for the three months ending.  It would also be in the nine

15   month period which begins on Page 4 of 9.

16           THE COURT:  So it would be inflated by the number --

17   well, let me see.

18           MR. ESPY:  That's where I was fixing to go, Judge.

19           THE COURT:  All right.  You can go there.

20   Q.   (By Mr. Espy)  In terms of CareMark, where in the

21   revenue numbers -- which number are we talking about?

22           I mean, for example, you said Page 3 it said

23   revenue.  Are you talking about which number?  Could you

24   just give us the number on Page 3 of Exhibit 2?

25   A.   It would be included in the -- I believe in the revenue

1    number.

2    Q.    Just give me the number.

3    A.    The number, which number?

4    Q.    The revenue number.

5    A.    That's listed in here?

6    Q.    Yes, sir.

7    A.    1,093,785,000.

8    Q.    How much of the CareMark revenue is in that almost 1.1

9    billion dollars?

10    A.    Approximately 27 million.

11    Q.    Would that be total revenue?

12    A.    Revenue, but that's not the gain number or the number that

13    goes down to the net income number.

14    Q.    Give us the net income number.

15            THE COURT:  Say that for me again.

16            THE WITNESS:  Sure.  The 27 million dollars that

17    everybody has been talking about with the CareMark, that would

18    have been the total cash proceeds and total revenue from the

19    transaction.

20            But part of it, like when you sell stock, you have a

21    basis, how much did you buy the stock for, and that amount

22    comes down to about 19 million dollars, which is reflected --

23    for example, if you go down to the line that says --

24            THE COURT:  19 million was the basis.

25            THE WITNESS:  No.  19 million was the actual gain

1  that they reported they made on the sale.  And when you go down

2  to the net income line, which is midway down, right above where

3  it says weighted average.  And the net income for the three

4  month period would be 53 --

5          THE COURT:  I'm sorry, I don't see it.

6          THE WITNESS:  Right above where it says weighted

7  average, common shares.  If you go down the column with the

8  September 30, 2002, you'll see a number that's 53,614.

9          THE COURT:  I'm there.

10          THE WITNESS:  Okay.  Included in that number is

11  approximately -- well, actually, it's really about 27 million

12  dollars.  The way they accounted for it, the gain part of 19

13  million dollars was improperly included in that 53 million

14  dollar number right there.  So, basically, almost a third of

15  that number was from the CareMark stock being improperly

16  booked.

17          There's another component of like 8 million dollars

18  or 9 million dollars that had to do with a receivable that they

19  booked at the same time in 2002 as a result of this CareMark

20  transaction, which should have reduced this number even more.

21  Q.   And if I'm correct, the other area you say that's

22  related to CareMark is on Page 4 where, in that almost three

23  billion dollar number, the twenty-seven million would be in

24  that; is that correct?

25  A.   Yes, it would be there, and it would also be on Page 5 of

1  9 which continues on in that particular income statement.  And

2  on Page 5 of 9, you come up with a net income number, right on

3  the top, the one thirty-five seven zero four number.

4          THE COURT:  I'm sorry, let me find it.

5          THE WITNESS:  Page 4 of 9.

6  Q.  And that's millions, isn't it, 135 million; isn't that

7  correct?

8  A.  135 million, right, of which approximately 27 million

9  dollars of that is improper in the CareMark transaction.

10  Q.  And all of these were disseminated in November 2002 for

11  the first time based upon your knowledge and information?

12  A.  Yes.

13  Q.  And the numbers had nothing to do with the division of

14  inpatient, did it?

15  A.  I don't believe so.

16  Q.  The division --

17  A.  Right, yes, I don't believe so.

18  Q.  The division of surgery?

19  A.  No, I don't believe so.

20  Q.  The division of diagnostic?

21  A.  You know, again, I don't believe so, but I'm not sure

22  based on the 302s.

23  Q.  The division of medical centers?

24  A.  Don't know.

25  Q.  You don't know?

1    A.    I'm not sure.  I know for sure the outpatient.  That's all

2    I know for sure.

3    Q.    Tell me, if you would, or tell the court what you

4    understand the elements of fraud are.

5            MR. INGRAM:  I'm going to object to that, Your Honor.

6            THE COURT:  Sustained.  Let me say this:  He's pled

7    guilty.  And let me tell you something, 27 million dollars in

8    fraud to me is huge.  That's all I can say, huge.  And that's

9    what he has pled guilty to doing.

10           Now, we're trying to determine how much of what he

11   did -- the scope of his agreement with the other conspirators

12   and what was reasonably foreseeable to him.  I know what fraud

13   is, and I don't need this agent to tell me.

14           MR. ESPY:  Can I respond to that just appropriately?

15           THE COURT:  You may.

16           MR. ESPY:  All I was trying to say is he's talked

17   about fraud.  I wanted to make sure he understood that it had

18   to be -- somebody had to rely upon something.  He's trying to

19   tag him with like two billion dollars.  We don't disagree with

20   the laws.  We've never disputed that from day one.  It's just

21   the way --

22           THE COURT:  It's the scope of his agreement with the

23   other conspirators and then what was reasonably foreseeable.

24   That's what the case law says.

25           MR. ESPY:  No, ma'am, I agree.

1          THE COURT:  What are you trying to get him to say?

2  Mean, what are you trying to ask him then?

3          MR. ESPY:  All I'm trying to say is it wasn't -- I

4  argue it was not reasonably foreseeable in July, when he became

5  a part of it, that this kind of loss would occur.

6          THE COURT:  You can ask him that.

7          MR. ESPY:  That's what I was --

8          THE COURT:  Well, ask him that, not the elements of

9  fraud.  You can ask him that.  You can ask him that.

10          This is not relevant to this sentencing, but I'm just

11  curious, the more I learn about this from Mr. Owens' sentencing

12  and this sentencing, are you familiar with any of the other

13  large frauds in the country, Worldcom, Enron?  Have you been

14  involved in any of that investigation?

15          THE WITNESS:  No, just reading about it.  And,

16  internally, at the SEC we get memos.

17          THE COURT:  This is again not relevant, I'm just

18  curious.  Do any of the other frauds have the number of

19  participants that HealthSouth had?

20          THE WITNESS:  Not that I've seen.

21          THE COURT:  Anything close to it?

22          THE WITNESS:  No.  Because I can also add there's a

23  lot more people.  I think prosecutor discretion was used of who

24  to charge or not to charge.  But I've never seen or heard of

25  this extent of people being involved; and, also, if I may add,

1   for how long this actually went on.

2              THE COURT:  It's just mind boggling to this court.

3              THE WITNESS:  And to me as well, Your Honor.

4              THE COURT:  Go ahead.

5   Q.   (By Mr. Espy)  Let me ask you this:  You've addressed

6   the stocks and bonds.  Did HealthSouth default on any bond

7   interest payments?

8              THE COURT:  I want to make sure you get back to that

9   question you were trying to ask him.  That's very important,

10  and I was sustaining to the question.  He can answer that, but

11  I do want you to get back, because I think that's important, to

12  where you were trying to go with that first question.  Go

13  ahead.

14             THE WITNESS:  I believe they did, and they

15  subsequently cured them overtime.

16  Q.   If I read your affidavit correctly, I believe that Page

17  9 sets forth the bonds that your testimony -- when I say

18  Page 9, Page 9 of the affidavit -- sets forth the bonds and

19  the dates of issuance that you've addressed here this

20  morning in response to the prosecution; is that correct?

21  A.   Yes.

22  Q.   And the date that the bonds were issued?

23  A.   Yes.

24  Q.   And Exhibit 2, tell me, if you would, what Exhibit 2 of

25  your affidavit purports to tell us?

1    A.    I would have to -- if someone could give me Exhibit 2.

2            THE COURT:  Don't you have your affidavit in front of

3    you?

4            THE WITNESS:  I've just got the actual affidavit, but

5    not the exhibits attached to it.

6    Q.    I don't mind just giving him -- all I'm trying to

7    figure out is what exact -- here's just parts of it.  It

8    says debt repurchases, I'm trying to figure out what that

9    is.

10           And that's just parts of them.  I'm going to give you

11   all of them.  I'm just trying to figure out what that exhibit

12   is purporting to represent.

13           THE COURT:  While he's looking at it, let me find it.

14           MR. ESPY:  It's Exhibit -- Judge, my page is not

15   numbered, Your Honor.

16   A.    My recollection is some of these bonds were issued, say,

17   day one, year one.  And over time, some of them were retired.

18   Some of them were repurchased by the company.

19   Q.    Is this supposed to be representing -- I'm just trying

20   to determine what it represents.  Does it represent sales,

21   does it represent repurchases by the company?  What does it

22   represent is all I'm trying to figure out?

23   A.    Repurchases by the company.

24   Q.    Thank you.  I believe that the HealthSouth stock closed

25   yesterday at $4.55 a share?

1  A.    I believe that is correct, yes, it did.

2         MR. ESPY:  Can I have one minute, Your Honor, just

3  to confer with my partner?

4         THE COURT:  Sure.  Let me just tell you how the

5  schedule is going to go today, and I'm sorry, but I have

6  something that I'm going to be out for about two hours,

7  beginning about 11:20 to 1:30.  Is that going to mess you up

8  tremendously?

9         MR. ESPY:  I will do whatever I have to do, Your

10  Honor.

11         THE COURT:  Well, I figured, you might have blocked a

12  whole day for court.  I, of course, at some point, want to hear

13  your version, and I guess it's zero, but your argument as to

14  what you contend the loss figure should be.

15         Go ahead and confer with your partner, but I'm just

16  telling you I'm going to need to leave at 11:20 and resume

17  around 1:30.

18         (Brief pause)

19  Q.    (By Mr. Espy)  Has your affidavit in this case or a

20  similar affidavit by you been submitted in connection with

21  any of the other HealthSouth defendants?

22  A.    Yes.

23  Q.    Okay.  Would you tell me who?

24  A.    Generally speaking, I think everyone who has pled guilty

25  except for -- I don't believe I did one for Kathryn -- I know I

1  did not do one for Katherine Fowler.  I do not believe I did

2  one for Will Hicks.

3          I'm pretty confident I've done an affidavit for

4  everybody else with respect to the accounting fraud, not the --

5  I think there were like three or four individuals who pled

6  guilty to the foreign payments or the bribery charges.  I was

7  not involved with those sentencing.

8  Q.   Let me just run some of them down to be sure.  Kathryn

9  Fowler?  I think you said no, but I want to be sure.

10 A.   I'm positive I did not do a loss calculation for her.

11 Q.   Any reason why not?

12 A.   I wasn't asked.

13 Q.   You weren't asked by the prosecution?

14 A.   That is correct.

15 Q.   Will Hicks?

16 A.   I was not asked -- I don't believe I was asked to do a

17 loss calculation.  I don't specifically remember.  I do not

18 believe I was asked to do one.

19 Q.   Virginia Valentine?

20 A.   I remember testifying at her sentencing.  I believe I did

21 an affidavit as well.

22 Q.   Kathy Edwards?

23 A.   Same as Virginia Valentine.

24 Q.   Angela, and it may be Ayers, and I may be saying it

25 wrong, A-y-e-r-s?

1    A.    Same as -- in fact, I can tell you, there was Emory

2    Harris, Virginia Valentine, Angela Ayers.  I'm drawing a blank,

3    but all that were done in front of Judge Johnson in November

4    and December of 2003.  They were all the same.  So if I did an

5    affidavit for one, I did it for all of them, and I testified at

6    their sentencings.

7    Q.    What about Ms. Morgan?

8    A.    Kay Morgan was in that group as well.

9    Q.    And what about Ken -- and I may mispronounce it -- I

10   think it's Livesay, L-i-v-e-s-a-y?

11   A.    Yes.

12   Q.    You did one for him?

13   A.    I believe so.

14   Q.    Okay.

15            MR. ESPY:  Judge, that's all I have.

16            THE COURT:  All right.  Any redirect?

17            MR. INGRAM:  Just briefly, Your Honor.

18                     **REDIRECT EXAMINATION**

19   **BY MR. INGRAM:**

20   Q.    Mr. Seiden, Mr. Espy just asked you about the different

21   divisions.  Are you familiar with the relative size of each

22   of those different divisions?

23   A.    I used to be, not any longer.

24   Q.    Let me ask you a more specific question.  With regard

25   to the outpatient rehab division, are you able to describe

1   how that relates in size to the other four divisions that

2   Mr. Espy asked about?

3   A.   I believe that was one of the bigger ones, if not the

4   biggest of the divisions.

5   Q.   And with regard to Mr. Brown's actions in generating

6   false numbers that made its way into the financial documents

7   and also made available to the investing public, is it fair

8   to say that providing false numbers would reasonably -- I'm

9   sorry, let me rephrase that.

10          Based on Mr. Brown's role in producing the false

11  numbers and given the fact that they made its way to the

12  public, is it reasonable to believe that the investing public

13  relied on those false numbers in making their investment

14  decisions?

15  A.   They relied on those numbers, and they were relying on the

16  integrity of management who provided those numbers.

17          MR. INGRAM:  That's all I have, Your Honor.

18          THE COURT:  Anything further?

19          MR. ESPY:  No, ma'am.

20          THE COURT:  All right.  If you would step down,

21  Mr. Seiden.  Thank you very much.

22          MR. INGRAM:  Your Honor, may Mr. Seiden be excused?

23          THE COURT:  Yes, unless you think you might want to

24  recall him for any reason.

25          MR. ESPY:  No, ma'am.  I know of no reason.

1          THE COURT:  Any further evidence from the government?

2          MR. INGRAM:  No, Your Honor.

3          THE COURT:  I would like, and maybe over the lunch

4    break if you could find the documents to verify -- the

5    defendant says it would have probably been a minus 9 percent as

6    opposed to 3.8 percent.  If you can find any 302 with regard to

7    that.  It's not crucial; but if you have it, I would like to

8    see it.

9          I would also like to see the 302 of the interview

10   that was referenced by Mr. Seiden pertaining to some

11   involvement by the defendant in some other fraud or false

12   actions with regard to HealthSouth.

13         MR. INGRAM:  Yes, Your Honor.  Both of those items

14   are in the same 302.  This is Mr. Brown's 302 from June 16th,

15   2003.

16         THE COURT:  If you would make a copy of it.

17         MR. INGRAM:  I would be happy to.  It doesn't --

18         THE COURT:  Do you all have it with you or not?  If

19   not, I'm going to give it to you.  I'm going to read it over

20   the break, and I will let you have a copy so you all can read

21   it.

22         MR. ESPY:  If we could have a copy, too, because we

23   don't.

24         THE COURT:  All right.  I will read it, and then we

25   will talk about it after lunch.  You can tell me what you want

1    to say about it.

2            MR. INGRAM:  It doesn't reflect the change that was

3    asked of Mr. Brown for 2002.  It states in comparison to what

4    the number was the previous year 2001.

5            It basically states that Brown recalled in November

6    of 2002 he was asked to attend a meeting, at which time Tad

7    McVay and Bill Owens directed him to change the same store

8    numbers in the third quarter of 2001 and to lower this number

9    to a negative three to four percent.

10           He stated that, in the preceding year, this figure

11   had been a negative 14 percent, and that by changing the

12   numbers or by adding numbers to the closed facilities for the

13   third quarter of 2001, it made the numbers for the third

14   quarter of 2002 look better, as if they were doing more

15   business in 2002.

16           This number showed up in the statistics page of the

17   press release which was submitted to Wall Street and would have

18   been a percentage of an actual number.

19           THE COURT:  All right.  Thank you.  If you will make

20   a copy.  Any further evidence from the government with regard

21   to the loss?

22           MR. INGRAM:  No, Your Honor.

23           THE COURT:  All right.  Any evidence from the

24   defendant with regard to the loss?

25           MR. ESPY:  No, ma'am.

1          THE COURT:  All right.  I would like you to make your

2    argument to me before lunch as to what you contend the loss

3    figure should be and your rationale for it.

4          I mean, I think the government's argument is

5    contained in Mr. Seiden's affidavit and testimony, so let me

6    hear from you.

7          MR. ESPY:  And, Your Honor, let me say this:  I

8    wanted to be candid with the court.  I was not trying to be --

9    we acknowledge that the loss at HealthSouth is large.  We're

10   not trying to say it wasn't.

11         All we were trying to show by a document that we

12   received within a couple of hours of this hearing, even though

13   this hearing has been set for a considerable amount of time,

14   all I wanted to do, as we looked at it quickly, was simply to

15   say to Your Honor, Jason Brown's guilty of a crime.  He's

16   acknowledged he's guilty of a crime.

17         He acknowledged exactly what he did.  He's

18   acknowledged that in November of 2002 this was disseminated to

19   the public.  But everybody in this whole case, Your Honor, has

20   said this started back in 1996 at least.

21         And my only contention was, Judge, this young man,

22   with what he did, didn't cause the loss that they're saying.  I

23   don't doubt that HealthSouth covered that loss.  I'm just

24   saying he didn't -- I don't know of anyway you can determine

25   what loss he covered, other than he was part of a loss that was

1    substantial.  I'm not trying to argue otherwise, Judge.

2        And the only questions I was trying to determine from

3    him and these other people was to testify what loss -- for

4    example, I was particularly interested in Kathryn Fowler.  I

5    mean, she is the one who moved the money; but yet, apparently,

6    there was no attempt to show -- I mean, he gave her the

7    numbers.  She moved it, and Kay Morgan.

8        That was the question, how did they determine that.

9    Obviously, they didn't.  They didn't show that.  In Katherine

10   Fowler, they contended there was no loss.  I filed that with

11   Your --

12       THE COURT:  What do you mean they said there was no

13   loss?  Did you all say that at her sentencing hearing?

14       MR. INGRAM:  No.

15       MR. ESPY:  And maybe I used the wrong words.  I filed

16   a copy of that with the court, which is under seal, and I

17   believe it's on Page 11, Number 33.  And if I used the wrong

18   language, I apologize.

19       But, basically, she wasn't asked for -- I say no

20   loss, maybe I'm using the wrong language, but whatever that

21   said.  So all I'm trying to say, Judge, is --

22       THE COURT:  Wait just a second.

23       MR. ESPY:  I apologize.

24       THE COURT:  I'm just trying to find where the loss --

25       MR. ESPY:  I may have used the wrong language.  But

1    my argument is, Judge, it's my understanding, and I wasn't

2    present --

3           THE COURT:  Actually, it's just that there was no

4    information at the time.  I don't know what the judge

5    eventually did with regard to the testimony.

6           MR. ESPY:  She got probation.

7           THE COURT:  Well, I know, but there was a finding as

8    to loss.  My recollection is -- I don't know if it was this

9    case that was reversed or not.

10          MR. ESPY:  It wasn't Fowler.

11          THE COURT:  But I don't know what the judge

12   eventually found.  And, as I said, in every case, I'm looking

13   at the evidence presented in this case.  Other judges looked at

14   the evidence and possibly viewed the culpability of defendants

15   differently than other judges.

16          I happen to think this is a massive, massive fraud.

17   As I say, to me it's a mind boggling situation with the number

18   of people that got involved in this and of the character of

19   some of the people that got involved, including your client,

20   who had an exemplary background and, apparently, other than

21   getting involved in this, had an exemplary life.

22          MR. ESPY:  Never had any problem.

23          THE COURT:  And there are other defendants like

24   that.  But the public was greatly harmed by the collective

25   actions of many, many people, including your client.

1          But I'm going to look at the evidence presented in

2    this case and make my finding as to the amount of loss.  But,

3    basically, what you're saying with regard to your argument

4    against the calculations in the presentence report is that

5    because he was only involved for a limited time, it's not fair

6    to attribute this loss to him; is that right?

7          MR. ESPY:  That is correct.  And we've said that all

8    -- we've never said that he didn't do something wrong and,

9    obviously, something, but that the burden was on them to show

10   what he did.

11         I'm not trying to -- but, Judge, I just don't think

12   common sense -- that it makes sense that a conspiracy that

13   started at least six or seven years before he ever got in it,

14   that he then caused the loss that goes back to '96.  It defies

15   common sense.  And that's been my argument from day one about

16   it.

17         THE COURT:  I do want to make sure that the record is

18   clear that, although you did not receive Mr. Seiden's affidavit

19   until yesterday, the way he calculated it -- I mean, it's all

20   in Paragraph 61 exactly what's in his presentence report --

21         MR. ESPY:  I know.

22         THE COURT:  -- and including the exact numbers are in

23   the presentence report that you've had for years.

24         MR. ESPY:  I don't dispute --

25         THE COURT:  I want to say and including his method of

1    calculating the loss.  All of that is in the presentence

2    report.  So his method of calculating the loss is something

3    you've had for years, and the exact numbers that he testified

4    to you've had for years.

5            MR. ESPY:  I'm not trying to argue any prejudice,

6    Judge.

7            THE COURT:  I know.  I just want to make sure for the

8    record --

9            MR. ESPY:  If I was, I would ask for a continuance

10   that I believe the court would give me.

11           THE COURT:  I just want to make sure the record is

12   clear that those numbers are in the presentence report and have

13   been there and the method that he used, and you've had them for

14   quite sometime.

15           MR. ESPY:  I don't deny that, Judge, but we didn't

16   have that 89 page document until yesterday, and it says a lot

17   more than the presentence.

18           All I was trying to tell the court is I typically

19   come in here and I go bam, bam, bam and ready to go.  But when

20   I got the thing at 3:00 and I got to it at 6:00 o'clock last

21   night, I had to do the best I could do with what I had.  That's

22   all I was saying.

23           THE COURT:  Well, the crux of his testimony is

24   contained in Paragraph 61 of the presentence report, and I

25   would have to look to compare it to the number in the

1  affidavit, but, I think that's --

2          MR. ESPY:  If the court says that, I have no --

3          THE COURT:  Well, that's how he came up with the

4  number.  The bottom line to me is how he came up with the

5  amount of loss that he says should be attributed to this

6  defendant, and that's contained in the presentence report in

7  Paragraph 61.

8          MR. ESPY:  And I've never really contested the

9  number.  My position has been I don't see how Mr. Brown could

10 be attributed to have caused that whole number.  That's been

11 the point.

12         THE COURT:  Right.  And I, for the record, again,

13 Mr. Espy, want to make sure that you are not asking for a

14 continuance or any time to retain your own expert, because if

15 you are, I certainly will give it to you.

16         MR. ESPY:  I know you will, but I'm not.

17         THE COURT:  Okay.  We're going to be in recess

18 until -- yes?

19         MR. INGRAM:  I'm sorry, Your Honor.  Just one point

20 to make.  I know the court needs to go.  The government's loss

21 calculation is only intended to present what is reasonably

22 foreseeable as a result of this defendant's actions.  It is not

23 intended to present Mr. Brown with the responsibility for the

24 entire loss.

25         THE COURT:  Well, I've already made a finding with

1   regard to Mr. Owens that the fraud was a great deal more that

2   was attributed to him than as to this defendant.  What you

3   presented in his case was a loss amount much greater than what

4   you're asking here.

5         But I'm going to go back and look at all this.  We'll

6   be in recess until 1:30.

7         MR. ESPY:  Can I ask a question so we can be

8   prepared?

9         THE COURT:  Sure.

10         MR. ESPY:  Could you give us some idea, Judge, of

11   kind of where we're going from here in terms of --

12         THE COURT:  The first thing when we come back, I'm

13   going to tell you my loss calculation.  Since there are no

14   other objections to the Guidelines, I'm either going to adopt

15   them or find a number lower than what's there if I think that's

16   the right thing to do, but I'm going to go back and look at

17   this.

18         I will make the Guideline calculations, and then I

19   will give you time for allocution and the government time for

20   allocution and impose sentence.  So it shouldn't be too long

21   depending on the length of time that you all want to speak.

22         And I will say, for the record, that I've read all

23   the letters.  They were most impressive, and I will say all

24   that later again, too.  But you can have as much time as you

25   wish this afternoon to speak on behalf of your client.

1          But, basically, I'm going to come right in and make a

2    finding and make the Guideline calculations, and then we'll

3    proceed with hearing from both sides.

4          MR. ESPY:  Does Your Honor typically go to the

5    government first and ask their thoughts?

6          THE COURT:  I hear from the defendant first, and then

7    I hear from the government.  But I think it would be helpful to

8    me, in thinking about this over lunch, although I'm going to be

9    gone most of the lunch hour, what does the government, and I

10   will hear from you why later, but what do you plan to ask for

11   this defendant?

12         MR. INGRAM:  The government's recommendation, Your

13   Honor, is Mr. Brown's Guidelines were 60 months, and the

14   government has filed a 5K motion on behalf of Mr. Brown.  The

15   general practice of our office is that a maximum of fifty

16   percent reduction be requested in appropriate circumstances.

17   Accordingly, the government is asking for a sentence of thirty

18   months.

19         THE COURT:  All right.  We'll be in recess until

20   1:30.  Thank you very much.

21         (Lunch recess)

22         THE COURT:  I'm going to overrule the defendant's

23   objection to the loss calculation and make some findings on the

24   record.

25         U.S. Sentencing Guideline Section 2B1.1, Application

1    Note 3(c), states that "The court need only make a reasonable

2    estimate of the loss.  The estimate of the loss shall be based

3    on available information, taking into account, as appropriate

4    and practicable under the circumstances, factors such as the

5    approximate number of victims multiplied by the average loss to

6    each victim."

7            In United States versus Hunter, 323 F.3d 1314 (11th

8    Cir. 2003), the Eleventh Circuit held that, "In order to

9    determine the defendant's liability for the acts of others, the

10   district court must first make individualized findings

11   concerning the scope of the criminal activity undertaken by the

12   defendant before it can determine reasonable foreseeability."

13           The defendant entered a conspiracy at the request of

14   senior officers in the corporation, including Bill Owens,

15   Weston Smith and Tad McVay.  The defendant performed at least

16   two significant overt acts to achieve the ends of the

17   accounting fraud, the CareMark transaction and the same store

18   sales manipulation.

19           These acts, including the elaborate -- I'm not sure

20   if that's the right way to call it, sales manipulation, but the

21   same store patient information manipulation.  These acts,

22   including the elaborate spreadsheet prepared in the CareMark

23   transaction, were designed by the defendant to conceal the true

24   financial condition of HealthSouth.  And these acts resulted in

25   the dissemination of false information to the investing public

1    through press releases.

2            The fact that senior officers were directing the

3    defendant to perform accounting fraud on more than one occasion

4    made it reasonably foreseeable to the defendant that his

5    co-conspirators would design, direct and make other false

6    entries to commit the accounting fraud that led to the fall of

7    the stock price.

8            According to Paragraph 10 of the Information to which

9    the defendant pled guilty and Page 11 of the factual basis for

10   his plea, the defendant became aware of the shortfalls and

11   potential adverse effect of HealthSouth's stock price if these

12   shortfalls were disclosed to the public.

13           It is noted that this court found in the case of

14   United States versus Bill Owens that the overall loss for the

15   entire conspiracy was over six billion dollars.  Thus, the

16   amount attributed to the defendant in the presentence report in

17   this case and in Mr. Seiden's affidavit is substantially lower

18   based on the scope of his agreement and the reasonable

19   foreseeability of the acts of others in furtherance of the

20   jointly undertaken criminal activity.

21           The probation officer used the method suggested by

22   the Eleventh Circuit in United States versus Snyder, 291 F.3d

23   1295, 1296 (11th Cir. 2002).  The court in Snyder suggested a

24   method of loss which takes into account the fact that the stock

25   was not completely worthless after fraud disclosure, but simply

1  fell in value, indicating that the fraud artificially inflated

2  the stock's trading price.

3        The court noted that, while this method of valuing

4  loss, subtracting the stock price after the fraud from the

5  average stock price over the life of the fraud, may be

6  appropriate in many cases involving securities fraud, it is

7  certainly not the only method available to the court.  The

8  court feels that in this case the Snyder method is appropriate.

9        The Snyder method involves an initial calculation

10 using the weekly average closing price during the life of the

11 fraud.  This method was used by the probation office because it

12 takes into account the fact that HealthSouth's stock was not

13 worthless after fraud disclosure but simply fell in value,

14 indicating that the fraud artificially inflated the stock's

15 trading price.

16        The method involves an initial calculation using the

17 weekly average closing price during the life of the fraud, the

18 time period of the defendant's criminal activity within the

19 scope of his agreement in the conspiracy.

20        According to Neal Seiden of the Securities and

21 Exchange Commission, from July 16th, 2002 to March 18th, 2003,

22 which focuses on the period from the time the defendant entered

23 the conspiracy until the date the offense became public, based

24 upon the closing price of each week during that period, the

25 average trading price of HealthSouth stock during the time of

1   the defendant's involvement in the accounting fraud was $5.06.

2          Then the average closing price after the fraud was

3   calculated, focusing on the time period between the resumption

4   of trading and shortly before the introduction of an outside

5   factor into the stock's price, that being when HealthSouth

6   announced that it believed it could avoid bankruptcy, from

7   March 26th, 2003 to the week ending July 3rd, 2003, the average

8   weekly closing price was .34.

9          The difference between the average price before the

10  fraud and the average price after the fraud was calculated is

11  $4.72.  If you multiply the number of innocent outstanding

12  shares times $4.72, it results in a total loss to stockholders

13  of $1,868,291,182.

14         Again, the loss calculation only encompasses the

15  period of the defendant's involvement and its aftermath.

16         The court is of the opinion that the appropriate

17  method of loss calculation and attribution to this defendant is

18  the Snyder method for the period of Mr. Brown's involvement.

19  So the objection to the loss calculation is overruled.

20         There are no more objections, Mr. Espy; is that

21  correct?

22         MR. ESPY:  Yes, that is correct, Your Honor.

23         THE COURT:  Having ruled on all the objections, the

24  court makes specific findings that the Offense Level is 43.

25  The criminal history category is I.

1          Pursuant to U.S. Sentencing Guideline Section 5G1.3,

2    the Advisory Guideline term of imprisonment is 60 months.

3    Further, the supervised release period is from two years to

4    three years, and the fine range is from 25,000 to $250,000.

5    Restitution is an issue in this case.

6          Mr. Espy, if you and Mr. Bain, am I pronouncing your

7    name correctly?

8          MR. BAIN:  Yes, Your Honor.

9          THE COURT:  And Mr. Brown would come to the podium.

10   All right.  Mr. Espy and Mr. Bain, do either you, Mr. Brown or

11   both have anything to say in mitigation or otherwise before the

12   court pronounces sentence?

13         MR. ESPY:  Yes, ma'am.  If it would be appropriate, I

14   would like to make a few brief remarks and then --

15         THE COURT:  I think what I will do, if it's okay, I'm

16   going to let Mr. Brown and, Mr. Bain, if you're not going to

17   speak right now, I will let you all sit down.  And then if they

18   plan to speak, they can come back up, so they don't have to

19   stand there while you speak.  All right.  You all can sit down,

20   and then, Mr. Brown, you can come back up in a minute.

21         MR. ESPY:  Your Honor, I'm going to speak for

22   counsel, but Mr. Brown would like to make a statement to the

23   court.

24         THE COURT:  Sure.

25         MR. ESPY:  Your Honor, may it please the court, we

1  have filed a memorandum in advance of this proceeding and

2  setting forth our presentation and request of the court.  So, I

3  certainly do not intend to go back over that, but rather I

4  would like to be brief in maybe bringing to the court certain

5  facts that have not been made or maybe highlighting some that

6  have been made.

7          First and foremost, Jason Brown has accepted full

8  responsibility for his conduct.  He has made no excuses for

9  what he has done.  Secondly, he has embarrassed and publicly

10 humiliated his family, for which he absolutely acknowledges.

11 His actions will affect him, not only today, but for the rest

12 of his life.  It doesn't matter, and I don't mean that in an

13 improper manner, Your Honor, he's branded.  So he sits here --

14         THE COURT:  You know what, maybe, maybe not.  Yes, in

15 a way, yes, but I believe by doing what he's done and coming

16 forward -- there were one or two letters, it seems to me, that

17 said they were proud of him, that he has done what he has done

18 in the sense of accepting responsibility and moving on with his

19 life.

20         And I'm hopeful that this will not -- yes, he will

21 always have a felony conviction for this, but he's one of many

22 who came forward and accepted responsibility.  And I think

23 people can put mistakes behind them, even criminal conduct, and

24 have a very productive and successful life.  So I'm hopeful

25 that Mr. Brown is in that group.

1      MR. ESPY:  Judge, I appreciate that, and that's our

2   hope.  Thank you very much.

3      Your Honor, as we've set forth, Jason is 36, and I

4   would respectfully say to Your Honor that except for about a

5   five-month period of his life, in the July to November time

6   frame of 2002, he's led certainly a good life, if not an

7   exemplary life.

8      And I think it may be appropriate here, Your Honor --

9   you had asked earlier about this -- there was one instance you

10   had asked about the bank compliance certificates that had to do

11   with the airplane.  I want to make it clear that he did not at

12   any time file a false bank compliance certificate regarding the

13   airplane.

14      In the treasury department where he worked, he filed,

15   when it was his responsibility, he filed a bank compliance

16   certificate quarterly showing the airplane was leased and

17   showing it was true.  So I do want to make clear that this --

18   that was the initial interview where Gerry Kelly was asking him

19   about anything he had ever done or ever heard or anything, and

20   he was saying that, but I do want to make that clear.

21      And, Judge, I would like to say, and I think it's

22   clear, that Jason was not a member of senior management.  He

23   was not ever a member of what is called, as I understand it,

24   the family that was having meetings.  He was not middle

25   management.  At best, he was lower middle management.  He was

1  one of fifty plus vice presidents there.

2          He's got a good family.  He's got a wife, and he's

3  got a child.  When he was contacted by the authorities, he went

4  forward.  He came forward.  The very first time he admitted and

5  acknowledged everything he had done, pledged full cooperation

6  for that.  Your Honor, that was in June of 2003, two and a half

7  years ago.  He pled guilty, as I recall, Your Honor, before

8  Your Honor on July 7, 2003, which is two years and five months.

9          We would have looked to have gone ahead and be

10  sentenced earlier and gotten this behind us, but we cooperated

11  with the people with whom we were working.  They didn't want

12  that to happen and fine, and we continued to put it off as he

13  struggled to -- our concern was getting jobs and trying to go

14  forward with his family.

15          THE COURT:  And, as I said in Mr. Owens' sentencing,

16  that is true, there is some punishment associated with the fact

17  of the delay, there's no doubt about it, and the uncertainty

18  associated with the delay.  So I understand that.

19          MR. ESPY:  And, Your Honor, that did put him in a

20  situation in terms of trying to do certain things, but he

21  didn't hesitate to get out and try to get a job.  He filed

22  resumes everywhere, applications everywhere.  He finally got a

23  job in a clothing store.  His wife got a job as a server at a

24  restaurant, and he finally got a good job as a financial

25  consultant with a construction company.

1    So he hasn't quit.  He's gone forward.  He went out

2  there and got a job.  He realized his responsibilities to his

3  wife, to his child, to his family, to take care of them, and

4  he's done all of that, Your Honor.

5    And, Your Honor, the government does not ask any

6  forfeiture in this case, because he didn't -- he didn't make

7  any money on what happened.  He did not do this for a profit.

8  He didn't sell any stock.  He didn't get a bonus.  He made a

9  criminal error and criminal mistake, which he will regret for

10  the rest of his life, but he didn't do it out of greed.

11    THE COURT:  And just in case I forget to note it

12  later, I am aware that many of the people who did get huge

13  bonuses and were involved for years got probation, and I'm

14  aware of that.

15    MR. ESPY:  And I was just going to mention that, and

16  I know the court is aware of the others, so I'm not going to go

17  into that.

18    I just come here on the merits of Jason Brown, and I

19  think we've said everything we can say, Your Honor.  We've laid

20  it out as best we can.  We've got one little span of his life,

21  and that's the only span, and we would ask the court --

22    THE COURT:  My problem, Mr. Espy, and I will tell

23  Mr. Brown this is, there is a great disparity in sentences in

24  some based on the involvement.  It's not necessarily fair;

25  different judges have sentenced different defendants, so

1  different judges have viewed the case differently.  And I

2  clearly view it differently than some of my colleagues, who I

3  respect very much.

4        I have to look at the fact that, even though it was a

5  very short period of time, the amount of fraud that he was

6  involved in was 27 million dollars.  Forget the

7  under-estimation of outpatient facilities and the number of

8  patients.  I do understand how management is telling you to do

9  things, but I just don't understand why so many people out

10 there went along with this year after year.  And I know he

11 didn't do it year after year.  Many did, many did who got

12 probation.

13       But it's an enormous fraud collectively, but this

14 defendant's own involvement was -- even though for a short

15 period of time, why didn't he say I'm not going to do this.

16 And he didn't just do one little sheet.  He had to go through a

17 whole spreadsheet, come up with a price that was sold that day

18 to make sure the number of shares weren't over what was sold

19 that day.  It took some time.  It was involved for what he did.

20       Anyway, I understand, and I certainly was impressed

21 by the letters, and I will maybe read some of them -- well, I

22 will wait until Mr. Brown comes up and talk about that, but

23 there were some very impressive letters that were written on

24 his behalf.

25       MR. ESPY:  Not being there, I probably can't answer

1  the court's question, but as I understand, from talking both to

2  the government and my client and other people that were

3  involved, the intimidation and the coercion, I don't mean in

4  terms of a gun to your head, was pretty intense from what I

5  understand.

6          Judge, if I may just close, you had brought up one

7  thing I did want to comment; and, obviously, we're looking for

8  what's fair and what's right.  As the CPA commented, in the 27

9  million dollars, the two people involved with him, one his

10 equal, Kathryn Fowler got probation.  One, his superior, Kay

11 Morgan got probation, and I think a short home detention.  And

12 I simply --

13         THE COURT:  And Tad McVay, I believe, got probation,

14 and Weston Smith, I think, got 27 months, but Tad McVay, who

15 was involved --

16         MR. ESPY:  Who was up at the high level.

17         THE COURT:  And for a long period, much longer period

18 of time.  Did he get probation?  Probation.

19         MR. ESPY:  Yes, ma'am.  I appreciate your comments.

20 Judge, Jason would like to make a comment to the court or

21 statement, and we appreciate any consideration the court could

22 give him in sentencing.

23         THE COURT:  Sure.  If you'll stand up here with him

24 when he comes.  I'm sure you will.  Let me also, before I hear

25 from you, Mr. Brown, Mr. Espy is a long-time acquaintance.  I

1    would like to say friend, but we don't ever see each other

2    anymore, but he has my utmost respect.  You could not have

3    picked a finer, better lawyer to have before me or before any

4    judge.  And I thought the sentencing memorandum he and Mr. Bain

5    did on your behalf was outstanding.

6            I guess I will hear from you, and then I will read

7    some quotes from some of the letters.  Go ahead.

8            THE DEFENDANT:  I made two very poor decisions in

9    2002.  It was out of character for me.  I regret it everyday.

10   And if I had the chance to go back, I would obviously go down a

11   different path.

12           This has caused a great deal of humiliation and

13   embarrassment to me and my family, and I'm very sorry for

14   that.  However --

15           THE COURT:  You have many people back there who love

16   and support you.

17           THE DEFENDANT:  Right.

18           THE COURT:  And they should, and you, obviously, are

19   deserving of that love and support.

20           THE DEFENDANT:  Well, thank you.  Since 2003, July of

21   2003, I've gained a great deal of perspective about what is

22   important in life, and I've had two and a half years to think

23   about that.  I have certainly a better appreciation now than I

24   did then.

25           I know what I did was not right.  I have always

1    respected and followed the rules and the laws of this country,

2    and my intention was not to harm anyone.  It was certainly not

3    to make any money for myself because I did not.

4            THE COURT:  Right.

5            THE DEFENDANT:  But it was a poor decision, and

6    I have learned a very painful and a very difficult lesson, and

7    I am very sorry for that.

8            Judge Blackburn, I would like to ask for mercy in

9    your sentencing of me today, so that I can continue to rebuild

10   my life.  Thank you, Your Honor.

11           MR. ESPY:  Can we step back, Your Honor?

12           THE COURT:  Maybe I will just do this right now, and

13   I actually didn't highlight them, but I turned them down.  Not

14   that they weren't all wonderful, but I did turn down some.  I'm

15   sure you've seen these, but I just want to make some statements

16   briefly from some of the letters into the record.

17           I heard from your counselor.  He said that he had not

18   been requested to write on your behalf, but had voluntary

19   chosen to do so.  And there was something else in here.

20   Unfortunately, when I was reading these last night, I didn't

21   have anything to highlight with.

22           He said, "Throughout the years I've been working, I

23   have worked with a number of individuals who have been in

24   similar situations such as Jason, but this is the first letter

25   I have ever written of this kind" -- and, again, he wrote it

1  unsolicited -- "in that Jason stands out as an individual who

2  has truly recognized what he has done and has made specific

3  changes to be different and to contribute to society."

4           Your father wrote a beautiful letter, and I know

5  you've read it, but he said, "I am proud of Jason and the

6  manner in which he has handled this adversity.  He was raised

7  to be honest, dependable and loyal, and he strove to be all of

8  those things while at HealthSouth.  We feel that no one could

9  have tried harder than Jason to move forward with his life

10 following his dismissal from HealthSouth.  I respectfully

11 request that Jason's background of extreme loyalty, excellent

12 work ethic and outstanding character be considered when

13 deciding his sentence."

14          I received a letter -- and again, these letters, I

15 read them all, and I'm certainly not trying to say that the

16 others weren't equally impressive, but Ms. Hester wrote, "The

17 polite, hard working, dependable young gentleman are apt

18 descriptions of Jason, always respectful of authority figures."

19 Of course, that could have played adversely in your situation

20 here.  "He consistently displayed a cooperative attitude.

21 Jason demonstrated a strong commitment to family as a young

22 person, and that commitment is evident now with his wife and

23 daughter.  The manner in which Jason has conducted himself over

24 the past several years speaks toward his commitment to family

25 as well as his exemplary character.  He has shown tremendous

1   resilience during adversity."

2           I received a letter from someone who works at

3   Tuscaloosa High School.  "I've known Jason since he was a small

4   child through our mutual church affiliation.  I've always found

5   him to be an honest, outstanding young man.  He was diligent,

6   conscientious and hard working in his class performance.  He

7   prepared every assignment thoroughly, promptly and well,

8   consistently making high grades.  In my role as National Honor

9   Society sponsor, I observed Jason as he participated in extra

10  curricular activities.  I found him to be a good, solid

11  citizen, trustworthy and capable in all his endeavors."

12          I'm going to read just a few more, but I will make

13  this observation:  Sometimes when I sentence people, and I say,

14  when I read the letters, that I don't know if I was on the

15  other side of this bench and standing where you are, whether

16  people could write the same kind of letters or whether I could

17  find the same number of people to write the number of letters

18  that have been written about some defendants.

19          You're one of not many, but I have had other

20  defendants who had wonderful letters written about them, but I

21  certainly think you are to be commended for having this number

22  of people and the quality of people who have written about you

23  to say these things.

24          One person, Mary Ann Brown wrote, "While I deplore

25  the fraud that took place at HealthSouth, it has become

1    apparent that many employees became involved during the course

2    of conducting their jobs without actually realizing the grand

3    scope of the situation.  Jason is one of these people.  He is

4    intelligent, honest and hard working."

5            This is from your mother.  "Of course, from a

6    mother's perspective, I feel that he has been punished so much

7    already.  I also know he feels great remorse and has been fully

8    cooperative in the whole HealthSouth investigation.  We are

9    very proud of him and will appreciate your leniency in the

10   rendering of his sentence."

11           You have a co-worker who wrote, "I'm writing you

12   today in support of former co-worker Jason Brown.  Obviously,

13   Jason made some mistakes.  His mistakes were mistakes in

14   judgment of who he should trust.  He's a good man, husband and

15   father.  I worked at HealthSouth for five years."  I'm not

16   reading every sentence.  "But I knew the culture that existed.

17   I knew the pressure that existed.  I knew everyone involved in

18   the HealthSouth scandal, and this is the only letter I am

19   writing.  At the end of the day, I am hoping that this kind of

20   support from one of the common, but equally hurt former

21   HealthSouth employees means something to you."

22           I want you to know that I carefully considered all

23   these letters.  And because of what has happened in the other

24   cases, your sentence is more difficult than it might have

25   otherwise been for me.

1        I'm going to ask you to be seated, and I am going to

2   hear from the government.  And then I actually am going to take

3   about a ten or fifteen minute break before I impose sentence.

4   All right.

5        MR. INGRAM:  Thank you, Your Honor.  May it please

6   the court.  Your Honor, Mr. Brown, as Mr. Espy pointed out, was

7   not a member of senior management, but he did become a

8   full-fledged member of the team of executives at HealthSouth

9   who engaged in furthering a conspiracy for the purpose of

10  misleading the investing public as to HealthSouth's true

11  financial picture.  And to that extent, he did play an integral

12  role in furthering the objectives of the conspiracy.

13  Notwithstanding the fact it was only for a five-month period,

14  he did a lot in the five months that he was involved.

15       Mr. Brown did cooperate once he was approached.  And

16  I will note again for the court that the government did file a

17  5K motion on Mr. Brown's behalf for his cooperation, and he did

18  everything that was asked of him once he came forward.

19       However, I would like to point out, he did not come

20  forward when the fraud broke in March.  He did not come forward

21  until the FBI knocked on his door three months later on.  Once

22  approached, he was cooperative; but to that extent, the FBI had

23  to go to him first to bring him forward.

24       A couple of things I would like to touch on just in

25  the defendant's sentencing memorandum.  To me it seemed like

1  that Mr. Brown was attempting to minimize his participation in

2  these two events.  The words "limited participation" with

3  regard to CareMark, correcting a mistake, he had no knowledge

4  and did not participate in moving money.

5          Well, the fact remains, Your Honor, that Mr. Brown is

6  a vice-president of finance at a Fortune 500 company, and he's

7  approached in July of 2002 by the CFO of the company and by the

8  treasurer of the company to do something, which it would seem

9  to anyone, even without an accounting background, that that's

10  simply wrong.  Stock that was sold in 2001, we need you,

11  Mr. Brown, to help us show that it's still on the books, and we

12  sold it again.  Well, it doesn't take an accounting background

13  to recognize what's wrong.

14          And as the court noted and as has been the case with

15  each of these defendants that this court and other courts have

16  considered in imposing a sentence, no one ever came forward and

17  said no.  No one said no to what they were asked to do.  They

18  went along for whatever reasons, whether they profited greatly

19  or not, they went along knowing what they were doing was wrong.

20          And with regard to the CareMark, he also, in addition

21  to the CFO and the treasurer, he was working with Ms. Fowler,

22  Ms. Morgan.  And this is in mid 2002.  This is after

23  Sarbanes-Oxley comes into effect.  This is post Enron, this is

24  post Worldcom where the atmosphere is charged, and the

25  government and the investing public is acutely aware of

1   accounting fraud with corporations.

2          So if, anything, the people at HealthSouth, including

3   Mr. Brown, should have been more on their toes about

4   recognizing fraud when it's presented to them and to do

5   something, but that did not happen.  He just went along and did

6   his job in furthering the objectives of the conspiracy.  He

7   never said no.

8          Again, with the same store volume, in the memorandum,

9   it's described as an isolated event.  It's minimized as one of

10  a hundred, the statistics approximately set out in the press

11  release, changed the number to look better is what Mr. Brown

12  did.  Even if it was still a negative, he lied.  He falsified

13  the numbers to make the company look better.  That's what all

14  of these people did.  That's what Mr. Brown did.  He knew it

15  was wrong, and he did it anyway.

16         Again, with the same store volume, he's being

17  approached by the CFO of the company, the CEO of the company,

18  who is also a member of the Board of Directors, asking him to

19  do things that he recognizes are wrong.

20         So, Your Honor, we would ask that the court bear in

21  mind that, notwithstanding what it has heard today, that

22  Mr. Brown should be given an appropriate sentence that meets

23  the factors as set out in Section 3553 of Title 18 that the

24  court considers, of course, each time it imposes sentence.  And

25  one of those elements is that the court impose a just

1    punishment in accordance with the crime that Mr. Brown has pled

2    guilty to, to promote respect for the law and to provide a

3    deterrence to other corporate executives that lying to the

4    investing public is not going to be tolerated.

5         The outpatient division was the one of the five

6    components that Mr. Brown was dealing with when he was

7    adjusting the same store numbers.  HealthSouth touted itself as

8    the country's largest provider of outpatient rehab services.

9    Outpatient services is a big deal.

10        HealthSouth was located in all fifty states and

11   several foreign countries.  People around the country who see

12   HealthSouth facilities, they can't come to Birmingham and meet

13   with the top executives to decide whether or not it's a good

14   investment decision.  They have to rely on what the company

15   puts out.  They have to rely on what Wall Street analysts put

16   out who in turn have relied upon what the company puts out in

17   its financial records.

18        The investing public has to be able to rely on what

19   HealthSouth and every other publicly-traded company put on

20   their books as the absolute truth.  And to shade that, to

21   misrepresent that, to paint a false picture, it cannot be

22   tolerated.  Whether it's a little lie or a big lie, the fact is

23   that lies are being made in those financial reports to

24   misrepresent the financial status of the company, and people

25   are relying on that to their detriment.

1          And having said that, Mr. Brown was a member of the

2    team and contributed to HealthSouth's false statements in which

3    the investing public suffered as a result.  We ask the court to

4    impose an appropriate sentence.  Thank you, Your Honor.

5          THE COURT:  All right.  We're going to be in recess

6    until 2:30.

7          (Brief recess)

8          THE COURT:  I'm going to tell you your sentence.  It

9    is a year and a day.  I'm going to make some statements on the

10   record, and then I'm going to make some additional comments.

11         18, U.S. Code, Section 3553(a)(6) provides that "a

12   court, in determining the particular sentence to be imposed,

13   shall consider, among a number of factors, the need to avoid

14   unwarranted sentence disparities among defendants with similar

15   records who have been found guilty of similar conduct."  Thus,

16   as required by this statute, and as I would do regardless, I

17   have certainly carefully considered the results in the other

18   HealthSouth cases in arriving at a reasonable sentence.

19         Your co-conspirators who have been sentenced, with

20   the exception of Weston Smith, received very light sentences,

21   ranging from probation to a three-month sentence.  Three of the

22   defendants who received light sentences were Chief Financial

23   Officers, who actively participated, often for years, in a

24   massive fraud.

25         There will clearly be a disparity between the prison

1    sentence that I am imposing and the sentences of your

2    co-conspirators.  I believe that this disparity would be a

3    legitimate reason to give you a lower sentence than what I

4    think you deserve.

5          Again, Section 3553(a) provides that "A court, in

6    determining the particular sentence to be imposed, shall

7    consider among a number of factors the need to avoid

8    unwarranted sentence disparities among defendants with similar

9    records who have been found guilty of similar conduct."

10         However, it is my opinion that other Section 3553(a)

11   factors outweigh this factor.  Specifically, Section 3553(a)

12   provides in pertinent part that "in determining the particular

13   sentence to be imposed, the court shall consider the nature and

14   circumstances of the offense, the need for the sentence imposed

15   to reflect the seriousness of the offense, to promote respect

16   for the law and to provide just punishment for the offense and

17   the need for the sentence imposed to afford adequate deterrence

18   to criminal conduct."  All of these factors, and I will

19   elaborate on that in a minute, weigh in favor of a longer

20   sentence.

21         As noted, Section 3553(a)(6) commands that a court

22   consider the need to avoid unwarranted sentence disparities

23   among defendants with similar records who have been found

24   guilty of similar conduct.  The key word is "unwarranted."  In

25   addition to your co-conspirators, there have been many other

1   defendants in the recent past with similar records who have

2   been found guilty of similar conduct in other jurisdictions.

3   And although I won't read them for the record, I did in the

4   Bill Owens case, I will note for the record that the sentence

5   you will receive is not out of line with several sentences

6   imposed in several recent white collar cases for similar

7   defendants in federal court in other jurisdictions.

8           By giving you a custodial sentence longer than that

9   imposed on many of the other HealthSouth defendants, Mr. Brown,

10  I want you to know that I do not think you are the only

11  defendant who deserves such a sentence.  There are certainly

12  others who I believe deserve significantly longer sentences.

13          In my opinion, a person involved in fraud of this

14  magnitude, regardless of the amount of their cooperation or the

15  length of time since their involvement, deserves a sentence of

16  imprisonment that will be sufficient to serve as a deterrent to

17  those contemplating white collar fraud and also sufficient to

18  provide just punishment.

19          In my view, a sentence of probation accomplishes

20  neither of these two important sentencing objectives.  Neither

21  does a short custodial sentence.

22          To be candid, and as I am well aware, and it's

23  difficult for me to impose this sentence knowing this, there

24  are some of the HealthSouth defendants whose culpability could

25  be compared to yours who received probationary sentences.

1   There were others whose involvement in the fraud was clearly

2   more extensive and long standing who received probationary

3   sentences.

4           I regret that there will be a disparity between your

5   sentence and some of the HealthSouth defendants who, based on

6   reading their presentence reports, were guilty of similar or

7   worse conduct than the conduct to which you pled guilty.

8           I am also not unaware that you have undoubtedly

9   suffered due to the delay in your sentencing.  The government

10  requested that you not be sentenced until all of the

11  HealthSouth defendants were tried and all the cases were

12  completed, which only occurred recently when the Crumpler case

13  was completed.

14          Although the request for delay in your sentencing was

15  motivated by the government's desire to have you available for

16  necessary meetings, and I know you didn't testify, but you were

17  available to testify if needed, the uncertainty of your fate in

18  the years since your plea have, I am sure, been difficult for

19  you and have made you unable to get on with your life.

20          While I recognize and certainly accept that you have

21  suffered, that fact frankly weighs very little in my decision

22  as to an appropriate sentence, and this is because, like all

23  the defendants in the HealthSouth case, your suffering is a

24  suffering of your own making.  And I recognize that you

25  accepted full responsibility for that.

1    You are guilty of participating in a massive

2  corporate fraud.  As I said earlier, frankly, the magnitude of

3  it is mind boggling to me.

4    In addition to the loss to the shareholders,

5  HealthSouth, the company, suffered enormous monetary losses in

6  the hundreds of millions of dollars.  Hundreds of HealthSouth

7  employees lost their jobs, and those that remained faced both

8  the uncertainty brought to their lives as a result of the

9  announcement of the fraud and the need to devote countless

10  hours to the stabilization and rebuilding of the company while

11  continuing to focus on providing quality care to their

12  patients.

13    I think the last part of my sentence is important

14  enough to repeat.  And I know you lost your job, but you were

15  involved in the fraud.  Hundreds of innocent HealthSouth

16  employees lost their jobs as a result of the fraud.

17    As I said at Mr. Owens' sentencing, the HealthSouth

18  accounting fraud is one of the largest in the history of our

19  country.  You were involved at least with regard to one small

20  period of time in putting on the books of HealthSouth over 27

21  million dollars in assets that the company did not have in that

22  year.

23    And I recognize that unlike many of those who got

24  probationary sentences, you did not personally benefit, and I

25  regret that your sentence is more severe than some of those

1  defendants.  But it is this court's intention that corporate

2  offenders in the Northern District of Alabama understand

3  clearly that white collar criminals will not be treated

4  leniently by this court.

5       Corporate offenders are nothing more than common

6  thieves wearing suits and wielding pens as their weapons.

7  Corporate executives' ambition for material wealth, corporate

8  success and social stature will not be fulfilled through

9  bilking innocent investors who place their life savings and

10  trust in them.

11       The criminal fraud which thrived in the culture of

12  corporate greed that existed at HealthSouth will not be

13  tolerated by this court.

14       The court finds that the government's motion for

15  downward departure pursuant to Section 5K1.1 and 18, U.S. Code,

16  Section 3553(e) based on the defendant's substantial assistance

17  to the government should be granted.

18       The court finds that the appropriate Guideline level

19  for consideration should be a Level 13 which, when combined

20  with a Criminal History Category of I, creates an advisory

21  Guideline range of 12 to 18 months, and a fine range from

22  $3,000 to $30,000.  The supervised release term is from two to

23  three years.

24       The court has departed based on the court's

25  evaluation of the significance and usefulness of the

1    defendant's assistance, taking into consideration the

2    government's evaluation of the assistance rendered, the

3    truthfulness, completeness and reliability of the information

4    provided by the defendant, the nature and extent of the

5    defendant's assistance, the risk of injury to the defendant.

6    In my view, all of the HealthSouth defendants who cooperated

7    placed themselves at some potential risk or danger.

8         Also the court has considered the timeliness of the

9    defendant's assistance.  I am not considering it in a negative

10   way at all that you did not come forward initially.  You did,

11   as soon as you were approached, cooperate.

12        Although the court recognizes its discretion under

13   Booker to further modify the sentence, it specifically declines

14   to do so.

15        Pursuant to the Sentencing Reform Act of 1984, it is

16   the judgment of the court that the defendant, Jason Brown, is

17   hereby committed to the custody of the Bureau of Prisons to be

18   imprisoned for a term of 12 months and one day.

19        Having considered the Guideline computations and

20   having taken them under advisement, the court finds that the

21   sentence is reasonable when considering the following

22   sentencing factors found at 18, U.S. Code, Section 3553(a).

23   First, the nature and circumstances of the offense.  As noted,

24   the HealthSouth accounting fraud was one of the most extensive

25   in the nation.  This defendant's participation helped

1  facilitate and conceal the fraud from auditors which resulted

2  in thousands of members of the investing public suffering

3  losses, millions of dollars in losses to HealthSouth, and the

4  loss of hundreds of employees' jobs at HealthSouth.

5          The court has also considered the history and

6  characteristics of the defendant.  The court recognizes that

7  the defendant has otherwise lived as a law-abiding citizen, and

8  the court has read and considered and finds very impressive all

9  the letters supporting the defendant's otherwise exemplary

10 character and has taken those into consideration.

11         The court has also taken into consideration the need

12 for the sentence imposed to reflect the seriousness of the

13 offense, to promote respect for the law and to provide just

14 punishment for the offense.

15         The court, as noted, does not take white collar crime

16 lightly.  This defendant's fraud involved over a billion

17 dollars and numerous victims.  It is the intent of the court

18 that the sentence imposed will promote respect for the laws

19 that protect citizens from this type of corporate fraud.

20         A year and a day is just punishment when taking into

21 account the fact that the original advisory Guideline range is

22 60 months, combined with the defendant's cooperation which is

23 resulting in the lower sentence.

24         The court is also taking into consideration the need

25 for the sentence imposed to afford adequate deterrence to

1  criminal conduct and to protect the public from further crimes

2  of the defendant.

3       The court believes that due to the defendant's

4  acceptance of responsibility and remorse, that a custodial

5  sentence is not needed to deter this defendant from further

6  criminal conduct.

7       However, the sentence is intended to send a message

8  to other corporate executives, no matter what their role, who

9  may be considering engaging in fraudulent behavior that a

10  custodial sentence will be forthcoming if they are caught.

11       Finally, the court has considered the need to avoid,

12  as mentioned, the unwarranted sentence disparities among

13  defendants with similar records who have been found guilty of

14  similar conduct.  Again, the key word is "unwarranted."

15       The various participants in the HealthSouth

16  conspiracy played different roles and had different periods and

17  degrees of involvement.  And I've noted that there are some who

18  had much more serious involvement than Mr. Brown who received

19  probation.

20       However, this court agrees with the holding in U.S.

21  versus Gallegos, 129 F.3d, 1140, 1143 (10th Cir. 1997), that

22  the purpose of the Guidelines is to eliminate disparities in

23  sentencing nationwide, not to eliminate disparity among

24  co-defendants.

25       As noted, the court has examined sentences from other

1    cooperating defendants in this district as well as numerous

2    sentences in corporate fraud cases, recent corporate fraud

3    cases, from around the nation.  Again, and I will state it

4    again, a person involved in a fraud of this magnitude,

5    regardless of the amount of their cooperation or the length of

6    their time in the involvement, deserves a sentence of

7    imprisonment that will be sufficient to serve as a deterrent to

8    those contemplating white collar crime and provide just

9    punishment.  And in my view, a sentence of probation or a short

10   custodial sentence accomplishes neither of these two sentencing

11   objectives.

12       The court finds that the sentence imposed is a

13   reasonable one in light of the Guidelines and the factors at

14   18, U.S. Code, Section 3553(a) and concludes that the sentence

15   imposed would have been the same regardless of how the

16   Guideline issues, particularly with regard to the loss amount,

17   had been resolved.

18       Pursuant to 18, U.S. Code, Section 3663(a)(c)(3) and

19   U.S. Sentencing Guideline Section 5E1.1, the court finds that

20   the number of identifiable victims is so large as to make

21   restitution impracticable, and determining complex issues of

22   fact related to the amount of victims' losses would complicate

23   or prolong the sentencing process to a degree that the need to

24   provide restitution to any victim is outweighed by the burden

25   on the sentencing process.  Therefore, no restitution is

1   ordered.

2          I am not imposing a fine.  It is further ordered that

3   the defendant shall pay to the United States a special

4   assessment of $100.  The assessment fee is due immediately.

5          Upon release from imprisonment, the defendant is

6   placed on supervised release for a term of two years.  While on

7   supervised release, the defendant shall comply with the

8   standard conditions of supervised release of record in this

9   court and the following special condition:

10          The mandatory drug testing provisions of 18, U.S.

11   Code, Section 3583(d) are waived upon the court's finding that

12   the offense of conviction is not drug related.  There is no

13   current or past history of substance abuse, and there is a low

14   risk of future substance abuse by the defendant.

15          Is there any objection from any party as to the

16   findings of fact, the calculations, the sentence or the manner

17   in which the sentence was pronounced or imposed other than

18   previously stated for the record?  Anything for the government?

19          MR. INGRAM:  Your Honor, just three items of

20   housekeeping.  With regard to Count Two, the forfeiture count,

21   the government would move to dismiss that.

22          THE COURT:  All right.  It will be dismissed.

23          MR. INGRAM:  With regard to the departure, just for

24   the record, the government would lodge an objection as to the

25   extent of the departure.

1          And, thirdly, just a matter of clarification, if I

2  may, when the court found its loss calculation, did that

3  include a finding both with regard to shareholders and

4  bondholders?

5          THE COURT:  Yes, I accepted the finding in the

6  presentence report.

7          MR. INGRAM:  So that was roughly the 1.8 million for

8  shareholders and then --

9          THE COURT:  I would have to look back at it.  Wasn't

10  that right?

11          MR. INGRAM:  I just may have taken it down wrong.

12          PROBATION OFFICER RICHARD:  The shareholders was the

13  1.8 million.  You did not add in your findings the bondholders.

14          THE COURT:  Let me look here.  I overruled the

15  objection to the presentence report, and the objection to the

16  bondholders is included in the presentence report.  I intended

17  to say, if I didn't say it, that it's the amount that's in

18  Paragraph 61 which is $2,836,393,638.

19          MR. INGRAM:  Thank you.  I just wanted to make sure.

20          THE COURT:  I may have only talked about the loss to

21  shareholders, but that was my intention.

22          MR. INGRAM:  Other than that, nothing else from the

23  government, Your Honor.  Thank you.

24          THE COURT:  All right.  Mr. Espy, anything else for

25  the defendant?

1          MR. ESPY:  No, ma'am, except we do except as to the

2     disparity, which the court has talked about.

3          THE COURT:  Right.  Okay.  I will let you tell me

4     within reason when he would like to report, and also I will

5     recommend that he be placed in a facility as close as possible

6     to his home.  Is that in Birmingham now?

7          MR. ESPY:  Yes, ma'am, it is.  He is in Birmingham.

8          THE COURT:  You all can talk a minute.  Let me say

9     this, Mr. Brown:  I know today seems the bleakest day of your

10    life and that you don't know how you're going to get through

11    this or that your family is or any of this.  But you were a

12    person who has admitted what you did.  You followed

13    directions.  A lot of people in your situation did the same

14    thing.

15         I really am confident with these people behind you

16    and just the character that you have that you can come forward

17    and be successful in life.  It's severe punishment, but this

18    whole crime, including your involvement in it, was very

19    serious.  And I want you to know that I wish you really well

20    when this is over.  And I know no one in the room -- all I can

21    tell all of you is that this sentence, as well as Mr. Owens'

22    sentence, because of the way these cases have gone, has caused

23    me a lot of soul searching.  And it's something I considered

24    very seriously.

25         Each judge on this court has to give the sentence

1    that they think is appropriate, and so that's what I've done.

2    Just as every other judge gave the sentence they thought was

3    appropriate, I'm giving the sentence I think is appropriate,

4    but I'm aware that there's a disparity in the sentence you

5    received and others who were much more involved, and that is

6    not something that is easy for me to do.

7            I will let you sit there and talk for a minute or

8    two, and then you can -- let me see counsel just briefly.

9            (Brief pause)

10           THE COURT:  All right.  What has the defendant

11   decided?

12           MR. ESPY:  February 1st, Your Honor.

13           THE COURT:  All right.  Mr. Brown, I will direct you

14   report to the designated institution or to the U.S. Marshal

15   downstairs at 10:00 a.m. on February 1st.  Until then you're

16   continued on your same bond, including the condition that you

17   not violate any local, state or federal law.  Do you

18   understand?

19           THE DEFENDANT:  Yes, ma'am.

20           THE COURT:  I don't think I said, but you have the

21   right to appeal the sentence imposed, even though I think that

22   right may have been given up in the plea agreement, but I

23   always tell a defendant at sentencing that he has the right to

24   appeal the sentence imposed within ten days if he believes the

25   sentence is in violation of the law.  Anything further from the

1    government?

2            MR. INGRAM:  Nothing from the government.

3            THE COURT:  Anything further from the defendant,

4    Mr. Espy?

5            MR. ESPY:  No, ma'am.

6            THE COURT:  Thank you.

7            (Court adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF ALABAMA

3                    SOUTHERN DIVISION

4

5  UNITED STATES OF AMERICA    *    CR-03-B-338-S

6          V.             *

7  JASON BROWN              *

8  * * * * * * * * * * * * * * * * * * * * * * * * *

9

10                CERTIFICATE OF REPORTER

11

12      I, Julie A. Martin, Official Court Reporter for the

13  United States District Court, Northern District of Alabama, do

14  hereby certify that the foregoing 96 pages are a true and

15  accurate transcript of the proceedings had in this matter, as

16  herein above set forth, and that I have no interest of any

17  nature whatsoever regarding the ultimate disposition of this

18  litigation.

19      I further certify that the transcript fees and format

20  comply with those prescribed by the Court and the Judicial

21  Conference of the United States.

22

23  _____    _____

24  Julie A. Martin, RMR, CRR        Date

25  Official Court Reporter