06641

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ALABAMA
2          SOUTHERN DIVISION

3

4  UNITED STATES OF AMERICA,

5              CR-03-BE-530-S

6    v.           Birmingham, Alabama

7  RICHARD M. SCRUSHY,      March 3, 2005

8
       Defendant.
9
   *********************
10

11
           TRANSCRIPT OF TRIAL
12   BEFORE THE HONORABLE KARON O. BOWDRE
     UNITED STATES DISTRICT JUDGE, and jury.
13

14

15          VOLUME XXIV

16

17

18

19

20

21

22

23

24

25

06745

1  we've got some ideas of how to fix it. We're not

2  going to do this forever.

3      He was articulating what he and I had

4  talked about, we needed to fix this problem, and

5  we needed to do something to fix it. And we

6  didn't want to do it everyday. We didn't want to

7  continue to do it. And he was just communicating

8  what he and I had already talked about to

9  Mr. Livesay.

10 Q.  During 1999, did HealthSouth consider any

11 strategic alternatives to deal with the problems

12 that were going on?

13 A.  Yes, sir.

14     MR. LEACH: Objection to HealthSouth,

15 Your Honor. We need to have a specific

16 individual.

17     THE COURT: All right.

18     MR. SMITH: We'll get there, Your

19 Honor.

20     THE COURT: Overruled. Quickly tie it

21 in.

22 Q.  Did you have any discussions with anyone

23 about the different alternatives that could be

24 done to address the problems?

25 A.  Yes, sir.

06746

1  Q.  Who did you speak with? And tell us what
2  those alternatives were.
3  A.  I spoke with Bill McGahan, our investment
4  banker, who I mentioned earlier today, and I also
5  spoke with Mr. Scrushy regarding those different
6  alternatives.
7  Q.  How many alternatives were there that were
8  being considered at this time?
9  A.  Mr. Smith, we would consider a number of
10 alternatives at any given time. I think every
11 public company is always looking at different
12 alternatives. So, we had a wide range of
13 alternatives that we were exploring.
14 Q.  Have you heard of Manorcare before?
15 A.  Yes, HCR Manorcare.
16 Q.  Can you tell us what that is?
17 A.  That's a public company that is in the
18 long-term care business.
19 Q.  Was Manorcare part of the one of the
20 alternatives that was being considered in 1999?
21 A.  Yes, sir, it was.
22 Q.  Let's talk about that alternative. Can you
23 tell us what that was and tell us whether you had
24 any discussions with the defendant about
25 Manorcare?

06747
1  A.  HCR Manorcare was a long-term care
2  company. It was about half the size of
3  HealthSouth. And one of the options that we were
4  exploring to overcome the issues that we faced on
5  missing Wall Street's expectations was doing a
6  large merger.
7      And that was one of the candidates that
8  came up when we started exploring candidates to do
9  a merger with.
10 Q.  Did you have any discussions with the
11 defendant about the possibility of doing a merger
12 with Manorcare to deal with the problems that
13 HealthSouth was experiencing?
14 A.  Yes, sir.
15 Q.  Mr. Scrushy and I had a number of
16 discussions relating to merging with Manorcare.
17 A.  Tell us about those discussions you and the
18 defendant had about that alternative.
19 Q.  Well, we first ran a model internally, as
20 well as investment bankers, which I went over with
21 Mr. Scrushy, which basically showed that the
22 option of merging with Manorcare looked pretty
23 good on paper at first glance.
24     So, we continued to explore whether or
25 not that would make any sense.

06748

1  Q.  When did you begin exploring this

2  alternative in 1999?

3  A.  It was sometime in the early spring of

4  1999.

5  Q.  What, if anything, did the defendant say

6  about potentially merging with Manorcare?

7  A.  Well, he wanted to explore it further, and

8  he asked me to ask Bill McGahan, our investment

9  banker, to set up a meeting or a call, a

10 telephonic call, between Paul Ormand, the chairman

11 and CEO of Manorcare, and himself.

12 Q.  Was that call set up?

13 A.  Yes, sir, it was.

14 Q.  Were you present when the call took place?

15 A.  Yes, sir, I was.

16 Q.  Were you able to hear what the defendant

17 said during the course of that conversation?

18 A.  Yes, sir.

19 Q.  Can you please tell the jury what the

20 defendant said when he spoke with Mr. Ormand?

21 A.  They exchanged greetings, and we talked

22 about the healthcare business and things kind of

23 at a high level. And we already knew, from Bill

24 McGahan, that Mr. Ormand was interested in

25 pursuing this.

06749

1  So, Mr. Scrushy invited Mr. Ormand to
2  come to Birmingham to meet with us to discuss --
3  to further discuss the possibly combination of the
4  two companies.
5  Q.  Did Mr. Ormand come to Birmingham?
6  A.  Yes, he did.
7  Q.  Did you meet with him?
8  A.  Yes, sir, I did.
9  Q.  Did the defendant meet with him?
10 A.  Yes, sir, he did.
11 Q.  Were you present when the defendant met
12 with Mr. Ormand?
13 A.  For the most part, I was.  They had a
14 private meeting at one point during the day.
15 Q.  Do you recall what, if anything, the
16 defendant told Mr. Ormand in your presence while
17 he was here?
18 A.  He told Mr. Ormand that it looked like the
19 combination of the two companies would be good,
20 and that he wanted to further explore it.  He
21 wanted our people to go up and visit their
22 headquarters, and then their people come down and
23 visit HealthSouth.
24 Q.  After that meeting, did representatives
25 from HealthSouth travel to Mr. Ormand's company?

06750

1 A. Yes, sir.

2 Q. Can you tell us who went and where they

3 traveled to?

4 A. HCR Manorcare is located in Toledo, Ohio.

5 And Mr. Scrushy, myself and Mr. Owens, Leif

6 Murphy, Tom Carman and Bill Horton, among others,

7 went up to meet with him.

8 Q. Do you recall what was done during the

9 course of the meeting while you all were at

10 Mr. Ormand's company?

11 A. The team, the HealthSouth team, met with

12 the HCR Manorcare team and discussed their

13 business and went through preliminary due

14 diligence with them, trying to understand what

15 their company was doing, how things were impacting

16 the company, the financial position of the

17 company.

18     Mr. Murphy and their CFO, whose name

19 escapes me now, and Mr. Owens had a separate

20 meeting relating to their financials. And we

21 spent pretty much a large part of the day up

22 there.

23 Q. You mentioned preliminary due diligence.

24 What is due diligence?

25 A. Due diligence is for a company that's going

06751

1  in and understanding the financials, understanding

2  the cash flow of the business, understanding the

3  risk, understanding the challenges that's facing

4  the company and evaluating whether or not the

5  company is doing what it says it's doing.

6  Q.  Did you have any concerns about the due

7  diligence process in relation to this merger?

8  A.  At this stage of the game, the preliminary

9  due diligence that we were performing on them, I

10 did not.

11 Q.  Did representatives from Mr. Ormand's care

12 company, Manorcare, come to Birmingham?

13 A.  Yes.  One of their largest shareholders, a

14 part of the Bynum family, came and spent a day

15 with the HealthSouth team.  So in addition to

16 Mr. Ormand coming earlier and spending a day, then

17 he sent one of his board members to spend a day

18 and interview virtually all of the executives at

19 HealthSouth.

20 Q.  Did HealthSouth complete the proposed

21 merger with Manorcare?

22 A.  No, sir.

23 Q.  Could you please tell us why not?

24 A.  Sometime, I think, in May of 1999, we got

25 approval from our Board to proceed with the merger

06752

1 and proceed with the due diligence.

2 At the same time, we were continuing to
3 see a decline in our revenues. The weekly trends
4 were continuing to go down, as well as the monthly
5 numbers for the first of the year, up through May,
6 were looking worse and worse.

7 And because of that, I became concerned
8 that if we merged with HCR Manorcare, then the
9 fraud would either be exposed in the due diligence
10 or on the other side of the transaction after we
11 closed it, and it would just make a bigger mess.

12 It would not only involve HealthSouth,
13 but it would involve, you know, a whole other
14 company that was half HealthSouth's size at that
15 time.

16 Q. Did you have any discussions with the
17 defendant about your concerns?

18 A. I had a number of discussions with
19 Mr. Scrushy.

20 Q. Can you tell us what you told the defendant
21 during the discussions, and also tell us what he
22 said to you when you expressed your concerns?

23 A. Well, I told him that I thought that we
24 were going to have a hard time making it through
25 due diligence. And he was -- the proposed