```
06641
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ALABAMA
 2             SOUTHERN DIVISION

 3

 4  UNITED STATES OF AMERICA,

 5              CR-03-BE-530-S

 6    v.        Birmingham, Alabama

 7  RICHARD M. SCRUSHY,    March 3, 2005

 8
       Defendant.
 9
    *********************
10

11
           TRANSCRIPT OF TRIAL
12    BEFORE THE HONORABLE KARON O. BOWDRE
      UNITED STATES DISTRICT JUDGE, and jury.
13

14

15            VOLUME XXIV

16

17

18

19

20

21

22

23

24

25
```

06755
1 of years before to Integrated Health, because we
2 didn't want to be in that business.
3 　　　So I wasn't so sure, and I think even
4 Mr. Scrushy wasn't so sure that that was
5 strategically the best move.
6 　　　MR. LEACH: Objection, Your Honor, to
7 Mr. Scrushy's knowledge.
8 　　　THE COURT: Sustained.
9 A.　I'm sorry. At any rate, it was -- I did
10 not believe it was a strategic move for the
11 company, a good strategic move for the company.
12 　　　So, I enlisted Bill McGahan, who was
13 our investment banker at that time, to assist me
14 in talking Mr. Scrushy out of doing the
15 transaction based on the fact that it was not a
16 good strategic fit. It didn't really fit with the
17 HealthSouth business.
18 Q.　Tell us how -- how did you get Mr. McGahan
19 to help you speak with the defendant about this
20 transaction?
21 A.　We were continuing to negotiate with
22 Mr. Ormand. And our price -- our stock price had
23 gone down, and their stock price had gone up, and
24 it was really not even making good sense in black
25 and white on paper.

06756
1     But Mr. Scrushy wanted to talk to me
2  about it. I got a call from Mr. Scrushy. He was
3  at his lake house, and he told me that he wanted
4  McGahan and I to come down to his lake house to
5  discuss whether or not we should do this.
6  Q.  Did you and Mr. McGahan travel down to the
7  defendant's lake house?
8  A.  Yes.
9  Q.  Do you recall where his lake house is
10 located?
11 A.  It's at Lake Martin.
12 Q.  Do you recall when you and Mr. McGahan
13 traveled to Mr. Scrushy's lake house to talk with
14 him?
15 A.  It was sometime in early June of 1999.
16 Q.  Tell us how you and Mr. McGahan travel down
17 to meet with Mr. Scrushy?
18 A.  Mr. McGahan was in New York that morning
19 when I got the call from Mr. Scrushy telling us to
20 come down and see him. So I met Mr. McGahan at
21 the airport, and then we took one of HealthSouth's
22 planes down to Lake Martin.
23 Q.  Did you have any conversation with
24 Mr. McGahan while you were traveling from
25 Birmingham down to Lake Martin?

06757

1  A.  Yes. I told Mr. McGahan that he had to
2  help me talk Mr. Scrushy out of this, because we
3  were not making our numbers. We were missing our
4  numbers by over three hundred million dollars at
5  that point or more. And I told him that, if we
6  did this transaction, that we would all go to
7  jail.
8  Q.  Did you and Mr. McGahan meet with the
9  defendant to talk about the proposed merger with
10 Manorcare?
11 A.  Yes, sir, we did.
12 Q.  Was there a conversation between you and
13 the defendant with Mr. McGahan being present?
14 A.  Yes. And the conversation with Mr. McGahan
15 being present centered around the strategic issues
16 with the merger. Mr. McGahan was not about to
17 bring up the fraud with Mr. Scrushy.
18     MR. LEACH: Objection, Your Honor.
19     THE COURT: Sustained.
20 Q.  Just tell us what you told the defendant
21 while Mr. McGahan was present and what the
22 defendant said to you during that conversation.
23 A.  I told the defendant I didn't think we
24 needed to do the transaction based on the fact
25 that we would be getting back into the nursing

06758
1  home business, and I didn't think it was a good
2  strategic move for HealthSouth.
3  Q.   What, if anything, did the defendant say
4  back to you, if you recall?
5  A.   When Mr. McGahan was present or --
6  Q.   While he was present first.
7  A.   He continued to think it was a good
8  transaction, and he was continuing to want to go
9  forward with it.
10 Q.   Did there come a time when Mr. McGahan left
11 the conversation?
12 A.   Yes.
13 Q.   Did you and Mr. Scrushy have additional
14 conversation without Mr. McGahan being present?
15 A.   We did.
16 Q.   Can you please tell us what you said and
17 what the defendant said when Mr. McGahan was not
18 present?
19 A.   I told Mr. Scrushy that if we go through
20 with this transaction, that the fraud would be
21 exposed. And I said the "fraud" (indicating).
22 Never before had I used that word "fraud."
23      And Mr. Scrushy, at that point, realized
24 that we didn't need to do it if I felt like --
25      MR. LEACH: Objection to realized, Your

06759

1 Honor.

2      THE COURT: Sustained.

3 Q.   After you told Mr. Scrushy that the fraud

4 would be exposed, did you all proceed with the

5 transaction?

6 A.   No, sir.

7 Q.   Did the defendant ask you any questions

8 after you told him that the fraud would be exposed

9 and the deal was not going to take place?

10 A.   Mr. Scrushy, because of the fact that

11 McGahan was nearby, said, did you tell Bill, Bill

12 McGahan? And I said, yeah, I told him, but he

13 won't tell anybody because he has as much to lose

14 as we do.

15 Q.   What were you talking about when you said

16 yeah, I told Mr. McGahan, but he won't say

17 anything?

18 A.   I was talking about the fraud.

19 Q.   Was there another alternative on the table

20 at the same time while you were considering

21 Manorcare? Was HealthSouth considering doing

22 anything else?

23 A.   Yes, sir. We had left on the table the

24 alternative to split the company into two pieces

25 that we were looking at back in 1998.

```
06817
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ALABAMA
 2            SOUTHERN DIVISION

 3

 4  UNITED STATES OF
    AMERICA,
 5
               CR-03-BE-530-S
 6
       v.        Birmingham, Alabama
 7
               March 4, 2005
 8  RICHARD M. SCRUSHY,

 9      Defendant.

10  *********************

11      TRANSCRIPT OF TRIAL
    BEFORE THE HONORABLE KARON O. BOWDRE
12  UNITED STATES DISTRICT JUDGE, and jury.

13

14
            VOLUME XXV
15

16

17

18

19

20

21

22

23

24

25
```

07024

1  A.  I don't recall saying that.

2  Q.  Do you ever recall on the same date and

3  time, the same FBI agent admitting that, in fact,

4  you had advised that McGahan knew that the numbers

5  were inflated?

6  A.  No, I don't remember that.

7  Q.  Do you ever recall having a conversation

8  with Mr. McGahan concerning cooking the books at

9  HealthSouth?

10 A.  You are asking me my recollection of what I

11 just said?

12 Q.  I'm asking you at any time --

13 A.  I had a conversation --

14 Q.  -- did you have a conversation with Bill

15 McGahan about cooking the books at HealthSouth.

16 A.  I had a conversation with Bill McGahan that

17 we had a three hundred million dollar problem some

18 time in the summer of 1999.

19 Q.  During that conversation, did you refer to

20 it as cooking the books?

21 A.  No, sir.

22 Q.  Did you tell the FBI agents on 10-9-03 and

23 2-9-04 Mr. McGahan knew of and used cooking the

24 books, quote/unquote?

25 A.  I can't tell you what was written in an FBI

07025
1  report. I didn't write that report. I haven't
2  reviewed it.
3  Q.  Did you ever tell them that?
4  A.  I told them what I just told you.
5  Q.  Did you ever have any conversations with
6  Mr. McGahan about waiting until the statute of
7  limitations had past on your case?
8  A.  Yes, sir, I did.
9  Q.  And when did that occur the first time?
10 A.  It was after I left the company.
11 Q.  When was it?
12 A.  I'm thinking. It was probably, the first
13 conversation I had with him regarding that was in
14 2000.
15 Q.  Okay.
16 A.  Subsequently, virtually every quarter when
17 HealthSouth would get one more quarter out, he
18 would tell me, I have got one more quarter under
19 my belt to get out of the statute of limitations,
20 if fraud was ever discovered.
21 Q.  Okay.
22 A.  And the irony of it is I didn't understand
23 the law and how far reaching it was and it didn't
24 matter.
25 Q.  So when he used the term, and you talked to

07026
1  him about the term statute of limitation, what
2  does that mean?
3  A.   What does statute of limitations mean?
4  Q.   Yes.
5  A.   I'm not a lawyer, but my --
6  Q.   You talked to Mr. --
7  A.   My impression at that time was the time
8  that had past between when I left HealthSouth and
9  when -- if HealthSouth was ever discovered of
10  committing fraud.
11       But my lack of legal knowledge, which
12  is still severely lacking, is if you leave a
13  conspiracy and you don't come down here and turn
14  yourself in, you don't leave the conspiracy. So I
15  had never left the fraud. I quit the company, and
16  I am still, even though I am thinking they are
17  going to be on solid ground, I am committing fraud
18  just as much as they are and I am not even there.
19  Q.   Are you through with your answer?
20  A.   Yes, sir.
21  Q.   Talking to Mr. McGahan, what were you
22  talking about with him when y'all talked about the
23  statute of limitations passing?
24       MR. SMITH: Objection, asked and
25  answered, Your Honor.

07027

1    THE COURT: Overruled.
2  Q.  Thank you, Your Honor.
3  A.  I was talking about what I had told him in
4  1999. And in 1999, I told him that we had a three
5  hundred million dollar problem that we were
6  dealing with on our books.
7  Q.  Now, you said Mr. McGahan was never
8  involved in the conspiracy; is that correct?
9  A.  I think I said Mr. McGahan did not
10 participate in the conspiracy.
11 Q.  Do you consider giving advice to someone in
12 a conspiracy about how to do it, being a member of
13 a conspiracy?
14 A.  I am not in a position to give that kind of
15 opinion.
16 Q.  Did Mr. McGahan ever give you advice about
17 how to handle the conspiracy and the cover up of
18 the fraud?
19 A.  No, sir.
20 Q.  Never?
21 A.  No, sir.
22 Q.  Can you tell me on 10-9-03, did you have a
23 conversation with the FBI agents at which time you
24 told them that Bill McGahan had told you to,
25 quote/unquote, bake the earnings for several

07028
1  quarters, unquote?
2  A.  That's correct.
3  Q.  What does it mean to bake the earnings for
4  several quarters?
5  A.  We were using aggressive, my opinion is we
6  were using aggressive acquisition accounting to
7  inflate earnings.
8  Q.  So aggressive accounting, though, is not
9  fraud, right?
10  A.  At that stage of the game, I didn't think
11  so.
12  Q.  Okay.
13  A.  When I did it.
14  Q.  Right. You thought it was just aggressive
15  accounting?
16  A.  Right.
17  Q.  You are not an accountant?
18  A.  That's right.
19  Q.  When Mr. McGahan talked about simply baking
20  the earnings for several quarters, he simply is
21  meaning what now, when y'all are discussing it,
22  what do you need to do to be just aggressive? How
23  do you do the numbers?
24  A.  I'm not sure what your question is.
25  Q.  Y'all are talking and you admit that he

07029

1 tells you to bake the earnings for several

2 quarters and you thought it was just aggressive

3 accounting.

4 A.  I don't -- sir, I don't know what you are

5 reading. Are you asking me a question?

6 Q.  Yes.

7 A.  What is the question?

8 Q.  The question is, did you tell an FBI agent

9 McGahan told you to bake the earnings and you said

10 yes, correct?

11 A.  Right.

12 Q.  And then I asked you to tell me what it

13 meant by baking the earnings and you said it was

14 simply using aggressive accounting.

15 A.  That's right.

16 Q.  Okay.

17 A.  Okay.

18 Q.  So tell me how you do it.

19     MR. SMITH: Time frame.

20 Q.  When he told him about baking the numbers,

21 how did you bake the numbers that was aggressive

22 accounting, in what areas?

23     MR. SMITH: Time frame when this

24 happened, Your Honor.

25     THE COURT: Give us a time period.

07038
1  Q.  What is the tree in your example?
2  A.  Doing that transaction is the tree.
3  Q.  Is the tree?
4  A.  That's right.
5  Q.  So, according to chipping away at the tree,
6  the chipping away came from getting Mr. McGahan to
7  talk to Richard Scrushy about it being simply bad
8  business to go in and do the merger, that is the
9  chipping away, correct?
10 A.  I wouldn't characterize it as bad business,
11 per se. I would characterize it as not meeting
12 with our strategic goals.
13 Q.  Being legitimate?
14 A.  I'm not saying legitimate or illegitimate.
15 Q.  What are you saying?
16 A.  I am just saying that it wasn't the type of
17 business that HealthSouth needed to be getting
18 into, just after we had sold for a billion two a
19 number of facilities just like what we were
20 talking about merging with.
21 Q.  But you remember in your conversation with
22 Mr. McGahan on the ride out, you said, look, we
23 are three hundred million short, right?
24 A.  At least three hundred million short.
25 Q.  Okay. Not four hundred million?

07039
1  A.  I could have said three to four hundred.
2  The truth of the matter, it was probably three to
3  five hundred million.
4  Q.  So you tell Mr. McGahan, we are three to
5  five hundred million dollars short, he now knows
6  about the fraud?
7  A.  He has knowledge of the fraud.
8  Q.  And then you tell him, I want you to talk
9  Richard Scrushy out of this, the merger?
10 A.  Again, I asked him to explain the reasons
11 it didn't make strategic sense for HealthSouth to
12 go into that business.
13 Q.  Now, tell me the strategic reasons, what
14 they are?
15 A.  There weren't any.
16 Q.  How was he going to explain strategic
17 reasons if there weren't any?
18 A.  It was not a strategic -- there were no
19 strategic reasons.
20 Q.  How was Mr. McGahan going to talk to
21 Richard Scrushy at the lake house about strategic
22 reasons if there weren't any?
23 A.  He was going to explain to him there were
24 no strategic reasons for us to get into this
25 business because we had just unloaded one point

07042
1  again to make sure I understand it.
2  Q.  Let's go back through it because I want to
3  make sure that we are correct here.
4  A.  Yes, sir. I want to be very careful.
5  Q.  Got it. I want you to, too.
6  A.  Thank you.
7  Q.  You told us, did you not, that you
8  instructed Mr. McGahan that when he talked to
9  Richard Scrushy at the lake house to give him
10  legitimate business reasons why not to go ahead
11  with this merger?
12  A.  Correct.
13  Q.  Did you also tell Mr. McGahan that there is
14  fraud and we cannot go further with this deal,
15  this merger, because due diligence or whatever is
16  going to reveal it?
17  A.  Yes, sir.
18  Q.  Did you tell Mr. McGahan at that time that
19  if the fraud is revealed through this merger, we
20  are all going to go to jail?
21  A.  Yes, sir, I believe we did.
22  Q.  So, did you tell Mr. McGahan at that time
23  when we get to the lake, do not tell Mr. Scrushy
24  about any of the fraudulent things that could send
25  us to jail, only talk to him about the legitimate