were incorporated by reference in the Offering Memoranda for the HealthSouth Private Placements:

(a)    The September 2000 Private Placement's Offering Memoranda incorporated HealthSouth's Annual Report on Form 10-K for the year ended December 31, 1999 and Quarterly Reports on Form 10-Q for the periods ended March 31, 2000 and June 30, 2000.

(b)    The February 2001 Private Placement's Offering Memoranda incorporated HealthSouth's Annual Report on Form 10-K for the year ended December 31, 2000.

(c)    The September 2001 Private Placement's Offering Memoranda incorporated HealthSouth's Annual Report on Form 10-K for the year ended December 31, 2000 and Quarterly Reports on Form 10-Q for the periods ended March 31, 2001 and June 30, 2001.

(d)    The May 2002 Private Placement's Offering Memoranda incorporated HealthSouth's Annual Report on Form 10-K for the year ended December 31, 2001 and Quarterly Report on Form 10-Q for the period ended March 31, 2002.

38.    As HealthSouth has publicly acknowledged, each of these Incorporated Financials not only failed to conform to GAAP, but fraudulently and materially overstated HealthSouth's revenue, assets and cash flow and materially understated operating costs for the period of 1996 to 2002. (*See* ¶¶ 15-18.)

39.    Accordingly, and despite HealthSouth's representations to the contrary, HealthSouth's Incorporated Financial Statements failed to comply with the requirements of the Securities Exchange Act of 1934, and the regulations promulgated thereunder, and did not fairly present HealthSouth's financial condition, results of operation or cash flow.    In addition,

HealthSouth was not in material compliance with other federal securities laws and state laws, including, but not limited to the Securities Act of 1933.

40.    Contrary to HealthSouth's representations in the Purchase Agreements, the various Offering Memoranda also contained numerous other material misstatements and omissions concerning HealthSouth that UBS reasonably believed were accurate, because they were consistent with HealthSouth's audited financials, such as:

(a)    The statement that HealthSouth was one of the lowest cost providers of healthcare services in HealthSouth's primary line of business. As reflected in the Report, this statement was materially misleading, because HealthSouth had fraudulently capitalized its expenses and therefore materially understated its operating costs.

(b)    The statement that HealthSouth had implemented disciplined financial policies that have resulted in strong cash flow. In fact, as HealthSouth has now publicly acknowledged, the positive cash flows reported in HealthSouth's audited financials were largely fictitious.

(c)    The statement that HealthSouth's consolidated balance sheets were prepared in accordance with accounting principles generally accepted in the United States. As now acknowledged by HealthSouth and E&Y, HealthSouth's financial statements for the period of 1996 to 2002 did not conform to GAAP because of the fraudulent accounting scheme committed by numerous HealthSouth insiders.

(d)    The section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation" was replete with material misstatements and omissions concerning HealthSouth's financial condition, because that section recited false

information from HealthSouth's audited financials, including HealthSouth's materially and fraudulently inflated revenues and understated operating costs.

41.    Moreover, as recently acknowledged by HealthSouth, HealthSouth did not file and complete accurate tax returns during the period of 1996 to 2002, despite HealthSouth's specific representation to the contrary in the Purchase Agreements. According to HealthSouth spokesperson Andy Brimmer, HealthSouth overpaid its federal taxes by approximately $300 million as a result of its inflated revenues.

42.    As acknowledged by the Audit Committee, HealthSouth also did not have an adequate system of internal controls during the time period of the HealthSouth Private Placements, despite HealthSouth's representations to the Initial Purchasers to the contrary.

## III.    UBS's Provision of Financial Advisory Services Based on HealthSouth's Repeated False Misrepresentations

### A.    The Engagement Letters and HealthSouth's Representations and Warranties

43.    Between March 1999 to March 2003, UBS was retained by HealthSouth on several occasions to provide financial advisory services on investment banking transactions.

44.    The terms of UBS's retention by HealthSouth to provide financial advisory services are reflected in letter agreements between UBS and HealthSouth that were customary in the industry ("Engagement Letters").

45.    UBS, who was unaware that HealthSouth insiders were engaged in accounting fraud, agreed to provide financial advisory services to HealthSouth based on customary terms and conditions set forth in the Engagement Letters.

46.    The investment banking services provided by UBS to HealthSouth were at all times governed by the terms and conditions of one or more Engagement Letters provided to HealthSouth, including: (a) a July 12, 2000 Engagement Letter concerning the refinancing of

certain HealthSouth indebtedness; (b) a September 28, 2000 Engagement Letter regarding the proposed disposition of HealthSouth's diagnostic imaging business; (c) a March 4, 2002 Engagement Letter regarding a potential transaction with Bally's Total Fitness; (d) a July 15, 2002 Engagement Letter regarding a potential transaction with Radiologix; (e) an August 7, 2002 Engagement Letter concerning the proposed restructuring of HealthSouth; and (f) a November 15, 2002 Engagement Letter concerning the issuance of a fairness opinion.

47.    The Engagement Letters contained substantially similar language from transaction to transaction.    In the Engagement Letters, HealthSouth "recognize[d] and confirm[ed]" that UBS, as an investment bank and not an auditor, would primarily rely on HealthSouth's audited financial statements and other publicly available information without independent verification of that information.  (*See, e.g.*, August 7, 2002 Engagement at ¶ 5 (annexed as Exhibit B hereto).)

48.    In the Engagement Letters, HealthSouth also represented that the information that HealthSouth provided to UBS would be true and correct in all material respects and would not contain any material misstatement of fact or omit to state a material fact necessary to make the statements contained therein not misleading.  (*See, e.g.*, August 7, 2002 Engagement Letter at ¶ 5.)

### B.    HealthSouth's Indemnification of UBS

49.    In the Engagement Letters, HealthSouth also agreed to indemnify UBS for all losses, claims, damages, liabilities, costs and expenses that arise out of, or relate in any way to such Engagement Letter or the transaction contemplated by such Engagement Letter, except for certain losses resulting solely from the gross or willful misconduct of UBS.  (*See, e.g.*, Indemnification Agreement attached to August 7, 2002 Engagement Letter.)

## C.    HealthSouth's Breach of the Engagement Letters

50.    In connection with the financial advisory services that UBS provided to HealthSouth, HealthSouth employees systematically provided UBS and its employees with materially false information concerning HealthSouth's financial condition, operations and businesses, and concealed HealthSouth's true financial condition.

51.    As HealthSouth acknowledged in the Engagement Letters, UBS, as HealthSouth's investment banker and not auditor, was entitled to rely and did rely on HealthSouth's audited financials and other publicly reported information in providing advisory services to HealthSouth. HealthSouth, however, failed to advise UBS that those statements and HealthSouth's press releases concerning its financial condition were materially false and misleading.

52.    In addition, HealthSouth repeatedly provided UBS with other materially false information concerning HealthSouth's financial condition, operations and businesses in connection with the financial advisory services that UBS provided to HealthSouth. The following are just some examples:

(a)    HealthSouth repeatedly provided UBS with false financial models and projections for HealthSouth's businesses. HealthSouth had actual knowledge that the models materially overstated HealthSouth's past earnings and that the projections for HealthSouth's future earnings were not achievable, based on HealthSouth's true past performance.

(b)    HealthSouth falsely told UBS that HealthSouth's earnings were reduced in 1998 because of the Balanced Budget Act of 1997 and pricing pressure from managed care contracts. As revealed by the testimony of former HealthSouth CFO Michael Martin at the

Scrushy trial, this explanation was false, and was conceived by HealthSouth insiders as a cover story to conceal HealthSouth's past fraud and to reduce Wall Street's expectations for HealthSouth's earnings. (March 1, 2005 Testimony of Michael Martin at 6559-6600.)

(c)     HealthSouth falsely told UBS that HealthSouth's earnings were reduced by approximately $300 million in 1999 because of a restructuring charge. As revealed by Mr. Martin's testimony at the Scrushy trial, this representation was false and was another story concocted by HealthSouth insiders to conceal the HealthSouth fraud by falsely attributing revenue shortfalls to other problems. (March 4 Testimony of Michael Martin at 6848-6851.)

(d)     HealthSouth routinely reviewed the information contained in HealthSouth's audited and pro forma financial statements with UBS, and failed to advise UBS that those statements did not fairly represent HealthSouth's financial condition, as they materially overstated HealthSouth's earnings.

(e)     HealthSouth provided UBS and/or its counsel with Audit Results Reports prepared by E&Y for the years of 2000 and 2001. Those reports reflect that E&Y had issued unqualified opinions with respect to HealthSouth's consolidated financial statements for the years 2000 and 2001. HealthSouth failed to advise UBS that the Audit Results Reports were incorrect, because HealthSouth employees undertook "considerable effort" to conceal the accounting fraud at HealthSouth from E&Y to ensure that E&Y would issue those opinions despite HealthSouth's fraud.

(f)     In August 2002, HealthSouth retained UBS to provide advisory services on a potential transaction. HealthSouth told UBS that HealthSouth was considering such a transaction, in part, because of the effects of Center for Medicare and Medical Services Transmittal 1753 concerning reimbursements for outpatient physical therapy services.

According to testimony from Scrushy's trial, however, that statement was false – it was simply another false story devised by HealthSouth insiders to conceal the accounting fraud and to reduce outsiders' expectations for HealthSouth's earnings. (*See*, *e.g.*, February 4, 2005 Testimony of William Owens from Scrushy Trial at 2647-2651.)

53.    In March 2003, HealthSouth requested that UBS prepare leveraged buy out ("LBO") models.  UBS ran the first set of those models using the assumption that $250 million of HealthSouth's approximate $399 million publicly reported cash would be used to fund the proposed LBO of HealthSouth. After receiving those models, HealthSouth then told UBS to re-run the LBO models using the assumption that HealthSouth would not use any cash to fund the proposed LBO.    HealthSouth concealed from UBS that HealthSouth made that request because HealthSouth, contrary to publicly reported cash position, in fact had no cash.

### FIRST CLAIM FOR RELIEF
### (Breach of the Purchase Agreements)

54.    UBS repeats and realleges the allegations made in paragraphs 1 to 53.

55.    The  Purchase Agreements dated September 25, 2000, February 1, 2001, September 28, 2001, and May 17, 2002 created valid and binding contracts between HealthSouth and UBS.  UBS has satisfied its obligations under those contracts.

56.    By reason of its actions and inactions set forth above, HealthSouth has breached its obligations under the Purchase Agreements to the Initial Purchasers, including UBS.

57.    By virtue of these breaches, UBS has incurred substantial damages, including, but not limited to significant litigation costs.  UBS also has suffered, and continues to suffer, injury to its goodwill and reputation.

58.    By reason of the above, HealthSouth is liable to UBS for damages in an amount to be determined at a trial of this action.

## SECOND CLAIM FOR RELIEF
### (Breach of the Engagement Letters)

59.    UBS repeats and realleges the allegations made in paragraphs 1 to 58.

60.    The Engagement Letters created valid and binding contracts between HealthSouth and UBS.  UBS satisfied its obligations under those contracts.

61.    By reason of its actions and inactions set forth above, HealthSouth has breached its obligations under the Engagement Letters to UBS.

62.    By virtue of these breaches, UBS has incurred damages, including, including, but not limited to significant litigation costs.  UBS also has suffered, and continues to suffer, injury to its goodwill and reputation.

63.    By reason of the above, HealthSouth is liable to UBS for damages in an amount to be determined at a trial of this action.

## THIRD CLAIM FOR RELIEF
### (Indemnity)

64.    UBS repeats and realleges the allegations made in paragraphs 1 to 63.

65.    In the Purchase Agreements and Engagement Letters, HealthSouth agreed to indemnify and hold harmless UBS and its affiliates against any and all damages and costs (including attorney's fees and expenses) incurred by UBS or its affiliates and arising out of any misrepresentation or breach of warranty made by HealthSouth in the Purchase Agreements or Engagement Letters.

66.    As a result that indemnification, HealthSouth is responsible to UBS for any and all damages incurred by UBS as a result of HealthSouth breaches of the Purchase Agreements and/or Engagement Letters, including, but not limited to litigation costs, and any settlement, damages or other award in this or other litigations relating to HealthSouth.

- 68 -

67.    By reason of the above, HealthSouth is liable to UBS for damages in an amount to be determined at a trial of this action.

### FOURTH CLAIM FOR RELIEF
### (Fraud)

68.    UBS realleges and incorporates by reference the allegations in preceding paragraphs 1 to 67 herein.

69.    As set forth above, HealthSouth made numerous, material false representations to UBS, including providing UBS with false financial statements, models and projections. HealthSouth also omitted and concealed material information from UBS concerning HealthSouth.

70.    HealthSouth made these misrepresentations and omissions either willfully with intent to deceive UBS or recklessly with disregard as to whether or not they were false when made.

71.    HealthSouth intended to induce UBS to rely on the false information that HealthSouth provided to UBS.

72.    UBS reasonably, justifiably and detrimentally relied upon HealthSouth's misrepresentations and omissions under the circumstances set forth above.

73.    As a direct and proximate consequence of HealthSouth's misrepresentations and omissions, UBS has suffered substantial injuries and damages.

74.    Wherefore, UBS seeks money damages from HealthSouth in amounts to be determined by the trier of fact plus interest, attorneys' fees, costs, and all such other relief at law and in equity as to which UBS may be entitled.

## FIFTH CLAIM FOR RELIEF
### (Fraudulent Suppression)

75.    UBS realleges and incorporates by reference the allegations in preceding paragraphs 1 to 75 herein.

76.    As set forth above, HealthSouth suppressed and withheld material information from UBS concerning HealthSouth's true financial condition and the accounting fraud being committed at HealthSouth.

77.    At the time that HealthSouth suppressed and withheld that information, HealthSouth had actual knowledge of the facts it suppressed and withheld from UBS.

78.    HealthSouth knew that the facts suppressed would cause UBS to act differently than had UBS possessed complete, accurate and truthful information.

79.    As a direct and proximate consequence of HealthSouth's suppression of the facts and withholding of information, UBS suffered substantial injuries and damages.

80.    Wherefore, UBS seeks money damages from HealthSouth in amounts to be determined by the trier of fact plus interest, attorneys' fees, costs, and all such other relief at law and in equity to which UBS may be entitled.

## SIXTH CLAIM FOR RELIEF
### (Misrepresentation)

81.    UBS realleges and incorporates by reference the allegations in preceding paragraphs 1 to 80 herein.

82.    As set forth above, HealthSouth repeatedly provided UBS with materially inaccurate and false information concerning HealthSouth.

83.    UBS reasonably, justifiably and detrimentally relied upon HealthSouth's misrepresentations and omissions under the circumstances set forth above.

84.    As   a   direct   and   proximate   consequence   of   HealthSouth's misrepresentations and omissions, UBS suffered substantial injuries and damages.

85.    Wherefore, UBS seeks money damages from HealthSouth in amounts to be determined by the trier of fact plus interest, attorneys' fees, costs, and all such other relief at law and in equity to which UBS may be entitled.

### SEVENTH CLAIM FOR RELIEF
### (Negligence)

86.    UBS realleges and incorporates by reference the allegations in the preceding paragraphs 1 to 85 herein.

87.    HealthSouth undertook a duty to provide complete, accurate and truthful information to UBS.  Instead, HealthSouth repeatedly supplied materially false information to UBS, and failed to exercise reasonable care in procuring or communicating that information.  As such, HealthSouth breached its duties to UBS.

88.    UBS justifiably relied on the false and inaccurate information and suffered considerable damages as a direct and proximate result of HealthSouth's failure to exercise reasonable care in providing information to UBS.

89.    The injuries and damages suffered by UBS and arising from the negligence of HealthSouth were foreseeable.

90.    Wherefore, UBS seeks money damages from HealthSouth in amounts to be determined by the trier of fact plus interest, attorneys' fees, costs, and all such other relief at law and in equity to which UBS may be entitled.

## EIGHTH CLAIM FOR RELIEF
### (Declaratory Judgment)

91.    UBS realleges and incorporates by reference the allegations in the preceding paragraphs 1 to 90 herein.

92.    As a result of the filing of this derivative action on behalf of HealthSouth and the filing of the related securities law and state law actions filed by HealthSouth investors against, among others, UBS, an actual controversy has arisen and now exists between UBS and HealthSouth with respect to HealthSouth's agreement in the Engagement Letters and Purchase Agreements to indemnify UBS and its affiliates for certain losses.

93.    As a result of that controversy, a judicial declaration is necessary declaring that UBS and its affiliates are entitled to recover from HealthSouth any and all losses, damages, awards, settlement fees, judgments, and/or other fees and costs incurred by them in connection with this action or any other action arising out of or relating to the services provided by UBS to HealthSouth.

### The Demand For Judgment

Wherefore, UBS respectfully requests the following relief:

a.    Money damages in an amount to be determined at trial;

b.    Litigation fees and expenses for all suits filed against UBS in any venue based on the HealthSouth fraud, including this matter, in an amount not less than (a) the total amount of damages or settlements paid by UBS; (b) reasonable attorneys' fees and expenses; and (c) interest;

c.    Reasonable attorneys' fees and costs, incurred by UBS in prosecuting its claims in this matter;

- 72 -

d.    Reasonable attorneys' fees and costs, incurred by UBS as a result of the HealthSouth financial fraud.

e.    Recoupment and setoff of any recovery against UBS by HealthSouth in this action;

f.    Damages for loss of business and damage to reputation resulting from the HealthSouth fraud in an amount to be determined by a trier of fact; and

g.    Punitive damages as allowed by law;

h.    A judgment declaring that HealthSouth is liable for any and all losses, damages, judgments, and/or fees and costs incurred by UBS or its affiliates in connection with this action or any other action arising out of or relating to the services provided by UBS to HealthSouth;

i.    A trial by jury; and

j.    Any and all other relief that the Court deems appropriate.

Dated: August 3, 2005

Respectfully submitted,

W. Stancil Starnes (STA025)
Jay M. Ezelle (EZE002)
Robin H. Jones (JON143)
STARNES & ATCHISON LLP
P.O. Box 598512
Birmingham, Alabama 35259-8512
(205) 868-6000

Attorneys for UBS Securities LLC

*Of Counsel:*

Robert J. Giuffra, Jr.
Brian T. Frawley
Thomas R. Leuba
Julia M. Jordan
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing pleading upon all attorneys of record by electronic mail pursuant to the Court's April 19, 2004 Order requiring the same, on this the 3rd day of August, 2005.

_____
OF COUNSEL

## Appendix 3:
## All Counsel in *Tucker v. Scrushy*
## Pending Before The Honorable Allwin E. Horn III

| Party | Name of Person to Serve | Email Address |
|---|---|---|
| Tucker, Wade | John Q. Somerville, Esq. | jqs@gallowaysomerville.com |
| | Ralph D. Cook, Esq. | ralph@hwnn.com |
| | John W. Haley, Esq. | haley@hwnn.com |
| | Bruce J. McKee, Esq. | bruce@hwnn.com |
| | Steve P. Gregory, Esq. | spg@diceandgregory.com |
| | Frank DiPrima, Esq. | diprimalaw@aol.com |
| | Ronald A. Brown, Esq. | rabrown@prickett.com |
| | Edward F. Haber, Esq. | ehaber@shulaw.com |
| | Robert C. Schubert, Esq. | rschubert@schubert-reed.com |
| | Juden Justice Reed, Esq. | jreed@schubert-reed.com |
| | Arthur L. Schingler, Esq. | ashingler@scott-scott.com |
| Peters, Tim | Eric J. Belfi, Esq. | ebelfi@murrayfrank.com |
| Scrushy, Richard M. | H. Lewis Gillis, Esq. | hlgillis@tmgpc.com |
| | April D. Williams, Esq. | adwilliams@tmgpc.com |
| | Donald V. Watkins, Esq. | donaldvwatkinspc@aol.com |
| Scrushy, Gerald P. | Tom E. Ellis, Esq. | tee@teelaw.com |
| MedCenterDirect.com | MedCenterDirect.Com, Inc., *pro se* 3500 Peachtree Road, Suite 1610 Atlanta, GA  30326 | |
| Source Medical Solutions, Inc. | James C. Huckaby Jr., Esq. John W. Scott Esq. | jch@hsdpc.com jws@hsdpc.com |
| Capstone Capital Corporation | James L. Goyer, Esq. Alan F. Enslen, Esq. Crystal McNair | jgoyer@mcglaw.com aenslen@mcglaw.com cmcnair@maynardcooper.com |
| G G Enterprises | G G Enterprises, *pro se* c/o Gary Gussing 865 Woodmere Creek Loop Birmingham, AL  35226 | |

| HealthSouth Corporation | J. Michael Rediker, Esq.<br>Thomas L. Krebs, Esq.<br>Michael K.K. Choy, Esq.<br>F. Lane Finch Jr., Esq.<br>Patricia C. Diak, Esq.<br>Peyton D. Bibb, Esq.<br>Lisa M. Rios<br>Julia Boaz Cooper, Esq.<br>Edward P. Welch, Esq.<br>Stephen Dargitz, Esq.<br>Edward B. Micheletti, Esq. | jmr@hsy.com<br>tlk@hsy.com<br>mkc@hsy.com<br>flf@hsy.com<br>pcd@hsy.com<br>pdb@hsy.com<br>lmr@hsy.com<br>jbcooper@bradleyarant.com<br>ewelch@skadden.com<br>sdargitz@skadden.com<br>emich@skadden.com |
| Martin, Michael D. | John H. Cooper, Esq.<br>C. Lee Reeves, Esq.<br>Robert W. Fleishman, Esq. | jcooper@sirote.com<br>lreeves@sirote.com<br>rfleishman@steptoe.com |
| Givens, C. Sage<br>Strong, George H.<br>Newhall, Charles W. III<br>Chamberlin, John S.<br>Gordon, Joel C.<br>Striplin, Larry D. Jr. | J. Mark Hart, Esq.<br>Paul C. Gluckow, Esq.<br>Allison R. Kimmel, Esq. | jmh@hsy.com<br>pgluckow@stblaw.com<br>akimmel@stblaw.com |
| Owens, William T. | Frederick Helmsing, Esq.<br>Patrick C. Finnegan, Esq.<br>Carolyn B. Quinn<br>Joy Brewer | fgh@helmsinglaw.com<br>pcf@helmsinglaw.com<br>cbq@helmsinglaw.com<br>mjb@helmsinglaw.com |
| Watkins, Phillip C.<br>Foster, Patrick A.<br>Riviere, Daniel J.<br>Taylor, Larry D. | N. Lee Cooper, Esq.<br>James L. Goyer III, Esq.<br>Patrick Cooper, Esq.<br>Carl Burkhalter, Esq.<br>James R. Bussian, Esq.<br>Amye J. Carle<br>Champ Lyons III, Esq.<br>Peter Q. Bassett, Esq.<br>Betsy Collins, Esq.<br>Susan Hurd, Esq. | lcooper@mcglaw.com<br>jgoyer@mcglaw.com<br>pcooper@mcglaw.com<br>cburkhalter@mcglaw.com<br>jbussian@mcglaw.com<br>acarle@mcglaw.com<br>cl@lyonshorn.com<br>pbassett@alston.com<br>bcollins@alston.com<br>shurd@alston.com |
| Smith, Weston L. | Charles A. Dauphin, Esq.<br>David McKnight, Esq. | cdauphin@bddmc.com<br>dmcknight@bddmc.com |
| Ernst & Young LLP | Henry Simpson, Esq.<br>Steven M. Farina, Esq.<br>Enu Mainigi, Esq.<br>Victoria Radd Rollins, Esq. | henry.simpson@arlaw.com<br>sfarina@wc.com<br>emainigi@wc.com<br>vrollins@wc.com |

| | | |
|---|---|---|
| UBS Warburg LLC<br>UBS Group<br>UBS Investment Bank | W. Stancil Starnes, Esq.<br>Jay M. Ezelle, Esq.<br>Robin H. Jones, Esq.<br>Robert J. Giuffra, Esq.<br>Brian T. Frawley, Esq.<br>Thomas L. Leuba, Esq.<br>Julia M. Jordan, Esq. | sstarnes@starneslaw.com<br>jme@starneslaw.com<br>rhj@starneslaw.com<br>giuffrar@sullcrom.com<br>frawleyb@sullcrom.com<br>leubat@sullcrom.com<br>jordanjm@sullcrom.com |
| Beam, Aaron Jr. | Mack B. Binion, Esq.<br>Jeremy Hazelton, Esq. | mbinion@briskman-binion.com<br>jhazelton@briskman-binion.com |
| McVay, Malcolm E. | J. Don Foster, Esq. | jdf@jacksonfosterlaw.com |
| Harris, Emery W. | J. Stephen Salter, Esq. | umstakwit@aol.com |
| Livesay, Kenneth K. | Joseph A. Fawal, Esq. | jfawal@bellsouth.net |

HEALTHSOUTH CORPORATION

$1,000,000,000  7.625% Senior Notes due 2012

## PURCHASE AGREEMENT

May 17, 2002
Stamford, Connecticut

UBS Warburg LLC
Deutsche Bank Securities Inc.
Banc of America Securities LLC
Scotia Capital (USA) Inc.
First Union Securities, Inc.
J.P. Morgan Securities, Inc.
Fleet Securities, Inc.
Salomon Smith Barney Inc.
NatCity Investments, Inc.
Jefferies & Company, Inc.


c/o UBS Warburg LLC
677 Washington Blvd
Stamford, Connecticut 06901


Ladies and Gentlemen:

HEALTHSOUTH Corporation, a Delaware corporation (the "Company"), agrees with you as follows:

1.    Issuance of Notes.   The Company proposes to issue and sell to UBS Warburg LLC, Deutsche Bank Securities Inc., Banc of America Securities LLC, Scotia Capital (USA) Inc., First Union Securities, Inc., J.P. Morgan Securities, Inc., Fleet Securities, Inc., Salomon Smith Barney Inc., NatCity Investments, Inc. and Jefferies & Company, Inc. (collectively, the "Initial Purchasers") $1,000,000,000 aggregate principal amount of the Company's 7.625% Senior Notes due 2012 (the "Initial Notes"). The Initial Notes will be issued pursuant to an indenture (the "Indenture"), to be dated the Closing Date (as defined herein), by and between the Company and The Bank of Nova Scotia Trust Company of New York, as trustee (the "Trustee"). Capitalized terms used but not otherwise defined herein shall

NewYork_300007668_21

have the meanings assigned to such terms in the Indenture, the Preliminary Memorandum or the Final Memorandum (each as defined herein).

The Initial Notes will be offered and sold to the Initial Purchasers pursuant to an exemption from the registration requirements under the Securities Act of 1933, as amended (the "Securities Act"). The Company has prepared a preliminary offering memorandum, dated May 16, 2002 (including any and all exhibits thereto, the "Preliminary Memorandum"), and a final offering memorandum dated and available for distribution on the date hereof (including any and all exhibits thereto, the "Final Memorandum") relating to the Company and the Initial Notes. Any references herein to the Preliminary Memorandum or the Final Memorandum shall be deemed to include all amendments and supplements thereto and any documents filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Securities and Exchange Commission (the "Commission") thereunder, which are incorporated by reference therein. As used herein, the term "Incorporated Documents" means the documents which at the time are incorporated by reference in the Preliminary Memorandum, the Final Memorandum or any amendment or supplement thereto.

The Initial Purchasers have advised the Company that the Initial Purchasers intend, as soon as they deem practicable after this Purchase Agreement (this "Agreement") has been executed and delivered, to resell (the "Exempt Resales") the Initial Notes purchased by the Initial Purchasers under this Agreement in private sales exempt from registration under the Securities Act on the terms set forth in the Final Memorandum, solely to (i) persons whom the Initial Purchasers reasonably believe to be "qualified institutional buyers" ("QIBs") as defined in Rule 144A under the Securities Act ("Rule 144A"), (ii) a limited number of other institutional "accredited investors" (as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D under the Securities Act ("Regulation D")) ("IAIs") in private sales exempt from registration under the Securities Act and (iii) other eligible purchasers pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act ("Regulation S"); the persons specified in clauses (i), (ii) and (iii) are sometimes collectively referred to herein as the "Eligible Purchasers".

Holders (including subsequent transferees) of the Initial Notes will have the registration rights set forth in the registration rights agreement (the "Registration Rights Agreement") to be dated the Closing Date in form and substance satisfactory to the Initial Purchasers and conforming to the description thereof in the Final Memorandum, for so long as such Initial Notes constitute Registrable Securities (as defined in the Registration Rights Agreement). Pursuant to the Registration Rights Agreement, the Company will agree to (i) file with the Commission under the circumstances set forth in the Registration Rights Agreement (a) a registration statement under the Securities Act (the "Exchange Offer Registration Statement") relating to a new issue of debt securities (the "Exchange Notes" and, together with the Initial Notes, the "Notes") to be offered in exchange for the Initial Notes (the "Exchange Offer") and issued under the Indenture or an indenture substantially identical to the Indenture and/or (b) under certain circumstances set forth in the Registration Rights Agreement, a shelf registration statement pursuant to Rule 415 under the Securities Act (the "Shelf Registration

Statement" and, together with the Exchange Offer Registration Statement, the "Registration Statements") relating to the resale by certain holders of the Initial Notes, and (ii) use its reasonable best efforts to cause such Registration Statements to be declared effective. This Agreement, the Notes, the Indenture and the Registration Rights Agreement are hereinafter sometimes referred to collectively as the "Operative Documents".

Upon issuance of the Initial Notes and until such time as the same is no longer required under the applicable requirements of the Securities Act, the Initial Notes shall bear the legend relating thereto set forth under "Notice to Investors" in the Final Memorandum.

2.      Agreements To Sell And Purchase. On the basis of the representations, warranties and covenants contained in this Agreement, and subject to the terms and conditions contained in this Agreement, the Company agrees to issue and sell to each Initial Purchaser, and each Initial Purchaser severally and not jointly agrees to purchase from the Company, the aggregate principal amount of Initial Notes set forth opposite its name in Schedule I hereto. The purchase price for the Initial Notes shall be 98.0815% of their principal amount.

Each Initial Purchaser severally and not jointly agrees with the Company that it (i) is purchasing the Initial Notes pursuant to a private sale exempt from registration under the Securities Act, (ii) will not solicit offers for, or offer or sell, the Initial Notes by means of any form of general solicitation or general advertising or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act, and (iii) will solicit offers for the Initial Notes only from, and will offer, sell or deliver the Initial Notes as part of its initial offering only to, (A) persons whom such Initial Purchaser reasonably believes to be QIBs, or if any such person is buying for one or more institutional accounts for which such person is acting as fiduciary or agent, only when such person has represented to such Initial Purchaser that each such account is a QIB, to whom notice has been given that such sale or delivery is being made in reliance on Rule 144A, in each case, in transactions under Rule 144A, (B) other IAIs who provide to it or to the Company a letter in the form of Exhibit A hereto and (C) persons other than U.S. persons pursuant to offers and sales that occur outside the United States in reliance on Regulation S.

Each Initial Purchaser severally and not jointly agrees with the Company that it will offer, sell and deliver the Initial Notes (i) as part of its distribution at any time, and (ii) otherwise until 40 days after the later of the commencement of the offering of the Initial Notes and the Closing Date, only in accordance with Rule 903 of Regulation S or as otherwise permitted pursuant to Rule 144A or another valid exemption from the registration requirements of the Securities Act. Each Initial Purchaser severally and not jointly agrees with the Company that neither the affiliates of such Initial Purchaser nor any persons acting on their behalf has engaged or will engage in any directed selling efforts with respect to the Initial Notes, and such Initial Purchaser has complied and will comply with the offering restrictions requirement of Regulation S.

Prior to confirmation of the sale of Initial Notes other than a sale pursuant to Rule 144A or another valid exemption from the registration requirements of the Securities Act, each Initial Purchaser will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Initial Notes from such Initial Purchaser during the "distribution compliance period" (as defined in Regulation S) a confirmation or notice to substantially the following effect:

"The Securities covered hereby have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and may not be offered and sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of the distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, except in either case in accordance with Regulation S under the Securities Act or an exemption from the registration requirements of the Securities Act. Terms used above have the meaning given to them by Regulation S".

3.    Delivery And Payment.  Delivery of, and payment of the purchase price for, the Initial Notes shall be made at 10:00 a.m., New York City time, on May 22, 2002 (such date and time, the "Closing Date") at the offices of Pillsbury Winthrop LLP, One Battery Park Plaza, New York, New York, or such other place in the City of New York as the parties hereto mutually agree.  The Closing Date and the location of delivery of and the form of payment for the Initial Notes may be varied by mutual agreement between the Initial Purchasers and the Company.

The Initial Notes will be issued in global form, except to the extent such Initial Notes are resold by the Initial Purchasers to IAIs, in which case such Initial Notes will be issued in certificated form.  The Initial Notes will be registered in such names as the Initial Purchasers may request upon at least one business day's notice prior to the Closing Date in an aggregate principal amount corresponding to the aggregate principal amount of the Initial Notes and shall be delivered by the Company to the Initial Purchasers (or as the Initial Purchasers direct), against payment by the Initial Purchasers of the purchase price therefor by means of transfer of immediately available funds to such account or accounts in accordance with their obligations under Section 8(k) hereof as the Company shall specify on or prior to the Closing Date, or in such other form or by such other means as the parties hereto shall agree prior to the Closing Date.

4.    Agreements of the Company.  The Company covenants and agrees with the Initial Purchasers as follows:

(a)    The Company will advise the Initial Purchasers promptly and, if requested by them, will confirm such advice in writing, within the period of time referred to in paragraph (e) below, of any change in the Company's condition (financial or other), business, prospects, properties, net worth or results of operations, or of the happening of any event, which either makes any statement made in the Preliminary Memorandum or

NewvYork_300007668_21                        4

the Final Memorandum (as then amended or supplemented) untrue or requires the making of any additions to or changes in the Preliminary Memorandum or the Final Memorandum (as then amended or supplemented) in order to make the statements therein not misleading, or of the necessity to amend or supplement the Final Memorandum (as then amended or supplemented) to comply with any law.

(b)     The Company will furnish to the Initial Purchasers, without charge, as of the date of the Final Memorandum, such number of copies of the Final Memorandum as it may then be amended or supplemented, as they may reasonably request.

(c)     The Company will not make any amendment or supplement to the Final Memorandum of which the Initial Purchasers have not previously been given two business days' prior advice or to which the Initial Purchasers have reasonably objected after being so advised, or file any document which upon filing becomes an Incorporated Document without delivering a copy of such document to the Initial Purchasers prior to or concurrently with such filing.

(d)     The Company consents to the use of the Preliminary Memorandum and the Final Memorandum (and of any amendment or supplement thereto) in accordance with the securities or Blue Sky laws of the jurisdictions in which the Initial Notes are offered by the Initial Purchasers and by all dealers to whom Initial Notes may be sold in connection with the offering and sale of the Initial Notes.

(e)     If, at any time prior to completion of the distribution of the Initial Notes by the Initial Purchasers to Eligible Purchasers, any event shall occur that in the judgment of the Company or in the opinion of counsel for the Initial Purchasers should be set forth in the Final Memorandum (as then amended or supplemented) in order to make the statements therein not misleading, or if it is necessary to supplement or amend the Final Memorandum, or to file under the Exchange Act any document which upon filing becomes an Incorporated Document, to comply with any law, the Company will forthwith prepare an appropriate supplement or amendment thereto or such document, and will expeditiously furnish to the Initial Purchasers and dealers a reasonable number of copies thereof. In the event that the Company and the Initial Purchasers agree that the Final Memorandum should be amended or supplemented, or that a document should be filed under the Exchange Act which upon filing becomes an Incorporated Document, the Company, if requested by the Initial Purchasers, will promptly issue a press release announcing or disclosing the matters to be covered by the proposed amendment or supplement or such document.

(f)     The Company will cooperate with the Initial Purchasers and with their counsel in connection with the qualification of the Initial Notes for offering and sale by the Initial Purchasers and by dealers under the securities or Blue Sky laws of such jurisdictions as the Initial Purchasers may designate and will file such consents to service of process or other documents necessary or appropriate in order to effect such

qualification; *provided* that in no event shall the Company be obligated to qualify to do business in any jurisdiction where it is not now so qualified or to take any action which would subject it to service of process in suits, other than those arising out of the offering or sale of the Initial Notes, in any jurisdiction where it is not now so subject.

(g)     So long as any of the Initial Notes are outstanding, the Company will furnish to the Initial Purchasers (1) as soon as available, a copy of each report of the Company mailed to stockholders or filed with the Commission, and (2) from time to time such other information concerning the Company as the Initial Purchasers may reasonably request.

(h)     The Company will apply the net proceeds from the sale of the Initial Notes to be sold by it hereunder substantially in accordance with the description set forth in the Final Memorandum.

(i)     Except as stated in this Agreement, the Preliminary Memorandum and the Final Memorandum, the Company has not taken, nor will it take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Initial Notes to facilitate the sale or resale of the Initial Notes. Except as permitted by the Securities Act, the Company will not distribute any offering material in connection with the Exempt Resales.

(j)     From and after the Closing Date, so long as any of the Initial Notes are outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act or, if earlier, until two years after the Closing Date, and during any period in which the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company will furnish to holders of the Initial Notes and prospective purchasers of the Initial Notes designated by such holders, upon request of such holders or such prospective purchasers, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to permit compliance with Rule 144A in connection with resale of the Initial Notes.

(k)     The Company agrees not to sell, offer for sale or solicit offers to buy or otherwise negotiate, and to cause its Subsidiaries not to sell, offer for sale or solicit offers to buy or otherwise negotiate, in respect of any security (as defined in the Securities Act) that would be integrated with the sale of the Initial Notes in a manner that would require the registration under the Securities Act of the sale to the Initial Purchasers or the Eligible Purchasers of the Initial Notes.

(l)     The Company agrees to comply with all of the terms and conditions of the Registration Rights Agreement, and all agreements set forth in the representation letters of the Company to The Depository Trust Company ("DTC") relating to the approval of the Initial Notes by DTC for "book entry" transfer.

(m)    The Company agrees that prior to any registration of the Notes pursuant to the Registration Rights Agreement, or at such earlier time as may be so required, the Indenture shall be qualified under the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), and that it will cause to be entered into any necessary supplemental indentures in connection therewith.

(n)    Neither the Company, any of its affiliates, nor any person acting on its or their behalf, will engage in any directed selling efforts with respect to the Initial Notes, and each of them will comply with the offering restrictions requirement of Regulation S. Terms used in this paragraph have the meanings given to them by Regulation S.

(o)    The Company will not, until 60 days following the Closing Date, without the prior written consent of the Initial Purchasers, offer, sell or contract to sell, or otherwise dispose of, directly or indirectly, or announce the offering of, any debt securities issued or guaranteed by the Company (other than the Notes).

(p)    The Company will not, and will not permit any of its affiliates to, resell any Initial Notes that have been acquired by any of them unless and until a registration statement with respect to such Initial Notes filed pursuant to the Securities Act has been declared effective.

(q)    The Company shall use its reasonable best efforts to prevent the issuance of any stop order or order suspending the qualification or exemption of any of the Initial Notes under any securities laws, and if at any time any securities commission or other regulatory authority shall issue an order suspending the qualification or exemption of any of the Initial Notes under any securities laws, the Company shall use its reasonable best efforts to obtain the withdrawal or lifting of such order at the earliest possible time.

(r)    The Company shall use its reasonable best efforts to effect the inclusion of the Initial Notes in The Portal Market[SM] ("PORTAL").

5.    Representations And Warranties of the Company and the Initial Purchasers.

(ε)    The Company represents and warrants to the Initial Purchasers that:

(i)    The Final Memorandum has been prepared by the Company for use by the Initial Purchasers in connection with Exempt Resales. No order or decree preventing the use of the Preliminary Memorandum or the Final Memorandum or any amendment or supplement thereto, nor any order asserting that the transactions contemplated by this Agreement are subject to the registration requirements of the Securities Act, has been issued and no proceeding for that purpose has commenced or is pending or, to the knowledge of the Company, is contemplated.

(ii)    The Preliminary Memorandum, at the date thereof, did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Final Memorandum, at the date hereof and at the Closing Date, does not and will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances in which they were made, not misleading, except that this representation and warranty does not apply to statements in or omissions from the Preliminary Memorandum or the Final Memorandum, as supplemented or amended, made in reliance upon and in conformity with information relating to the Initial Purchasers furnished to the Company in writing by or on behalf of the Initial Purchasers expressly for use therein.

(iii)    The Incorporated Documents heretofore filed were filed in a timely manner and, when they were filed (or, if any amendment with respect to any such document was filed, when such amendment was filed), conformed in all material respects to the requirements of the Exchange Act and the rules and regulations thereunder, and any further Incorporated Documents so filed will, when they are filed, conform in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder; no such document when it was filed (or, if an amendment with respect to any such document was filed, when such amendment was filed) contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and no such further document, when it is filed, will contain an untrue statement of a material fact or will omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading.

(iv)    The Indenture has been duly and validly authorized by the Company and, upon its execution, delivery and performance by the Company and assuming due authorization, execution, delivery and performance by the Trustee, will be a valid and binding agreement of the Company, enforceable in accordance with its terms, except as enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally, and conforms in all material respects to the description thereof in the Preliminary Memorandum and the Final Memorandum; no qualification of the Indenture under the Trust Indenture Act is required in connection with the offer and sale of the Initial Notes contemplated hereby or in connection with the Exempt Resales.

(v)    The Initial Notes have been duly authorized by the Company and, when executed by the Company and authenticated by the Trustee in accordance with the Indenture and delivered to the Initial Purchasers against payment therefor in accordance with the terms hereof, will have been validly issued and delivered,

and will constitute valid and binding obligations of the Company entitled to the benefits of the Indenture and enforceable in accordance with their terms, except as laws affecting the enforcement thereof may be limited by bankruptcy, insolvency or other similar applicability of general principles of equity, and the Initial Notes will conform in all material respects to the description thereof in the Preliminary Memorandum and the Final Memorandum.

(vi)    Each of the Company and its corporate subsidiaries (collectively, the "Subsidiaries") has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation with full power and authority (corporate and other) to own, lease and operate its properties and conduct its business as described in the Preliminary Memorandum and the Final Memorandum; each of the Company's affiliated partnerships (collectively, the "Controlled Entities") is duly formed and validly existing under the laws of the jurisdiction pursuant to which it was organized with full power and authority (partnership and other) to own, lease and operate its properties and conduct its business as described in the Preliminary Memorandum and the Final Memorandum; and each of the Company, the Subsidiaries and the Controlled Entities is duly qualified to do business as a foreign corporation or partnership in good standing in all other jurisdictions, if any, where the ownership or leasing of properties or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on the condition (financial or other), business, prospects, properties, net worth or results of operations of the Company, the Subsidiaries and the Controlled Entities taken as a whole (a "Material Adverse Effect"); all of the issued shares of capital stock of each of the Subsidiaries, and the partnership interests representing ownership in each Controlled Entity held of record or beneficially by the Company, have been duly authorized and validly issued, are fully paid and nonassessable and are owned by the Company free and clear of all liens, security interests, charges or other encumbrances, except for those liens, security interests, charges or other encumbrances that would not have a Material Adverse Effect; and all of the outstanding interests representing ownership in the Controlled Entities have been offered, sold and issued in compliance with applicable state and federal laws related to the issuance of securities.

(vii)    There is no legal or governmental proceeding pending or, to the Company's knowledge, threatened to which the Company, any Subsidiary or any Controlled Entity is a party or of which the business or property of the Company, any Subsidiary or any Controlled Entity is the subject which is not disclosed in the Preliminary Memorandum and the Final Memorandum and which the Company reasonably believes might result in a judgment or decree having a Material Adverse Effect or which is otherwise of a character that would be required to be described in the Preliminary Memorandum and the Final

Memorandum if the Preliminary Memorandum and the Final Memorandum were prospectuses included in a registration statement on Form S-1 under the Securities Act, and there is no contract, license or other document of a character that would be required to be described in the Preliminary Memorandum and the Final Memorandum or to be filed as an exhibit to any Incorporated Document which is not described or filed as required by the Securities Act or the Exchange Act.

(viii)   The Company and its Subsidiaries are not in violation of their respective charters or bylaws, the Controlled Entities are not in violation of their respective agreements of limited partnership, and neither the Company nor any Subsidiary or Controlled Entity is in default or, upon receipt of notice or the lapse of time, will be in default, in any respect in the performance of any obligation, agreement or condition contained in any bond, debenture, note or any other evidence of indebtedness or in any agreement, indenture or other instrument to which it is a party or by which it is bound, which violation or default would have a Material Adverse Effect; and neither the issuance, offer, sale or delivery of the Initial Notes, the execution, delivery or performance of this Agreement, the Indenture or the Registration Rights Agreement by the Company nor the consummation by the Company of the transactions contemplated hereby or thereby require any consent, approval, authorization or other order of any court, regulatory body, administrative agency or other governmental body (except such as may be required in connection with the registration under the Securities Act of the Initial Notes in accordance with the Registration Rights Agreement and the qualification of the Indenture under the Trust Indenture Act and except for compliance with the securities or Blue Sky laws of various jurisdictions), and will not conflict with or constitute a breach of or default under, or violate, the charter or bylaws of the Company or any Subsidiary, or the agreement of limited partnership of any Controlled Entity, or any agreement, indenture or other instrument to which the Company or any Subsidiary or any Controlled Entity is a party or by which it is bound, or any law, regulation, order or decree applicable to the Company, any Subsidiary or any Controlled Entity.

(ix)   The accountants, Ernst & Young LLP, who have certified or shall certify the financial statements included as part of the Preliminary Memorandum and the Final Memorandum (or any amendment or supplement thereto) or the Incorporated Documents, are independent public accountants as required by the Securities Act.

(x)   The financial statements, together with related schedules and notes, included or incorporated by reference in the Preliminary Memorandum and the Final Memorandum (and any amendment or supplement thereto), present fairly the consolidated financial position, results of operations and cash flows of the Company, the Subsidiaries and the Controlled Entities on the basis stated in the Preliminary Memorandum and the Final Memorandum at the respective dates or

10

for the respective periods to which they apply; such statements and related schedules and notes have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, except as disclosed therein; and the other financial and statistical information and data included or incorporated by reference in the Preliminary Memorandum and the Final Memorandum (and any amendment or supplement thereto) are accurately presented and prepared on a basis consistent with such financial statements and the books and records of the Company, the Subsidiaries and the Controlled Entities; since March 31, 2002, except as set forth or contemplated in the Preliminary Memorandum and the Final Memorandum, (a) none of the Company or any Subsidiary has (1) incurred any liabilities or obligations, direct or contingent, that would reasonably be expected to have a Material Adverse Effect or (2) entered into any material transaction not in the ordinary course of business, (b) there has not been any event or development in respect of the business or condition (financial or other) of the Company and the Subsidiaries that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect and (c) there has been no dividend or distribution of any kind declared, paid or made by the Company on any class of its capital stock.

(xi)  The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the Registration Rights Agreement; the execution and delivery of, and the performance by the Company of its obligations under, this Agreement and the Registration Rights Agreement have been duly and validly authorized by the Company, and this Agreement and the Registration Rights Agreement have been duly executed and delivered by the Company and constitute the valid and legally binding agreements of the Company, enforceable against the Company in accordance with their terms, except as the enforcement hereof and thereof may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and subject to the applicability of general principles of equity, and except as rights to indemnity and contribution hereunder and thereunder may be limited by Federal or state securities laws or principles of public policy.

(xii)  Except as disclosed in the Preliminary Memorandum and the Final Memorandum (or any amendment or supplement thereto), subsequent to the dates as of which such information is given in the Preliminary Memorandum and the Final Memorandum (or any amendment or supplement thereto), neither the Company nor any of the Subsidiaries or Controlled Entities has incurred any liability or obligation, direct or contingent, or entered into any transaction, not in the ordinary course of business, that is material to the Company, the Subsidiaries and the Controlled Entities taken as a whole, and there has not been any change in the capital stock, or material increase in the short-term debt or long-term debt, of the Company or any of the Subsidiaries or Controlled Entities, or any material adverse change, or any development involving or which may reasonably be

11

expected to involve a prospective material adverse change in the condition (financial or other), business, net worth or results of operations of the Company, the Subsidiaries and the Controlled Entities taken as a whole.

(xiii)  The Company and each Subsidiary and Controlled Entity have good and marketable title to all real and personal property described in the Preliminary Memorandum and the Final Memorandum as being owned respectively by them, in each case free and clear of all liens, claims, security interests or other encumbrances, except such as are described in the Preliminary Memorandum and the Final Memorandum or such as are not materially significant or important in relation to the business of the Company, the Subsidiaries and the Controlled Entities taken as a whole; and the real and personal property held under lease by the Company, any Subsidiary or any Controlled Entity is held by such entity under valid, subsisting and enforceable leases with only such exceptions as in the aggregate are not material and do not interfere with the conduct of the business of the Company, the Subsidiaries and the Controlled Entities taken as a whole; *provided, however,* that no representation is made hereby as to the title of the lessors of such property.

(xiv)  Except as permitted by the Securities Act, the Company has not distributed and, prior to the later to occur of the Closing Date and completion of the distribution of the Initial Notes, will not distribute any offering material in connection with the offering and sale of the Initial Notes other than the Preliminary Memorandum and the Final Memorandum.

(xv)  Each of the Company, the Subsidiaries and the Controlled Entities holds and is operating in compliance (in all material respects) with all material franchises, grants, authorizations, licenses, permits, easements, consents, certificates and orders of any governmental or self-regulatory body required for the conduct of its business, and all of such are valid and in full force and effect, and each of the Company, the Subsidiaries and the Controlled Entities is in compliance in all material respects with all laws, regulations, orders and decrees applicable to it which have a material effect on its business, properties or assets.

(xvi)  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

12

NewvYork_300007668_21

(xvii)  To the best of the Company's knowledge after reasonable investigation, neither the Company, any Subsidiary or any Controlled Entity, nor any employee or agent thereof, has made any payment of funds of the Company, any Subsidiary or any Controlled Entity or received or retained any funds in violation of any law, rule or regulation, which violation would have a Material Adverse Effect.

(xviii)  The Company, each Subsidiary and each Controlled Entity have filed or timely obtained extensions to file all tax returns required to be filed by it, which returns are complete and correct, and are not in default in the payment of any taxes which were payable pursuant to said returns or any assessments with respect thereto, except where the failure to file such returns and make such payments would not have a Material Adverse Effect.

(xix)  No holder of any security of the Company (other than holders of the Initial Notes) has any right to request or demand registration of any security of the Company because of the consummation of the transactions contemplated by this Agreement or the Registration Rights Agreement.

(xx)  Each of the Company, the Subsidiaries and the Controlled Entities owns all patents, trademarks, trademark registrations, service marks, service mark registrations, trade names, domain names, copyrights, licenses, inventions, trade secrets and rights described in the Preliminary Memorandum and the Final Memorandum as being owned by them or any of them or necessary for the conduct of their respective businesses, and the Company is not aware of any claim to the contrary or any challenge by any other person to the rights of the Company, the Subsidiaries or the Controlled Entities with respect to the foregoing that would have a Material Adverse Effect.

(xxi)  When the Initial Notes are issued and delivered pursuant to this Agreement, such Initial Notes will not be of the same class (within the meaning of Rule 144A(d)(3) under the Securities Act) as any security of the Company that is listed on a national securities exchange registered under Section 6 of the Exchange Act or that is quoted in a United States automated inter-dealer quotation system.

(xxii)  Neither the Company nor any affiliate (as defined in Rule 501(b) of Regulation D) of the Company has directly, or through any agent (*provided* that no representation is made as to the Initial Purchasers or any person acting on their behalf), (A) sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security (as defined in the Securities Act) which is or will be integrated with the offering and sale of the Initial Notes in a manner that would require the registration of the Initial Notes under the Securities Act or

(B) engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offering of the Initial Notes.

(xxiii)  Except as otherwise provided in the Indenture, the Company is not required to deliver the information specified in Rule 144A(d)(4) in connection with the offering and resale of the Initial Notes by the Initial Purchasers.

(xxiv)  The, Exchange Notes have been, or upon the Closing Date will be, duly and validly authorized for issuance by the Company and, when issued, authenticated and delivered by the Company in accordance with the terms of the Registration Rights Agreement, the Exchange Offer and the Indenture, the Exchange Notes will be legal, valid and binding obligations of the Company, entitled to the benefits of the Indenture and enforceable against the Company in accordance with their terms, except that enforceability of the Exchange Notes may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.  The Exchange Notes, when issued, authenticated and delivered, will conform in all material respects to the description thereof in the Preliminary Memorandum and the Final Memorandum.

(xxv)  All taxes, fees and other governmental charges that are due and payable on or prior to the Closing Date in connection with the execution, delivery and performance of the Operative Documents and the execution, delivery and sale of the Initial Notes shall have been paid by or on behalf of the Company at or prior to the Closing Date.

(xxvi)  Except as would not reasonably be expected to have a Material Adverse Effect, no labor disturbance by the employees of any of the Company or the Subsidiaries exists or, to the knowledge of the Company, is imminent.

(xxvii)  None of the Company or any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(xxviii)  The Company and each Subsidiary maintains insurance covering its properties, assets, operations, personnel and businesses, and such insurance is of such type and in such amounts as the Company reasonably deems necessary to protect the Company and the Subsidiaries and their businesses.  None of the Company or any Subsidiary has received notice from any insurer or agent of such insurer that any material capital improvements or other material expenditures will have to be made in order to continue any insurance maintained by any of them other than capital improvements and other expenditures that have been budgeted by the Company or the Subsidiaries, as the case may be.

(xxix)   None of the Company or any Subsidiary (or any agent thereof acting on their behalf) has taken, and none of them will take, any action that might cause this Agreement or the issuance or sale of the Notes to violate Regulations T, U or X of the Board of Governors of the Federal Reserve System or analogous foreign laws and regulations, in each case as in effect, or as the same may hereafter be in effect, on the Closing Date.

(xxx)   As of the date hereof and immediately prior to and following the issuance of the Initial Notes, the Company is and will be Solvent. The Company is not contemplating either the filing of a petition by it under any bankruptcy or insolvency laws or the liquidating of all or a substantial portion of its property, and the Company has no knowledge of any Person contemplating the filing of any such petition against the Company. As used herein, "Solvent" shall mean, for any person on a particular date, that on such date (a) the fair value of the assets of such person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such person, (b) such person does not intend to, and does not believe that it will, incur debts and liabilities beyond such person's ability to pay as such debts and liabilities mature, (c) such person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such person's property would constitute an unreasonably small capital and (d) such person is able to pay its debts as they become due and payable.

(xxxi)   Except as described under the caption "Plan of Distribution" in the Preliminary Memorandum and the Final Memorandum, there are no contracts, agreements or understandings between the Company or any of the Subsidiaries and any other person other than the Initial Purchasers that would give rise to a valid claim against the Company, any such Subsidiary or the Initial Purchasers for a brokerage commission, finder's fee or like payment in connection with the issuance, purchase and sale of the Notes.

(xxxii)   Except as set forth in the Preliminary Memorandum and the Final Memorandum, the Company and each Subsidiary (A) is in compliance with, or not subject to costs or liabilities under, laws, regulations, rules of common law, orders and decrees, as in effect as of the date hereof, and any present judgments and injunctions issued or promulgated thereunder relating to pollution or protection of public and employee health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants applicable to it or its business or operations or ownership or use of its property ("Environmental Laws"), other than noncompliance or such costs or liabilities that would not reasonably be expected to have a Material Adverse Effect, and (B) possesses all permits, licenses or other approvals required under applicable Environmental Laws, except where the failure to possess any such permit, license or other approval would not reasonably be expected to have, either individually or

in the aggregate, a Material Adverse Effect. All currently pending and, to the knowledge of the Company, threatened proceedings, notices of violation, demands, notices of potential responsibility or liability, suits and existing environmental conditions by any governmental authority which the Company or the Subsidiaries could reasonably expect to result in a Material Adverse Effect are fully and accurately described in all material respects in the Preliminary Memorandum and the Final Memorandum. The Company and each Subsidiary maintains a system of internal environmental management controls sufficient to provide reasonable assurance of compliance in all material respects of its business facilities, real property and operations with requirements of applicable Environmental Laws.

(xxxiii)  None of the Company or any of its affiliates (as defined in Rule 501(b) of Regulation D) has (A) taken, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Initial Notes or (B) sold, bid for, purchased or paid any person any compensation for soliciting purchases of the Initial Notes in a manner that would require registration of the Initial Notes under the Securities Act or paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company in a manner that would require registration of the Initial Notes under the Securities Act.

(xxxiv)  The statistical and market-related data and forward-looking statements (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) included in the Preliminary Memorandum and the Final Memorandum are based on or derived from sources that the Company believes to be reliable and accurate in all material respects and represent the Company's good faith estimates that are made on the basis of data derived from such sources.

(b)     Each of the Initial Purchasers, severally and not jointly, represents, warrants and covenants to the Company that:

(i)    Such Initial Purchaser has not offered or sold and, during the period of six months from the date hereof, will not offer or sell any Initial Notes to persons in the United Kingdom, except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995 (the "UK Regulations").

(ii)   Such Initial Purchaser has complied and will comply with all applicable provisions of the Financial Services and Markets Act 2000 of Great

Britain ("FSMA") and the UK Regulations with respect to anything done by it in relation to the Initial Notes in, from or otherwise involving the United Kingdom; and

(iii)    Such Initial Purchaser has only communicated or caused to be communicated and will only communicate and cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue and sale of any Initial Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Company.

Each of the Initial Purchasers understands that the Company and, for purposes of the opinions to be delivered to the Company pursuant to Section 8 hereof, counsel to the Company and counsel to the Initial Purchasers, will rely upon the accuracy and truth of the foregoing representations, and each of the Initial Purchasers hereby consents to such reliance.

6.    Indemnification.

(a)    The Company agrees to indemnify and hold harmless each of the Initial Purchasers, each person, if any, who controls any Initial Purchaser within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act, the agents, employees, officers and directors of any Initial Purchaser and the agents, employees, officers and directors of any such controlling person from and against any and all losses, liabilities, claims, damages and expenses whatsoever (including, but not limited to, reasonable attorneys' fees and any and all reasonable expenses whatsoever incurred in investigating, preparing or defending against any litigation, commenced or threatened, or any claim whatsoever, and any and all reasonable amounts paid in settlement of any claim or litigation) (collectively, "Losses") to which they or any of them may become subject under the Securities Act, the Exchange Act or otherwise insofar as such Losses (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Memorandum or the Final Memorandum, or in any supplement thereto or amendment thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that the Company will not be liable in any such case to the extent, but only to the extent, that any such Loss arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information relating to any Initial Purchaser furnished to the Company by or on behalf of such Initial Purchaser expressly for use therein. This indemnity will be in addition to any liability that the Company may otherwise have, including, but not limited to, liability under this Agreement.

(b)    Each Initial Purchaser agrees, severally and not jointly, to indemnify and hold harmless the Company, each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act, and each of their respective agents, employees, officers and directors and the agents, employees, officers and directors of any such controlling person from and against any Losses to which they or either of them may become subject under the Securities Act, the Exchange Act or otherwise insofar as such Losses (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Memorandum or the Final Memorandum, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that any such Loss arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with information relating to such Initial Purchaser furnished in writing to the Company by such Initial Purchaser expressly for use therein.    The Company and each of the Initial Purchasers acknowledge that the information set forth in Section 9 is the only information furnished in writing by the Initial Purchasers to the Company expressly for use in the Preliminary Memorandum or the Final Memorandum.

(c)    Promptly after receipt by an indemnified party under Section 6(a) or 6(b) above of notice of the commencement of any action, suit or proceeding (collectively, an "action"), such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such Section, notify each party against whom indemnification is to be sought in writing of the commencement of such action (but the failure so to notify an indemnifying party shall not relieve such indemnifying party from any liability that it may have under this Section 6 except to the extent that it has been prejudiced in any material respect by such failure or from any liability which it may otherwise have).  In case any such action is brought against any indemnified party, and it notifies an indemnifying party of the commencement of such action, the indemnifying party will be entitled to participate in such action, and to the extent it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense of such action with counsel satisfactory to such indemnified party.  Notwithstanding the foregoing, the indemnified party or parties shall have the right to employ its or their own counsel in any such action, but the fees and expenses of such counsel shall be at the expense of such indemnified party or parties unless (i) the employment of such counsel shall have been authorized in writing by the indemnifying parties in connection with the defense of such action, (ii) the indemnifying parties shall not have employed counsel to take charge of the defense of such action within a reasonable time after notice of commencement of the action or (iii) the named parties to such action (including any impleaded parties) include such indemnified party and the indemnifying parties (or such indemnifying parties have assumed the defense of such action), and such indemnified party or parties shall have

reasonably concluded that there may be defenses available to it or them that are different from or additional to those available to one or all of the indemnifying parties (in which case the indemnifying parties shall not have the right to direct the defense of such action on behalf of the indemnified party or parties), in any of which events such reasonable fees and expenses of counsel shall be borne by the indemnifying parties. In no event shall the indemnifying party be liable for the fees and expenses of more than one counsel (together with appropriate local counsel) at any time for all indemnified parties in connection with any one action or separate but substantially similar or related actions arising in the same jurisdiction out of the same general allegations or circumstances. An indemnifying party shall not be liable for any settlement of any claim or action effected without its written consent; *provided, however*, that such consent may not be unreasonably withheld. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by paragraph (a) or (b) of this Section 6, then the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 business days after receipt by such indemnifying party of the aforesaid request, (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement and (iii) such indemnified party shall have given the indemnifying party at least 30 days' prior notice of its intention to settle. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding.

7.    Contribution.  In order to provide for contribution in circumstances in which the indemnification provided for in Section 6 of this Agreement is for any reason held to be unavailable from the indemnifying party, or is insufficient to hold harmless a party indemnified under Section 6 of this Agreement, each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such aggregate Losses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and the Initial Purchasers, on the other hand, from the offering of the Initial Notes or (ii) if such allocation is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to above but also the relative fault of the Company, on the one hand, and the Initial Purchasers, on the other hand, in connection with the statements or omissions that resulted in such Losses, as well as any other relevant equitable considerations. The relative benefits received by the Company, on the one hand, and the Initial Purchasers, on the other hand, shall be deemed to be in the same proportion as (x) the total proceeds from the offering of Initial Notes (net of discounts and commissions but before deducting expenses) received by the Company, and (y) the total discounts and commissions received by the Initial Purchasers. The relative fault of the Company, on the one hand, and the Initial Purchasers, on the other hand, shall be determined by reference to, among other things, whether the untrue or

19

alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Initial Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission or alleged untrue statement or omission.

The Company and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to above. Notwithstanding the provisions of this Section 7, (i) in no case shall an Initial Purchaser be required to contribute any amount in excess of the amount by which the total discount and commissions applicable to the Initial Notes purchased by such Initial Purchaser pursuant to this Agreement exceeds the amount of any damages that such Initial Purchaser has otherwise been required to pay by reason of any untrue or alleged untrue statement or omission or alleged omission and (ii) no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 7, each person, if any, who controls the Initial Purchasers within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act shall have the same rights to contribution as the Initial Purchasers, and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act shall have the same rights to contribution as the Company. Any party entitled to contribution will, promptly after receipt of notice of commencement of any action against such party in respect of which a claim for contribution may be made against another party or parties under this Section 7, notify such party or parties from whom contribution may be sought, but the failure to so notify such party or parties shall not relieve the party or parties from whom contribution may be sought from any obligation it or they may have under this Section 7 or otherwise, except to the extent that it has, or they have, been prejudiced in any material respect by such failure; *provided, however,* that no additional notice shall be required with respect to any action for which notice has been given under Section 6 for purposes of indemnification. Anything in this section to the contrary notwithstanding, no party shall be liable for contribution with respect to any action or claim settled without its written consent, *provided, however,* that such written consent was not unreasonably withheld.

8.    Conditions of Initial Purchasers' Obligations.  The several obligations of the Initial Purchasers to purchase and pay for the Initial Notes, as provided for in this Agreement, shall be subject to satisfaction of the following conditions prior to or concurrently with such purchase:

(a)    All of the representations and warranties of the Company contained in this Agreement shall be true and correct, or true and correct in all material respects where such representations and warranties are qualified by references to materiality or Material Adverse Effect or similar terms, on the date of this Agreement and, in each case after giving effect to the transactions contemplated hereby, on the Closing Date, except that if a representation and warranty is made as of a specific date, and such date is expressly

20

referred to therein, such representation and warranty shall be true and correct (or true and correct in all material respects, as applicable) as of such date. The Company shall have performed or complied with all of the agreements and covenants contained in this Agreement and required to be performed or complied with by it at or prior to the Closing Date.

(b)     The Final Memorandum shall have been printed and copies distributed to the Initial Purchasers not later than 5:00 p.m., New York City time, on the day following the date of this Agreement or at such later date and time as the Initial Purchasers may determine. No stop order suspending the qualification or exemption from qualification of the Initial Notes in any jurisdiction shall have been issued and no proceeding for that purpose shall have been commenced or shall be pending or threatened.

(c)     No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any governmental agency that would, as of the Closing Date, prevent the issuance of the Initial Notes or consummation of the Exchange Offer; except as disclosed in the Preliminary Memorandum and the Final Memorandum, no action, suit or proceeding shall have been commenced and be pending against or affecting or, to the best knowledge of the Company, threatened against the Company and/or any Subsidiary before any court or arbitrator or any governmental body, agency or official that, if adversely determined, would reasonably be expected to have a Material Adverse Effect; and no stop order preventing the use of the Preliminary Memorandum or the Final Memorandum, or any amendment or supplement thereto, or any order asserting that any of the transactions contemplated by this Agreement are subject to the registration requirements of the Securities Act shall have been issued.

(d)     The Initial Purchasers shall have received certificates, dated the Closing Date, signed by two authorized officers of the Company confirming, as of the Closing Date, the matters set forth in paragraphs (a) and (c) of this Section 8 and the last sentence of paragraph (b) of this Section 8.

(e)  ·   The Initial Purchasers shall have received on the Closing Date an opinion of Haskell Slaughter Young & Rediker, L.L.C., counsel for the Company, dated the Closing Date and addressed to the Initial Purchasers to the effect that:

(i)     Each of the Company and those corporate subsidiaries that constitute "significant subsidiaries" under Rule 1-02(w) of Regulation S-X (the "**Significant Subsidiaries**") has been incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation.

(ii)     Each of the Preliminary Memorandum and the Final Memorandum has been prepared by the Company solely for use by the Initial Purchasers in connection with the Exempt Resales. To the best of such counsel's knowledge, no order or decree preventing the use of the Preliminary Memorandum or the Final Memorandum or any amendment or supplement thereto, or asserting that the

New York_300007668_21

transactions contemplated by this Agreement are subject to the registration requirements of the Securities Act, has been issued and no proceeding for that purpose has been commenced, is pending or is contemplated.

(iii)   The Incorporated Documents heretofore filed were filed in a timely manner and, when they were filed (or, if any amendment with respect to any such document was filed, when such amendment was filed), conformed in all material respects to the requirements of the Exchange Act.

(iv)   The Indenture has been duly and validly authorized by the Company and, assuming due authorization, execution, delivery and performance thereof by the Trustee, is a valid and binding agreement of the Company, enforceable in accordance with its terms, except as enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally, and subject to the applicability of general principles of equity, and conforms in all material respects to the description thereof in the Preliminary Memorandum and the Final Memorandum.

(v)   The Initial Notes have been duly authorized by the Company and, when executed by the Company and authenticated by the Trustee in accordance with the Indenture and delivered to the Initial Purchasers against payment therefor in accordance with the terms hereof, will have been validly issued and delivered, and will constitute valid and binding obligations of the Company entitled to the benefits of the Indenture and enforceable in accordance with their terms, except as enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally, and subject to the applicability of general principles of equity, and the Initial Notes will conform in all material respects to the description thereof in the Preliminary Memorandum and the Final Memorandum.

(vi)   All of the issued and outstanding shares of capital stock of each of the Significant Subsidiaries have been duly authorized and validly issued, are fully paid and nonassessable and are owned by the Company, free and clear of any adverse claims; all of the issued and outstanding partnership interests representing ownership in the Controlled Entities have been duly authorized and, to the extent material to the business, operations or financial condition of the Company, the Significant Subsidiaries and the Controlled Entities taken as a whole, have been validly issued, and all such the partnership interests held of record by the Company are owned free and clear of any adverse claims, except such claims that would not have a Material Adverse Effect.

(vii)   Each of the Company and the Significant Subsidiaries has full power and authority (corporate or otherwise) to own, lease and operate its properties and to conduct its business as described in the Preliminary Memorandum and the

Final Memorandum; and each of the Company and the Significant Subsidiaries is duly qualified to do business as a foreign corporation, and is in good standing in all jurisdictions in the United States, if any, in which it is required to be so qualified and in which the failure so to qualify would have a Material Adverse Effect;

(viii)    To the best of such counsel's knowledge, there are no legal or governmental proceedings pending or threatened against the Company, any Significant Subsidiary or any Controlled Entity, or to which the Company, any Significant Subsidiary or any Controlled Entity, or any of their property, is subject, which would be required to be disclosed in the Preliminary Memorandum, the Final Memorandum or both (or any amendment or supplement thereto) if the Preliminary Memorandum and the Final Memorandum were prospectuses included in a registration statement on Form S-1 under the Securities Act, other than those disclosed therein; and to the best knowledge of such counsel after reasonable inquiry, neither the Company, any Significant Subsidiary nor any Controlled Entity is in violation of any law, ordinance, administrative or governmental rule or regulation applicable to the Company, any Significant Subsidiary or any Controlled Entity, except for violations, if any, which in the aggregate do not have a Material Adverse Effect.

(ix)    Neither the Company nor any Significant Subsidiary or Controlled Entity is in violation of its respective certificate or articles of incorporation or bylaws, or other organizational documents, and, to the best knowledge of such counsel after reasonable inquiry, neither the Company nor any Significant Subsidiary or Controlled Entity is in default in the performance of any material obligation, agreement or condition contained in any bond, debenture, note or other evidence of indebtedness, which default could have a Material Adverse Effect, except as may be disclosed in the Preliminary Memorandum or the Final Memorandum (or any amendment or supplement thereto).

(x)    Each of this Agreement and the Registration Rights Agreement has been duly authorized, executed and delivered by the Company and, assuming due authorization, execution, delivery and performance thereof by the Initial Purchasers, is a valid and binding agreement of the Company, enforceable in accordance with its respective terms, except as enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and subject to the applicability of general principles of equity, and except as enforcement of rights to indemnity and contribution may be limited by applicable law.

(xi)    Each of the Company, the Significant Subsidiaries and the Controlled Entities holds all material permits, licenses, certificates of need and other approvals or authorizations of and from governmental regulatory officials and

bocres necessary to entitle it to own its properties and to conduct its business as described in the Preliminary Memorandum and the Final Memorandum, or to receive reimbursement under Medicare (if represented in the Preliminary Memorandum or the Final Memorandum as being Medicare-certified), except where the lack of such approval or authorization would not have a Material Adverse Effect.

(xii)  No holder of any security of the Company (other than holders of the Initial Notes) has any right to request or demand registration of any security of the Company because of the consummation of the transactions contemplated by this Agreement or the Registration Rights Agreement.

(xiii)  When the Initial Notes are issued and delivered pursuant to this Agreement, such Initial Notes will not be of the same class (within the meaning of Rule 144A(d)(3) under the Securities Act) as any security of the Company that is listed on a national securities exchange registered under Section 6 of the Exchange Act or that is quoted in a United States automated inter-dealer quotation system.

(xiv)  To the best of such counsel's knowledge after reasonable inquiry, neither the Company nor any affiliate (as defined in Rule 501(b) of Regulation D) of the Company has directly, or through any agent (*provided* that no opinion need be expressed as to the Initial Purchasers or any person acting on their behalf), (A) sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security (as defined in the Securities Act) which is or will be integrated with the offering and sale of the Initial Notes in a manner that would require the registration of the Initial Notes under the Securities Act or (B) engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offering of the Initial Notes.

(xv)  Except as otherwise provided in the Indenture, the Company is not required to deliver the information specified in Rule 144A(d)(4) in connection with the offering and resale of the Initial Notes by the Initial Purchasers.

(xvi)  Assuming (A) that any Eligible Purchaser who buys the Initial Notes in the Exempt Resales is a QIB, an IAI or a person other than a U.S. person outside the United States in reliance on Regulation S and (B) the accuracy of the representations of the Initial Purchasers and those of the Company in this Agreement regarding the absence of general solicitation in connection with the Exempt Resales, no registration of the Initial Notes under the Securities Act is required for the sale of the Initial Notes as contemplated in this Agreement or for the Exempt Resales and no qualification of the Indenture under the Trust Indenture Act is required in connection with the offer and sale of the Initial Notes contemplated by this Agreement or in connection with the Exempt Resales.

24

(xvii)   The descriptions in the Preliminary Memorandum and the Final Memorandum of statutes, governmental regulations, agreements, contracts, leases and other documents are accurate and fairly present the information that would be required to be presented therein if the Preliminary Memorandum and the Final Memorandum were prospectuses included in a registration statement on Form S-1 under the Securities Act; and, to the best of such counsel's knowledge, there are no statutes, governmental regulations, agreements, contracts, leases or documents of a character required to be described or referred to in the Preliminary Memorandum or the Final Memorandum (or any amendment or supplement thereto) that are not either described or referred to therein or filed as an exhibit to the Preliminary Memorandum or the Final Memorandum, if the Preliminary Memorandum and the Final Memorandum were prospectuses included in a registration statement on Form S-1 under the Securities Act.

(xviii)   Neither the offer, sale or delivery of the Initial Notes, the execution, delivery or performance of this Agreement, the Registration Rights Agreement and the Indenture, compliance by the Company with the provisions of this Agreement, the Registration Rights Agreement and the Indenture, nor consummation by the Company of the transactions contemplated by this Agreement, the Registration Rights Agreement and the Indenture, conflicts or will conflict with or constitutes or will constitute a breach of, or a default under, the certificate or articles of incorporation or bylaws, or other organizational documents, of the Company, any Significant Subsidiary or any Controlled Entity or any agreement, indenture, lease or other instrument to which the Company, any Significant Subsidiary or any Controlled Entity is a party or by which any of them or any of their respective properties is bound, which is known to such counsel after reasonable inquiry, or will result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Company, any Significant Subsidiary or any Controlled Entity.

(xix)   The Exchange Notes have been duly authorized by the Company and, when executed by the Company and authenticated in accordance with the terms of the Registration Rights Agreement, the Exchange Offer and the Indenture, the Exchange Notes will be legal, valid and binding obligations of the Company, entitled to the benefits of the Indenture and enforceable against the Company in accordance with their terms, except that enforceability of the Exchange Notes may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(xx)   A New York court would apply the substantive law of the State of New York in construing the Initial Notes and the Indenture and in ascertaining the validity of the payment of interest and the permissible rate of interest on the Initial Notes, and would hold that such substantive law of the State of New York

25

governs the rights and obligations of the parties to the Initial Notes and the Indenture.

(xxi)   A New York court applying the substantive law of the State of New York would hold that the payment of interest on the Initial Notes and the rate of interest provided pursuant to the Indenture with respect to the Initial Notes do not violate the usury laws of the State of New York.

(xxii)   An Alabama court should apply the substantive law of the State of New York in construing the Indenture and the Initial Notes and in ascertaining the validity of the payment of interest and the rate of interest provided pursuant to the Indenture with respect to the Initial Notes, and should hold that New York law governs the rights and obligations of the parties to the Initial Notes, the Indenture and the Registration Rights Agreement. If. the internal laws of the State of Alabama were applicable to the Initial Notes, with respect to loans of $2,000 or more, Section 8-8-5 of the Code of Alabama (1975) permits the parties to agree upon an interest rate to be charged (subject to principles of unconscionability and to the extent not deemed a penalty).

(xxiii)   No consent, approval, authorization or order of any court or governmental agency or body is required for the consummation of the transactions contemplated herein, except such as may be required under the Blue Sky or securities laws of any jurisdiction in connection with the purchase and sale of the Initial Notes by the Initial Purchasers and such other approvals as have been obtained.

Such counsel shall also state that nothing has come to their attention that would lead them to believe that (i) the Preliminary Memorandum as of its date and as of the Closing Date (including the Incorporated Documents but not including the financial statements and supporting schedules, upon which such counsel need express no opinion), contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (ii) any amendment or supplement to the Final Memorandum (including the Incorporated Documents but not including the financial statements and supporting schedules, upon which such counsel need express no opinion), as of its date and as of the Closing Date, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

In rendering the opinions concerning valid and binding obligations of the Company and the enforceability thereof set forth in paragraphs (iv), (v), (x) and (xix) above and the opinions set forth in paragraphs (xx) and (xxi) above, such counsel may rely upon an opinion dated the Closing Date of Pillsbury Winthrop LLP as to laws of the State of New York, *provided that* (I) such reliance is expressly authorized by each opinion so relied upon and a copy of each

(m)    The Initial Notes shall be eligible for trading in PORTAL upon issuance.

(n)    All agreements set forth in the letter of representations of the Company to DTC relating to the approval of the Initial Notes by DTC for "book-entry" transfer shall have been complied with.

If any of the conditions specified in this Section 8 shall not have been fulfilled when and as required by this Agreement to be fulfilled (or waived by the Initial Purchasers), this Agreement may be terminated by the Initial Purchasers on notice to the Company at any time at or prior to the Closing Date, and such termination shall be without liability of any party to any other party. Notwithstanding any such termination, the provisions of Sections 6, 7, 10, 11 and 12(d) shall remain in effect.

9.    Initial Purchasers' Information.  The Company and the Initial Purchasers acknowledge that the statements with respect to the offer and sale of the Initial Notes set forth in (i) the first paragraph under the caption "Important Notice to Readers" in the Preliminary Memorandum and the Final Memorandum, (ii) the first sentence of the sixth paragraph under the caption "Plan of Distribution" in the Preliminary Memorandum and the Final Memorandum, (iii) the seventh paragraph under the caption "Plan of Distribution" in the Preliminary Memorandum and the Final Memorandum and (iv) solely with respect to First Union Securities, Inc. as an Initial Purchaser, the last paragraph under the caption "Plan of Distribution" in the Preliminary Memorandum and the Final Memorandum constitute the only information furnished in writing by the Initial Purchasers expressly for use in the Preliminary Memorandum or the Final Memorandum.

10.    Expenses; Reimbursements.  The Company agrees to pay the following costs and expenses and all other costs and expenses incident to the performance by it of its obligations hereunder:  (i) the preparation, printing or reproduction of the Preliminary Memorandum and the Final Memorandum, this Agreement, the Registration Rights Agreement and the Indenture; (ii) the printing (or reproduction) and delivery (including postage, air freight charges and charges for counting and packaging) of such copies of the Preliminary Memorandum and the Final Memorandum, the Incorporated Documents, and all amendments or supplements to any of them as may be reasonably requested for use in connection with the offering and sale of the Initial Notes; (iii) the preparation, printing, authentication, issuance and delivery of certificates for the Initial Notes, including any stamp taxes in connection with the original issuance and sale of the Initial Notes; (iv) the printing (or reproduction) and delivery of this Agreement, the preliminary and supplemental Blue Sky Memoranda, if any, and all other agreements or documents printed (or reproduced) and delivered in connection with the offering of the Initial Notes; (v) the qualification of the Initial Notes for offer and sale under the securities or Blue Sky laws of the several states of the United States (including the reasonable fees, expenses and disbursements of counsel for the Initial Purchasers relating to the preparation, printing or reproduction, and delivery of the preliminary and supplemental Blue Sky Memoranda, if any, and such qualification); (vi) the performance by the Company of its obligations under the Registration Rights Agreement; and (vii) the fees and expenses of the

Company's accountants and the fees and expenses of counsel (including local and special counsel) for the Company. The Company hereby agrees that it will pay in full on the Closing Date the fees and expenses referred to in clause (v) of this Section 10 by delivering to counsel for the Initial Purchasers on such date a check payable to such counsel in the requisite amount.

11.    Survival Of Representations And Agreements.  All representations and warranties, covenants and agreements contained in this Agreement, including the agreements contained in Sections 10 and 12(d), the indemnity agreements contained in Section 6 and the contribution agreements contained in Section 7 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Initial Purchasers or any controlling person thereof or by or on behalf of the Company or any controlling person thereof, and shall survive delivery of and payment for the Initial Notes to and by the Initial Purchasers. The agreements contained in Sections 6, 7, 9, 10 and 12(d) shall survive the termination of this Agreement, including pursuant to Section 12.

12.    Effective Date Of Agreement: Termination: Default by Initial Purchaser.

(a)    This Agreement shall become effective upon execution and delivery of a counterpart hereof by each of the parties hereto.

(b)    The Initial Purchasers shall have the right to terminate this Agreement at any time prior to the Closing Date by notice to the Company from the Initial Purchasers, without liability (other than with respect to Sections 6 and 7) on the Initial Purchasers' part to the Company if, on or prior to such date, (i) the Company shall have failed, refused or been unable to perform in any material respect any agreement on its part to be performed under this Agreement when and as required, (ii) any other condition to the obligations of the Initial Purchasers under this Agreement to be fulfilled by the Company pursuant to Section 8 is not fulfilled when and as required in any material respect, (iii) trading in securities generally on the New York Stock Exchange, the American Stock Exchange or the Nasdaq National Market shall have been suspended or materially limited, or minimum prices shall have been established thereon by the Commission, or by such exchange or other regulatory body or governmental authority having jurisdiction, or (iv) a general banking moratorium shall have been declared by federal or New York authorities, or if a moratorium on foreign exchange trading by major international banks or persons shall have been declared, (v) there is an outbreak or escalation of hostilities or other national or international calamity on or after the date of this Agreement, or if there has been a declaration by the United States of a national emergency or war or other national or international calamity or crisis (economic, political, financial or otherwise) which affects the U.S. and international markets, making it, in the Initial Purchasers' judgment, impracticable to proceed with the offering or delivery of the Initial Notes on the terms and in the manner contemplated in the Final Memorandum or (vi) there shall have been such a material adverse change in general economic, political or financial conditions or the effect (or potential effect if the financial markets in the United States have not yet opened) of international conditions on the financial markets in the United

States shall be such, as in the Initial Purchasers' judgment, to make it inadvisable or impracticable to proceed with the offering or delivery of the Initial Notes on the terms and in the manner contemplated in the Final Memorandum.

(c)     Any notice of termination pursuant to this Section 12 shall be given at the address specified in Section 13 below by telephone, telex, telephonic facsimile or telegraph, confirmed in writing by letter.

(d)     If this Agreement shall be terminated pursuant to clause (i) or (ii) of Section 12(b), or if the sale of the Initial Notes provided for in this Agreement is not consummated because of any refusal, inability or failure on the part of the Company to satisfy in any material respect any condition to the obligations of the Initial Purchasers set forth in this Agreement to be satisfied on its part or because of any refusal, inability or failure on the part of the Company to perform in any material respect any agreement in this Agreement or comply in any material respect with any provision of this Agreement, the Company will, subject to demand by the Initial Purchasers, reimburse the Initial Purchasers for all of their reasonable out-of-pocket expenses (including the fees and expenses of the Initial Purchasers' counsel) incurred in connection with this Agreement.

(e)     If any one or more Initial Purchasers shall fail to purchase and pay for any of the Initial Notes agreed to be purchased by such Initial Purchaser hereunder and such failure to purchase shall constitute a default in the performance of its or their obligations under this Agreement, the remaining Initial Purchasers shall be obligated severally and not jointly to purchase (in the respective proportions which the principal amount of Initial Notes set forth opposite their names in Schedule 1 hereto bears to the aggregate principal amount of Initial Notes set forth opposite the names of all the remaining Initial Purchasers) the Initial Notes which the defaulting Initial Purchaser or Initial Purchasers agreed to purchase but failed to purchase; provided, however, that in the event that the aggregate principal amount of Initial Notes which the defaulting Initial Purchaser or Initial Purchasers agreed to purchase but failed to purchase exceeds 10% of the aggregate principal amount of Initial Notes set forth in Schedule 1 hereto, the remaining Initial Purchasers shall have the right to purchase all, but shall not be under any obligation to purchase any, of the Initial Notes, and if such nondefaulting Initial Purchasers do not purchase all the Initial Notes, this Agreement will terminate without liability to any nondefaulting Initial Purchaser or the Company. In the event of a default by any Initial Purchaser as set forth in this Section 12(e), the Closing Date shall be postponed for such period, not to exceed five business days, as the Initial Purchasers shall determine in order that the required changes in the Final Memorandum or in any other documents or arrangements may be effected. Nothing contained in this Agreement shall relieve any defaulting Initial Purchaser of its liability, if any, to the Company.

13.     Notices.  All communications with respect to or under this Agreement, except as may be otherwise specifically provided in this Agreement, shall be in writing and, if sent to the Initial Purchasers, shall be mailed, delivered, or telexed, telegraphed or telecopied and

30

confirmed in writing to UBS Warburg LLC, 677 Washington Boulevard, Stamford, Connecticut 06901 Attention: Syndicate Department, Telephone: (203) 719-1088, Facsimile: (203) 719-0495; and if sent to the Company, shall be mailed, delivered or telexed, telegraphed or telecopied and confirmed in writing to HEALTHSOUTH Corporation, One HealthSouth Parkway, Birmingham, Alabama 35243, Attention: William W. Horton, Telephone: (205) 969-4977, Facsimile: (205) 969-4730.

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five business days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; when receipt acknowledged by telecopier machine, if telecopied; and one business day after being timely delivered to a next-day air courier.

14.    Parties.  This Agreement shall inure solely to the benefit of, and shall be binding upon, the Initial Purchasers, the Company and the controlling persons and agents referred to in Sections 6 and 7, and their respective successors and assigns, and no other person shall have or be construed to have any legal or equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision herein contained.  The term "successors and assigns" shall not include a purchaser, in its capacity as such, of Notes from the Initial Purchasers.

15.    Construction.  This Agreement shall be construed in accordance with the internal laws of the State of New York (without giving effect to any provisions thereof relating to conflicts of law).

16.    Captions.  The captions included in this Agreement are included solely for convenience of reference and are not to be considered a part of this Agreement.

17.    Counterparts.  This Agreement may be executed in various counterparts that together shall constitute one and the same instrument.

If the foregoing Purchase Agreement correctly sets forth the understanding among the Company and the Initial Purchasers, please so indicate in the space provided below for the purpose, whereupon this letter and your acceptance shall constitute a binding agreement among the Company and the Initial Purchasers.

HEALTHSOUTH CORPORATION

By: _____

Name:      WILLIAM W. HORTON
Title:      EXECUTIVE VICE PRESIDENT

Confirmed and accepted as of
the date first above written:

UBS WARBURG LLC
DEUTSCHE BANK SECURITIES INC.
BANC OF AMERICA SECURITIES LLC
SCOTIA CAPITAL (USA) INC.
FIRST UNION SECURITIES, INC.
J.P. MORGAN SECURITIES, INC.
FLEET SECURITIES, INC.
SALOMON SMITH BARNEY INC.
NATCITY INVESTMENTS, INC.
JEFFERIES & COMPANY, INC.

By:        UBS WARBURG LLC

By: _____
Name:
Title:

By: _____
Name:
Title:

300007668v2          32

Schedule I

| Initial Purchaser | Principal Amount of Notes |
| --- | --- |
| UBS Warburg LLC | |
| Deutsche Bank Securities Inc. | $200,045,139 |
| Banc of America Securities LLC | 200,045,138 |
| Scotia Capital (USA) Inc. | 159,010,238 |
| First Union Securities, Inc. | 153,880,876 |
| J.P. Morgan Securities, Inc. | 119,001,211 |
| Fleet Securities, Inc. | 88,225,035 |
| Salomon Smith Barney Inc. | 33,340,856 |
| NatCity Investments, Inc. | 20,517,450 |
| Jefferies & Company, Inc. | 13,623,587 |
| | 12,310,470 |
| Total | $1,000,000,000 |

EXHIBIT A

Form of Purchaser Letter for Institutional Accredited Investors

_____, 200_

HEALTHSOUTH CORPORATION
HealthSouth Parkway
Birmingham, Alabama 35243

UBS Warburg LLC
Deutsche Bank Securities Inc.
Banc of America Securities LLC
Scotia Capital (USA) Inc.
First Union Securities, Inc.
J.P. Morgan Securities, Inc.
Fleet Securities, Inc.
Salomon Smith Barney Inc.
NatCity Investments, Inc.
Jefferies & Company, Inc.

c/o UBS Warburg LLC
677 Washington Blvd.
Stamford, Connecticut 06901

Ladies and Gentlemen:

We are delivering this letter in connection with an offering by HEALTHSOUTH Corporation, a Delaware corporation (the "Company"), of its 7.625% Senior Notes due 2012 (the "Securities").

We understand that the Securities are being offered in transactions not involving any public offering within the United States within the meaning of, or in transactions not subject to registration under, the Securities Act of 1933, as amended (the "Securities Act"), and that the Securities have not been registered under the Securities Act or any applicable state securities law and we agree, on our own behalf and on behalf of each account for which we acquire any Securities, that prior to the expiration of the holding period applicable to sales of restricted securities pursuant to Rule 144 under the Securities Act, the Securities may be offered, resold, pledged or otherwise transferred only in accordance with any applicable securities laws of any state of the United States or any other applicable jurisdiction (i) (a) so long as the Securities are eligible for resale pursuant to Rule 144A, to a person the seller reasonably believes is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, (b)

A-1

in a transaction meeting the requirements of Rule 144 under the Securities Act, (c) outside the United States to a person who is not a U.S. person in a transaction meeting the requirements of Rule 904 of Regulation S or (d) in accordance with another exemption from the registration requirements of the Securities Act, *provided* that in the case of a transfer, pledge or sale pursuant to this clause (d), such transfer is subject to the receipt by the registrar (and the Company, if it so requests) of a certification of the transferor and an opinion of counsel to the effect that such transfer is in compliance with the Securities Act, (ii) to HEALTHSOUTH or its affiliates, (iii) pursuant to an effective registration statement under the Securities Act and (iv) in each case, in accordance with any applicable securities laws of the United States or any other applicable jurisdiction and in accordance with the legends set forth on the Securities. We further agree to provide any person purchasing any of the Securities from us a notice advising such purchaser that resales of such Securities are restricted as stated herein. We understand that the registrar for the Securities will not be required to accept for registration of transfer any Securities, except upon presentation of evidence satisfactory to the Company that the foregoing restrictions on transfer have been complied with. We further understand that any Securities will be in the form of definitive physical certificates and that such certificates will bear a legend reflecting the substance of this paragraph.

We confirm that:

(i)    we are an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act (an "Institutional Accredited Investor");

(ii)    any purchase of Securities by us will be for our own account or for the account of one or more Institutional Accredited Investors or as fiduciary for the account of one or more trusts, each of which is an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and for each of which we exercise sole investment discretion;

(iii)    in the event that we purchase any Securities, we will acquire Securities having a minimum purchase price of not less than $250,000 for our own account or for any separate account for which we are acting;

(iv)    we have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of purchasing the Securities;

(v)    we are not acquiring the Securities with a view to distribution thereof or with any present intention of offering or selling Securities, except as permitted above; *provided* that the disposition of our property and property of any accounts for which we are acting as fiduciary shall remain at all times within our control; and

(vi)    we have received a copy of the Final Memorandum relating to the Securities and acknowledge that we have had access to such financial and other information, and have been afforded the opportunity to ask such questions of representatives of the Company and receive answers thereto, as we deem necessary in connection with our decision to purchase the Securities.



UBS Warburg LLC
299 Park Avenue
New York, NY 10171-0026
Telephone 212 821-4000
www.ubswarburg.com

August 7, 2002

CONFIDENTIAL

HEALTHSOUTH Corporation
1 HEALTHSOUTH Parkway
Birmingham, Alabama 35243

Attention: Mr. William Owens
President and Chief Operating Officer

Ladies and Gentlemen:

1.  UBS Warburg LLC ("UBS Warburg") is pleased to act as exclusive financial advisor and capital markets advisor to HEALTHSOUTH Corporation (the "Company") in connection with a potential Transaction (as defined below) involving the Company. This letter agreement (the "Agreement") confirms the terms of our engagement. The term of UBS Warburg's engagement hereunder shall commence on the date hereof and continue until August 7, 2003 (the "Term").

As used in this Agreement, the term "Transaction" means, whether effected directly or indirectly or in one transaction or a series of transactions, any: (i)(a) merger, consolidation, reorganization or other business combination pursuant to which the Company and a third party (together with its affiliates and subsidiaries, an "Acquiror") or any of their respective divisions or businesses, including, without limitation, the Company's diagnostic imaging business (the "Diagnostic Imaging Business"), are combined or (b) sale, transfer or other disposition (other than a Spin-Off as defined below) of all or a significant portion of the capital stock or assets of the Company by way of tender or exchange offer, option, negotiated purchase, leveraged buyout, minority investment or partnership, joint or collaborative venture or otherwise (any such transaction described in this clause (i), a "Sale Transaction") and/or (ii) spin-off, split-off or other transaction described or a portion of the Company's surgery centers business (the "Surgery Centers"), whether through a dividend, distribution or otherwise (a "Spin-Off").

On the terms and subject to the conditions of this Agreement, UBS Warburg will provide the Company with such financial and market related advice and assistance as may be appropriate and mutually agreed upon by the Company and UBS Warburg, which may include assisting the Company in analyzing, structuring, negotiating and effecting the proposed Transaction.

If appropriate and customary in connection with a Transaction, UBS Warburg also will, upon the request of the Company, undertake a study to enable it to render an opinion (the "Opinion") with respect to the fairness, from a financial point of view, to the Company or holders of the Company's common stock (other than certain affiliates of the Company), as the case may be, of the consideration to be received in a proposed Transaction (or, if the Transaction involves an exchange of securities, the exchange ratio). The nature and scope of UBS Warburg's investigation, as well as the scope, form and substance of any such Opinion, shall be such as UBS Warburg may consider appropriate. If requested, such Opinion will be in written form.

UBS Warburg LLC is a subsidiary of UBS AG.
UBS Warburg is a business group of UBS AG.

Member SIPC

Member New York Stock Exchange
and other Principal Exchanges

# ❄ UBS Warburg

HEALTHSOUTH Corporation
August 7, 2002
Page 2

    2.  For UBS Warburg's services hereunder, the Company agrees to pay fees to UBS Warburg
in cash as follows:

   a)    Opinion Fee

         In the case of a Transaction which involves the delivery of an Opinion by UBS
         Warburg, an opinion fee in respect of each Opinion equal to 25% (the "Opinion
         Fee") of the Transaction Fee (as defined below and calculated as if the Transaction
         were consummated on the date on which the Opinion Fee is payable), subject to a
         minimum Opinion Fee of $500,000, payable promptly upon UBS Warburg having
         substantially completed the work that, in its determination, is appropriate to prepare
         it to render an Opinion. Such Opinion Fee shall be offset, to the extent previously
         paid, against the Transaction Fee payable to UBS Warburg by the Company in
         respect of such Transaction or, in the case of multiple Transactions, the Transaction
         Fee payable to UBS Warburg by the Company in respect of the Transaction to
         which the Opinion relates.

   b)    Agreement/Announcement Fee

         In the case of a Transaction which does not involve the delivery of an Opinion by
         UBS Warburg, a fee equal to 25% (the "Agreement/Announcement Fee") of the
         Transaction Fee (as calculated as if the Transaction were consummated on the date
         on which the Agreement/Announcement Fee is payable), subject to a minimum
         Agreement/Announcement Fee of $500,000, payable, in the case of a Spin-Off,
         promptly upon the Company's first public announcement of its intention to pursue a
         Spin-Off (an "Announcement") and, in the case of a Transaction other than a Spin-
         Off, promptly upon execution of a letter of intent, agreement in principle, definitive
         agreement or similar agreement (a "Transaction Agreement") in respect of a
         Transaction. Such Agreement/Announcement Fee shall be offset, to the extent
         previously paid, against the Transaction Fee payable to UBS Warburg by the
         Company in respect of such Transaction or, in the case of multiple Transactions, the
         Transaction Fee payable to UBS Warburg by the Company in respect of the
         Transaction to which the Transaction Agreement or Announcement, as the case may
         be, relates.

   c)    Transaction Fee

         In connection with a Transaction, the following transaction fees (each, a
         "Transaction Fee"):

         (i)  In the case of a Sale Transaction involving all or substantially all of the Company
              (a "Company Sale"), a transaction fee, payable promptly upon the closing of such
              Company Sale, equal to 0.35% of Transaction Value (as defined in Annex A).

         (ii)  In the case of a Sale Transaction solely involving the Surgery Centers (a "Surgery
              Centers Sale"), a transaction fee, payable promptly upon the closing of such Surgery
              Centers Sale, equal to 0.45% of Transaction Value.

         (iii)  In the case of a Sale Transaction (other than a Company Sale or a Surgery
              Centers Sale), including, without limitation, a Sale Transaction involving a

# ❦ UBS Warburg

HEALTHSOUTH Corporation
August 7, 2002
Page 3

> significant portion of the Diagnostic Imaging Business, a transaction fee, payable promptly upon closing of such Sale Transaction, equal to 0.75% of Transaction Value.
>
> (iv)  In the case of a Spin-Off involving the Surgery Centers, a transaction fee, payable promptly upon the fifth trading day following consummation of the Spin-Off, equal to 0.45% of Transaction Value.
>
> It is expressly understood that a separate Transaction Fee shall be payable in the event that more than one Transaction shall occur.

If, at any time prior to the expiration of 12 months following the Term, a Transaction is consummated, or the Company enters into an agreement which subsequently results in a Transaction, then the Company will pay UBS Warburg the Transaction Fee specified above in cash promptly upon the closing of such Transaction.

Whether or not any Transaction is consummated, and in addition to any fees payable to UBS Warburg, the Company will reimburse UBS Warburg, upon its request from time to time, for expenses actually and reasonably incurred by it in entering into and performing services pursuant to this Agreement, including the fees, disbursements and other charges of its legal counsel.

3.  It is understood that the written Opinion, if rendered by UBS Warburg pursuant to this Agreement, may be reproduced in full in any document that is required to be filed with the Securities and Exchange Commission and required to be mailed by the Company to its stockholders relating to the Sale Transaction in respect of which the Opinion was rendered; provided that, all references to UBS Warburg or any such Opinion in any such document and the description or inclusion of any such Opinion and advice therein shall be subject to UBS Warburg's prior written consent with respect to form and substance. Except (a) as otherwise provided by the immediately preceding sentence or (b) to the extent legally required (after consultation with UBS Warburg and its counsel), none of (i) the name of UBS Warburg, (ii) any advice rendered by UBS Warburg to the Company or any Opinion, or (iii) the terms of this Agreement or any communication from UBS Warburg in connection with the services performed by UBS Warburg pursuant to this Agreement will be quoted or referred to orally or in writing, or in the case of (ii) and (iii), reproduced or disseminated, by the Company or any of its affiliates or any of their agents, without UBS Warburg's prior written consent (which consent will not be unreasonably withheld).

4.  During the Term or 12 months following the earlier of termination or expiration of this Agreement, the Company shall offer UBS Warburg the right to act as sole arranger, sole book-running lead manager or sole placement agent, as the case may be, for any (a) bridge or syndicated bank loan in connection with a Transaction involving the Surgical Centers, (b) public offering or private placement of equity, equity-linked or debt (including, without limitation, asset-backed) securities (collectively, the "Securities") of the Company in connection with a Transaction involving the Surgical Centers or (c) public offering or private placement of Securities of the entity resulting from the Spin-Off (the "Surgical Spinco") (collectively, a "Financing"), under a separate agreement containing terms and conditions customary for UBS Warburg and mutually agreed upon by the Company and UBS Warburg.

5.  The Company will furnish UBS Warburg (and, if negotiations proceed with a potential Acquiror, will request that such Acquiror furnish UBS Warburg) with such information as UBS Warburg believes appropriate to its assignment (all such information so furnished being the

UBS Warburg LLC

# ❊ UBS Warburg

HEALTHSOUTH Corporation
August 7, 2002
Page 4

"Information"). The Company recognizes and confirms that UBS Warburg (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement and in rendering the Opinion without having assumed responsibility for independently verifying the same, (b) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other information and (c) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company or a potential Acquiror. To the best of the Company's knowledge, the Information to be furnished by or on behalf of the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. The Company will promptly notify UBS Warburg if it learns of any material inaccuracy or misstatement in, or material omission from, any Information previously delivered to UBS Warburg.

6.  UBS Warburg's services hereunder may be terminated by the Company or UBS Warburg upon 30 days prior written notice without liability or continuing obligation of the Company or UBS Warburg except that UBS Warburg shall be entitled to the fees payable pursuant to Section 2 hereof and the right of first refusal (measured from the earlier of termination or expiration of this Agreement contemplated by Section 4 hereof in accordance with the terms thereof and except that expenses incurred by UBS Warburg as a result of services rendered prior to the date of termination shall become immediately payable in full, and provided that Sections 3, 5 (other than the first sentence thereof, 6, 7, 11, 12, 13 and 14 hereof shall remain operative and in full force and effect regardless of any termination.

7.  The obligations of the Company hereunder shall be the joint and several obligations of the Company and Surgical Spinco.

8.  UBS Warburg may, at its own expense, place customary tombstone announcements or advertisements in financial newspapers and journals describing its services hereunder.

9.  The Company acknowledges and agrees that UBS Warburg has been retained to act solely as an advisor to the Company, and not as an advisor to any other person, and the Company's engagement of UBS Warburg is not intended to confer rights upon any person (including shareholders, employees or creditors of the Company) not a party hereto as against UBS Warburg or its affiliates, or their respective directors, officers, employees or agents, successors, or assigns. UBS Warburg shall act as an independent contractor under this Agreement, and not in any other capacity including as a fiduciary, and any duties arising out of its engagement shall be owed solely to the Company.

10.  UBS AG (the parent of UBS Warburg and its subsidiaries, branches and affiliates (the "UBS Group") are involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) from which conflicting interests or duties may arise. Information which is held elsewhere within UBS Warburg or within the UBS Group but of which none of the individuals in the Investment Banking Department of UBS Warburg involved in providing the services contemplated by this engagement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining UBS Warburg's responsibilities to the Company under this engagement. Neither UBS Warburg nor any other part of the UBS Group will have any duty to disclose to the Company or utilize for the Company's benefit any non-public information acquired in the course of providing services to any third party, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business. In

UBS Warburg LLC

# ❧ UBS Warburg

HEALTHSOUTH Corporation
August 7, 2002
Page 5

addition, in the ordinary course of business, UBS Warburg and its affiliates may trade the securities of the Company, Surgical Spinco and a potential Acquiror for its own account and for the accounts of customers, and may at any time hold a long or short position in such securities.

11.    The Company agrees to the indemnification and other agreements set forth in the Indemnification Agreement attached hereto, the provisions of which are incorporated herein by reference and shall survive the termination, expiration or supersession of this Agreement.

12.    THIS AGREEMENT AND ANY CLAIM, COUNTERCLAIM OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EXCEPT AS SET FORTH BELOW, NO CLAIM MAY BE COMMENCED, PROSECUTED OR CONTINUED IN ANY COURT OTHER THAN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND THE COMPANY AND UBS WARBURG CONSENT TO THE JURISDICTION OF SUCH COURTS AND PERSONAL SERVICE WITH RESPECT THERETO. THE COMPANY HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT IS BROUGHT BY ANY THIRD PARTY AGAINST UBS WARBURG OR ANY INDEMNIFIED PARTY. EACH OF UBS WARBURG AND THE COMPANY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR CLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE COMPANY AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE COMPANY IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

13.    This Agreement (including the attached Indemnification Agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof.. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect or any other provision of this Agreement, which will remain in full force and effect. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing signed by both UBS Warburg and the Company. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

14.    This Agreement (including the attached Indemnification Agreement) shall be binding upon the Company and UBS Warburg and their respective successors and assigns and any successor or assign of any substantial portion of the Company's and UBS Warburg's respective businesses and/or assets.

UBS Warburg LLC

# ❈ UBS Warburg

HEALTHSOUTH Corporation
August 7, 2002
Page 6

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon .this Agreement and your acceptance shall constitute a binding agreement between us.

Very truly yours,

UBS WARBURG LLC

By: _____                    By: _____
William C. McGahan                                  Roderick J. O'Neill
Managing Director                                   Executive Director

Accepted and agreed to as of
the date first above written:

HEALTHSOUTH CORPORATION

By: _____
William Owens
President and Chief Operating Officer

# ❈ UBS Warburg

## ANNEX A

For the purposes hereof, "Transaction Value" shall equal the greater of (A) "Equity Value," which shall mean (i) in the case of the sale, exchange or purchase of equity securities, the total consideration paid or received or to be paid or received for such securities (including, for purposes of this clause (A)(i), amounts payable to holders of options, warrants and convertible securities and amounts in escrow), plus payments made in installments, plus amounts payable in connection with the Sale Transaction under consulting agreements, agreements not to compete or similar arrangements (including such payments to management), plus contingent payments (whether or not related to future earnings or operations); and (ii) in the case of a sale or disposition of assets, the total consideration paid or received or to be paid or received for such assets (including amounts in escrow and installment payments), plus the net value of any current assets (such as accounts receivable, inventory, cash and cash equivalents) not sold, plus contingent payments (whether or not related to future earnings or operations) or (B) "Enterprise Value," which shall mean (i) in the case of the sale, exchange or purchase of equity securities, the total consideration paid or received or to be paid or received for such securities (including, for purposes of this clause (B)(i), amounts payable to holders of options, warrants and convertible securities and amounts in escrow), plus the principal amount of all indebtedness for borrowed money as set forth on the most recent consolidated balance sheet of the acquired company prior to the consummation of such sale, exchange or purchase (less the amount of cash and cash equivalents set forth on such balance sheet), plus payments made in installments, plus amounts payable in connection with the Sale Transaction under consulting agreements, agreements not to compete or similar arrangements (including such payments to management), plus contingent payments (whether or not related to future earnings or operations); and (ii) in the case of a sale or disposition of assets, the total consideration paid or received or to be paid or received for such assets (including amounts in escrow and installment payments), plus the net value of any current assets (such as accounts receivable, inventory, cash and cash equivalents) not sold and the principal amount of all indebtedness for borrowed money assumed by a purchaser, plus contingent payments (whether or not related to future earnings or operations). In the case of a recapitalization, all equity securities retained by security holders of the acquired company upon consummation of the Sale Transaction will be deemed acquired in the Sale Transaction.

Notwithstanding the foregoing, in the case of a joint or collaborative venture, strategic alliance or similar transaction (a "Joint Venture"), Transaction Value shall equal (i) the aggregate value of the proceeds, assets and other consideration payable or to be contributed to such Joint Venture by all parties to such Joint Venture in connection with the Sale Transaction (which shall be deemed to include installment or contingent amounts and other payments), including, without limitation, cash, notes, securities, intellectual property, licenses, distribution agreements and other property, as mutually agreed upon by the Company and UBS Warburg in good faith or (ii) in the event such Sale Transaction does not involve the payment or contribution of consideration to a Joint Venture, such amount as mutually upon agreed by the Company and UBS Warburg in good faith.

In connection with a Spin-Off, "Transaction Value" shall mean the total value of the securities distributed or transferred (including amounts payable to holders of warrants and convertible securities, and amounts in escrow), plus the principal amount of all indebtedness for borrowed money as set forth on the most recent consolidated balance sheet of Surgical Spinco upon consummation of the Spin-Off (less the amount of cash and cash equivalents set forth on such balance sheet).

Notwithstanding any provision in this Agreement to the contrary, if all or a portion of Transaction Value consists of contingent payments, then that portion of the Transaction Fee attributable thereto shall be payable, at the option of UBS Warburg, either (i) upon consummation of the Transaction, calculated at the present value of such amounts, based on a discount rate to be mutually agreed upon by the Company and UBS Warburg or (ii) when such amounts are due and payable.

UBS Warburg LLC

## ❊ UBS Warburg

For purposes of calculating the Transaction Fee, equity securities constituting a part of the consideration payable in the Transaction that are traded on a national securities exchange or quoted on The NASDAQ National Market System shall be valued at the last closing price thereof prior to the date of the consummation or closing of the Sale Transaction or, in the case of a Spin-Off, at the last closing price thereof prior to the fifth trading day after consummation or closing of the Spin-Off. Such equity securities which are traded in an over-the-counter market shall be valued at the mean between the latest bid and asked prices prior to such date. Any debt or other securities or other property shall be valued as the Company and UBS Warburg may mutually agree.

# ❈ UBS Warburg

<u>UBS Warburg LLC Indemnification Agreement</u>

August 7, 2002

UBS Warburg LLC
299 Park Avenue
New York, New York 10171

Ladies and Gentlemen:

In connection with the engagement of UBS Warburg LLC ("UBS Warburg") to advise and assist the undersigned (together with its affiliates and subsidiaries, referred to as the "Company") with the matters set forth in the Agreement, dated August 7, 2002, between the Company and UBS Warburg (the "Agreement"), in the event that UBS Warburg becomes involved in any capacity in any claim, suit, action, proceeding, investigation or inquiry (including, without limitation, any shareholder or derivative action or arbitration proceeding) (collectively, a "Proceeding") in connection with any matter in any way relating to or referred to in the Agreement or arising out of the matters contemplated by the Agreement, including, without limitation, related services and activities prior to the date of the Agreement, the Company agrees to indemnify, defend and hold UBS Warburg harmless to the fullest extent permitted by law, from and against any losses, claims, damages, liabilities and expenses in connection with any matter in any way relating to or referred to in the Agreement or arising out of the matters contemplated by the Agreement, including, without limitation, related services and activities prior to the date of the Agreement, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that such losses, claims, damages, liabilities and expenses resulted solely from the gross negligence or willful misconduct of UBS Warburg. In addition, in the event that UBS Warburg becomes involved in any capacity in any Proceeding in connection with any matter in any way relating to or referred to in the Agreement or arising out of the matters contemplated by the Agreement, the Company will reimburse UBS Warburg for its legal and other expenses (including the cost of any investigation and preparation) as such expenses are incurred by UBS Warburg in connection therewith. If such indemnification were not to be available for any reason, the Company agrees to contribute to the losses, claims, damages, liabilities and expenses involved (i) in the proportion appropriate to reflect the relative benefits received or sought to be received by the Company and its stockholders and affiliates and other constituencies, on the one hand, and UBS Warburg, on the other hand, in connection with the matters contemplated by the Agreement or (ii) if (but only if and to the extent) the allocation provided for in clause (i) is for any reason held unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and its stockholders and affiliates and other constituencies, on the one hand, and the party entitled to contribution, on the other hand, as well as any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative benefits received, or sought to be received, by the Company and its stockholders and affiliates and other constituencies, on the one hand, and the party entitled to contribution, on the other hand, in connection with the matters contemplated by the Agreement shall be deemed to be in the same proportion that the total value received or paid or contemplated to be received or paid by the Company or its stockholders or affiliates and other constituencies, as the case may be, as a result of or in connection with the matters (whether or not consummated) for which UBS Warburg has been retained to perform financial services bears to the fees paid to UBS Warburg under the Agreement; <u>provided</u>, that in no event shall the Company contribute less than the amount necessary to assure that UBS Warburg is not liable for losses, claims, damages, liabilities and expenses in excess of the amount of fees actually received by UBS Warburg pursuant to the Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents), on the one hand, or by UBS Warburg, on the other hand. The Company will not settle any Proceeding in respect of

UBS Warburg LLC

# ✤ UBS Warburg

which indemnity may be sought hereunder, whether or not UBS Warburg is an actual or potential party to such Proceeding, without UBS Warburg's prior written consent. For purposes of this Indemnification Agreement, UBS Warburg shall include UBS Warburg LLC, any of its affiliates, each other person, if any, controlling UBS Warburg or any of its affiliates, their respective officers, current and former directors, employees and agents, and the successors and assigns of all of the foregoing persons. The foregoing indemnity and contribution agreement shall be in addition to any rights that any indemnified party may have at common law or otherwise.

The Company agrees that neither UBS Warburg nor any of its affiliates, officers, directors, agents, employees or controlling persons shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either UBS Warburg's engagement under the Agreement or any matter referred to in the Agreement, including, without limitation, related services and activities prior to the date of the Agreement, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that any losses, claims, damages, liabilities or expenses incurred by the Company resulted solely from the gross negligence or willful misconduct of UBS Warburg in performing the services that are the subject of the Agreement.

THIS INDEMNIFICATION AGREEMENT AND ANY CLAIM, COUNTERCLAIM OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EXCEPT AS SET FORTH BELOW, NO CLAIM MAY BE COMMENCED, PROSECUTED OR CONTINUED IN ANY COURT OTHER THAN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND THE COMPANY AND UBS WARBURG CONSENT TO THE JURISDICTION OF SUCH COURTS AND PERSONAL SERVICE WITH RESPECT THERETO. THE COMPANY HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT IS BROUGHT BY ANY THIRD PARTY AGAINST UBS WARBURG OR ANY INDEMNIFIED PARTY. EACH OF UBS WARBURG AND THE COMPANY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR CLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE COMPANY AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE COMPANY IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

UBS Warburg LLC

**UBS Warburg**

The foregoing Indemnification Agreement shall remain in full force and effect notwithstanding any termination of UBS Warburg's engagement. This Indemnification Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

Very truly yours,

HEALTHSOUTH CORPORATION

By: _____

William Owens
President and Chief Operating Officer

Accepted and agreed to as of
the date first above written:

UBS WARBURG LLC

By: _____
William C. McGahan
Managing Director

By: _____
Roderick J. O'Neill
Executive Director

3 :