UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) | Master File No. CV-03-BE-1500-S |
| This Document Relates To: All Actions | ) ) ) | |
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION | ) ) ) ) | Consolidated Case No. CV-03-BE-1501-S

CLASS ACTION |
| This Document Relates To: All Actions | ) ) ) | |
| In re HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION | ) ) ) ) | Consolidated Case No. CV-03-BE-1502-S

CLASS ACTION |
| This Document Relates To: All Actions | ) ) ) | |

JOINT AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS [FACTUAL BASIS]

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This is a joint consolidated class action complaint filed on behalf of all individual and institutional investors who have been victimized by one of the largest and most egregious securities frauds since the enactment of the federal securities laws.  Pursuant to the Court's order of June 23, 2003, this pleading sets forth the factual basis for the claims of those investors.  The legal theories and claims of the Stockholder Class (as defined below) and the Bondholder Class (as defined below) are set forth in separate consolidated complaints filed concurrently with this pleading.  The Stockholder Class complaint asserts claims for violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all persons (other than defendants) who, between April 24, 1997 and March 18, 2003 (the "Stockholder Class Period"), purchased or otherwise acquired the stock or options of HealthSouth Corporation ("HRC," "HealthSouth" or the "Company"), including HealthSouth securities received in exchange for the stock or options of certain other companies acquired by HealthSouth (the "Stockholder Class").  The Bondholder Class complaint asserts claims for violations of the Securities Act and Exchange Act on behalf of all persons (other than defendants) who, between March 31, 1998 and March 18, 2003 (the "Bondholder Class Period"), purchased or otherwise acquired bonds, notes or other debt instruments issued by HealthSouth (the "Bondholder Class").[1]  The defendants for these claims include HealthSouth; a founder and the former Chief Executive Officer, Richard M. Scrushy ("Scrushy"); other former top officers and directors of the Company; HealthSouth's former outside accountants, Ernst & Young LLP

---

[1]      Unless otherwise indicated, references in this pleading to "Class Period" shall refer to the period between April 24, 1997 and March 18, 2003.

- 1 -

("E&Y"); the Company's investment bankers, including individual lead bankers Benjamin Lorello ("Lorello") and William McGahan ("McGahan") and the investment banks at which they managed the HealthSouth account from 1986 to 1999 (at Citi/Salomon, as defined below) and from 1999 to 2003 (at UBS, as defined below); and Howard Capek ("Capek"), a UBS healthcare analyst.[2]

2.    In a series of shocking revelations, it has been disclosed that, for many years, HealthSouth was falsifying its reported financial condition and operating results – including its reported revenue, net income, earnings-per-share ("EPS"), assets and stockholders' equity. HealthSouth has now fired E&Y, and belatedly warned investors not to rely on any of the E&Y-audited financial statements HealthSouth issued as a public company, eliminating more than $2.8 billion in previously reported net income, and wiping out every dollar of profit ever reported by HealthSouth as a public company.    Joel Gordon, who was appointed interim chairman of HealthSouth's Board of Directors on March 19, 2003, has admitted that the Company's fraud harmed investors.  Gordon testified before Congress on November 5, 2003, that "HealthSouth public stockholders have clearly been harmed by the fraud," and said the Board "recognize[d] that many of our ... stockholders ... have been hurt by the action of the people who committed the fraud."  Fifteen of the 38 Individual Defendants, including every one of the Company's Chief Financial Officers, have already pled guilty to criminal violations of the federal securities laws – the largest number of corporate officers at one company ever to admit to criminal wrongdoing at a single company.

---

[2]    Pursuant to the Court's September 2, 2003 Memorandum of Opinion and Order, the proceedings in this case are stayed as to defendants who have either been indicted or pled guilty in criminal cases pending in this District until after their respective sentencing.

**The Scheme**

3.    During the Class Period, at the direction of Scrushy, defendants implemented a pervasive fraudulent scheme to falsify HealthSouth's financial statements in order to meet or exceed "Wall Street" expectations, which were, in fact, projections disseminated by HealthSouth and the investment banks and analysts that were involved in the scheme.  The dissemination of false financial results that were manipulated to meet "analyst" estimates concealed HealthSouth's slowing growth rate and the adverse impact of the Balanced Budget Act of 1997 (the "BBA"), artificially inflating the price of HealthSouth's securities.  *See* App. 12.[3] Defendants took advantage of HealthSouth's high stock price to acquire other companies in stock-for-stock transactions, and selling over 16.7 million shares of their personal holdings for insider trading proceeds of over $300 million, while also pocketing millions of dollars more in cash bonuses based on HealthSouth's false profits during the years 1997-2002. *See* App. 9.

4.    This massive scheme of fraudulent financial manipulation and falsification included "cooking" HealthSouth's books to meet Wall Street expectations created by HealthSouth.  At the end of every month and every quarter, HealthSouth's top financial officers would provide Scrushy with HealthSouth's actual (but not yet publicly reported) results of operations.  When Scrushy and his top lieutenants saw that actual results were well below forecasted results and those necessary for the scheme to continue, Scrushy and HealthSouth's then-CFO would direct accounting subordinates to "fix" the shortfall through the entry of false

---

[3]    In the interest of brevity, plaintiffs have also filed two documents which contain additional detailed facts to support the allegations. These documents are entitled "Appendices to Joint Amended Consolidated Complaint for Violations of the Federal Securities Laws" ("App.") and "Exhibits to Joint Amended Consolidated Complaint for Violations of the Federal Securities Laws" ("Ex.").

accounting entries to create made-up revenue and income on HealthSouth's records. This was known internally at HealthSouth as "shoveling dirt into the hole."

5.    In order to accomplish accounting falsifications of this size and scope, it was necessary for HealthSouth's financial personnel to have regular meetings to coordinate their efforts to "fix" the financial results. By 1997, the individuals who attended these meetings became known within the upper echelons of HealthSouth – and eventually UBS – as "family" members, and the meetings became known as "family meetings." At these meetings, "family" members discussed and agreed upon the amount of "dirt" to fill the holes in HealthSouth's financial results.

6.    Defendants also inflated HealthSouth's financial results by systematically over-billing for group therapy sessions as individual therapy (the "Overbilling Fraud"). This was illegal under applicable Medicare regulations and also resulted in an overcharge to private insurance payors that utilized Medicare reimbursement rules, and rate schedules in their contracts with HealthSouth. The Overbilling Fraud made HealthSouth's reported revenues and earnings materially false and misleading.

7.    This multi-year scam could not have been, and was not, perpetrated only by HealthSouth and its insiders. Rather, HealthSouth's outside accounting and investment banking firms were knowing participants in the scheme. Working very closely with McGahan's and Lorello's investment banking firms, Citi/Salomon (until 1999) and UBS (after 1999), and its outside auditors, E&Y, HealthSouth by 2002 completed more than twenty acquisitions by issuing 237 million HealthSouth shares, which leaped to a high of about $31 per share in early 1998. For their part, Citi/Salomon and UBS pocketed millions of dollars in fees for helping HealthSouth arrange its stream of acquisitions, and selling its securities to the public. HealthSouth thus grew into a highly lucrative investment banking client of these firms – enabling

- 4 -

Lorello, McGahan and later Capek to earn millions of dollars in compensation each year. By the end of 1999, as a result of its acquisition binge, HealthSouth was reporting annual revenues and net income exceeding $4 billion and $350 million, respectively, and had grown into the nation's largest provider of outpatient surgery and rehabilitative services. *See* App. 8. From 1996 through June 30, 2002, HealthSouth reported aggregate profits exceeding $2.7 billion, all audited and/or reviewed and approved by E&Y, which pocketed millions of dollars of fees each year as HealthSouth grew into the largest client of E&Y's Birmingham, Alabama office.

**Ernst & Young's Participation in the Fraudulent Scheme**

8.      E&Y knowingly turned a blind eye to the very fraudulent and illegal practices by which HealthSouth falsified its financial statements and cheated Medicare and private insurers. Indeed, as alleged in detail below, as early as 1994, E&Y learned of HealthSouth's practice of reporting fictitious revenues and earnings, but chose to "turn its head" to retain the Company as a lucrative client:

(a)      By early 1994, E&Y knew that the Company had wrongfully overstated 1993 earnings by $27 million, through three improper activities: (i) overstating revenue by shifting extraordinary revenue items into ordinary recurring revenues; (ii) understating its allowance for contractual adjustments – the difference between the amount HealthSouth bills payors for services and the amount it expected to be paid for those services; and (iii) under-accruing expenses, thereby deferring those expenses to later periods. As E&Y concluded its audit of HealthSouth's 1993 financial statements, the E&Y audit engagement partner, defendant G. Marcus Neas ("Neas"), informed a senior executive of HealthSouth that HealthSouth must acquiesce to E&Y's accounting treatment of $3 million in investment banking fees because E&Y had looked the other way on the $27 million earnings overstatement. Specifically, Neas told that HealthSouth senior executive, in words, or substance: "Don't question me on this; I turned my

- 5 -

head on the $27 million." While the amounts of the overstatements grew far greater in later years, the accounting shenanigans known to E&Y in early 1994 remained substantially the same throughout the Class Period. HealthSouth systematically falsified its allowances for contractual adjustments or contractual accounts, and understated its expenses. Thus, E&Y had actual acknowledge of the ongoing and pervasive fraud at HealthSouth since at least 1994.

(b)    Similarly, on March 9, 1995, the Center for Financial Research & Analysis issued a report on HealthSouth which concluded that there were operational concerns and a weak control environment at HealthSouth and that the Company engaged in aggressive accounting for acquisitions and for startup and related costs. A copy of that report was attached to an internal E&Y memorandum from James P. Conley to Neas who, as noted previously, was aware from his work as the E&Y audit engagement partner that HealthSouth was falsifying its earnings and assets.

(c)    E&Y profited directly from turning a blind eye to the financial wrongdoing at HealthSouth, and sought to conceal some of this profit by mislabeling payments as audit related services. In this regard, as part of a program commenced in 1996 at Scrushy's insistence and with the Board's approval, E&Y was hired and paid tens of millions of dollars by HealthSouth to check the cleanliness and physical appearance of HealthSouth's approximately 1,800 surgical and rehabilitation facilities. Despite its name, the "Pristine Audits," had nothing to do with audits of the Company's financial statements. Rather, they just enabled E&Y to increase sharply its billings to HealthSouth. Indeed, in some years, HealthSouth paid E&Y more for the Pristine Audits than it paid for year-end financial statement audits. E&Y then compounded its wrongdoing by having HealthSouth misleadingly classify the payments for the Pristine Audits as "Audit-Related Fees" in the Company's public filings.

9.      Further evidence concerning E&Y's central role in the fraud came to light in related criminal proceedings pending in this District before the Honorable Inge P. Johnson, captioned *U.S. v. Emery Harris*, Case No. CR-03-J-157-S and *U.S. v. Ayers, et al.*, Case No. CR-03-J-183 ("Harris Proceedings").  On November 12, 2003, Emery Harris, a defendant in this litigation who was Group Vice President, Accounting and Assistant Controller for HealthSouth from March 2000 to March 2002, testified that E&Y had regularly turned a blind eye to material issues during the course of its audits of HealthSouth's financial statements.  In sworn testimony, Harris detailed how E&Y, after discussions with HealthSouth's senior management, systematically issued unqualified auditor's reports on HealthSouth's financial statements when, in fact, E&Y had open audit questions on those financial statements and concerns about the accounting practices being utilized by the Company.  Harris also testified that the accounting fraud at HealthSouth should have been "obvious" to E&Y, and that the only rational explanation for E&Y's failure to expose the fraud was a desire by E&Y to avoid jeopardizing its highly lucrative relationship with a long-standing client.

10.      Michael Vines, another former HealthSouth employee, testified before the House Committee on Energy and Commerce ("E&C Committee") on October 16, 2003.  Vines was employed in the Asset Management Department from April 1997 through May 2002.  He testified that he knew that certain accounting personnel at HealthSouth were making improper accounting entries, including falsifying records regarding fixed assets purportedly acquired by HealthSouth.  In June 2002, a month after he left HealthSouth, Vines sent E&Y an e-mail detailing various accounting improprieties at HealthSouth, including the illegitimate transfer of expenses into capital accounts, and the existence of fictitious expenses and assets.  E&Y never contacted Vines to discuss the improprieties identified in his email.

**Underwriters' Knowing Involvement**

      11.    As alleged herein, the Underwriter Defendants (defined below) are directly liable to the Stockholder Class and Bondholder Class for making materially false and misleading statements in Registration Statements and Prospectuses utilized by HealthSouth and its investment banks to raise billions of dollars of new capital for HealthSouth and for materially false and misleading statements in analysts' reports written and issued by Citi/Salomon or UBS, which artificially inflated the trading price of HealthSouth's publicly traded securities.

      12.    Keeping HealthSouth's stock price inflated was vitally important to UBS and Citi/Salomon for they knew that if the stock price fell, it would reduce HealthSouth's shareholders' equity by hundreds of millions, if not billions, of dollars; endanger the Company's investment-grade credit rating; would likely cut off its access to the capital markets; and thus endanger the ongoing scheme from which UBS, Citi/Salomon and its top partners were profiting.

      13.    As detailed herein, HealthSouth needed constant infusions of new capital to help cover up the true (and undisclosed) poor state of its operations, to pay taxes on fictitious revenue and to help fund its growth by acquisitions scheme. HealthSouth had to report strong revenues and profits to enable it to sell new securities to the public to support its stock price, to permit acquisition after acquisition, which, in turn, helped generate the apparent growth necessary to keep the overall scheme going. Therefore, a symbiotic relationship with the banks and their analysts was a vital necessity – HealthSouth and its insiders could not pull off the massive scheme alone. The defendants at HealthSouth therefore made certain that their relationship with the Company's investment banks was as close as possible – a goal accomplished by making it a very lucrative relationship for the lead individual investment bankers, Lorello and McGahan, and their employees at Citi/Salomon and UBS. Working side-by-side on an almost daily basis during the Class Period with these bankers at Citi/Salomon and later UBS (after 1999), HealthSouth

completed scores of acquisitions – adding hundreds of millions of dollars in annualized revenues and selling more than $4 billion in new securities to investors via Citi/Salomon and UBS, which pocketed millions in fees for helping HealthSouth arrange its stream of acquisitions and selling its securities to the public. HealthSouth naturally grew into a highly lucrative investment banking client of these firms. The phenomenal financial rewards to Citi/Salomon and later UBS flowed down, as planned, to Lorello, McGahan and Capek, who earned millions of dollars each year from the incestuous relationship.

14.    Although the HealthSouth scheme was very lucrative, it was not without its glitches. Each time a "glitch" arose, however, Citi/Salomon and/or UBS stepped up to the plate to help HealthSouth lie its way through the problem. For example, by early 1997, passage of the BBA had become inevitable. To continue the scheme and conceal the negative impact of the BBA, defendants lied to the investment community about the consequences the BBA would have on HealthSouth's business and finances. UBS also lied to investors in order to artificially inflate HealthSouth's stock with July 1997 analysts' reports that represented "we anticipate a continuation of the company's solid gains," due to the "company's robust earnings record [and] strong management team" and that any BBA changes would have "no impact on HealthSouth's results" and not "result in earnings estimate revisions," enabling "the company to maintain 24% earnings growth." UBS characterized HealthSouth during the early 1997 time period as a company with "tight cost controls," a "good quality growth story; with EPS growth expected to average 20%-25%." Rating HealthSouth a "strong buy," UBS cited HealthSouth's "robust earnings track record, strong management team ... and the ability to integrate a constant stream of acquisitions." Citi/Salomon also strongly recommended purchase of HealthSouth shares during this time period after the BBA was proposed, citing HealthSouth's "rock-solid fundamentals," "financial strength," which would lead to "strong EBITDA growth in the

- 9 -

upcoming years." According to Citi/Salomon, HealthSouth "has saved the Medicare program approximately $150 million and will generate an additional $1.5 billion more in the upcoming five years ... by reducing its cost structure to the minimum amount possible." Citi/Salomon said HealthSouth's reduced costs were "due to its internal compliance programs ... an extensive internal control system to monitor legal, accounting and accounts payable functions ... dedicated to eliminating any accounting or operational irregularities." So that "unlike other healthcare service operators which have been plagued by federal investigations related to reimbursement and operating procedures, HealthSouth has long been in good standing at the national healthcare agencies." As detailed herein, these statements were false.

15.     As a result of these false statements, HealthSouth stock soared from $15 in July 1996 to $29 by July 1997 and to its all-time high of $31 in April 1998. Citi/Salomon, Lorello and McGahan took quick advantage of the artificial inflation they helped create by assisting HealthSouth to sell to investors more than $1 billion in new HealthSouth notes via a fraudulent offering structure using documents that between March 1998 and September 1998 contained further false statements about HealthSouth's business and financial results. This resulted in pocketing millions in fees for Citi/Salomon, (and huge salaries for Lorello and McGahan), while providing the desperately needed fresh capital that HealthSouth needed to stay afloat so defendants' self-enriching scheme could go on. And the scheme did go on – quite successfully. See Apps. 7, 10.

16.     Between 1999 and mid-2002 alone, Scrushy and his cohorts created more than $2.5 billion in phony HealthSouth profits, overstated HealthSouth's assets by more than $800 million and even covered up its deteriorating financial condition by overstating its cash balances at June 30, 2002 by some $300 million. During this same time period, UBS constantly rated HealthSouth stock a "strong buy," and Citi/Salomon repeatedly rated the stock a "buy,"

while issuing glowing reports on the Company, extolling the skill of its management team, the integrity of its financial reports, the strength of its business and the Company's excellent future outlook. *See* App. 6

      17.    UBS, Citi/Salomon, Lorello, McGahan and Capek were knowing participants in the wrongdoing. Defendants Lorello, McGahan and later Capek had direct knowledge of the fraudulent nature of HealthSouth's accounting at the very same time their employer, be it Citi/Salomon or UBS, was helping HealthSouth arrange its stream of acquisitions, selling billions of dollars of HealthSouth securities to investors, and issuing glowing analyst research reports, often "strongly" recommending that investors buy HealthSouth securities. *See* App. 10. The facts evidencing this knowledge include the following:

      (a)    McGahan had personal knowledge of the financial fraud by no later than the Summer of 1999. In or about June or July 1999, HealthSouth was on track to miss its earnings target for the year by approximately $280-$300 million. In the past, HealthSouth had made false acquisition-related entries to provide cover for their overstatements of revenue and earnings. Accordingly, the Company was desperately looking to make another acquisition to cover up this gaping hole in its financial statements. At that time, however, there were very few, if any, appropriate acquisition candidates in HealthSouth's business sector. Thus, HealthSouth began to look at high-end nursing homes, and ultimately decided on HCR-Manor Care as a potential acquisition candidate. Senior executives of HealthSouth were concerned that a due diligence investigation conducted by the prospective merger partner would uncover HealthSouth's financial manipulations. In June or July 1999, after UBS was retained to act as HealthSouth's investment banker for this prospective acquisition, a senior executive of HealthSouth told McGahan that HealthSouth had been systematically falsifying its financial statements, explained the manner in which the fraud was being accomplished, and stated that the

Company was on track to miss earnings estimates for that year by $280 to $300 million. None of this information surprised McGahan, who promptly agreed with the senior HealthSouth executive's request that he (McGahan) help him persuade Scrushy not to proceed with the acquisition. McGahan, Scrushy and other HealthSouth executives agreed that HealthSouth should abandon its plans to acquire HCR-Manor Care. Even if McGahan was previously unaware of the scheme at HealthSouth, as a result of this conversation with the senior executive, McGahan and UBS had actual knowledge of the nature and scope of the financial fraud as of mid-1999.

(b)     In or about the Summer of 2001, Capek acknowledged to a business acquaintance familiar with HealthSouth's operations that he (Capek) knew that HealthSouth had been improperly capitalizing expenses as part of its scheme to inflate its earnings. When asked by the acquaintance about how HealthSouth was performing, Capek told the acquaintance, in words or substance: "The Company is going to have to stop capitalizing expenses." That Capek would be loyal to Scrushy is hardly surprising as UBS invited Scrushy to select the analyst to issue reports on the Company once the prior analyst had left that post; UBS hired Capek at specific direction of Scrushy, who was pleased with the reports Capek had issued on HealthSouth while an analyst at Credit Suisse. While he had a "Strong Buy" recommendation on HealthSouth, UBS analyst Capek privately told a favored client in writing that because HealthSouth was "a mess" and a "pig" he "would not own a share of this stock," yet at the very same time Capek was publicly extolling the purported strength of HealthSouth's business, its minimal exposure to Medicare reimbursement problems, the quality and integrity of its management team and its strong earnings and financial condition. *See* Apps. 6, 11, 12.

(c)     In addition, from 1999 through at least the Fall of 2002, McGahan had regular conversations with at least one former HealthSouth official who had participated in the

- 12 -

fraud regarding the potential civil and criminal ramifications of the ongoing fraud, including specific discussions regarding the statute of limitations applicable to potential civil claims, and the likelihood of criminal prosecution and the penalties likely to follow from such prosecution, including the possibility that McGahan and senior HealthSouth executives could go to prison.

(d)      Lorello also was aware of the fraud at HealthSouth, and indeed, affirmatively took steps to insure that the "family members" continued to report false earnings. Among the facts evidencing Lorello's knowledge of, and involvement in, the wrongdoing were that, as McGahan testified before Congress, he kept Lorello informed about all HealthSouth matters, and, as Harris testified at his sentencing hearing, he and his accounting team listened to a voicemail message to Martin, the then-CFO of the Company, from "Ben" at "U[B]S Warburg" (understood to be Ben Lorello), warning Martin that "it was important for him to lay down for the family," *i.e.*, to make sure that HealthSouth continued to report earnings matching Wall Street expectations, or else he (and presumably others) could "get whacked." *See* Transcript of November 12, 2003 Sentencing Hearing ("H.R.") (Ex. C) at 158:5-19.

**Financial Fraud**

18.     The accounting falsifications and manipulations at HealthSouth were pervasive. HealthSouth senior accounting personnel made thousands of false journal entries to HealthSouth's income statement and balance sheet accounts, created and falsified documents to support fictitious accounting entries, and doctored account ledgers for the Company's health facilities to include assets that simply did not exist. There was no factual or accounting justification for these entries. By June 30, 2002, in reports filed with the Securities and Exchange Commission ("SEC"), HealthSouth's fixed assets, known as property, plant and equipment, were overstated by more than $1 billion; total assets were inflated by $1.5 billion; the consolidated balance sheet included more than $300 million in cash that did not exist; and

"Income Before Income Taxes and Minority Interests" had been artificially inflated by at least $2.7 billion, as follows:

| Income (Loss) Before Income Taxes and Minority Interests (in millions) | 1996 Form 10-K | 1997 Form 10-K | 1998 Form 10-K | 1999 Form 10-K | 2000 Form 10-K | 2001 Form 10-K | 6 mos. ended 6/30/02 | Total |
|---|---|---|---|---|---|---|---|---|
| As reported | $440 | $601 | $267 | $230 | $559 | $434 | $337 | $2,869 |
| Actual Amounts | $370 | ($99) | ($283) | ($160) | $209 | ($16) | $107 | $129 |

19.    The false accounting entries often consisted of reducing a contra revenue account called "contractual adjustment," which is a revenue account that estimated the difference between gross charges to patients and the amounts health insurers or the government actually would pay, thereby artificially inflating earnings.  The amount of these entries to the contractual adjustments account were arbitrary, designed solely to increase bottom-line earnings to meet Wall Street analysts' expectations that the HealthSouth defendants and its investment bankers had created.  The constant manipulation of contractual adjustments resulted in massive – and artificial – increases in HealthSouth's revenues, earnings and assets.

20.    In order to conceal and avoid the required recognition of millions of dollars of actual current period operating costs, HealthSouth recorded ordinary operating expenses as assets.    Specifically, HealthSouth improperly misclassified operating expenditures as the purchase of plant, property and equipment (also known as "PPE" expenses) to be depreciated over time rather than expensed in the current period – a manipulation that reduced current-period operating expenses and further inflated profits.  Another part of the fraud was to continue to carry on HealthSouth's books assets it no longer owned (*e.g.*, corporate stock in companies it had sold), and not to write off more than $500 million in overdue accounts receivable of dubious collectibility, further inflating HealthSouth's profits.

**Medicare Fraud**

21.     HealthSouth's revenues were largely dependent upon reimbursement from Medicare and private health insurance payors for the services HealthSouth provided patients. However, the federal government and private insurance payors imposed detailed restrictions on the level of reimbursements to healthcare providers, as well as on the types of care that would be reimbursed.  These restrictions constrained HealthSouth's ability to consistently achieve real profits of substantial size.

22.     With the knowledge of its outside accountants and investment bankers, HealthSouth compounded the financial fraud by systematically cheating the federal Medicare reimbursement program out of hundreds of millions of dollars.  For instance, in addition to paying costs for patient treatment, Medicare reimburses health care providers like HealthSouth for part of the costs of their facilities (*e.g.*, hospital rooms, equipment), based on the proportion of use by Medicare patients.  Here, HealthSouth created fictitious PPE expenses – based upon hospital rooms, equipment, etc. that did not exist – which were allocated among its 1,800 plus health care facilities.  Those facilities then filed for reimbursement from Medicare for that portion of PPE expenses that was "attributable" to Medicare patients.  As Medicare accounted for nearly one-third of HealthSouth's revenues, the Company would have received Medicare reimbursement for a substantial portion of the $1.0 billion in PPE expenses during the Class Period, absent instructions to each facility to exclude these suspect PPE expenses from their filings with the Government.

23.     In addition, HealthSouth illegally overcharged Medicare for services that HealthSouth had not provided, by causing the Company's employees to systematically "upcode" the billing for group therapy sessions as individual sessions (the Overbilling Fraud).  As a healthcare provider, HealthSouth is required to comply with federal regulations governing billing

for services to patients covered by Medicare and other federal reimbursement programs. For many years, the federal government has had separate billing procedures and codes distinguishing between individual and group therapy sessions, with decidedly higher rates of reimbursement being paid for individual rather than group therapy sessions. However, contrary to these rules and regulations, HealthSouth systematically caused its physical therapists and other employees at its over 1,800 facilities to illegally overcharge Medicare for group therapy sessions at the decidedly higher individual therapy rates.

24. These massive overcharges also affected private insurance payors that "piggy-backed" onto the Medicare reimbursement rules, restrictions and rate schedules. HealthSouth deliberately overestimated and over-accrued the amounts it would receive from these carriers, thereby causing its reported revenues and profits to be further artificially inflated. By systematically overcharging Medicare and private insurance payors, inflating revenues, and failing to record expenses, HealthSouth repeatedly reported revenues, profits, assets, EPS and shareholders' equity that were materially overstated by billions of dollars.

**Passage of the Balanced Budget Act and
Defendants' Sale of Stock and Notes**

25. By 1996-97, HealthSouth's ability to grow by acquisition became increasingly difficult. To make matters worse, during early 1997, Congress was considering the BBA, which sought to refine the procedures for, and decrease federal spending on, entitlement programs such as Medicare. Because of HealthSouth's dependence on Medicare reimbursement, and the fact that, when enacted, the BBA would have a material adverse impact upon HealthSouth's business and financial performance, Scrushy and HealthSouth's other insiders closely followed every aspect and detail of the development of the BBA, and caused HealthSouth to spend millions of dollars opposing its enactment.

26.    By mid-1997, when passage of the BBA had become inevitable, several Company executives urged Scrushy to bring the fraudulent scheme and financial falsification to a halt and operate HealthSouth in an honest manner.    Scrushy, a domineering executive known for his violent temper, intimidating manner and arbitrary mistreatment of subordinates, refused to do so. Scrushy rejected such pleas, stating in words or substance: "we aren't stopping until I sell my stock."    Thus, to enable Scrushy and other HealthSouth executives to sell large amounts of their HealthSouth stock at inflated prices, and to allow HealthSouth to raise desperately needed cash through new public offerings of securities, defendants caused HealthSouth and the investment banks involved in the scheme to issue a series of public statements that falsely represented that HealthSouth "will emerge relatively unscathed" from the BBA, that the BBA "would not have any adverse impact" on HealthSouth's earnings, would not "result in earnings estimate revisions," that HealthSouth's "financial performance remains strong," and that HealthSouth's "earnings will grow at a rate of 25% for the next 3-5 years."

27.    For its part, Citi/Salomon strongly recommended the purchase of HealthSouth shares, citing the Company's "rock-solid fundamentals" and "financial strength," which would lead to "strong EBITDA growth in the upcoming years."    According to Citi/Salomon, HealthSouth "has saved the Medicare program approximately $150 million and will generate an additional $1.5 billion more in the upcoming five years ... by reducing its cost structure to the minimum amount possible."    In fact, according to Citi/Salomon, HealthSouth's reduced costs were "due to its internal compliance programs ... an extensive internal control system to monitor legal, accounting and accounts payable functions ... dedicated to eliminating any accounting or operational irregularities."    Based on the foregoing, Citi/Salomon concluded that, "unlike other healthcare service operators which have been plagued by federal investigations related to

- 17 -

reimbursement and operating procedures, HealthSouth has long been in good standing at the national healthcare agencies."

28.    As a result of HealthSouth's false financial statements (audited and/or reviewed and approved by E&Y) and assurances of business and financial success, HealthSouth shares soared from $15 per share in July 1996, to $29 per share by July 1997, and to its all-time high of $31 per share in April 1998.  With HealthSouth shares selling at or near their all-time highs during late 1997 and 1998, Company executives unloaded almost 6.2 million of their shares of HealthSouth stock at prices between $26-$30 per share, pocketing almost $166 million in illegal insider trading proceeds.  Scrushy himself sold 4 million shares at $27 per share, for gross proceeds of $108 million.  And, in March 1998 and September 1998, Lorello, McGahan and their then-investment banking firm, Citi/Salomon, sold to investors more than $1.5 billion in new HealthSouth notes through fraudulent use of an SEC regulation exemption and offering documents containing patently false statements about HealthSouth's business and financial results, all audited and/or reviewed and approved by E&Y.  These sales of securities to the investing public enabled Citi/Salomon to pocket millions of dollars in fees and provided HealthSouth with the desperately needed fresh cash it needed to stay afloat.

29.    By the Fall of 1998, it became apparent to Scrushy and other HealthSouth executive defendants that they could no longer conceal the BBA's negative impact on HealthSouth's earnings and operations.  Thus, in the Fall of 1998, Scrushy and other HealthSouth executive defendants caused HealthSouth to report a $300 million revenue shortfall, and to lower forecasted revenue and profit growth, attributing both to the adverse impact of the BBA.

**Defendants Reinflate the Price of HealthSouth Stock**

30.    As a result of these revelations and HealthSouth's reporting in early 1999 of poorer than previously forecasted net income and EPS, HealthSouth shares declined to as low as $5-$6 per share in the Fall of 1999.  This decline in the price of HealthSouth shares destroyed the value of HealthSouth executives' stock options, and made acquisitions using HealthSouth stock as currency impossible.

31.    But Scrushy and his cohorts did not stop their fraudulent practices.  Rather, they continued their fraudulent scheme and course of conduct of over-charging Medicare and private insurance payors, and falsifying and manipulating HealthSouth's financial condition and results, utilizing the same tactics and techniques they had become expert at employing.  Also, to help manipulate HealthSouth's stock price higher from September 1998 through March 31, 2000, Scrushy and HealthSouth's other top executives used $363 million of HealthSouth corporate funds to repurchase 38 million shares of HealthSouth stock on the open market.  Then, they spent an additional $32 million to repurchase four million more shares in mid-2002, even though they knew that HealthSouth shares were not worth the prices that the Company was paying.

32.    Furthermore, during 1998-2002, in six offerings with the help of E&Y, UBS, and Citi/Salomon, HealthSouth sold $3.4 billion in HealthSouth notes to investors to raise the fresh cash necessary to keep the scheme going.  These securities sales to investors were possible only through fraudulent use of SEC registration exemption and because HealthSouth's audited financial results and apparent financial strength, business success and forecasts of continued profitable growth were the result of constant manipulation of HealthSouth's financial results to show profits when there were none.

33.    Based upon HealthSouth's consistent reporting of strong net income, revenues, EPS, and shareholders equity, which Scrushy and HealthSouth's investment bankers falsely

attributed to a strong management team, cost control measures and a successful integration of acquisitions, the price of HealthSouth stock increased by more than 300% from its Fall 1999 lows of about $5-$6 per share, to more than $18 per share in August 2001. Scrushy and other HealthSouth executive defendants used HealthSouth's inflated stock prices as yet another opportunity to engage in insider trading, dumping more than 2.3 million additional shares of their HealthSouth common stock for some $27 million in illegal insider trading proceeds during the period April 2000 through December 2001.

**Transmittal 1753**

34.     For years, one important Medicare procedure used to control costs was separate billing procedures and codes distinguishing between individual and group therapy sessions, with much higher rates of reimbursement being paid for individual therapy sessions. However, one of the ways HealthSouth had been cheating Medicare and inflating its revenues and profits by millions of dollars for years had been to charge individual rates for group therapy treatments often by using unqualified, untrained personnel or "extenders." In fact, this very practice was the subject of several *qui tam* lawsuits filed against HealthSouth, including one such suit filed in August 1998 in Texas federal court. Despite the filing of the *qui tam* lawsuits, as well as the repeated complaints by HealthSouth supervisory employees that they were being compelled to participate in Medicare fraud, HealthSouth's top executives continued to cause HealthSouth to violate Medicare regulations. In fact, the Company's proprietary billing system did not even permit the thousands of HealthSouth physical therapists located across the nation to record charges for group (as opposed to individual) therapy sessions.

35.     In December 2001, the United States Department of Justice (the "DOJ") notified HealthSouth that it was going to intervene in the *qui tam* suit referred to above. When the DOJ later joined that suit, UBS, where Lorello, McGahan and Capek then worked, downplayed the

- 20 -

suit as "sensationalism," and characterized the event as "operationally non-material," as "the practices in question are industry standard and covered by state-level regulation." Similarly, Citi/Salomon, reiterating its "buy" rating, further assured investors that HealthSouth's conduct "is industry practice," and involved conduct "for which there is no federal standard."

36. In early 2002, defendants learned that Medicare's Center for Medicare and Medicaid Services ("CMS") was about to issue regulations which would reaffirm that group therapy sessions must be billed as such, not as individual sessions, as HealthSouth had been doing for years. Although Scrushy and his cohorts knew that HealthSouth's systematic practice of overbilling Medicare for group therapy sessions as though they were individual therapy sessions would therefore finally have to come to an end, and result in a material adverse impact on HealthSouth's reported earnings, defendants continued to cause HealthSouth to issue inflated estimates of the Company's revenues and earnings during 2002 to enable Scrushy and others to sell additional shares of HealthSouth stock at artificially inflated prices.

37. Indeed, just days after defendants pushed HealthSouth stock toward its 2002 high of $15.89 per share through, among other acts, representations by Scrushy on May 2, 2002 that HealthSouth stock should be "north of $20 per share right now" based on the Company's "growth rate" and "strong cash flow," and within weeks of the May 17, 2002 issuance of Transmittal 1753 by CMS which reaffirmed that group therapy sessions had to be billed as such and not as individual therapy – Scrushy, with the assistance of UBS, unloaded 5,275,360 shares of HealthSouth stock at $14 per share, pocketing $74 million in gross proceeds. When knowledge of this sale became public, HealthSouth claimed it was for "personal estate planning and financial diversification reasons." Later, on July 31, 2002, Scrushy used another 2.5 million shares of inflated HealthSouth stock to repay the principal of a $25 million loan Scrushy received from the Company (the "Loan").

38.     During the Class Period, HealthSouth insiders also took advantage of the Company's inflated stock price, dumping over 17 million shares for gross proceeds of $305 million. Likewise, during the time they were unloading their HealthSouth shares, HealthSouth's top executives spent more than $250 million of HealthSouth's cash to repurchase four million shares of HealthSouth common stock on the open market to keep the market price of HealthSouth shares inflated.

39.     In mid-2002, HealthSouth senior officers reiterated to Scrushy their concern about continuing the scheme in light of the new and increased consequences for violating the August 14, 2002 financial statement certification required under the Sarbanes-Oxley Act, SEC Order No. 4-460, Requiring the Filing of Sworn Statements Pursuant to §21(a) (1) of the Securities Exchange Act of 1934 (June 27, 2002) ("Order 4-460"). However, as he had done in the past, Scrushy rejected those pleas and arguments.

40.     HealthSouth and its banks worked furiously to put together a plan to take HealthSouth "private" – whereby it would no longer be a public company, no longer have to report its financial results publicly and no longer be subject to SEC oversight – all in hope to conceal their massive multi-year scheme which resulted in billions of dollars in reported false profits. Also, UBS and Citi/Salomon, working with Scrushy and HealthSouth's other top executives and E&Y, put together a $1 billion offering of notes that closed in May 2002 – providing HealthSouth with the cash necessary either to help fund a going private transaction or allow HealthSouth to stay afloat if it remained a public company – again improperly invoking a SEC registration exemption.

41.     On August 7, 2002, HealthSouth reported very strong financial results of $57 million net income ($0.14 EPS) for the 2nd Quarter ending June 30, 2002. In reporting HealthSouth's 2nd Quarter results, Scrushy said HealthSouth's results reflected "'strength across

all product lines,'" with each business line "'demonstrating continued positive volume ... trends,'" which showed "'the success we are having under the new Prospective Payment System.'" He also assured investors that HealthSouth would "comply with all ... SEC and New York State Exchange corporate accountability ... standards." Similarly, Capek and UBS continued to push the stock, rating it a "strong buy," and forecasting 2002 and 2003 EPS of $1.15 and $1.35, respectively. In a report issued on August 8, 2002, UBS said HealthSouth's "[b]usiness gains and balance sheet changes bode very well," that HealthSouth was at the "start of stronger ... income statement ... results," which "should bolster the share price over the coming quarters."

42.    Then, only three weeks later, on August 27, 2002, Scrushy and other HealthSouth executives caused HealthSouth to announce that it was disavowing its previous earnings forecasts for 2002 and 2003, and that the Company's annualized earnings would be reduced by approximately $175 million as a result of Transmittal 1753, which the Company claimed was an unforeseen "change" in the government's Medicare billing regulations. Investor reaction to HealthSouth's announcement was swift. HealthSouth shares plunged nearly 60% on August 27-28 to $5 per share, on extraordinary two-day volume exceeding 84 million shares – compared to its 2002 high of $15.89 per share near the time Scrushy sold, with UBS' help, 5.2 million shares at $14 per share for illegal insider proceeds of $74 million.

43.    After the August 27, 2002 revelations, HealthSouth's insiders engaged in a final desperate attempt to support HealthSouth's stock and cover up their prior wrongdoing. In mid-September 2002, Scrushy told analysts and investors he had been subjected to "inaccurate and misleading" reports, "unfounded rumors" and "frivolous lawsuits." He insisted "the company is in solid financial health.... There is no restatement of earnings here. There is nothing going back ... we have a very profitable company that is extremely strong and has incredible value."

- 23 -

Scrushy assured investors that the suits alleging insider trading by him and other HealthSouth executives – later consolidated into the present Stockholder Class litigation – were "without merit."

44.    However, on September 5, 2002, The Wall Street Journal ran a major story entitled "HealthSouth Corp. Executives Had an Inkling of Problems," which suggested that, despite his denials, Scrushy had in fact known of Transmittal 1753 and its adverse impact on HealthSouth before he unloaded his HealthSouth stock.

45.    Scrushy and his cohorts now knew that they were in big trouble. As part of their effort to cover up their massive fraud, HealthSouth hired a large prestigious national law firm, Fulbright & Jaworski, to conduct an "outside review," i.e., a purportedly independent investigation, of the insider trading allegations that certain shareholders had made against Scrushy. Scrushy exclaimed, "We have brought in an outstanding law firm and pledged to give them everything they need for a full review." According to another HealthSouth insider, "When the reviews were completed, it will be shown that we acted properly.... The personal attacks on Richard [Scrushy] are wrong and those making the attacks obviously don't have the facts .... We have a highly profitable company with operating margins in the mid-20s and all our lines of business are doing well." When the media questioned the credibility of HealthSouth hiring Fulbright & Jaworski to do the investigation in light of Fulbright & Jaworski's prior representation of HealthSouth in several of the qui tam lawsuits, a HealthSouth spokesperson said "The Company is resting on the integrity and reputation of Fulbright & Jaworski."

46.    However, the Fulbright & Jaworski investigation was never intended to be either independent or thorough – but rather, a cover up that Scrushy and his cohorts hoped would sanitize Scrushy's illegal insider trading, and put off or avoid a government investigation, enforcement action or even criminal prosecution.

- 24 -

47.    To provide sophisticated financial expertise and assistance in its "review," Fulbright & Jaworski retained FTI Consulting.  However, at the outset of the investigation, defendant William T. Owens ("Owens"), HealthSouth's former CFO and then President and CEO, refused to cooperate with Fulbright & Jaworski.  Nevertheless, during the investigation, Fulbright & Jaworski obtained evidence that, prior to Scrushy's stock sales in May and July 2002, Scrushy was aware that the government was going to issue revised or clarifying Medicare regulations regarding reimbursement for individual versus group treatment that indicated increased focus on the very area where he knew HealthSouth had over-charged Medicare for years, and which would adversely impact HealthSouth's business.  Fulbright & Jaworski also found evidence of widespread Medicare billing irregularities by HealthSouth.  In addition, Fulbright discovered relevant and damaging evidence shredded by top executives at HealthSouth.  And when FTI began to question the accuracy of certain financial representations being made by HealthSouth, HealthSouth arbitrarily shut down this part of the investigation and promptly fired FTI.

48.    When Fulbright & Jaworski eventually provided its report to HealthSouth, Scrushy and other HealthSouth insiders quickly crafted a false and misleading public characterization of the investigative report.  The initial report mentioned the shredded documents, but mentioning of the shredding was removed at Scrushy's insistence.  On October 30, 2002, HealthSouth issued a release headlined "HealthSouth Chairman Richard Scrushy Cleared By Outside Investigation of Advance Knowledge of Medicare Rule Change Prior to Stock Transactions."  The release falsely described the investigation as "extensive" and "'thorough,'" and boasted that the review conducted by Fulbright & Jaworski "'puts to rest any question whether Mr. Scrushy had any inkling or knowledge of the Medicare reimbursement rule change or its impact prior to his stock transactions in May and July 2002.'"  The release also

- 25 -

quoted the report as concluding that Fulbright & Jaworski "'has uncovered no oral interview or written document'" indicating Scrushy was aware of the Medicare rule change when he sold his stock. In fact, behind the scenes, Fulbright & Jaworski disputed HealthSouth's characterization of its investigation and report as "clearing" Scrushy, and demanded that HealthSouth publicly retract or correct any such characterization. In the end, HealthSouth terminated Fulbright & Jaworski, too.

49.    On November 5, 2002, when HealthSouth reported its results of operations for the third quarter of 2002, Scrushy stressed the "'positive things happening,'" including "'higher revenues in each of our ... lines of business [other than outpatient rehabilitation].'" Scrushy proclaimed that he and the HealthSouth Board were "'committed ... to continue to build a blue ribbon company and one that shareholders will be proud of and to own the stock.'" HealthSouth also stressed that, due to the "'incredible investigation'" of the Fulbright & Jaworski law firm and its "strong results," people now "'understand that the company has been straight forward.'"

50.    In early February 2003, Scrushy was interviewed and insisted that "the company is doing extremely well," "very well in all divisions," and again condemned the shareholder suits as "frivolous, the stock dropped, you get sued ... many companies in America are going through the same thing. Any time your stock drops, you have these frivolous lawsuits." According to Scrushy, "this will go away because we haven't done anything wrong ... we have hired an independent law firm who said that management has done nothing wrong." As subsequently revealed, these statements by Scrushy were patently false.

51.    Indeed, by early February 2003, the DOJ and the Federal Bureau of Investigation ("FBI") had already commenced a criminal investigation into securities laws violations by Scrushy and other Company executives. On the evening of March 18, 2003, a fraud SWAT team assembled in Birmingham. DOJ and SEC officials flew in from Washington and, together with

- 26 -

representatives of the FBI and the Birmingham U.S. Attorney's office, searched HealthSouth's corporate office for evidence of accounting and Medicare billing fraud, removing numerous documents and computer files.

52.     The next day, March 19, 2003, defendants' scheme further unraveled with the filing of SEC actions against HealthSouth and Scrushy, and the first guilty plea of a HealthSouth officer. Weston Smith, a defendant herein and HealthSouth's then Chief Financial Officer, pled guilty to securities fraud, conspiracy to commit securities fraud and wire fraud, and false certification of financial records. HealthSouth and its shareholders have been devastated by these revelations.

53.     Indeed, within weeks of the filing of the SEC actions and the guilty plea by Weston Smith, the following events transpired:

(a)     HealthSouth disavowed its financial statements for the prior years, as audited by E&Y, in light of the SEC Actions and DOJ criminal investigations;

(b)     the New York Stock Exchange suspended trading in HealthSouth stock indefinitely, and the stock collapsed to a low of $0.10 per share in the over-the-counter pink-sheets;

(c)     Scrushy and other high-level HealthSouth executives were fired, including defendants Owens and Harris;

(d)     E&Y was removed as the Company's outside auditor, and, in an attempt to stave off bankruptcy, a forensic auditing team led by PricewaterhouseCoopers LLP was retained to determine the actual state of HealthSouth's financial condition;

(e)     the turnaround advisory firm, Alvarez & Marsal, Inc., was brought in to help run the day-to-day affairs of the Company;

- 27 -

(f)  Fulbright & Jaworski disclaimed HealthSouth's characterization that its report "cleared" Scrushy, stating that the Company's characterization "may not have been accurate or complete";

(g)  defendants Owens and Harris pled guilty to criminal charges of securities and wire fraud;

(h)  the SEC represented that, in connection with its investigation, Scrushy "appears to have testified untruthfully" at a March 14, 2003 deposition, in which he denied instructing HealthSouth employees to change the Company's financial results;

(i)  the Company's $1.25 billion line of credit was frozen;

(j)  HealthSouth defaulted on the payment of approximately $354 million in outstanding convertible notes, which were to mature on April 1, 2003; and

(k)  Standard & Poor's ("S&P") reduced HealthSouth's credit rating to "D."

54.  More recently, on October 16 and November 5, 2003, the financial collapse of HealthSouth was the subject of hearings before the E&C Committee in which numerous key witnesses were called to testify, including defendant Scrushy (who also invoked the Fifth Amendment privilege against self-incrimination under questioning by the committee); Susan Jones Smith, former HealthSouth Senior VP Finance, Reimbursement (who invoked the Fifth Amendment); other HealthSouth former and current executives and employees possessing direct knowledge of the fraud; representatives from E&Y who directed the purported audits of HealthSouth; and representatives from UBS, including defendants Lorello, McGahan and Capek.

55.  On October 29, 2003, defendant Scrushy was indicted on 85 counts of criminal violations including conspiracy and multiple counts of securities fraud, mail fraud, money laundering and false certifications (*United States v. Scrushy*, No. 03-CR- 0530, indictment unsealed, N.D. Ala. Nov. 4, 2003) ("Scrushy Indictment"). Scrushy was arrested by the FBI on

- 28 -

November 4, 2003. The charges against Scrushy could result in a maximum total of 650 years in prison and $36 million in fines.

## JURISDICTION AND VENUE

56.    Jurisdiction exists pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331. The claims arising from the facts set forth herein and asserted in the accompanying Stockholder and Bondholder complaints arise under §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, §§10(b), 14(a), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a), 78t-1 and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC.

57.    Venue is proper in this District pursuant to §22 of the Securities Act, and §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts giving rise to the violations complained of occurred in this District. HealthSouth maintains its headquarters in this District.

58.    Defendants used the instrumentalities of interstate commerce, including the U.S. mails, and the facilities of the national securities markets.

## THE PARTIES

### Stockholder Plaintiffs

59.    Lead Stockholder Plaintiff Oracle Partners, LP ("Oracle") acquired HealthSouth securities during the Class Period and was damaged thereby, as detailed in the Certification previously submitted to the Court. Oracle was appointed Lead Plaintiff in the Stockholder Litigation by Order dated June 24, 2003.

60.    Plaintiff International Union of Operating Engineers, Local 132 Pension Plan ("IUOE") acquired HealthSouth securities during the Class Period and was damaged thereby, as detailed in the Certification attached hereto as Ex. E. IUOE, which is not a Lead Plaintiff in this action, has joined this action as a named plaintiff and proposed Class Representative.

- 29 -

Superior Court to rescind all insurance policies issued or renewed since September 1998, based on fraud.

688.   The market price of the Company's stock, which traded as high as $31 per share during the Class Period, collapsed to the range of $0.08 to $0.11 per share.

### LEGAL THEORIES AND CLAIMS

689.   Pursuant to the Court's June 24, 2003 Order, the Stockholder and Bond Classes, and the Merger Subclasses, have set forth, in separate documents, their respective legal theories, claims and prayers for relief.

Plaintiffs demand a jury trial as to all issues so triable.

Dated: January 8, 2004

*FOR THE STOCKHOLDER CLASS*

WHATLEY DRAKE, LLC
JOB R. WHATLEY, JR.
RUSSELL JACKSON DRAKE
G. DOUGLAS JONES (ASB-3880-S82G)

_____
G. DOUGLAS JONES

2323 Second Avenue North
Birmingham, AL 35202
Telephone:  205/328-9576
205/328-9669 (fax)

*Liaison Counsel for Stockholder Class*

*FOR THE BONDHOLDER CLASS*

DONALDSON & GUIN, L.L.C.
DAVID J. GUIN (ASB-3461-G67D)
DAVID R. DONALDSON
TAMMY McCLENDON STOKES

_____
DAVID J. GUIN

Two North Twentieth Street, Suite 1100
Birmingham, AL 35223
Telephone:  205/226-2282
205/226-2357 (fax)

*Liaison Counsel for Bondholder Class*

- 267 -

MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
WILLIAM S. LERACH
EDWARD P. DIETRICH
KATHLEEN A. HERKENHOFF
DEBRA J. WYMAN
VALERIE L. McLAUGHLIN
ELIZABETH J. ARLEO
401 B Street, Suite 1700
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)


MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
PATRICK J. COUGHLIN

      PATRICK J. COUGHLIN


100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone: 415/288-4545
415/288-4534 (fax)


      - and -
LOWEY DANNENBERG BEMPORAD
      & SELINGER, P.C.
NEIL L. SELINGER
RICHARD BEMPORAD
THOMAS SKELTON
VINCENT BRIGANTI
The Gateway -- 11th Floor
One North Lexington Avenue
White Plains, NY  10601
Telephone: 914/997-0500
914/997-0035 (fax)

*Co-Lead Counsel for Stockholder Class and*
*the Additional Stockholder Named Plaintiffs*


BERNSTEIN LITOWITZ BERGER &
      GROSSMANN LLP
MAX W. BERGER
JOHN P. COFFEY
JEFFREY N. LEIBELL
JENNIFER L. EDLIND

      JOHN P. COFFEY

1285 Avenue of the Americas, 38th Floor
New York, NY  10019
Telephone: 212/554-1400
212/554-1444 (fax)

      - and -


CUNNINGHAM BOUNDS YANCE
      CROWDER & BROWN
JOHN T. CROWDER
ROBERT T. CUNNINGHAM, JR.
RICHARD T. DORMAN
P.O. Box 66705
Mobile, AL  36660
Telephone: 251/471-6191
251/479-1031 (fax)


*Co-Lead Counsel for Bondholder Class*

FOR NSC & TCD STOCKHOLDERS
SUBCLASS

SCHATZ & NOBEL, P.C.
ANDREW M. SCHATZ
330 Main Street
Hartford, CT 06106
Telephone: 860/493-6292
860/493-6290 (fax)


FOR HORIZON STOCKHOLDER SUBCLASS

LAW OFFICES OF M. CLAY RAGSDALE
M. CLAY RAGSDALE
1929 Third Avenue North, Suite 550
Birmingham, AL 35203
Telephone: 205/251-4775
205/251-4777 (fax)


S:\Pleadings\SD\Healthsouth02\CPT 00004916.doc

ADDITIONAL NAMED BONDHOLDER
PLAINTIFF'S COUNSEL

BERMAN DeVALERIO PEASE TABACCO
    BURT & PUCILLO
MICHAEL J. PUCILLO
515 North Flagler Drive, Suite 1701
W. Palm Beach, FL 33401
Telephone: 561/835-9400
561/835-0322 (fax)

*Attorneys for Additional Named Bondholder
Plaintiff State Universities Retirement System
of Illinois*