# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) | MASTER FILE NO. CV-03-BE-1500-S |
| This Document Relates To: All Actions | ) ) ) | |
| | ) | |
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION | ) ) ) | CONSOLIDATED CASE NO. CV-03-BE-1501-S |
| This Document Relates To: All Actions | ) ) ) | |
| | ) | |
| In re HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION | ) ) ) | CONSOLIDATED CASE NO. CV-03-BE-1502-S |
| This Document Relates To: All Actions | ) ) | |

## RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT UBS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 26.1 of the Local Rules for the United States District Court for the Northern District of Alabama (the "Local Rules"), UBS AG, UBS Securities LLC (formerly UBS Warburg LLC), Howard Capek, Benjamin D. Lorello and William C. McGahan (collectively, "UBS") hereby respond and object to Plaintiffs' First Set of Interrogatories, dated April 17, 2007 (the "Interrogatories"), as follows:

information may exist. UBS's responses to the Interrogatories are therefore limited by present recollection and records and information that can be ascertained with reasonable diligence. Accordingly, these Responses and Objections are subject to and without waiver of: (a) UBS's right to object to other interrogatories directed to the subject matter of the Interrogatories; (b) UBS's right to make additional or supplemental objections to the Interrogatories or other interrogatories; or (c) UBS's right to revise, correct, supplement or clarify these responses or objections. Without in any way obligating itself to do so, UBS reserves the right to amend, supplement, correct or modify its responses and objections, and to rely on such supplemented, corrected, amended or modified responses and objections in any proceeding in this action.

## SPECIFIC OBJECTIONS AND RESPONSES

<u>INTERROGATORY NO. 1</u>:

 Identify all financial transactions or business relationships since January 1, 1997 involving HealthSouth or any of its directors or Officers (including any member of his or her family and every family or business entity in which such director or Officer holds a direct or indirect interest) in which You played a role as an underwriter, initial purchaser, financial advisor, lender or in any other capacity.

RESPONSE:

 UBS objects to Interrogatory No. 1 on the grounds set forth above in the General Objections and on the additional grounds that this Interrogatory is vague and ambiguous. In particular, Plaintiffs have not defined the terms

"financial transactions," "business relationships," "underwriter," "initial purchaser," and "financial advisor." UBS further objects to Interrogatory No. 1 on the ground that this Interrogatory is overbroad in that this Interrogatory asks UBS to identify all "financial transactions" and "business relationships" in which UBS played a role in "any . . . capacity."

UBS additionally objects to Interrogatory No. 1 to the extent that this Interrogatory seeks information that is neither relevant to the claims or defenses of any party to this action nor reasonably calculated to lead to the discovery of admissible evidence. In particular, UBS objects to this request to the extent that this Interrogatory purports to request UBS to identify routine trading activities involving HealthSouth securities or any business relationships involving any HealthSouth director or Officer or any business related to HealthSouth in which such directors or Officers may have had some financial interest.

Subject to and without waiving the General Objections or the specific objections set forth in response to this specific interrogatory, and without limiting or waiving UBS's right to present additional evidence during the pendency of this case, UBS refers Plaintiffs to **APPENDIX A** for a listing of (a) transactions in which HealthSouth retained or used the services of the Investment Banking Department of UBS Warburg LLC (now UBS Securities LLC) during the Applicable Time Period; (b) credit facilities that UBS AG made available to

HealthSouth or that were guaranteed by HealthSouth during the Applicable Time Period; and (c) credit facilities, or the amendment thereof, that were requested from UBS AG by HealthSouth during the Applicable Time Period.

In addition, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, UBS further refers Plaintiffs to the documents that UBS produced to the Document Depository.

INTERROGATORY NO. 2:

Identify, by transaction, each of Your current or former Employees (excluding clerical staff) who performed services in connection with any of the transactions referenced in Interrogatory No. 1, including such Employee's (a) title at the time of the transaction, (b) description of duties and responsibilities in connection with such transactions, (c) amount of time spent in connection with their work on these transactions.

RESPONSE:

UBS objects to Interrogatory No. 2 on the grounds set forth above in the General Objections and incorporates by reference the entirety of its response to Interrogatory No. 1, including all objections thereto. UBS further objects to Interrogatory No. 2 on the grounds that this Interrogatory is vague and ambiguous. In particular, Plaintiffs have not defined the terms "services" and "duties and responsibilities."

UBS further objects to Interrogatory No. 2 on the grounds that this Interrogatory is unreasonable, unduly burdensome and incapable of response to the extent that this Interrogatory purports to seek the identification of each and every

APPENDIX A

| Date | Transaction | Project Group List and Titles |
|---|---|---|
| 02/01/01 | UBSW was the sole bookrunning manager and lead manager on HS's $375 million private placement of 8 ½% senior notes due 2008 (the "February 2001 Private Placement"). UBSW purchased $187.5 million in notes in connection with the February 2001 Private Placement. Deutsche Bank Alex. Brown, Chase Securities Inc., First Union Securities Inc. and Scotia Capital (USA) Inc. were the other initial purchasers in the February 2001 Private Placement. | David Barth (Director, Leveraged Finance); John Crockett (Associate Director, Leveraged Finance); Alex Geier (Director, High Yield Research); Frank Hoener (Associate Director, Leveraged Finance); Michael Leder (Managing Director, Corporate Finance); Ed Massaro (Managing Director, High Yield/Fixed Income); William McGahan (Managing Director, Corporate Finance – Healthcare); Roderick O'Neill (Executive Director, Corporate Finance – Healthcare); Phillip Pucciarelli (Corporate Finance – Healthcare); and Scott Wollard (Associate, Corporate Finance – Healthcare). |
| 03/31/01 | UBS AG made a $15 million loan to MedCenterDirect.com, Inc. ("MCD"). On or about March 28, 2002, that loan was increased to $20 million. HS guaranteed the repayment of UBS AG's loan to MCD. | David Barth (Director, Leveraged Finance); Phillip Catularo (CRM); John Crockett (Director, Loan Syndication); Michael Farah (Analyst, Corporate Finance – Healthcare); Alex Geier (Director, High Yield Research); David Goldman (Director, CRM); Frank Hoener (Associate Director, Leveraged Finance); Renata Jacobson (First Vice President, LPRM); David Juge (Managing Director, Loan Syndication); Dan Ladd (UBS Legal); Michael Leder (Managing Director, Corporate Finance – Healthcare); Michael Leung (CRM); William McGahan (Managing Director, Corporate Finance – Healthcare); Roderick O'Neill (Executive Director, Corporate Finance – Healthcare); Phillip Pucciarelli (Associate Director, Corporate Finance – Healthcare); Scott Wollard (Associate Director, Corporate Finance – Healthcare); and Andreas Wyler (Executive Director, CRM). |

# EXHIBIT E

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8–K

CURRENT REPORT
Pursuant To Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (date of earliest event reported):  March 22, 2005 (March 21, 2005)

HEALTHSOUTH Corporation
(Exact Name of Registrant as Specified in its Charter)

Delaware
(State or Other Jurisdiction of Incorporation)

| 1–10315 | 63–0860407 |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

One HEALTHSOUTH Parkway, Birmingham, Alabama 35243
(Address of Principal Executive Offices, Including Zip Code)

(205) 967–7116
(Registrant's Telephone Number, Including Area Code)

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐  Pre-commencement communications pursuant to Rule 14d–2(b) under the Exchange Act
(17 CFR 240.14d–2(b))

☐  Pre-commencement communications pursuant to Rule 13e–4(c) under the Exchange Act
(17 CFR 240.13e–4(c))

---

**ITEM 1.01.**  *Entry into a Material Definitive Agreement.*

On March 21, 2005, HEALTHSOUTH Corporation (the "Company") issued a press release, a copy of which is attached hereto as Exhibit 99 and incorporated herein by reference, announcing that it had entered into an amended and restated credit agreement (the "Restated Credit Agreement") with a consortium of financial institutions (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent ("JPMorgan"), Wachovia Bank, National Association ("Wachovia"), as Syndication Agent, and Deutsche Bank Trust Company Americas, as Documentation Agent. The Restated Credit Agreement amends and restates the Credit Agreement dated as of June 14, 2002, as amended on August 20, 2002 (the "Original Credit Agreement"), among the Company, the lenders from time to time party thereto, JPMorgan, as Administrative Agent, Wachovia, as Syndication Agent, UBS Warburg LLC, as Co–documentation Agent, ScotiaBanc, Inc., as Co–documentation Agent, Deutsche Bank AG, New York Branch, as Co–documentation Agent, and Bank of America, N.A., as Senior Managing Agent.

Pursuant to the Restated Credit Agreement, the Lenders converted $315 million in aggregate principal amount of the loans outstanding under the Original Credit Agreement into a senior secured term facility which, will mature on June 14, 2007 (the "Term Loans"). Such maturity date for the Term Loans, however, will automatically be extended to March 21, 2010 in the event that (1) such extension becomes permitted under the Company's Senior Subordinated Credit Agreement (as defined in the Restated Credit Agreement) or (2) such Senior Subordinated Credit Agreement ceases to be in effect. No portion of the Term Loans that are repaid may be reborrowed. The Term Loans amortize in quarterly installments, commencing with the quarter ending on September 30, 2005, equal to 0.25% of the original principal amount thereof, with the balance payable upon the final maturity. Until the Company has obtained ratings from Moody's and S&P, the Term Loans bear interest, at the Company's option, at a rate of (1) LIBOR (adjusted for statutory reserve requirements) plus 2.50% or (2) 1.50% plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate. After the Company has obtained such ratings, the Term Loans will bear interest, at the Company's option, (1) at a rate of LIBOR (adjusted for statutory reserve requirements) plus a spread ranging from 2.00% to 2.50%, depending on the Company's ratings with such institutions or (2) at a rate of a spread ranging from 1.00% to 1.50%, depending on the Company's ratings with such institutions, plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate.

In addition, the Restated Credit Agreement makes available to the Company a new senior secured revolving credit facility in an aggregate principal amount of $250 million (the "Revolving Facility") and a new senior secured revolving letter of credit facility in an aggregate principal amount of $150 million (the "LC Facility"). The commitments under the Revolving Facility and the LC Facility expire, and all borrowings under such facilities mature, on March 21, 2010.

Until the Company files audited financial statements with the SEC for the fiscal year ended December 31, 2004, the Revolving Facility will accrue interest at the Company's option, at a rate of (1) LIBOR (adjusted for statutory reserve requirements) plus 2.75% or (2) 1.75% plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate. After the Company files audited financial statements with the SEC for the fiscal year ended December 31, 2004, the interest rates and commitment fees on the Revolving Facility will be determined based upon the Company's ratio of (1) consolidated total indebtedness minus the amount by which the

unrestricted cash and cash equivalents on such date exceed $50 million to (2) adjusted consolidated EBITDA of the Company for the period of four consecutive fiscal quarters ending on or most recently prior to such date (the "Net Leverage Ratio"). During such period, the Revolving Facility will bear interest, at the Company's option, (1) at a rate of LIBOR (adjusted for statutory reserve requirements) plus a spread ranging from 1.75% to 2.75%, depending on the Net Leverage Ratio or (2) at a rate of a spread ranging from 0.75% to 1.75%, depending on the Net Leverage Ratio, plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate.

Until the Company files audited financial statements with the SEC for the fiscal year ended December 31, 2004, the Company is subject to commitment fees of 0.75% per annum on the daily amount of the unutilized commitments under the Revolving Facility and the LC Facility. After such filing, the commitment fees will range between 0.50% and 0.75%, depending on the Net Leverage Ratio.

A letter of credit participation fee will be payable to the Lenders under the LC Facility with respect to a particular commitment under the LC Facility on the aggregate face amount of the commitment outstanding thereunder upon the later of the termination of the particular commitment under the LC Facility and the date on which the Lenders letters of credit exposure for such commitment cease, in an amount at any time equal to the LIBOR interest rate spread applicable at such time to loans outstanding under the Revolving Facility. In addition, the Company shall pay, for its own account, (1) a fronting fee of 0.25% per annum on the aggregate face amount of the letters of credit outstanding under the LC Facility upon the later of the termination of the commitments under the LC Facility and the date on which the Lenders letters of credit exposure for such commitment cease, and (2) customary issuance and administration fees relating to the letters of credit.

The proceeds of the loans under the Revolving Facility will be used for general corporate purposes and the letters of credit under the LC Facility will be used in the ordinary course of business to secure workers' compensation and other insurance coverages and for general corporate purposes.

Pursuant to a Collateral and Guarantee Agreement (the "Collateral and Guarantee Agreement"), dated as of March 21, 2005, between the Company and JPMorgan, the Company's obligations under the Restated Credit Agreement are secured (1) by substantially all of the assets of the Company and (2) from and after the date on which the Restrictive Indentures (as defined in the Restated Credit Agreement) and the Senior Subordinated Credit Agreement permit the obligations (or an amount thereof) to be guaranteed by or secured by the assets of certain existing and subsequently acquired or organized material subsidiaries of the Company by substantially all of the assets of such subsidiaries.

The Restated Credit Agreement contains customary representations, warranties affirmative and negative covenants, default and acceleration provisions.

The foregoing descriptions of the Restated Credit Agreement and the Collateral and Guarantee Agreement are qualified in their entirety to such agreements, copies of which are attached hereto as Exhibits 10.1 and 10.2, respectively, and incorporated herein by reference.

**ITEM 2.03.** *Creation of a Direct Financial Obligation or an Obligation under an Off–Balance Sheet Arrangement of a Registrant.*

The disclosure included under Item 1.01 of this Current Report on Form 8–K is incorporated by reference into this Item 2.03.

**ITEM 9.01.** *Financial Statements and Exhibits.*

(c)    Exhibits.

See Exhibit Index.

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Current Report on Form 8–K to be signed on its behalf by the undersigned hereunto duly authorized.

HEALTHSOUTH CORPORATION

By:    /s/ Gregory L. Doody

Name:    Gregory L. Doody
Title:    Executive Vice President,
        General Counsel and Secretary

Dated:    March 22, 2005

---

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Amended and Restated Credit Agreement dated as of March 21, 2005, among HEALTHSOUTH Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, Wachovia Bank, National Association, as Syndication Agent, Deutsche Bank Trust Company Americas, as Documentation Agent, Deutsche Bank Securities Inc., as Arranger and J.P. Morgan Securities Inc. and Wachovia Capital Markets, LLC as Co–Lead Arrangers and Bookrunners. |
| 10.2 | Collateral and Guarantee Agreement, dated as of March 21, 2005, between HEALTHSOUTH Corporation and JPMorgan Chase Bank, N.A., as Collateral Agent. |

99          Press release of HEALTHSOUTH Corporation dated March 21, 2005.

Exhibit 10.1
------------

EXECUTION COPY

================================================================================

AMENDED AND RESTATED
CREDIT AGREEMENT

dated as of

March 21, 2005

among

HEALTHSOUTH CORPORATION,

The Lenders Party Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent
and Collateral Agent,

WACHOVIA BANK, NATIONAL ASSOCIATION,
as Syndication Agent,

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Documentation Agent

—————————————————————

DEUTSCHE BANK SECURITIES INC.,
as Arranger

J.P. MORGAN SECURITIES INC.                WACHOVIA CAPITAL MARKETS, LLC
as Co-Lead Arrangers and Joint Bookrunners

================================================================================

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, for any Fiscal Year, the sum (without duplication) of:

(a) Consolidated Net Income of the Borrower for such Fiscal Year, adjusted to exclude any gains or losses attributable to Prepayment Events; plus

(b) depreciation, amortization and other non-cash charges or losses deducted in determining such Consolidated Net Income (provided that any cash payment made with respect to any non-cash charge that shall have been added in computing Excess Cash Flow hereunder during a prior Fiscal Year shall be subtracted in computing Excess Cash Flow for the Fiscal Year in which such cash payment is made); plus

(c) the sum of (i) the amount, if any, by which Net Working Capital of the Borrower decreased during such Fiscal Year; minus

(d) the sum of (i) any non-cash gains included in determining such Consolidated Net Income for such Fiscal Year plus (ii) the amount, if any, by which such Net Working Capital increased during such Fiscal Year; minus

(e) the sum of (i) Capital Expenditures for such Fiscal Year (except to the extent attributable to the incurrence of Capitalized Lease Obligations or otherwise financed by incurring long-term Indebtedness) plus (ii) cash consideration paid during such Fiscal Year to make acquisitions or other capital investments (except to the extent financed by incurring long-term Indebtedness); minus

(f) the aggregate principal amount of long-term Indebtedness repaid or prepaid by the Borrower and its consolidated Subsidiaries during such Fiscal Year in compliance with Section 6.09, excluding (i) Indebtedness in respect of Revolving Loans and Letters of Credit or other revolving extensions of credit (except to the extent that any repayment or prepayment of such Indebtedness is accompanied by a permanent reduction in related commitments), (ii) Term Loans prepaid pursuant to Section 2.10(c) or (d), (iii) repayments or prepayments of long-term Indebtedness financed by incurring other long-term Indebtedness and (iv) repayments or prepayments of Indebtedness under the Indentures (other than the 2005 Notes); minus

(g) cash payments made during such Fiscal Year pursuant to the Borrower's obligations under (i) its settlement agreements with the U.S. Department of Justice and the CMS relating to Medicare billing practices and (ii) payments in respect of other judgments and settlements of litigation described in Schedule 3.10, to the extent not deducted in arriving at Consolidated Net Income.

"Exchange Act" means the Securities and Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Excluded Indebtedness" means (a) the guarantee by the Borrower in favor of UBS AG, Stamford Branch with respect to UBS AG, Stamford Branch's $22,891,449 loan to medcenterdirect.com, Inc., (b) $11,573,000 principal amount of 8.375% Convertible Senior Subordinated Notes due 2015 of Greenery Rehabilitation Group, Inc. and (c) $6,311,000 principal amount of 6.50% Convertible Subordinated Debentures due 2011 of Greenery Rehabilitation Group, Inc.

"Excluded Subsidiaries" means Subsidiaries designated from time to time by the Borrower that (a) do not at any time account for more than $100,000

# EXHIBIT F

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant To Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (date of earliest event reported): June 15, 2005

HEALTHSOUTH Corporation
-----------------------
(Exact Name of Registrant as Specified in its Charter)

Delaware
--------
(State or Other Jurisdiction of Incorporation)

1-10315                                  63-0860407
-------                                  ----------
(Commission File Number)        (IRS Employer Identification No.)

One HEALTHSOUTH Parkway, Birmingham, Alabama 35243
--------------------------------------------------
(Address of Principal Executive Offices, Including Zip Code)

(205) 967-7116
--------------
(Registrant's Telephone Number, Including Area Code)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of
the following provisions:

[ ]    Written communications pursuant to Rule 425 under the Securities Act
       (17 CFR 230.425)

[ ]    Soliciting material pursuant to Rule 14a-12 under the Exchange Act
       (17 CFR 240.14a-12)

[ ]    Pre-commencement communications pursuant to Rule 14d-2(b) under the
       Exchange Act (17 CFR 240.14d-2(b))

[ ]    Pre-commencement communications pursuant to Rule 13e-4(c) under the
       Exchange Act (17 CFR 240.13e-4(c))

ITEM 1.01. Entry into a Material Definitive Agreement.

On June 15, 2005, HEALTHSOUTH Corporation (the "Company") issued a press release, a copy of which is attached hereto as Exhibit 99 and incorporated herein by reference, announcing that it has closed a $200 million term loan agreement (the "Term Loan Agreement") with a consortium of financial institutions, JPMorgan Chase Bank, N.A., as Administrative Agent ("JPMorgan") and Citicorp North America, Inc., as Syndication Agent.

Pursuant to the Term Loan Agreement the Company has obtained a new senior unsecured term facility consisting of term loans (the "Term Loans") in an aggregate principal amount of $200 million. The Term Loans will initially bear interest at a rate of LIBO (adjusted for statutory reserve requirements) plus 5.0% per year (the "Initial Rate"). Thereafter, they willl bear interest, at the Company's option, at a rate of (1) the Initial Rate or (2) 4.0% per year plus the higher of (x) JPMorgan's prime rate and (y) the Federal Funds Rate plus 0.50%. The Term Loans mature in full on June 15, 2010.

The Term Loan Agreement contains customary representations, warranties, affirmative and negative covenants, default and acceleration provisions. In addition, the Company will be responsible for customary fees and expenses associated with the Term Loans.

The proceeds of the Term Loans, together with cash on hand, were used to repay the Company's $245 million 6.875% senior notes due June 15, 2005 and to pay fees and expenses related to the Term Loans.

The foregoing description of the Term Loan Agreement is qualified in its entirety by reference to such agreement, a copy of which is attached hereto as Exhibit 10, and incorporated herein by reference.

ITEM 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The disclosure included under Item 1.01 of this Current Report on Form 8-K is incorporated by reference into this Item 2.03.

ITEM 9.01. Financial Statements and Exhibits.

(c) Exhibits.

See Exhibit Index.

SIGNATURES

        Pursuant to the requirements of the Securities Exchange Act of 1934,
the Registrant has duly caused this Current Report on Form 8-K to be signed on
its behalf by the undersigned hereunto duly authorized.

                            HEALTHSOUTH CORPORATION


                            By: /s/ Gregory L. Doody
                                ----------------------------
                                Name:   Gregory L. Doody
                                Title:  Executive Vice President,
                                        General Counsel and
                                        Secretary


Dated: June 15, 2005

EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 10 | Term Loan Agreement dated as of June 15, 2005, among HEALTHSOUTH Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, Citicorp North America, Inc., as Syndication Agent and J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. as Co-Lead Arrangers and Bookrunners. |
| 99 | Press release of HEALTHSOUTH Corporation dated June 15, 2005. |

Exhibit 10

EXECUTION COPY

================================================================================

TERM LOAN AGREEMENT

dated as of

June 15, 2005

among

HEALTHSOUTH CORPORATION,

The Lenders Party Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent,

and

CITICORP NORTH AMERICA, INC.,
as Syndication Agent,

----------------------------

J.P. MORGAN SECURITIES INC.                CITIGROUP GLOBAL MARKETS INC.
          as Co-Lead Arrangers and Joint Bookrunners
================================================================================

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Act" means the Securities and Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Excluded Indebtedness" means (a) the guarantee by the Borrower in favor of UBS AG, Stamford Branch with respect to UBS AG, Stamford Branch's $22,891,449 loan to medcenterdirect.com, Inc., (b) $11,573,000 principal amount of 8.375% Convertible Senior Subordinated Notes due 2015 of Greenery Rehabilitation Group, Inc. and (c) $6,311,000 principal amount of 6.50% Convertible Subordinated Debentures due 2011 of Greenery Rehabilitation Group, Inc.

"Excluded Taxes" means, with respect to the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income or net worth by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.14(b)), any withholding tax that is (i) imposed by the United States of America on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.12(a), or (ii) is attributable to such Foreign Lender's failure to comply with Section 2.12(e) and (d) any Taxes imposed as a result of its gross negligence or wilful misconduct.

"Existing Indebtedness" means all of the Indebtedness of the Borrower and the Subsidiaries that is outstanding on the Effective Date, as set forth on Schedule 1.01B.

"Facility" means an inpatient or outpatient rehabilitation facility, certified outpatient rehabilitation facility, skilled nursing facility, specialty medical center or facility, specialty orthopedic hospital or acute care hospital, subacute inpatient facility, transitional living center, medical office building, outpatient surgery center or outpatient diagnostic center, with all buildings and improvements associated therewith, that is owned or leased, in whole or in part, by the Borrower or a Subsidiary.

"Fair Market Value" of any asset or items means the fair market value of such asset or items as determined in good faith by the Board of Directors of the Borrower or a Subsidiary, as applicable, and evidenced by a resolution of such Board of Directors.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Fiscal Year" means the twelve month period ending on

# EXHIBIT G

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------
FORM 8-K
------------------

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): March 16, 2006
(March 10, 2006)
------------------
HealthSouth Corporation
(Exact Name of Registrant as Specified in Charter)
------------------

| Delaware | 000-14940 | 63-0860407 |
|---|---|---|
| (State or Other Jurisdicti of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

One HealthSouth Parkway
Birmingham, Alabama                                35243
(Address of Principal Executive Offices)          (Zip Code)

Registrant's telephone number, including area code: (205) 967-7116

Not Applicable
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act
     (17 CFR 230.425)

[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act
     (17 CFR 240.14a-12)

[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the
     Exchange Act (17 CFR 240.14d-2(b))

[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the
     Exchange Act (17 CFR 240.13e-4(c))

Item 1.01. Entry Into a Material Definitive Agreement.

On March 10, 2006, the Company announced that it had completed a series of previously announced recapitalization transactions (the "Recapitalization Transactions") and repaid substantially all of its existing indebtedness. The Recapitalization Transactions included (i) entering into credit facilities that provide for credit of up to $2.55 billion of senior secured financing, (ii) entering into an interim loan agreement that provides the Company with $1.0 billion of senior unsecured financing, (iii) completing a $400 million offering of convertible perpetual preferred stock; and (iv) completing cash tender offers to purchase $2.03 billion of the Company's then outstanding senior notes and $319 million of the Company's then outstanding senior subordinated notes and consent solicitations with respect to proposed amendments to the indentures governing each outstanding series of notes. In order to complete the Recapitalization Transactions, the Company also entered into amendments, waivers and consents to the Company's then existing senior secured credit facility, $200 million senior unsecured term loan agreement and $355 million senior subordinated credit agreement to allow for the completion of the Recapitalization Transactions.

The Company used a portion of the proceeds of the loans under the new senior secured credit facilities, the proceeds of the interim loans and the $400 million of proceeds from its previously announced issuance and sale of 400,000 shares of 6.50% Series A Preferred Stock, completed on March 7, 2006, along with cash on hand, to prepay substantially all of its existing indebtedness and to pay fees and expenses related to such prepayment and the Recapitalization Transactions. The remainder of the proceeds and availability under the senior secured credit facilities are expected to be used for general corporate purposes. The Company anticipates refinancing the $1 billion interim loans in the second quarter or third quarter of 2006 through an issuance of debt securities.

As part of the completion of the Recapitalization Transactions, the Company announced on March 10, 2006 that it successfully completed its cash tender offers and related consent solicitations to purchase $2.03 billion of outstanding senior notes and $319 million of outstanding senior subordinated notes. The tender offers expired at 5:00 p.m., New York City time, on March 9, 2006 (the "Expiration Time"). As of the Expiration Time, $1,996,842,000 in aggregate principal amount of senior notes, representing 98.4 % of the senior notes, and $288,964,000 in aggregate principal amount of senior subordinated notes, representing 90.5 % of the senior subordinated notes, were validly tendered for purchase and not withdrawn, and the Company accepted such notes for purchase. The aggregate purchase price, including accrued and unpaid interest and the consent payment, was $2,530,331,119.

A copy of the press release announcing the closing of the Recapitalization Transactions is included as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.

Credit Agreement

On March 10, 2006, the Company entered into the Credit Agreement (the "Credit Agreement") with a consortium of financial institutions (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as the administrative agent and the collateral agent ("JPMorgan"), Citicorp North America, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as co-syndication agents, and Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P. and Wachovia Bank, National Association, as co-documentation agents.

The Credit Agreement provides for credit of up to $2.55 billion of senior secured financing. The $2.55 billion available under the Credit Agreement includes (1) a six-year $400 million revolving credit facility (the "Revolving Loans"), with a revolving letter of credit subfacility and swingline loan subfacility, (2) a six-year $100 million synthetic letter of credit facility and (3) a seven-year $2.050 billion term loan facility (the "Term Loans"). The Term Loans amortize in quarterly installments, commencing with the quarter ending on

September 30, 2006, equal to 0.25% of the original principal amount thereof, with the balance payable upon the final maturity. The Term Loans and, prior to the "Leverage Pricing Date" (as defined in the Credit Agreement), the Revolving Loans bear interest (1) if the Company has received an initial corporate credit rating after entering into the Credit Agreement of B+ or better by S&P and B1 or better by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 2.50% or (b) 1.50% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate, (2) if the Company has received an initial corporate credit rating after entering into the Credit Agreement of B or better by S&P and B2 or better by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 2.75% or (b) 1.75% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate or (3) if the Company has not received an initial corporate credit rating from either or both of S&P and Moody's after entering into the Credit Agreement, or has not received an initial corporate credit rating of at least B by S&P and B2 by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 3.25% or (b) 2.25% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate. After the Leverage Pricing Date, the revolving loans will bear interest at a rate of, at the Company's option, (1) LIBOR (adjusted for statutory reserve requirements) or (2) the higher of (a) the federal funds rate plus 0.50% and (b) JPMorgan's prime rate, in each case, plus an applicable margin that varies depending upon the Company's leverage ratio and its initial corporate credit rating after entering into the Credit Agreement.

As described above, a portion of the proceeds of the loans under the Credit Agreement were used to refinance a portion of the Company's existing indebtedness and to pay fees and expenses related to such refinancing. The remainder of the proceeds will be used for general corporate purposes. The letters of credit issued under the revolving letter of credit subfacility and the synthetic letter of credit facility will be used in the ordinary course of business to secure workers' compensation and other insurance coverages and for general corporate purposes.

The Credit Agreement contains customary representations, warranties and affirmative and negative covenants. The Credit Agreement also includes customary events of default, including, without limitation, payment defaults, cross-defaults to other material indebtedness and bankruptcy-related defaults. If any "event of default" (as defined in the Credit Agreement) occurs and is continuing, JPMorgan may, and at the request of the required Lenders will, terminate the commitments and declare all of the amounts owed under the Credit Agreement to be immediately due and payable.

Pursuant to a Collateral and Guarantee Agreement (the "Collateral and Guarantee Agreement"), dated as of March 10, 2006, between the Company, the subsidiaries of the Company identified therein (collectively, the "Subsidiary Guarantors") and JPMorgan, the Company's obligations under the Credit Agreement are (a) secured by substantially all of the assets of the Company and the Subsidiary Guarantors and (b) guaranteed by the Subsidiary Guarantors.

The foregoing descriptions of the Credit Agreement and the Collateral and Guarantee Agreement are qualified in their entirety by reference to such agreements, copies of which are attached hereto as Exhibits 10.1 and 10.2, respectively, and are incorporated herein by reference.

Interim Loan Agreement

On March 10, 2006, the Company and the Subsidiary Guarantors also entered into the Interim Loan Agreement (the "Interim Loan Agreement") with a consortium of financial institutions (collectively, the "Interim Lenders"), Merrill Lynch Capital Corporation, as administrative agent ("Merrill"), Citicorp North America, Inc. and JPMorgan Chase Bank, N.A., as co-syndication agents, and Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Credit Partners L.P. and Wachovia Bank, National Association, as co-documentation agents. The Interim Loan Agreement provides the Company with $1 billion of senior unsecured interim financing. The loans under the Interim Loan Agreement will mature on March 10,

2007 (the "Initial Maturity Date"). Any Interim Lender who has not been repaid in full on or prior to the Initial Maturity Date will have the option to receive exchange notes (the "Exchange Notes") issued under a certain indenture (the "Exchange Note Indenture") in exchange for the outstanding loan. If any such Lender does not exchange its loans for Exchange Notes on the Initial Maturity Date, the maturity date of the loans will automatically extend to March 10, 2014, prior to which such Lender may exchange its loans for Exchange Notes at any time. The proceeds of the loans under the Interim Loan Agreement were used to refinance a portion of the Company's existing indebtedness and to pay fees and expenses related to such refinancing. The Company's obligations under the Interim Loan Agreement are guaranteed by the Subsidiary Guarantors.

Prior to the Initial Maturity Date, subject to certain agreed upon minimum and maximum rates, the loans will bear interest at a rate per annum equal to: (1) LIBOR, adjusted for statutory reserve requirements ("Adjusted LIBOR") plus 4.50% for the period following the closing date on March 10, 2006 and ending prior to September 10, 2006 and (2) Adjusted LIBOR plus 5.50% as of September 10, 2006 and an additional 0.50% at the end of each three-month period commencing on September 10, 2006 until but excluding the Initial Maturity Date. After the Initial Maturity Date, subject to certain agreed upon minimum and maximum rates, the loans that have not been repaid or exchanged for Exchange Notes will bear interest at the rate borne by the loans on the day immediately preceding the Initial Maturity Date plus 0.50% during the three-month period commencing on the Initial Maturity Date and an additional 0.50% at the beginning of each subsequent three-month period.

The Interim Loan Agreement contains representations and warranties, affirmative and negative covenants and default and acceleration provisions that are substantially similar to the provisions contained in the Credit Agreement. However, following the Initial Maturity Date, most of the affirmative covenants will cease to apply to the Company and the Subsidiary Guarantors and the negative covenants and the default and acceleration provisions will be replaced by those contained in the Exchange Note Indenture (such provisions are customary for high yield transactions).

A copy of the Interim Loan Agreement, together with the Exchange Note Indenture, is filed as Exhibit 10.3 to this report and is incorporated herein by reference. The description above of the Interim Loan Agreement and the Exchange Note Indenture is qualified in its entirety by the complete text of the Interim Loan Agreement and the Exchange Note Indenture, as applicable.

As described above, a portion of the Company's proceeds from the series of Recapitalization Transactions were used to prepay substantially all of the Company's then existing indebtedness. The Company's prepayment of indebtedness included loans under the following agreements: (i) Senior Subordinated Credit Agreement, dated as of January 16, 2004, by and among the Company, the lenders party thereto, and Credit Suisse First Boston, as administrative agent and syndication agent (the "Senior Subordinated Credit Agreement"); (ii) Amended and Restated Credit Agreement, dated as of March 21, 2005, by and among the Company, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, Wachovia Bank, National Association, as syndication agent, and Deutsche Bank Trust Company Americas, as documentation agent (the "Amended and Restated Credit Agreement"); and (iii) Term Loan Agreement, dated as of June 15, 2005, by and among the Company, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Citicorp North America, Inc., as syndication agent, and J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. as co-lead arrangers and joint bookrunners (the "Term Loan Agreement").

Upon the closing of the Recapitalization Transactions on March 10, 2006, the Company prepaid and terminated the Senior Subordinated Credit Agreement, the Amended and Restated Credit Agreement, and the Term Loan Agreement. Descriptions of each of the terminated agreements follow.

Senior Subordinated Credit Agreement

On January 16, 2004, the Company entered into the $355 million Senior Subordinated Credit Agreement, which had an interest rate of 10.375% per annum, payable quarterly, with a 7-year maturity, callable after the third year with a premium.

On February 15, 2006, the Company entered into a consent and waiver (the "Consent") to the Senior Subordinated Credit Agreement. Pursuant to the terms of the Consent, the "required lenders" (as defined in the Senior Subordinated Credit Agreement) consented to the prepayment of all outstanding loans in full (together with all accrued and unpaid interest) on or prior to March 20, 2006 and waived certain provisions of the Senior Subordinated Credit Agreement to the extent such provisions prohibited such prepayment. Pursuant to the Consent, along with the payment-in-full of all principal amount of loans and accrued and unpaid interest thereon owed under the Senior Subordinated Credit Agreement, the Company paid a prepayment premium equal to 15.00% of the principal amount of the loans.

The foregoing description of the Senior Subordinated Credit Agreement is qualified in its entirety by the complete text of the Senior Subordinated Credit Agreement, which was attached as Exhibit 10.1 to the Company's Current Report on Form 8-K dated January 20, 2004, and is incorporated herein by reference.

Amended and Restated Credit Agreement

The Amended and Restated Credit Agreement amended and restated the Credit Agreement dated as of June 14, 2002, as amended on August 20, 2002 (the "Original Credit Agreement"), among the Company, the lenders from time to time party thereto, JPMorgan Chase, N.A., as administrative agent, Wachovia Bank, National Association, as syndication agent, UBS Warburg LLC, ScotiaBanc, Inc., and Deutsche Bank AG, New York Branch, as co-documentation agents, and Bank of America, N.A., as senior managing agent.

Pursuant to the Amended and Restated Credit Agreement, the lenders converted $315 million in aggregate principal amount of the loans outstanding under the Original Credit Agreement into a senior secured term facility which would have matured on June 14, 2007 (the "Converted Term Loans"). Such maturity date for the Converted Term Loans, however, would have automatically been extended to March 21, 2010 in the event that (1) such extension became permitted under the Company's Senior Subordinated Credit Agreement or (2) the Senior Subordinated Credit Agreement ceased to be in effect. The Converted Term Loans amortized in quarterly installments, commencing with the quarter ended on September 30, 2005, equal to 0.25% of the original principal amount thereof, with the balance payable upon the final maturity. Until the Company had obtained ratings from Moody's and S&P, the Converted Term Loans carried interest, at the Company's option, at a rate of (1) LIBOR (adjusted for statutory reserve requirements) plus 2.50% or (2) 1.50% plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate. After the Company had obtained such ratings, the Converted Term Loans carried interest, at the Company's option, (1) at a rate of LIBOR (adjusted for statutory reserve requirements) plus a spread ranging from 2.00% to 2.50%, depending on the Company's ratings with such institutions or (2) at a rate of a spread ranging from 1.00% to 1.50%, depending on the Company's ratings with such institutions, plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate.

In addition, the Amended and Restated Credit Agreement made available to the Company a senior secured revolving credit facility in an aggregate principal amount of $250 million (the "Revolving Facility") and a senior secured revolving letter of credit facility in an aggregate principal amount of $150 million (the "LC Facility"). The commitments under the Revolving Facility and the LC Facility would have expired, and all borrowings under such facilities would have matured, on March 21, 2010.

Pursuant to the Collateral and Guarantee Agreement (the "2005 Collateral and Guarantee Agreement"), dated as of March 21, 2005, between the Company and JPMorgan, the Company's obligations under the Amended and Restated Credit Agreement were secured (1) by substantially all of the assets of the Company and (2) from and after the date on which the Restrictive Indentures (as defined in the Amended and Restated Credit Agreement) and the Senior Subordinated Credit Agreement permitted the obligations (or an amount thereof) to be guaranteed by or secured by the assets of certain existing and subsequently acquired or organized material subsidiaries of the Company by substantially all of the assets of such subsidiaries. The 2005 Collateral and Guarantee Agreement, along with the guaranty obligation made and the security interests granted therein

terminated automatically upon the termination of the Amended and Restated Credit Agreement.

On February 22, 2006, the Company entered into an amendment and waiver (the "Waiver") to the Amended and Restated Credit Agreement. Pursuant to the terms of the Waiver, the "required lenders" (as defined in the Amended and Restated Credit Agreement) waived, in the event that all the transactions contemplated by the Recapitalization Transactions did not occur substantially simultaneously, certain provisions of the Amended and Restated Credit Agreement, to the extent such waiver was required to permit the Company to apply 100% of the net proceeds of the issuance of the convertible preferred stock to the prepayment or repayment of other existing indebtedness. In connection with the Waiver, the Company paid to each lender executing the Waiver on or prior to 5:00 p.m., February 22, 2006, a waiver fee equal to 0.05% of the principal amount of such lender's loans.

The foregoing description of the Amended and Restated Credit Agreement and the 2005 Collateral and Guarantee Agreement is qualified in its entirety by the complete text of the agreements, which were attached as Exhibits 10.1 and 10.2 to the Company's Current Report on Form 8-K dated March 22, 2005, respectively, and are incorporated herein by reference.

Term Loan Agreement

Pursuant to the Term Loan Agreement, the Company obtained a senior unsecured term facility consisting of term loans (the "2005 Term Loans") in an aggregate principal amount of $200 million. The 2005 Term Loans initially carried interest at a rate of LIBO (adjusted for statutory reserve requirements) plus 5.0% per year (the "Initial Rate") and thereafter, at the Company's option, at a rate of (1) the Initial Rate or (2) 4.0% per year plus the higher of (x) JPMorgan's prime rate and (y) the Federal Funds Rate plus 0.50%. The 2005 Term Loans would have matured in full on June 15, 2010.

On February 15, 2006, the Company entered into an amendment and waiver (the "Amendment") to the Term Loan Agreement. Pursuant to the terms of the Amendment, the "required lenders" (as defined in the Term Loan Agreement) amended certain provisions of the Term Loan Agreement to the extent such provisions prohibited a prepayment of the loans thereunder prior to June 15, 2006. In connection with the prepayment-in-full of the principal amount of loans and accrued and unpaid interest thereon owed under the Term Loan Agreement, the Company paid a prepayment fee equal to 2.00% of the aggregate principal amount of the prepayment.

The foregoing description of the Term Loan Agreement is qualified in its entirety by the complete text of the agreement, which is attached as Exhibits 10 to the Company's Current Report on Form 8-K dated June 15, 2005, and is incorporated herein by reference.

Item 1.02. Termination of a Material Definitive Agreement.

The information contained in Item 1.01 concerning the Company's termination of certain material definitive agreements is hereby incorporated herein by reference.

Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The information contained in Item 1.01 concerning the Company's direct financial obligations is hereby incorporated herein by reference.

Item 9.01  Financial Statements and Exhibits.

See Exhibit Index.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HEALTHSOUTH CORPORATION

By: /s/ JOHN WORKMAN
    ------------------------------------
    Name:  John Workman
    Title: Executive Vice President and
           Chief Financial Officer

Date: March 16, 2006

EXHIBIT INDEX

| Exhibit No. | Description |
| ----------- | ----------- |
| 10.1 | Credit Agreement, dated March 10, 2006, by and among the Company, the lenders party thereto, JP Morgan Chase Bank, N.A., as the administrative agent and the collateral agent, Citicorp North America, Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as co-syndication agents; and Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P. and Wachovia Bank, National Association, as co-documentation agents. |
| 10.2 | Collateral and Guarantee Agreement, dated as of March 10, 2006, by and among the Company, certain of the Company's subsidiaries and JPMorgan Chase Bank, N.A., as collateral agent. |
| 10.3 | Interim Loan Agreement, dated March 10, 2006, by and among the Company and certain of the Company's subsidiaries, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, Citicorp North America, Inc. and JP Morgan Chase Bank, N.A., as co-syndication agents; and Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Credit Partners L.P. and Wachovia Bank, National Association, as co-documentation agents. |
| 99.1 | Press release dated March 10, 2006. |

Exhibit 10.1

EXECUTION COPY

=============================================================================

CREDIT AGREEMENT

dated as of

March 10, 2006

among

HEALTHSOUTH CORPORATION,

The Lenders Party Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent
and Collateral Agent,

CITICORP NORTH AMERICA, INC.
and
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
as Co-Syndication Agents,

and

DEUTSCHE BANK SECURITIES INC.,
GOLDMAN SACHS CREDIT PARTNERS L.P.,
and
WACHOVIA BANK, NATIONAL ASSOCIATION,
as Co-Documentation Agents

--------------------------

J.P. MORGAN SECURITIES INC. CITIGROUP
GLOBAL MARKETS INC. MERRILL LYNCH &
CO.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
as Co-Lead Arrangers and Joint Bookrunners

-----------------------------------------------------------------------------

(f) the aggregate principal amount of long-term Indebtedness repaid or prepaid by the Borrower and its consolidated Subsidiaries during such Fiscal Year in compliance with Section 6.09, excluding (i) Indebtedness in respect of Revolving Loans and Letters of Credit or other revolving extensions of credit (except to the extent that any repayment or prepayment of such Indebtedness is accompanied by a permanent reduction in related commitments), (ii) Loans prepaid pursuant to Section 2.11(c) or (d), (iii) repayments or prepayments of long-term Indebtedness financed by incurring other long-term Indebtedness and (iv) repayments or prepayments of Existing Notes pursuant to the Note Tender Offer or otherwise; minus

(g) cash payments made during such Fiscal Year pursuant to the Borrower's obligations under (i) its settlement agreements with the SEC, the U.S. Department of Justice and the CMS relating to Medicare billing practices and (ii) payments in respect of other judgments and settlements of litigation described in Schedule 3.10, in each case to the extent not deducted in arriving at Consolidated Net Income.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Excluded Equity Interests" means (a) voting Equity Interests in excess of 65% of the total outstanding voting Equity Interests of any Foreign Subsidiary (such Equity Interests being collectively called "Class A Excluded Equity Interests") and (b) Equity Interests in each Subsidiary that is not a Wholly Owned Subsidiary if the pledging of Equity Interests in such Subsidiary to secure the Obligations would be prohibited by, or would trigger a dissolution, disassociation, put, call or other similar adverse consequence, under the terms of any shareholder agreement, partnership agreement, limited liability company agreement or other similar agreement binding on such Subsidiary and in effect on the date hereof (such Equity Interests being collectively called "Class B Excluded Equity Interests").

"Excluded Indebtedness" means the guarantee by the Borrower in favor of UBS AG, Stamford Branch with respect to UBS AG, Stamford Branch's $22,891,449 loan to medcenterdirect.com, Inc.

"Excluded Subsidiaries" means:

(a) each Foreign Subsidiary as to which the Borrower shall have reasonably determined, in good faith, that the guaranteeing or securing by such Subsidiary of the Obligations (i) would violate applicable laws or regulations of the jurisdiction in which such Subsidiary is organized or (ii) could result in adverse tax consequences to the Borrower (each such Subsidiary being called a "Class A Excluded Subsidiary");

(b) each Subsidiary that is not a Wholly Owned Subsidiary as to which the guaranteeing or securing by such Subsidiary of the Obligations would be (i) prohibited by, or would trigger a dissolution, disassociation, put, call or other similar adverse consequence, under the terms of any shareholder agreement, partnership agreement, limited liability company agreement or other similar agreement binding on such Subsidiary or (ii) prohibited by applicable laws with respect to duties owed by majority owners to minority or non-controlling owners (each such Subsidiary being called a "Class B Excluded Subsidiary");

(c) each Subsidiary that (i) is a direct or indirect owner of Equity Interests in one or more Class B Excluded Subsidiaries, (ii) is a subsidiary of a Subsidiary that is a direct or indirect owner of Equity Interests in one or more Class B Excluded Subsidiaries and (iii) does not have any asset or liability or engage in any business or activity other than the direct or indirect ownership of Equity Interests in Class B Excluded Subsidiaries or other Class C Excluded Subsidiaries (each such Subsidiary being