# EXHIBIT H

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

-------------------
FORM 8-K
-------------------

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): March 16, 2006
(March 10, 2006)
-----------------
HealthSouth Corporation
(Exact Name of Registrant as Specified in Charter)
-----------------

| Delaware | 000-14940 | 63-0860407 |
|---|---|---|
| (State or Other Jurisdicti of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

One HealthSouth Parkway
Birmingham, Alabama                                    35243
(Address of Principal Executive Offices)         (Zip Code)

Registrant's telephone number, including area code: (205) 967-7116

Not Applicable
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act
     (17 CFR 230.425)

[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act
     (17 CFR 240.14a-12)

[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the
     Exchange Act (17 CFR 240.14d-2(b))

[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the
     Exchange Act (17 CFR 240.13e-4(c))

Item 1.01. Entry Into a Material Definitive Agreement.

On March 10, 2006, the Company announced that it had completed a series of
previously announced recapitalization transactions (the "Recapitalization
Transactions") and repaid substantially all of its existing indebtedness. The
Recapitalization Transactions included (i) entering into credit facilities that
provide for credit of up to $2.55 billion of senior secured financing, (ii)
entering into an interim loan agreement that provides the Company with $1.0
billion of senior unsecured financing, (iii) completing a $400 million offering
of convertible perpetual preferred stock; and (iv) completing cash tender offers
to purchase $2.03 billion of the Company's then outstanding senior notes and
$319 million of the Company's then outstanding senior subordinated notes and
consent solicitations with respect to proposed amendments to the indentures
governing each outstanding series of notes. In order to complete the
Recapitalization Transactions, the Company also entered into amendments, waivers
and consents to the Company's then existing senior secured credit facility, $200
million senior unsecured term loan agreement and $355 million senior
subordinated credit agreement to allow for the completion of the
Recapitalization Transactions.

The Company used a portion of the proceeds of the loans under the new senior
secured credit facilities, the proceeds of the interim loans and the $400
million of proceeds from its previously announced issuance and sale of 400,000
shares of 6.50% Series A Preferred Stock, completed on March 7, 2006, along with
cash on hand, to prepay substantially all of its existing indebtedness and to
pay fees and expenses related to such prepayment and the Recapitalization
Transactions. The remainder of the proceeds and availability under the senior
secured credit facilities are expected to be used for general corporate
purposes. The Company anticipates refinancing the $1 billion interim loans in
the second quarter or third quarter of 2006 through an issuance of debt
securities.

As part of the completion of the Recapitalization Transactions, the Company
announced on March 10, 2006 that it successfully completed its cash tender
offers and related consent solicitations to purchase $2.03 billion of
outstanding senior notes and $319 million of outstanding senior subordinated
notes. The tender offers expired at 5:00 p.m., New York City time, on March 9,
2006 (the "Expiration Time"). As of the Expiration Time, $1,996,842,000 in
aggregate principal amount of senior notes, representing 98.4 % of the senior
notes, and $288,964,000 in aggregate principal amount of senior subordinated
notes, representing 90.5 % of the senior subordinated notes, were validly
tendered for purchase and not withdrawn, and the Company accepted such notes for
purchase. The aggregate purchase price, including accrued and unpaid interest
and the consent payment, was $2,530,331,119.

A copy of the press release announcing the closing of the Recapitalization
Transactions is included as Exhibit 99.1 to this Form 8-K and is incorporated
herein by reference.

Credit Agreement

On March 10, 2006, the Company entered into the Credit Agreement (the "Credit
Agreement") with a consortium of financial institutions (collectively, the
"Lenders"), JPMorgan Chase Bank, N.A., as the administrative agent and the
collateral agent ("JPMorgan"), Citicorp North America, Inc. and Merrill Lynch,
Pierce, Fenner & Smith Incorporated, as co-syndication agents, and Deutsche Bank
Securities Inc., Goldman Sachs Credit Partners L.P. and Wachovia Bank, National
Association, as co-documentation agents.

The Credit Agreement provides for credit of up to $2.55 billion of senior
secured financing. The $2.55 billion available under the Credit Agreement
includes (1) a six-year $400 million revolving credit facility (the "Revolving
Loans"), with a revolving letter of credit subfacility and swingline loan
subfacility, (2) a six-year $100 million synthetic letter of credit facility and
(3) a seven-year $2.050 billion term loan facility (the "Term Loans"). The Term
Loans amortize in quarterly installments, commencing with the quarter ending on

September 30, 2006, equal to 0.25% of the original principal amount thereof, with the balance payable upon the final maturity. The Term Loans and, prior to the "Leverage Pricing Date" (as defined in the Credit Agreement), the Revolving Loans bear interest (1) if the Company has received an initial corporate credit rating after entering into the Credit Agreement of B+ or better by S&P and B1 or better by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 2.50% or (b) 1.50% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate, (2) if the Company has received an initial corporate credit rating after entering into the Credit Agreement of B or better by S&P and B2 or better by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 2.75% or (b) 1.75% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate or (3) if the Company has not received an initial corporate credit rating from either or both of S&P and Moody's after entering into the Credit Agreement, or has not received an initial corporate credit rating of at least B by S&P and B2 by Moody's (in each case with at least a stable outlook), at a rate of, at the option of the Company, (a) LIBOR (adjusted for statutory reserve requirements) plus 3.25% or (b) 2.25% plus the higher of (i) the federal funds rate plus 0.50% and (ii) JPMorgan's prime rate. After the Leverage Pricing Date, the revolving loans will bear interest at a rate of, at the Company's option, (1) LIBOR (adjusted for statutory reserve requirements) or (2) the higher of (a) the federal funds rate plus 0.50% and (b) JPMorgan's prime rate, in each case, plus an applicable margin that varies depending upon the Company's leverage ratio and its initial corporate credit rating after entering into the Credit Agreement.

As described above, a portion of the proceeds of the loans under the Credit Agreement were used to refinance a portion of the Company's existing indebtedness and to pay fees and expenses related to such refinancing. The remainder of the proceeds will be used for general corporate purposes. The letters of credit issued under the revolving letter of credit subfacility and the synthetic letter of credit facility will be used in the ordinary course of business to secure workers' compensation and other insurance coverages and for general corporate purposes.

The Credit Agreement contains customary representations, warranties and affirmative and negative covenants. The Credit Agreement also includes customary events of default, including, without limitation, payment defaults, cross-defaults to other material indebtedness and bankruptcy-related defaults. If any "event of default" (as defined in the Credit Agreement) occurs and is continuing, JPMorgan may, and at the request of the required Lenders will, terminate the commitments and declare all of the amounts owed under the Credit Agreement to be immediately due and payable.

Pursuant to a Collateral and Guarantee Agreement (the "Collateral and Guarantee Agreement"), dated as of March 10, 2006, between the Company, the subsidiaries of the Company identified therein (collectively, the "Subsidiary Guarantors") and JPMorgan, the Company's obligations under the Credit Agreement are (a) secured by substantially all of the assets of the Company and the Subsidiary Guarantors and (b) guaranteed by the Subsidiary Guarantors.

The foregoing descriptions of the Credit Agreement and the Collateral and Guarantee Agreement are qualified in their entirety by reference to such agreements, copies of which are attached hereto as Exhibits 10.1 and 10.2, respectively, and are incorporated herein by reference.

Interim Loan Agreement

On March 10, 2006, the Company and the Subsidiary Guarantors also entered into the Interim Loan Agreement (the "Interim Loan Agreement") with a consortium of financial institutions (collectively, the "Interim Lenders"), Merrill Lynch Capital Corporation, as administrative agent ("Merrill"), Citicorp North America, Inc. and JPMorgan Chase Bank, N.A., as co-syndication agents, and Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Credit Partners L.P. and Wachovia Bank, National Association, as co-documentation agents. The Interim Loan Agreement provides the Company with $1 billion of senior unsecured interim financing. The loans under the Interim Loan Agreement will mature on March 10,

2007 (the "Initial Maturity Date"). Any Interim Lender who has not been repaid in full on or prior to the Initial Maturity Date will have the option to receive exchange notes (the "Exchange Notes") issued under a certain indenture (the "Exchange Note Indenture") in exchange for the outstanding loan. If any such Lender does not exchange its loans for Exchange Notes on the Initial Maturity Date, the maturity date of the loans will automatically extend to March 10, 2014, prior to which such Lender may exchange its loans for Exchange Notes at any time. The proceeds of the loans under the Interim Loan Agreement were used to refinance a portion of the Company's existing indebtedness and to pay fees and expenses related to such refinancing. The Company's obligations under the Interim Loan Agreement are guaranteed by the Subsidiary Guarantors.

Prior to the Initial Maturity Date, subject to certain agreed upon minimum and maximum rates, the loans will bear interest at a rate per annum equal to: (1) LIBOR, adjusted for statutory reserve requirements ("Adjusted LIBOR") plus 4.50% for the period following the closing date on March 10, 2006 and ending prior to September 10, 2006 and (2) Adjusted LIBOR plus 5.50% as of September 10, 2006 and an additional 0.50% at the end of each three-month period commencing on September 10, 2006 until but excluding the Initial Maturity Date. After the Initial Maturity Date, subject to certain agreed upon minimum and maximum rates, the loans that have not been repaid or exchanged for Exchange Notes will bear interest at the rate borne by the loans on the day immediately preceding the Initial Maturity Date plus 0.50% during the three-month period commencing on the Initial Maturity Date and an additional 0.50% at the beginning of each subsequent three-month period.

The Interim Loan Agreement contains representations and warranties, affirmative and negative covenants and default and acceleration provisions that are substantially similar to the provisions contained in the Credit Agreement. However, following the Initial Maturity Date, most of the affirmative covenants will cease to apply to the Company and the Subsidiary Guarantors and the negative covenants and the default and acceleration provisions will be replaced by those contained in the Exchange Note Indenture (such provisions are customary for high yield transactions).

A copy of the Interim Loan Agreement, together with the Exchange Note Indenture, is filed as Exhibit 10.3 to this report and is incorporated herein by reference. The description above of the Interim Loan Agreement and the Exchange Note Indenture is qualified in its entirety by the complete text of the Interim Loan Agreement and the Exchange Note Indenture, as applicable.

As described above, a portion of the Company's proceeds from the series of Recapitalization Transactions were used to prepay substantially all of the Company's then existing indebtedness. The Company's prepayment of indebtedness included loans under the following agreements: (i) Senior Subordinated Credit Agreement, dated as of January 16, 2004, by and among the Company, the lenders party thereto, and Credit Suisse First Boston, as administrative agent and syndication agent (the "Senior Subordinated Credit Agreement"); (ii) Amended and Restated Credit Agreement, dated as of March 21, 2005, by and among the Company, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, Wachovia Bank, National Association, as syndication agent, and Deutsche Bank Trust Company Americas, as documentation agent (the "Amended and Restated Credit Agreement"); and (iii) Term Loan Agreement, dated as of June 15, 2005, by and among the Company, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Citicorp North America, Inc., as syndication agent, and J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. as co-lead arrangers and joint bookrunners (the "Term Loan Agreement").

Upon the closing of the Recapitalization Transactions on March 10, 2006, the Company prepaid and terminated the Senior Subordinated Credit Agreement, the Amended and Restated Credit Agreement, and the Term Loan Agreement. Descriptions of each of the terminated agreements follow.

Senior Subordinated Credit Agreement

On January 16, 2004, the Company entered into the $355 million Senior Subordinated Credit Agreement, which had an interest rate of 10.375% per annum, payable quarterly, with a 7-year maturity, callable after the third year with a premium.

On February 15, 2006, the Company entered into a consent and waiver (the "Consent") to the Senior Subordinated Credit Agreement. Pursuant to the terms of the Consent, the "required lenders" (as defined in the Senior Subordinated Credit Agreement) consented to the prepayment of all outstanding loans in full (together with all accrued and unpaid interest) on or prior to March 20, 2006 and waived certain provisions of the Senior Subordinated Credit Agreement to the extent such provisions prohibited such prepayment. Pursuant to the Consent, along with the payment-in-full of all principal amount of loans and accrued and unpaid interest thereon owed under the Senior Subordinated Credit Agreement, the Company paid a prepayment premium equal to 15.00% of the principal amount of the loans.

The foregoing description of the Senior Subordinated Credit Agreement is qualified in its entirety by the complete text of the Senior Subordinated Credit Agreement, which was attached as Exhibit 10.1 to the Company's Current Report on Form 8-K dated January 20, 2004, and is incorporated herein by reference.

Amended and Restated Credit Agreement

The Amended and Restated Credit Agreement amended and restated the Credit Agreement dated as of June 14, 2002, as amended on August 20, 2002 (the "Original Credit Agreement"), among the Company, the lenders from time to time party thereto, JPMorgan Chase, N.A., as administrative agent, Wachovia Bank, National Association, as syndication agent, UBS Warburg LLC, ScotiaBanc, Inc., and Deutsche Bank AG, New York Branch, as co-documentation agents, and Bank of America, N.A., as senior managing agent.

Pursuant to the Amended and Restated Credit Agreement, the lenders converted $315 million in aggregate principal amount of the loans outstanding under the Original Credit Agreement into a senior secured term facility which would have matured on June 14, 2007 (the "Converted Term Loans"). Such maturity date for the Converted Term Loans, however, would have automatically been extended to March 21, 2010 in the event that (1) such extension became permitted under the Company's Senior Subordinated Credit Agreement or (2) the Senior Subordinated Credit Agreement ceased to be in effect. The Converted Term Loans amortized in quarterly installments, commencing with the quarter ended on September 30, 2005, equal to 0.25% of the original principal amount thereof, with the balance payable upon the final maturity. Until the Company had obtained ratings from Moody's and S&P, the Converted Term Loans carried interest, at the Company's option, at a rate of (1) LIBOR (adjusted for statutory reserve requirements) plus 2.50% or (2) 1.50% plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate. After the Company had obtained such ratings, the Converted Term Loans carried interest, at the Company's option, (1) at a rate of LIBOR (adjusted for statutory reserve requirements) plus a spread ranging from 2.00% to 2.50%, depending on the Company's ratings with such institutions or (2) at a rate of a spread ranging from 1.00% to 1.50%, depending on the Company's ratings with such institutions, plus the higher of (x) the Federal Funds Rate plus 0.50% and (y) JPMorgan's prime rate.

In addition, the Amended and Restated Credit Agreement made available to the Company a senior secured revolving credit facility in an aggregate principal amount of $250 million (the "Revolving Facility") and a senior secured revolving letter of credit facility in an aggregate principal amount of $150 million (the "LC Facility"). The commitments under the Revolving Facility and the LC Facility would have expired, and all borrowings under such facilities would have matured, on March 21, 2010.

Pursuant to the Collateral and Guarantee Agreement (the "2005 Collateral and Guarantee Agreement"), dated as of March 21, 2005, between the Company and JPMorgan, the Company's obligations under the Amended and Restated Credit Agreement were secured (1) by substantially all of the assets of the Company and (2) from and after the date on which the Restrictive Indentures (as defined in the Amended and Restated Credit Agreement) and the Senior Subordinated Credit Agreement permitted the obligations (or an amount thereof) to be guaranteed by or secured by the assets of certain existing and subsequently acquired or organized material subsidiaries of the Company by substantially all of the assets of such subsidiaries. The 2005 Collateral and Guarantee Agreement, along with the guaranty obligation made and the security interests granted therein

terminated automatically upon the termination of the Amended and Restated Credit Agreement.

On February 22, 2006, the Company entered into an amendment and waiver (the "Waiver") to the Amended and Restated Credit Agreement. Pursuant to the terms of the Waiver, the "required lenders" (as defined in the Amended and Restated Credit Agreement) waived, in the event that all the transactions contemplated by the Recapitalization Transactions did not occur substantially simultaneously, certain provisions of the Amended and Restated Credit Agreement, to the extent such waiver was required to permit the Company to apply 100% of the net proceeds of the issuance of the convertible preferred stock to the prepayment or repayment of other existing indebtedness. In connection with the Waiver, the Company paid to each lender executing the Waiver on or prior to 5:00 p.m., February 22, 2006, a waiver fee equal to 0.05% of the principal amount of such lender's loans.

The foregoing description of the Amended and Restated Credit Agreement and the 2005 Collateral and Guarantee Agreement is qualified in its entirety by the complete text of the agreements, which were attached as Exhibits 10.1 and 10.2 to the Company's Current Report on Form 8-K dated March 22, 2005, respectively, and are incorporated herein by reference.

Term Loan Agreement

Pursuant to the Term Loan Agreement, the Company obtained a senior unsecured term facility consisting of term loans (the "2005 Term Loans") in an aggregate principal amount of $200 million. The 2005 Term Loans initially carried interest at a rate of LIBO (adjusted for statutory reserve requirements) plus 5.0% per year (the "Initial Rate") and thereafter, at the Company's option, at a rate of (1) the Initial Rate or (2) 4.0% per year plus the higher of (x) JPMorgan's prime rate and (y) the Federal Funds Rate plus 0.50%. The 2005 Term Loans would have matured in full on June 15, 2010.

On February 15, 2006, the Company entered into an amendment and waiver (the "Amendment") to the Term Loan Agreement. Pursuant to the terms of the Amendment, the "required lenders" (as defined in the Term Loan Agreement) amended certain provisions of the Term Loan Agreement to the extent such provisions prohibited a prepayment of the loans thereunder prior to June 15, 2006. In connection with the prepayment-in-full of the principal amount of loans and accrued and unpaid interest thereon owed under the Term Loan Agreement, the Company paid a prepayment fee equal to 2.00% of the aggregate principal amount of the prepayment.

The foregoing description of the Term Loan Agreement is qualified in its entirety by the complete text of the agreement, which is attached as Exhibits 10 to the Company's Current Report on Form 8-K dated June 15, 2005, and is incorporated herein by reference.

Item 1.02. Termination of a Material Definitive Agreement.

The information contained in Item 1.01 concerning the Company's termination of certain material definitive agreements is hereby incorporated herein by reference.

Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The information contained in Item 1.01 concerning the Company's direct financial obligations is hereby incorporated herein by reference.

Item 9.01  Financial Statements and Exhibits.

See Exhibit Index.

SIGNATURE

     Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HEALTHSOUTH CORPORATION

By: /s/ JOHN WORKMAN
    ------------------------------------
    Name:  John Workman
    Title: Executive Vice President and
           Chief Financial Officer

Date: March 16, 2006

EXHIBIT INDEX

Exhibit No.                    Description
----------                     -----------

10.1                           Credit Agreement, dated March 10, 2006, by and among
                               the Company, the lenders party thereto, JP Morgan
                               Chase Bank, N.A., as the administrative agent and the
                               collateral agent, Citicorp North America, Inc. and
                               Merrill Lynch, Pierce, Fenner & Smith Incorporated,
                               as co-syndication agents; and Deutsche Bank
                               Securities Inc., Goldman Sachs Credit Partners L.P.
                               and Wachovia Bank, National Association, as
                               co-documentation agents.

10.2                           Collateral and Guarantee Agreement, dated as of March
                               10, 2006, by and among the Company, certain of the
                               Company's subsidiaries and JPMorgan Chase Bank, N.A.,
                               as collateral agent.

10.3                           Interim Loan Agreement, dated March 10, 2006, by and
                               among the Company and certain of the Company's
                               subsidiaries, the lenders party thereto, Merrill
                               Lynch Capital Corporation, as administrative agent,
                               Citicorp North America, Inc. and JP Morgan Chase
                               Bank, N.A., as co-syndication agents; and Deutsche
                               Bank AG Cayman Islands Branch, Goldman Sachs Credit
                               Partners L.P. and Wachovia Bank, National
                               Association, as co-documentation agents.

99.1                           Press release dated March 10, 2006.

Exhibit 10.3

EXECUTION COPY

--------------------------------------------------------------------------------

INTERIM LOAN AGREEMENT

dated as of

March 10, 2006

among

HEALTHSOUTH CORPORATION,

The Subsidiary Guarantors Party Hereto,

The Lenders Party Hereto,

MERRILL LYNCH CAPITAL CORPORATION,
as Administrative Agent,

CITICORP NORTH AMERICA, INC.

and

JPMORGAN CHASE BANK, N.A.,
as Co-Syndication Agents,

and

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH,
GOLDMAN SACHS CREDIT PARTNERS L.P.

and

WACHOVIA BANK, NATIONAL ASSOCIATION,
as Co-Documentation Agents

----------------------------

MERRILL LYNCH & CO.,
MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED,

CITIGROUP GLOBAL MARKETS INC.

and

J.P. MORGAN SECURITIES INC.,
as Joint Bookrunners and Co-Lead Arrangers

--------------------------------------------------------------------------------

"Eurodollar", when used in reference to any Loan, refers to whether such Loan is bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Exchange Note" means the note (or, if more than one such note is outstanding, all such notes, including any Increasing Rate Notes and Fixed Rate Notes (unless the context otherwise requires)) issued under the Exchange Note Indenture in exchange for one or more Loans, substantially in the form attached as an exhibit to the Exchange Note Indenture.

"Exchange Note Indenture" means the Exchange Note Indenture in the form of Exhibit C hereto to be entered into pursuant to Section 5.13 among the Borrower, the Subsidiary Guarantors and the Trustee relating to the issuance of the Exchange Notes.

"Excluded Indebtedness" means the guarantee by the Borrower in favor of UBS AG, Stamford Branch with respect to UBS AG, Stamford Branch's $22,891,449 loan to medcenterdirect.com, Inc.

"Excluded Subsidiaries" has the meaning assigned thereto in the Credit Agreement.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income or net worth by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.13(b)), any withholding tax that is (i) imposed by the United States of America on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.11(a), or (ii) is attributable to such Foreign Lender's failure to comply with Section 2.11(e) and (d) any Taxes imposed as a result of its gross negligence or wilful misconduct.

"Existing Indebtedness" means all of the Indebtedness of the Borrower and the Subsidiaries that is outstanding on the Effective Date, as set forth on Schedule 1.01A.

"Existing Note Indentures" means each of the indentures (including any related supplemental indentures, directors' resolutions or officers' certificates) in effect on the Effective Date and listed on Schedule 1.01B hereto.

"Existing Notes" means the Borrower's 7.375% Senior Notes due 2006, 8.500% Senior Notes due 2008, 7.000% Senior Notes due 2008, 10.750% Senior Subordinated Notes due 2008, 8.375% Senior Notes due 2011 and 7.625% Senior Notes due 2012, issued and outstanding under the Existing Note Indentures.

"Existing Senior Secured Credit Agreement" means the Amended and Restated Credit Agreement dated as of March 21, 2005, among the Borrower, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, Wachovia Bank, National Association, as syndication agent, and Deutsche Bank Trust Company Americas, as documentation agent.

# EXHIBIT I

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
HEALTHSOUTH CORPORATION 2002 DERIVATIVE LITIGATION

| | | |
|---|---|---|
| WADE TUCKER, ET AL.,FOR AND ON BEHALF OF HEALTHSOUTH CORPORATION, | ) ) ) | |
| | ) | No. CV 02-5212 |
| Plaintiff, | ) ) | |
| v. | ) | |
| RICHARD M. SCRUSHY, UBS SECURITIES, LTD., ET AL., | ) ) ) | |
| Defendants | ) | |

ORDER AND MEMORANDUM OPINION GRANTING DERIVATIVE
PLAINTIFF'S MOTION TO STRIKE DEFENDANT UBS SECURITIES LLC'S
MOTION TO AMEND ITS ANSWER

This matter came to be heard on January 22, 2008, on motion of derivative plaintiffs ("Tucker") for and on behalf of HealthSouth Corporation ("HealthSouth"), titled "PLAINTIFF'S MOTION TO STRIKE UBS SECURITIES LLC'S AMENDED ANSWER TO THE THIRD . . . AND FOURTH AMENDED COMPLAINT."

This Court has considered the argument held on January 22, 2008, as well as relevant matters on file herein, including the following:

(a)    Tucker's Third Amended Complaint and Fourth (Supplemental) Amended Complaint; UBS's Answer and Counterclaim; and UBS's amendment to its Answer dated November 16, 2007;

(b)    Tucker's MOTION TO STRIKE, filed December 17, 2008, together with matters filed therewith, including a brief and exhibits filed December 21, 2007;

(c)    UBS Securities LLC's opposition to the MOTION TO STRIKE, filed January 17, 2008, together with exhibits;

1

(d)     Matters involving the Guarantee Suit (as hereinafter defined) to the extent filed herein by HealthSouth and UBS Securities LLC;

(e)     All submissions and oral argument relative to (i.e., in support of and opposing) the motions to dismiss filed by UBS Securities LLC in October 2003 and May 2004 and motion for summary judgment filed by UBS Securities LLC in November 2007; and

(f)     Proceedings, hearings, and orders of this Court in connection with the management of this suit.

Defendant UBS Securities LLC filed its responsive pleading to Tucker's operative Third and Fourth Complaints herein on August 3, 2005 (the "Answer"), and 28 months later, without leave of court,[1] filed an amendment to the Answer on November 16, 2007 (the "Amendment" or the "Amended Answer"). The Amendment relates to a separate suit that an affiliate of UBS Securities LLC filed in New York against HealthSouth in September 2007, putting at issue in New York certain matters that have long been at issue in this case as well. Tucker moves to strike the Amendment. Because the relevant procedural history weighs so heavily in this Court's considerations, it will now be summarized here at some length, as follows:

---

[1] While seeking leave of court before filing the Amendment may not have been technically required, for reasons stated herein, seeking guidance of this Court given the stage of these proceedings would plainly have been the more prudent course.

I.    FINDINGS REGARDING RELEVANT PROCEDURAL HISTORY

   A.    Background, Co-ordination and Case Management

   1.    Tucker's original complaint herein was filed on August 28, 2002, and amended on November 15, 2002.  The public disclosure on March 18, 2003, of the financial fraud at HealthSouth exponentially broadened the Tucker suit, and as new facts came to light, successive amended complaints added parties and claims.

   2.    The accounting fraud at HealthSouth became the subject of securities class actions consolidated in the United States District Court for the Northern District of Alabama, as In re HealthSouth Securities Litigation, Master File Nos. CV-03-BE-1500-S, 1501-S, and 1502-S, under Judge Bowdre (the "Securities Suit").

   3.    HealthSouth shareholders filed derivative suits in three jurisdictions – this Court, the United States District Court for the Northern District of Alabama (consolidated under Judge Bowdre), and the Delaware Court of Chancery (under Vice Chancellor Strine).  With the encouragement of all three courts, the parties to all these derivative suits agreed on a method of rationalizing and simplifying co-ordination and forum issues: that a single discrete claim would proceed in Delaware and all other claims would proceed in this action in this Court.  All three courts, including this one, entered harmonized coordination orders. See: Order, July 13, 2003.  The extensive cooperation among the three courts and its salutary effect on case management of these complex matters is discussed approvingly in Ernst & Young LLP v. Tucker, 940 So.2d 269, 270-277 (Ala. 2006), and in Teachers'

3

Retirement System of Louisiana v. Scrushy, 2004 WL 423122, at *9, (Del. Ch., Mar.2, 2004).

4.    The Delaware derivative suit and this one have already resulted in two large judgments entered, appealed, affirmed, and collected.    In re HealthSouth Corp. Shareholders Litig, 845 A.2d 1096 (Del. Ch. 2003), aff'd. 847 A.2d 1121 (Del. 2004); Tucker v. Scrushy, 2006 WL 37028 (Ala. Cir. Ct. Jan. 3, 2006), aff'd. Scrushy v. Tucker, 955 So.2d 988 (Ala. 2006). This suit has also resulted in rival cases filed by various parties herein and consolidated.    It has also encompassed vigorously contested arbitration orders, the terms of which were subject to two appeals.    Ernst & Young LLP v. Tucker, 940 So.2d 269 (Ala. 2006); Ex parte Scrushy, 940 So.2d 290 (Ala. 2006).  It has also resulted in a complex settlement of claims against director and officer defendants who were not criminally accused in the accounting fraud; the settlement is not final because it is contingent on the finality of a settlement with the same parties in the Securities Suit, and the Securities Suit settlement is in turn the subject of pending appeals by two non-settling parties. *What is relevant here is that these matters have complicated the case management here, making it extremely important that matters related to this suit remain before this Court.*

5.    Discovery in this suit was subject to various stays in deference to the pendency of numerous criminal proceedings arising out of the accounting fraud at HealthSouth, including sentencing proceedings that were the subject of various contests, appeals, and remands.  Discovery herein accelerated in 2007, and co-ordination and case management has grown increasingly far-reaching and complex

since early 2007, when discovery here and in the Securities Suits began in earnest, with document and deposition discovery coordinated between this case and the Securities Suit. See, e.g., Orders of April 5, 2007; April 6, 2007; May 15, 2007; June 4, 2007; and October 5, 2007. The parties have advised this Court that intensive deposition discovery is proceeding, and this Court, as well as the United States District Court for the Northern District of Alabama, has been called on to give guidance on, or to resolve, numerous discovery-related matters.

B.    History of Relevant Pleadings and Dismissal Motions

1.    The Third Amended Complaint, filed August 8, 2003, and the Fourth (Supplemental) Amended Complaint, filed March 25, 2004, taken together, comprise the operative complaint herein. The Third Amended Complaint is the first pleading in this suit to name any UBS party or affiliate as a defendant herein.

2.    The Third Amended Complaint named "UBS Group" and "UBS Investment Bank" as parties defendant herein, and defined the term "UBS Parties" as including both "UBS Group" and "UBS Investment Bank." Third Am. Compl. at ¶ 21.

3.    The Third Amended Complaint alleges, *inter alia*, that defendant Scrushy and other disloyal insiders breached their fiduciary duty to HealthSouth by establishing off-the-books self-dealing entities to usurp corporate opportunity and to siphon off money from HealthSouth; one such entity was MedCenterDirect.com ("MCDC"). Id. at ¶¶ 91-117, 129, 134, 174-175. The complaint alleges that UBS aided and abetted these breaches of fiduciary duty, conspired with the faithless

fiduciaries to do harm to HealthSouth, and committed various other torts including suppression, fraud, and direct breach of fiduciary duty. Id. at, ¶¶ 83-90, 134(e), 164-172. The complaint also alleges that UBS funded and raised investment capital for MCDC to help fund this self-dealing entity (Id. at, ¶ 134[e]), and although that particular allegation appears in the demand futility section of the complaint, it is incorporated by reference in each and every count in the complaint. Accordingly, it constitutes one of the supporting allegations for the claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, and civil conspiracy. This allegation (together with other allegations in the complaint) is sufficient to put UBS on notice that such funding is alleged to be an issue in this case. Id. at ¶ 134(e).

    4.    On October 17, 2003, UBS Securities LLC brought a Motion to Dismiss the Third Amended Complaint. The motion states at its outset:

> COMES NOW defendants "UBS Investment Bank" and "UBS Group" (collectively the "UBS Parties"), the entities identified in the Third Amended Complaint ("Amended Complaint" or "Am. Compl."), *whose true and correct name is UBS Securities LLC ("UBS Securities"), formerly known as UBS Warburg. . . .*

[Emphasis added.] The motion then argues that the complaint should be dismissed, among other reasons, because the identity of the defendants was wrongly stated and should have been "UBS Securities LLC." Id. at 1, 3-4. In an accompanying affidavit, UBS's counsel (then and now), Robert J. Giuffra, Jr., Esq., conceded that "UBS Group" is a term in use at UBS to reference and subsume all UBS entities, stating –

> UBS Group is a term used to reference numerous UBS entities, including UBS Securities, its affiliates and parent corporation.

5.    Tucker's Fourth (Supplemental) Amended Complaint, filed March 25, 2004, at ¶ 234, added UBS Securities LLC as a named entity, pleading as follows:

> 234.    Defendants UBS Group and UBS Investment Bank have advised the Court and the parties herein that the correct name of their affiliated party defendant is UBS Securities LLC.  Accordingly, UBS Securities LLC has been named as a defendant herein, and the phrase "UBS Parties" as used in Paragraphs 83 through 222 and the Prayer for Relief in the Third Amended Verified Complaint includes and shall be deemed to include UBS Securities LLC.

6.    On May 27, 2004, UBS Securities LLC brought a new motion to dismiss the Third and Fourth Amended complaint raising numerous grounds, including the conventional ones such as failure to make a demand, failure to state a claim, and failure to plead fraud with specificity, but raising two grounds relevant here –

(a)    that UBS Group and UBS Investment Bank are non-existent entities (*see* Motion to Dismiss Fourth Amended Compl., at 2, ¶ 1, and Memorandum of Law In Support of Motion to Dismiss dated May 27, 2004 at 3, 7-8); and

(b)    that this Court should enforce an outbound choice-of-forum clause in various contracts between the UBS Parties and HealthSouth in favor of New York.  See: Memorandum of Law In Support of Motion to Dismiss dated May 27, 2004, at 4-5, 20-21.  The forum selection clause was argued intensely and at length in several submissions by both parties and in oral argument held November 10, 2004.

7.    This Court denied the motion to dismiss in an order entered March 3, 2005.  UBS Securities LLC filed a motion to reconsider and modify the March 3, 2005, order, arguing that Tucker's claims against the two entities they said were

non-existent, UBS Group and UBS Investment Bank, should be dismissed. UBS Securities LLC's Motion to Reconsider at ¶ 2.

8.      On July 13, 2005, this Court entered a "Modified Order Denying Motion to Dismiss Brought by UBS" ("Modified Order").

9.      The Modified Order denied the motion to dismiss on substantive grounds, reinforcing a prior ruling that demand is excused under Ala. R. Civ. P., Rule 23.1 (id. at ¶ 2), and holding that the complaint had adequately stated causes of action for aiding and abetting breaches of fiduciary duty by HealthSouth insiders, civil conspiracy, direct breach of fiduciary duty, fraud, suppression, breach of contract, and unjust enrichment. Id. at ¶¶ 4-6.

10.     The Modified Order granted the "motion to dismiss with respect to non-entity defendants UBS Group and UBS Investment Bank" based on representations made by UBS Securities LLC in its motion papers. This Court ruled that "[i]n the event discovery reveals that either UBS Group or UBS Investment Bank is a legal entity, however, plaintiff's right to seek leave for their readdition as defendants is hereby reserved." Id. at ¶ 7.

11.     The Modified Order denied the motion to enforce the outbound choice-of-forum clause, ruling at ¶ 3:

(a)     As the contract claims herein against UBS are inextricably intertwined with the other claims against UBS as well as other claims against other parties, being based on the same nucleus of operative facts, it would be seriously inconvenient and unreasonable to send off one smaller part of this case to New York while retaining most of it here. Ex Parte Leasecomm v. Galaxy Mall, 2003 WL 22753454 (Ala. Nov. 21, 2003);

(b)    There is a strong public policy of the State of Alabama against splitting causes of action, and that is what would occur if the contract claims were sent off to New York. Galaxy Mall, *supra*; and

(c)    Enforcing the outbound forum selection clause would upset the carefully crafted co-ordination orders in effect in three jurisdictions regarding the case management of these complex derivative suits, including the Co-ordination Order of July 14, 2003 herein, and would result in duplicative discovery and trial. Teachers' Retirement System v. Scrushy, 2004 WL 423122 (Del.Ch. Mar. 2004).

This Court notes that the message thus rendered could not have been clearer – and it is even more "seriously inconvenient" and "unreasonable" today, than it was in 2004-2005, to send off one "inextricably intertwined" claim based on the "same nucleus of operative facts" to New York while retaining all the other claims here.

12.    On August 3, 2005, UBS Securities LLC filed its responsive pleading in Tucker, including an Answer and Counterclaim. UBS's Answer in its preamble defines "UBS" to mean UBS Securities LLC, and at ¶ 134, responding to an allegation that UBS funded and raised investment capital for MCDC, "admits that UBS provided a loan to MCDC" (i.e., MedCenterDirect.com).

13.    Tucker has presented evidence on file herein that senior executives of UBS Securities LLC proposed the loan of $20 million to MCDC, that UBS Securities LLC approved the loan in its various committees, and that UBS Securities LLC had planned to be the investment banker in a contemplated initial public offering of the shares of MCDC, valuing MCDC at approximately $1 billion.[2] DiPrima Aff., Dec.

---

[2] This evidence and its alleged relevance are summarized by Tucker at PLAINTIFF TUCKER'S BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BROUGHT BY DEFENDANT UBS SECURITIES LLC, at 55-57.

17, 2007, Ex. 8-10. Tucker contends that at the very least UBS Securities LLC was the moving force behind the loan.

14.    On September 6, 2007, a Connecticut banking entity called "UBS AG, Stamford Branch," an affiliate of UBS Securities LLC, commenced suit against HealthSouth in the Supreme Court of the State of New York, County of New York, alleging that UBS AG, Stamford Branch loaned $20 million to MCDC, that HealthSouth guaranteed the loan, and that MCDC failed to pay the loan when it came due (the "Guarantee Suit").[3]

15.    On October 1, 2007, HealthSouth removed the Guarantee Suit to the United States District Court for the Southern District of New York ("SDNY"), where it is now pending. HealthSouth and UBS Securities LLC have informed this Court that HealthSouth has cross-moved in SDNY to dismiss or stay the Guarantee Suit in deference to the present Tucker suit, and the motion to dismiss or stay is now pending.

---

[3] Tucker contends that the UBS parties brought the suit in New York instead of in this Court (a) to gain tactical advantage, and (b) to take advantage of New York's procedure permitting expedited judgment on instruments for the payment of money at New York Civil Practice Law and Rules, Section 2313, which dispenses with the filing of a complaint and permits the initial pleading to be only the instrument itself combined with a motion for summary judgment. UBS Securities LLC acknowledges that it sought to take advantage of the New York rule, but argued for the first time at oral argument on January 22, 2008, that UBS AG, Stamford Branch could not have brought suit in this court. This Court does not need to reach this issue of intent, but notes with disapproval that UBS Securities LLC could have, but did not, seek the guidance of this Court before it filed the Guarantee suit in New York. It could easily have done so, as counsel signing the New York suit papers for UBS AG, Stamford Branch is Sullivan & Cromwell, the same firm that has represented UBS Securities LLC throughout the <u>Tucker</u> suit.

16.    On November 16, 2007, after HealthSouth removed the Guarantee Suit to SDNY, UBS Securities LLC amended its Answer herein without leave of Court. The Amended Answer restated Paragraph 134 to state that "UBS denies the allegations in Paragraph 134, and each subparagraph thereof . . . except (i) admits that UBS AG, Stamford Branch provided a loan to MCDC." Thus the Amendment purported to change the pleading in only one respect – to change the identity of the lender from UBS Securities LLC to UBS AG, Stamford Branch. This aligned UBS's pleading here with the Guarantee Suit in New York.

17.    While HealthSouth made its motions in the Guarantee Suit, Tucker here moved on December 17, 2007, to strike the Amended Answer.

## II.    LEGAL STANDARD AND CONCLUSIONS

### A.    Legal Standard

1.    Under Ala. R. Civ. P., Rule 15, an amendment pleading without leave of court is "subject to disallowance on a court's own motion or a motion to strike of an adverse party . . . ". Moreover, "grant or denial of leave to amend" under Rule 15(a) "is a matter within the sound discretion of the trial judge and is subject to reversal on appeal only for an abuse of that discretion." Ex Parte Reynolds, 436 So.2d 873, 874 (Ala. 1983).

2.    While the Courts of Alabama liberally allow amendments to the pleadings, "the trial court acts within its discretion so long as its disallowance of the amendment to the pleadings is based on some valid ground, such as actual prejudice or undue delay." Ex parte Thomas, 628 So.2d 483, 486 (Ala. 1993).

11

B.    Conclusions of Law

1.    This Court finds that there are several valid grounds, each individually sufficient to disallow the amendment, as follows:

(a)    Tucker alleges that the facts surrounding the creation and funding of MCDC constitute breach of fiduciary duties owed by Scrushy and others and that UBS Securities LLC conspired with the fiduciaries and aided and abetted their breach.  Based on the operative complaint herein, and arguments and evidence presented in the pending motion for summary judgment brought by UBS Securities LLC and opposed by Tucker, the loan to MCDC, whichever UBS entity technically made it, is at issue in the Tucker litigation.  HealthSouth advises this Court (a) that it will assert fraud in the inception as a defense to a suit to enforce the guarantee, whether in the Guarantee Suit or in this Court, and (b) that said defense alleges that both the underlying loan obligation and the guarantee were conceived in fraud and entered into by faithless agents working in concert with UBS.  Thus, the same nucleus of operative facts will govern the outcome of virtually the same issue in both suits.  It is unreasonable and seriously inconvenient to have this matter heard in two jurisdictions, defeating judicial economy.

(b)    This Court, the parties hereto, and judges in three jurisdictions, have worked together for almost five years to co-ordinate and manage this extremely complex case involving the accounting fraud at HealthSouth.  This effort is at its most sensitive, intensive, and difficult phase right now, as discovery is past the midway point, fraught with complicated disputes, and speeding toward conclusion.

Tucker and HealthSouth assert that if it were not for the admission in UBS Securities LLC's Answer that UBS Securities LLC was the entity that made the loan, an admission that stood for almost two and a half years, there would have been efforts to do more fact finding in discovery or otherwise, and this Court finds this representation credible.

(c)    This Court looks with disfavor on UBS Securities LLC's failure to seek the guidance of this Court before its affiliate, represented by the same New York counsel, filed the Guarantee Suit in New York, especially in light of this Court's ruling, quoted above, declining to enforce the outbound choice-of-forum clause.[4]

(d)    UBS Securities LLC seeks to blame plaintiffs for failing to discover the "mistake" in the Answer. This Court finds this topsy-turvy logic unpersuasive for several reasons. First, Tucker and HealthSouth had the right to accept the admission in the Answer as to which entity made the loan, and were not required to look behind that admission, especially since the Answer aligned with UBS's representations as to proper party. Second, the loan documents (Exhibit B to UBS Brief in Opposition to Motion to Strike, filed January 17, 2008) list UBS AG, Stamford Branch as "administrative agent" to the lender, and surely the UBS parties should have had a better idea what that meant than HealthSouth and Tucker. Third, the issue of proper party was litigated, with UBS Securities LLC

---

[4] UBS Securities LLC's statement in oral argument it that could not have enforced the guarantee in this Court is too simplistic, as there was no attempt by UBS AG, Stamford Branch to intervene in this action, and counsel for the two UBS entities – the same New York firm – might have sought the benefit if this Court's guidance before filing the Guarantee Suit in New York.

strenuously objecting to the two entities Tucker first named; Tucker and this Court relied on (and had the right to rely on) *not only the accuracy but the completeness* of UBS's representation that "the entities identified in the Third Amended Complaint . . . whose *true and correct name is UBS Securities LLC."* UBS Motion to Dismiss, October 17, 2003.

(e)    Tucker and HealthSouth represent that they took at face value the admission in the original Answer that UBS Securities LLC made the loan. UBS Securities LLC represents that it simply "made a mistake" when it pled that it is the entity that made the loan. Given that the Answer was filed right after a long and vigorous fight over the identity of the UBS parties that Tucker named, this Court finds plaintiffs' representation more credible.

(f)    Even if UBS Securities LLC truly just "made a mistake," it should be and is estopped from changing that representation and pleading. "For equitable estoppel to apply, (1) the actor with knowledge [UBS Securities LLC] must communicate misleadingly; (2) the other [Tucker] must rely on the misleading communication; and (3) the other must be harmed materially if the actor acts inconsistently with his earlier conduct." Smith v. State Farm Auto. Ins. Co., 952 So.2d 342, 351 (Ala. 2006) [Citations omitted]. Here, Tucker, HealthSouth and the several other parties who are trying to move this case toward a conclusion would be harmed materially by allowing UBS Securities LLC to withdraw, at this late stage, its admission that it made the loan to MCDC. HealthSouth is "harmed materially"

even more if it has to litigate the same issue in two different jurisdictions 900 miles apart.

(g)    UBS Securities LLC is not prejudiced by enforcing this estoppel. That entity can assert the claim on the guarantee here, and HealthSouth would not be permitted to assert in defense that UBS AG, Stamford Branch, rather than UBS Securities LLC, is the real lender. All other arguments and defenses remain intact.

(h)    UBS Securities LLC is similarly judicially estopped from so amending the pleading, as it asserted in its motion to dismiss, first brought in October 2003, that it is the correct name of the entity named in the Third Amended Complaint. It eventually won on this issue. It cannot now change that position. "Judicial estoppel applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system, while equitable estoppel focuses on the relationship between the parties to the prior litigation." Ex parte First Alabama Bank, 883 So.2d 1236, 1241 (Ala. 2003) (internal quotations omitted). "Reliance and privity . . . should not be essential elements of the doctrine of judicial estoppel." Id. at 1243. This Court invokes the doctrine of judicial estoppel to prevent the UBS Parties change in position and to protect this Court's efforts at case management.

2.    The complaint was last amended four years ago, and Tucker is not obligated to plead evidentiary facts. This Court specifically finds that allegations in the Third and Fourth Amended Complaints are broad enough to encompass the loan as an integral part of Tucker's claims against UBS Securities LLC, including claims

for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy.

3.    As UBS Securities LLC is deemed to be the entity that made the loan and received the guarantee, any suit on the loan or guarantee is a compulsory counterclaim here under Ala. R. Civ. P., Rule 13(a).

ORDER –

WHEREFORE, FOR ALL THE REASONS ABOVE STATED, IT IS ORDERED THAT –

FIRST, Tucker's Motion to Strike UBS Securities LLC's Amended Answer is GRANTED, and the said Amended Answer is disallowed.

SECOND, UBS Securities LLC is hereby granted leave to amend its Counterclaim herein within 14 days following the date this Order is entered to assert the claim against HealthSouth on the guarantee of the loan made to MedCenterDirect.com as previously asserted by UBS AG, Stamford Branch in the Guarantee Suit.

THIRD, if UBS Securities LLC so amends its Counterclaim herein as contemplated in "SECOND," above, HealthSouth shall not raise by way of defense that the loan was made by UBS AG, Stamford Branch rather than UBS Securities LLC, but all other arguments and defenses of either party shall remain intact, neither enlarged or diminished by this Order.

FOURTH, if UBS Securities LLC does not amend its counterclaim herein within 14 days following the entry of this Order, to state a claim under the loan guarantee contract, Tucker and HealthSouth may then apply to this Court by motion for judgment in HealthSouth's favor on issues involving the guarantee of the loan made to MedCenterDirect.com, or for other appropriate relief or sanctions.


IT IS SO ORDERED THIS ____ DAY OF _____, 2008.



_____
ALLWIN E. HORN, III
Circuit Judge



COPIES OF THIS ORDER ARE BEING PROVIDED TO ALL STEERING COMMITTEE COUNSEL WITH DIRECTIONS THAT SAID COUNSEL FURTHER DISTRIBUTE THIS ORDER TO ALL PARTIES WITHIN THEIR RESPECTIVE GROUPS. And copy to: The Honorable Karon O. Bowdre, Judge, United States District Court, Hugo Black U.S. Courthouse, 1729 Fifth Avenue North, Birmingham, AL 35203.