Page 1

```
 1           IN THE CIRCUIT COURT OF

 2          JEFFERSON COUNTY, ALABAMA

 3        HEALTHSOUTH CORPORATION 2002

 4             DERIVATIVE LITIGATION

 5

 6

 7    WADE TUCKER, et al.,

 8              Plaintiff

 9    VS.                        CV 02-5212

10    RICHARD M. SCRUSHY, et al.,

11              Defendants

12    ----------------------------------

13    GREENWICH INSURANCE CO.

14              Plaintiff

15    VS.                        CV 03-3522

16    HEALTHSOUTH CORPORATION, et al.,

17              Defendants

18    ----------------------------------

19    STEVEN R. NICHOLS, et al.,

20              Plaintiff

21    VS.                        CV 03-2023

22    HEALTHSOUTH CORPORATION et al.,

23              Defendants
```

FREEDOM COURT REPORTING

Page 2

1  FEDERAL INSURANCE COMPANY, et al.,
2       Plaintiffs
3  VS.            CV 03-2420
4  HEALTHSOUTH CORPORATION, et al.,
5       Defendants
6  ---------------------------------------
7  DENNIS FAMILY TRUST
8       Plaintiff
9  VS.            CV 98-6592
10 HEALTHSOUTH CORPORATION, et al.,
11      Defendants
12
13
14
15
16
17 BEFORE HONORABLE ALLWIN HORN, III
18      BIRMINGHAM, ALABAMA
19        MARCH 6, 2008
20
21
22
23

Page 3

1       A P P E A R A N C E S
2
3  Mr. W. Michael Atchison
4  Starnes & Atchison
5  100 Brookwood Place
6  Birmingham, Alabama 35209
7
8  Mr. Robert J. Giuffra, Jr.
9  Sullivan & Cromwell
10 125 Broad Street
11 New York, New York 10004
12
13 Mr. John W. Haley
14 Hare, Wynn, Newell & Newton
15 2025 Third Avenue North
16 Suite 800
17 Birmingham, Alabama 35203
18
19 Ms. Julia Cooper
20 Bradley Arant
21 One Federal Place
22 1819 Fifth Avenue North
23 Birmingham, Alabama 35203

Page 4

1  Mr. Jack B. McNamee
2  McNamee & Liddon
3  2126 Morris Avenue
4  Birmingham, Alabama 35203
5
6  Mr. Will A. Smith
7  Maynard Cooper
8  1901 Sixth Avenue North
9  Birmingham, Alabama 35203
10
11 Mr. John Q. Somerville
12 Galloway & Somerville
13 11 Oak Street
14 Birmingham, Alabama 35213
15
16
17
18
19
20
21
22
23

Page 5

1           I, Christie L. Williams,
2  Commissioner, State of Alabama at
3  Large, acting as commissioner,
4  certify that on this date the
5  following proceedings were had:
6
7
8
9           THE COURT: We're on the
10 record this afternoon. We will
11 consider UBS's motion to reconsider
12 my February 19, 2008 order which I
13 will call for purposes of this
14 hearing the estoppel order. That's
15 how I'm going to refer to it. I've
16 read all your papers and I realize
17 that the parties are going to argue
18 whether the Court correctly or
19 incorrectly decided the estoppel
20 issue, but in addition to that
21 argument I want the parties to also
22 address this question: Assuming that
23 the estoppel issue was correctly

2 (Pages 2 to 5)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 6

1  decided under the February 19
2  estoppel order, why is it not
3  preserved to UBS the right to assert
4  the MCDC loan or alternatively if in
5  fact UBS is not the actual lender,
6  why does that order not preserve to
7  UBS the right to prevail upon the
8  actual lender to intervene in this
9  case and assert the MCDC loan issue.
10  So in addition to what you're going
11  to argue I would like for everybody
12  to address that issue, too.
13       MR. GIUFFRA:  Robert
14  Giuffra, G-I-U-F-F-R-A, for UBS
15  Securities which is the only party
16  that's a defendant in this case.
17       Judge, I think this
18  particular motion and issue goes back
19  to first principles of civil
20  procedure and first principles in
21  terms of enforcement of a contract
22  because what we're talking about here
23  is the enforcement of a contract and

Page 7

1  we're also talking about the Court's
2  subject matter jurisdiction and
3  personal jurisdiction, and these are
4  not things that should be treated
5  lightly or that can be waived.  Now,
6  our position and the reason we filed
7  the motion for reconsideration was
8  because in the Court's order the
9  Court had looked at the credit
10  agreement which identified UBS AG
11  Stamford Branch as the administrative
12  agent.
13       Now, just by way of
14  background, it's quite common when
15  there's a credit agreement of this
16  sort that administrative agent
17  controls things like enforcement of
18  the credit agreement and at the time
19  when the credit agreement is signed
20  initially which entity is going to be
21  the lender is not determined.  That
22  gets determined later down the road.
23  In this case there were two

Page 8

1  amendments to the credit agreement
2  and those amendments are as much a
3  part of a contract as the original
4  agreement.  And we gave Your Honor in
5  our motion for reconsideration copies
6  of those amendments and those
7  amendments are --
8       THE COURT:  I believe the
9  amendments are Q and R to your
10  original notebook.  When I say
11  original notebook I mean the notebook
12  filed January 17, 2008.
13       MR. GIUFFRA:  I believe
14  that's correct, Your Honor.  One
15  amendment is amendment number one and
16  that amendment --
17       THE COURT:  Dated June 12,
18  2001.
19       MR. GIUFFRA:  Correct, Your
20  Honor.  And there's a second
21  amendment which is dated March 28,
22  2002.  Now, what's important about
23  these amendments are several things.

Page 9

1  One, if you look at the little
2  numbers down at the bottom,
3  particularly the copy that -- I don't
4  remember what was in the earlier
5  filing we made, but in the filing we
6  made on the motion for
7  reconsideration it says HD282 and all
8  the documents say HD on them.  What
9  that means is that these amendments
10  were in the files of HealthSouth.
11  These are not documents that UBS had
12  squirreled away in UBS's files.
13  These were amendments signed by
14  HealthSouth in HealthSouth's files.
15  So that if I enter into a contract
16  with Jack McNamee over here, I keep a
17  copy of it in my files, he keeps a
18  copy of it in his files and if
19  there's a dispute between the two of
20  us presumably we look at the copy of
21  the document that's in our files.
22       THE COURT:  And I will ask
23  you to look at the execution copy of

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 10

1  amendment number one dated June 12,
2  2001. Do you have that before you,
3  Robert?
4         MR. GIUFFRA: Yes, I do.
5         THE COURT: I don't really
6  know what the correct term is for
7  that first paragraph. I will call it
8  the preamble paragraph.
9         MR. GIUFFRA: Yes, Your
10 Honor.
11        THE COURT: It identifies
12 UBS AG Stamford Branch as
13 administrative agents for the lenders
14 thereunder.
15        MR. GIUFFRA: That's
16 correct, Your Honor, but then if you
17 look --
18        THE COURT: If you go to
19 the signature page and there is the
20 identification UBS AG Stamford Branch
21 as administrative agent and lender.
22        MR. GIUFFRA: That is
23 correct, Your Honor.

Page 11

1         THE COURT: And I believe
2  that is also true for the March 28,
3  2002 addendum.
4         MR. GIUFFRA: Yes, Your
5  Honor, but then attached to the March
6  28, 2002 part of the contract is a
7  lender addendum.
8         THE COURT: I understand,
9  but what I'm -- and I'm glad you
10 raised this. Do these two documents
11 then within the four corners of the
12 documents not contain an inherent
13 contradiction?
14        MR. GIUFFRA: No, Your
15 Honor.
16        THE COURT: Why is that?
17        MR. GIUFFRA: The reason
18 why they don't contain a
19 contradiction is because on the
20 signature page of the document it
21 makes it quite clear that the entity
22 that made the loan and is identified
23 as administrative agent and lender is

Page 12

1  UBS AG Stamford Branch. On the last
2  page of the second amendment where
3  this is the commitment section of
4  this document and I've walked these
5  documents through with folks in my
6  law firm who do these kinds of
7  agreements all the time and this is
8  exactly the way this type of an
9  agreement would be documented. So
10 for example, on the last page it says
11 commitments and notice address and it
12 says name of lender, UBS AG Stamford
13 Branch, talks about the commitment
14 amount being 20 million dollars.
15 Now, it gets beyond that because if
16 you were to look in the filings made
17 by -- and we cited another one that
18 we found on our reply brief.
19 HealthSouth filed SEC filings where
20 corporate lawyers went and studied
21 these issues and these were documents
22 and of course since the fraud has
23 come out where they had to figure out

Page 13

1  where the different loans would be
2  subordinated in the capital structure
3  and they full well knew who the
4  lender was. And those filings which
5  were made by HealthSouth say UBS AG
6  Stamford Branch is the lender. We've
7  submitted an affidavit to the Court
8  from UBS AG Stamford Branch making
9  clear that the position of UBS AG
10 Stamford Branch is that they are the
11 lender and on the books and records
12 of UBS AG Stamford Branch the money
13 went from UBS AG Stamford Branch down
14 to Med Center Direct.
15        One of the issues that gets
16 glossed over here is that if you look
17 at the actual credit agreement it
18 says on its face that the credit
19 agreement was to be treated as duly
20 executed and delivered in New York.
21 That's what it says in the signature
22 page signed by HealthSouth. Now, Med
23 Center Direct is a company whose

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1  principle place of business was in
2  Georgia and the money went to
3  Georgia. The money did not go to
4  Alabama. HealthSouth was the
5  guarantor to a contract that
6  HealthSouth agreed would be governed
7  by New York law. They agreed that
8  the contract would be executed and
9  delivered in New York and where they
10 consented to jurisdiction in New
11 York. Now, you have a breach of
12 contract claim and so if you go
13 back --
14       THE COURT: Let me try to
15 clear up something in my own mind,
16 Robert. I don't mean to interrupt
17 you, but I need to clear this up. I
18 have not read any first party
19 personal knowledge testimony either
20 by way of a deposition or an
21 affidavit or otherwise that tells me
22 that AG was in fact the lender. I
23 have looked at these documents.

Page 15

1       MR. GIUFFRA: Well, we also
2  gave you a sworn declaration that was
3  submitted by someone who is an
4  officer of AG in the New York action.
5       THE COURT: His December 17
6  affidavit?
7       MR. GIUFFRA: Correct.
8       THE COURT: But I did not
9  have that at the time that I ruled on
10 this motion.
11      MR. GIUFFRA: And I
12 apologize, Your Honor, that you did
13 not have that, but I think that what
14 you have here when you slice it out
15 is the following: When the
16 derivative plaintiffs brought their
17 case against -- and they filed it
18 initially against something called
19 UBS Group and I put an affidavit in
20 and I said not a legal entity, it's a
21 business group name.
22      THE COURT: Based upon your
23 understanding.

Page 16

1       MR. GIUFFRA: Based on my
2  understanding. And then they sued
3  somebody called UBS Investment Bank,
4  said exactly the same thing. I
5  appear before courts and regulators
6  all around the country and my word
7  has to stand for something or else
8  I'm not going to be able to do this
9  for very long. That's correct and it
10 was correct when we put the papers
11 in. There was no attempt to trick
12 anyone. So we put in the documents
13 saying those entities that you sued
14 are not legal entities.
15      THE COURT: Let me ask you
16 something about that, Robert.
17 Suppose that -- when did you file the
18 answer, in August of '05?
19      MR. GIUFFRA: I think
20 that --
21      THE COURT: -- wherein UBS
22 admitted that it made the loan to
23 MCDC? Suppose instead the disclosure

Page 17

1  had been made that UBS AG Stamford
2  Branch had made the loan. Do you
3  think that the plaintiffs would have
4  amended and brought in AG?
5       MR. GIUFFRA: If you were
6  to look at the complaint that was
7  filed, the original complaint, they
8  don't bring a claim seeking to undo
9  the guarantee under New York law. It
10 doesn't say this guarantee should be
11 declared void, it doesn't say
12 anything about the guarantee. The
13 words guarantee do not appear to use
14 a word within the four corners of the
15 document. There's one discussion of
16 UBS providing funding to Med Center.
17 There's not even a description of the
18 loan. And if someone wants to bring
19 a breach of contract case, normally
20 you would identify the contract, you
21 might attach it to the complaint;
22 they didn't do it. My own view is --
23 and HealthSouth knew full well that

5 (Pages 14 to 17)

Page 18

1  there was this claim.  They thought
2  that UBS could just -- UBS AG
3  Stamford Branch would just sit
4  quietly by and just either write this
5  off or do nothing.  So what
6  essentially they want to do is the
7  following:  When we brought the case
8  in New York, which we were entitled
9  to do, they consented to New York
10 jurisdiction, they had agreed to New
11 York law, they had agreed not to
12 object on forum non conveniens or any
13 other kind of grounds to New York
14 law, because that was how they got
15 the loan in the first place.  There
16 was a filing where they said, oh,
17 there's this error in the answer.
18 What I did when I saw that, and I
19 discussed it with Mike, was I don't
20 like errors in filings that I've made
21 before courts, so I filed an
22 amendment and I did that because I
23 want to be transparent with everyone

Page 19

1  and there was no attempt by us to
2  trick anyone.
3          THE COURT:  And this may be
4  an impertinent question and you may
5  not be able to answer it.  Did you
6  discover the error before or after
7  the suit was filed in New York?
8          MR. GIUFFRA:  I found out
9  about the error when I read papers
10 filed by HealthSouth in the New York
11 litigation.  I did not know about the
12 error and the reason why the error
13 happened, as best I've been able to
14 tell, is you have a 71-page answer
15 and UBS, UBS, UBS is being used
16 throughout the answer and it's being
17 defined at the beginning as UBS
18 Securities.  So what happened is one
19 time of the number of times when they
20 used the word UBS where it needs to
21 be done more carefully it wasn't
22 done.  But if you look at the answer
23 it also refers to the underlying

Page 20

1  documents, documents in HealthSouth's
2  own files.  This was not a situation
3  where we were playing games in the
4  federal case.  We answered the
5  complaint correctly.  They knew who
6  to sue.  I mean, that is not the way
7  we handle this.
8          So the question becomes how
9  do you deal with it right now, Your
10 Honor.  I think the only legitimate
11 way to deal with it is the following:
12 Your Honor, in the decision said if
13 group and investment banks turn out
14 to be legal entities I'll give them
15 the leave to bring a claim against
16 group and investment bank.  If Your
17 Honor wants to give plaintiffs leave
18 to sue UBS AG Stamford Branch under
19 this contract Your Honor can do that
20 and then UBS AG Stamford Branch can
21 be served.  It's never been served,
22 never been served.  UBS Securities or
23 its predecessor UBS Warburg was

Page 21

1  served because they had a registered
2  agent in the state of Alabama.
3          THE COURT:  If I did that,
4  Robert, would I not be opening up
5  Pandora's box with regard to this New
6  York litigation because I had
7  previously ruled some two and a half
8  years ago, I believe, that because of
9  the matters that were intertwined in
10 this lawsuit that the choice of form
11 clause I would not enforce.
12         MR. GIUFFRA:  There's an
13 issue that I think sometimes gets
14 glossed over.  Those agreements that
15 Your Honor was addressing were
16 agreements between UBS Warburg and
17 then the predecessor which is UBS
18 Securities.  UBS AG Stamford Branch
19 was not a party to any of those
20 agreements and this Court
21 respectfully does not have
22 jurisdiction over UBS AG Stamford
23 Branch and it goes back to basic

Page 22

1  principles one learns in -- that you
2  cannot --
3         THE COURT: I guess the
4  question really is whether I do have
5  jurisdiction based upon an act of
6  UBS. I guess that's really the
7  question.
8         MR. GIUFFRA: Your Honor,
9  respectfully when you have two
10 separate legal entities, UBS
11 Securities, LLC and you have UBS AG
12 Stamford Branch, a separate legal
13 entity, I don't see how what was
14 clearly an error in a filing could
15 become the basis for --
16        THE COURT: I'm not
17 contending there was anything
18 intentional about that, you
19 understand that.
20        MR. GIUFFRA: I understand
21 that, but there's not a basis for
22 saying, oh, suddenly we have
23 jurisdiction over UBS AG Stamford

Page 23

1  Branch. There's an issue that really
2  does need to be litigated which is
3  whether these plaintiffs can get
4  jurisdiction over UBS AG Stamford
5  Branch because, as I've pointed out
6  before, you read the contracts, they
7  agreed it was made in New York. UBS
8  AG Stamford Branch is in Connecticut,
9  the money flowed to Georgia.
10        THE COURT: Is my order,
11 the estoppel order, broad enough or
12 for UBS AG to intervene in this case
13 and assert the MCDC loan issue?
14        MR. GIUFFRA: Your Honor,
15 the law is quite clear and we cite a
16 case called Martin versus Wilks which
17 is a U.S. Supreme Court case that a
18 party can have -- that an entity can
19 have notice of some litigation going
20 on but no party has an obligation.
21 And it would violate the 14th
22 amendment. It may well violate
23 Alabama law to require a party that

Page 24

1  has never been served, that is not
2  before the Court to intervene in a
3  lawsuit. And there are many cases
4  that stand for that proposition. The
5  only way that this Court can litigate
6  and can decide in this case the
7  contract rights of a nonparty is for
8  the Court to give plaintiffs the
9  ability to amend their complaint,
10 bring the claim which they didn't
11 bring in the first instance, serve
12 UBS AG Stamford Branch which doesn't
13 have a registered agent in the state
14 of Alabama and then we would litigate
15 about personal jurisdiction. My own
16 view is I don't think the Court will
17 have personal jurisdiction over UBS
18 AG Stamford Branch because the loan
19 documents reflect that the loan was
20 made, the contract was signed in New
21 York, the money was sent to Georgia,
22 there's no contacts with Alabama.
23        Now, we can disagree about

Page 25

1  that and I'm sure they would have a
2  different view, but plaintiffs should
3  have to meet their burden. They have
4  an obligation under basic principles
5  of law to serve a party, establish
6  personal jurisdiction over a party
7  and they have essentially tried to
8  have the Court use this -- latch onto
9  this mistake in an answer to suddenly
10 ignore basic principles like personal
11 jurisdiction, subject matter
12 jurisdiction, forcing parties to
13 intervene in cases that they're not a
14 party to and have never been served
15 in. When you start laying it all out
16 it doesn't make sense.
17        Let me make another point
18 which is a useful one. The claim
19 that they have in this case is about
20 the conduct of UBS Securities, the
21 investment banking part of UBS AG,
22 the ultimate parent. The claims they
23 have are about conspiracy, aiding and

7 (Pages 22 to 25)

Page 26

1  abetting a breach of judiciary duty.
2        THE COURT: Who was the
3  parent company of UBS at the time the
4  credit agreement was initially
5  entered?
6     A.  UBS AG, the Suisse parent,
7  would have been the ultimate parent
8  of all these entities.
9        THE COURT: That's a
10 different entity from UBS AG Stamford
11 Branch.
12       MR. GIUFFRA: It gets a
13 little complicated, but UBS AG
14 Stamford Branch is a branch of UBS AG
15 and there is some pretty technical
16 banking law issues about what exactly
17 it is as a --
18       THE COURT: I take your
19 word for that.
20       MR. GIUFFRA: I think I
21 know the answer, but I don't want to
22 say something that could be wrong
23 because one of my banking partners in

Page 27

1  New York will say, Bob, how could you
2  be saying things in court in Alabama
3  on the record that are just wrong as
4  a matter of law, but there's a lot of
5  law about the question of where a
6  loan is made and whether that
7  subjects the bank to jurisdiction in
8  the place where the loan is even
9  received which in this case would be
10 Georgia. But let me go back to where
11 I was and I think maybe this is a
12 point that might give Your Honor a
13 little bit of comfort about this.
14       There's a contract case
15 between UBS AG Stamford Branch and
16 HealthSouth about the repayment of
17 the money and the view of UBS AG
18 Stamford Branch is that under New
19 York law they've got to pay the 30
20 million dollars back because it's an
21 absolute and unconditional guarantee.
22 They've waived any defenses that they
23 have. That issue would be decided by

Page 28

1  the judge in New York. Now, the
2  claim that's being litigated here
3  against UBS Securities is a
4  conspiracy aiding and abetting claim.
5  Respectfully, we don't think it's a
6  claim that can survive unless there's
7  summary judgment. We'll bring it.
8        THE COURT: That's a
9  separate issue.
10       MR. GIUFFRA: Separate
11 issue, but the point is certainly
12 plaintiffs in listing their damages
13 that they've suffered because of the
14 alleged malfeasance of UBS Securities
15 can point to the fact that they had
16 to pay this loan back as part of
17 their damages. So it's not as if
18 they don't have a remedy in this
19 court. We have the right to get the
20 money back in the New York action and
21 they can come back and get it right
22 back conceivably in this action.
23 They can at least try to.

Page 29

1        Now, that's something that
2  comports with law and is consistent
3  with the fact that Your Honor has UBS
4  Securities before the Court. I think
5  what Ms. Cooper mentioned before a
6  deposition involving an employee of
7  UBS Securities and what did or didn't
8  happen with UBS Securities, they can
9  certainly include the 30 million
10 dollars as a claim as part of their
11 damages, they can try to, against
12 Securities and say UBS Securities was
13 involved, but the question that's
14 before the New York court is whether
15 they have an obligation now to pay
16 the money back. And the reason why
17 banks like UBS AG make loans that are
18 guaranteed by third parties is
19 because they have all the legal
20 protections that are in the original
21 loan documents, things like
22 consenting to New York law,
23 consenting to jurisdiction in New

8 (Pages 26 to 29)

Page 30

1  York, having the contract be deemed
2  made in New York and that's
3  ultimately a good thing for everyone
4  concerned because that's why company
5  banks in New York and elsewhere will
6  make loans in Alabama, that's why
7  they will make loans in Georgia
8  because they have those legal
9  protections. That doesn't mean that
10 HealthSouth can't bring its so-called
11 tort claims against UBS Securities.
12 I'm not saying they can't. What I'm
13 saying is if you want to litigate the
14 question of whether or not the loan
15 guarantee should be thrown out and is
16 somehow void, a question of New York
17 law, you've got to bring the party
18 before this Court that's the other
19 party to the contract. You can't say
20 that the party was the investment
21 bank or the investment bank suddenly,
22 which didn't make the loan, is not a
23 party to the contract, its name

Page 31

1  doesn't appear on the contracts
2  should enforce it. It would be --
3  it's inconsistent in fact with what
4  Your Honor contemplated in your order
5  where you said, look, if Giuffra's
6  affidavit about group and investment
7  bank is wrong I'm going to give them
8  leave to sue those entities and serve
9  them. Now, if they want to try to
10 serve UBS AG Stamford Branch, they
11 can try to and we'll litigate about
12 that. My own view is the way this
13 should proceed is we'll litigate the
14 New York action on the question of
15 New York law under the guarantee,
16 we'll win or lose. If we lose the
17 motion for summary judgment I've said
18 and I'll say it on the record again
19 there's no desire to conduct
20 additional discovery.
21     THE COURT: Why would UBS
22 want to incur additional litigation
23 defense in New York when it can

Page 32

1  resolve this issue down here in
2  Alabama in a case that's been pending
3  for five and a half years?
4      MR. GIUFFRA: Very simple
5  reason. The issue before the New
6  York court is a very narrow question
7  of New York law and our position is
8  that regardless of the allegations
9  that HealthSouth makes against UBS,
10 someone knew about the fraud, they
11 cite the research report, all that is
12 irrelevant because the loan guarantee
13 says that you're waiving a claim as
14 to the validity of the guarantee,
15 whether it was induced by fraud and
16 the New York law is pretty clear that
17 you can allege that the bank induced
18 the guarantee by fraud.
19     THE COURT: Is fraud in the
20 inducement a defense in New York?
21     MR. GIUFFRA: No, not a
22 defense in the New York action. They
23 don't have it as a defense and that's

Page 33

1  why we're coming before Your Honor.
2  Even if Your Honor decided the issue
3  you have to apply the New York law
4  anyway.
5      Your Honor, the New York
6  courts provide for an expedited
7  procedure for addressing these
8  issues. It was contemplated by the
9  parties when they entered into the
10 loan when HealthSouth got the money
11 and all UBS AG Stamford Branch is
12 doing is enforcing its contract which
13 it has a right to do. HealthSouth
14 could before Your Honor claim --
15 let's suppose Judge Preska gives the
16 30 million dollars back, the New York
17 law says fraud inducement is not a
18 defense and there are many cases in
19 New York that hold that fraud in the
20 inducement is not a defense.
21 HealthSouth has to write a check to
22 UBS AG Stamford Branch. If this case
23 goes forward they certainly can say,

Page 34

1  well, we have to pay this 30 million
2  dollars back to UBS AG Stamford
3  Branch and that's one of the things
4  that we think the people from UBS
5  Securities did that was wrong and
6  damaged us. So they can do that, but
7  it's a process that it requires some
8  steps and they want to avoid steps
9  that they had agreed to when they
10 entered into the underlying document.
11 I mean, I think clearly the reason
12 why we're here is they are concerned.
13 I would be if I were sitting in their
14 shoes about the law in New York which
15 is what the contract says provides
16 which is pretty strict about the
17 enforcement of these loan guarantees.
18 But I think what they're asking the
19 Court to do is they latch on to what
20 was a mistake in drafting an answer
21 and saying Your Honor should ignore
22 jurisdiction, subject matter,
23 personal, should ignore service and

Page 35

1  you should require the party that
2  didn't make the loan that's not a
3  party to the contract to litigate
4  about this contract issue.
5      THE COURT: If I did not
6  give UBS the relief which it is
7  requesting then your remedy would be
8  mandamus?
9      MR. GIUFFRA: That is
10 correct, Your Honor. Your other
11 alternative would be if you just
12 denied the motion to amend for
13 whatever reason -- although I must
14 admit my only motivation for filing
15 the motion to amend was to correct an
16 error in the record in our answer
17 that was called to my attention by
18 HealthSouth and I discussed it with
19 Mike and I said, what do we do here,
20 he said file the correction. I never
21 in my wildest dreams, but maybe I'm
22 being -- wasn't thinking far enough
23 ahead, thought that that amendment

Page 36

1  would become a hook that would be
2  used to try to essentially have the
3  Court rule, no, UBS AG didn't make
4  the loan, it was really made by the
5  investment banking part of UBS and
6  therefore they should enforce the
7  loan issue. I never thought that
8  would happen. The issue didn't come
9  into my thought process. I give the
10 plaintiffs credit for thinking up the
11 strategy that they have here. But
12 the bottom line is I think that we
13 can let the New York case go forward,
14 whatever happens in the New York case
15 will happen, maybe we'll get our 30
16 million, maybe we won't. They can
17 still come and litigate before Your
18 Honor the issue of whether that's
19 part of the damages that HealthSouth
20 suffered, the payment of the 30
21 million dollars. But what I think
22 would be error, respectfully on Your
23 Honor's part, is to just ignore basic

Page 37

1  things like what the contract itself
2  says. And there's no question that
3  the contract was UBS AG Stamford
4  Branch. They haven't put forward any
5  evidence that the loan wasn't made by
6  UBS AG Stamford Branch. In fact,
7  their own SEC filings indicate that.
8  They pick a few documents where it
9  has UBS Warburg and they say this
10 proves that the loan was really made
11 by UBS Warburg. The entity that made
12 the loan and actually shipped the
13 money down to Georgia was UBS AG
14 Stamford Branch and whether New York
15 or Alabama, the entity that has the
16 legal right to seek return of that
17 money is the party that was the
18 lender. In addition the
19 administrative agent under the loan
20 agreement has the right to seek the
21 money back. Now, if they want to
22 bring that somehow before Your Honor
23 a claim that was not brought in the

Page 38

1   original complaint, the only way --
2   it's my understanding and I've talked
3   about it with Mike, Alabama law, New
4   York law, Texas law, you pick your
5   place, you've got to have service,
6   you've got to have personal
7   jurisdiction and you've got to have
8   subject matter jurisdiction and what
9   they want to do is ignore all of
10  that. And I think respectfully, Your
11  Honor, that would be error for Your
12  Honor to say, well, you don't have to
13  serve UBS AG, you don't have to fight
14  the battle of personal jurisdiction
15  with respect to UBS AG Stamford
16  Branch, instead we'll just fight the
17  judicial decision that they weren't
18  really the lender, but it's just not
19  true. It's contrary to the evidence.
20        So to sum up, Your Honor,
21  what I think should be done here is
22  that Your Honor should say to them,
23  look, you either can sue UBS AG

Page 39

1   Stamford Branch, serve them and we'll
2   litigate about personal jurisdiction,
3   you can have the case get litigated
4   in New York and then if that's part
5   of the damages that you want to
6   allege in this case based on
7   conspiracy in aiding and betting --
8   I'm not disputing that that's a claim
9   they could try to bring in this
10  court. Because clearly people who
11  worked at UBS Securities were
12  involved and knew about this loan.
13  But in terms of saying that the
14  guarantee is invalid, which is the
15  claim that's being litigated in New
16  York, that's something where you need
17  to have the party to the contract
18  before the Court.
19        THE COURT: I would presume
20  that if I granted AG the relief that
21  it seeks, in other words, allowing
22  Tucker to sue them in this case, if
23  that occurred, would I be wrong that

Page 40

1   the first pleading I would get from
2   AG would be that there is a prior
3   pending New York case?
4         MR. GIUFFRA: I think the
5   first pleading you'd get, Your Honor,
6   is there's no jurisdiction.
7         THE COURT: Pardon?
8         MR. GIUFFRA: First of all,
9   they have to serve us and the first
10  filing would be no jurisdiction.
11  That would be the first filing. But
12  I think in terms of -- I think my
13  basic point is the issue of the
14  validity of the loan guarantee has
15  never been brought into this case,
16  it's not in the four corners of the
17  complaint and that's an issue that is
18  properly before the New York court.
19  As I said before, I'm not saying if
20  we get the 30 million dollars back
21  that they can't claim that as part of
22  their damages. They've already
23  identified that as part of their

Page 41

1   damages even though they haven't had
2   to pay the money back, but the whole
3   purpose of the New York loan
4   guarantee procedures essentially are
5   if you agree to a loan, if you agree
6   to guarantee a loan you're agreeing
7   to the New York expedited procedures,
8   you're agreeing to the New York law
9   governing loan guarantees and you
10  don't have any defenses to things
11  like validity and regularity with
12  respect to the loan. You can't cite
13  fraud in the inducement as a defense.
14  And the reason for that is New York
15  courts and New York law and the New
16  York legislature and the statutes
17  about this talk about the fact that
18  we want to encourage our banks to
19  make loans in places like Georgia and
20  we want to ensure that they can get
21  prompt repayment on a loan guarantee.
22  So I think the only sensible way to
23  deal with this is to allow the New

Page 42

1  York action to go forward. If they
2  want to litigate about this as part
3  of HealthSouth litigation before Your
4  Honor as some sort of a fraud case or
5  aiding and abetting, conspiracy, they
6  can do so, but they certainly -- if
7  they want to litigate about the
8  validity of the loan guarantee you've
9  got to get UBS AG Stamford Branch
10 before the court and you've got to
11 establish personal jurisdiction.
12         THE COURT: Thank you, sir.
13         MS. COOPER: Your Honor,
14 let me just respond to a couple of
15 things here that Mr. Giuffra has said
16 which is actually nothing new. We've
17 heard this all before. These
18 arguments were made in the initial
19 motion and have sharpened somewhat as
20 a result of the situation that
21 Mr. Giuffra now finds himself in
22 which is the appropriate action he
23 would need to take having received

Page 43

1  your initial order on this matter
2  would be to go back into New York
3  court and dismiss that action. That
4  would be the appropriate action for
5  UBS to take at this juncture. Is
6  there any doubt, Your Honor, what UBS
7  will do when they -- in the event
8  that they received an order from this
9  Court backing up from that initial
10 order --
11         THE COURT: Let's look at
12 it from this prospective. Let's
13 suppose that I don't change my order
14 and let's suppose that AG proceeds
15 forward with the case in New York and
16 suppose the New York court takes that
17 case, keeps that case and doesn't
18 under principles of comity stay that
19 case and then our case goes down to
20 Montgomery and my ruling is upheld.
21 Aren't we facing the possibility of
22 two different outcomes.
23         MS. COOPER: Absolutely,

Page 44

1  Your Honor, because our argument --
2  HealthSouth's argument in the New
3  York court is twofold. Our threshold
4  argument is New York judge, stay your
5  hand, there is a prior pending
6  Alabama action at which the Med
7  Center Direct loan is at the heart of
8  that.
9          THE COURT: You're saying
10 the New York court could exercise
11 principles of comity and stay the
12 case.
13         MS. COOPER: That's
14 correct, Your Honor. There's a host
15 of principles. And our second
16 argument, Your Honor, to go to a
17 question that you asked to
18 Mr. Giuffra, our second argument is
19 on the merits of the guarantee and
20 our argument, Your Honor, is that the
21 underlying loan and the guarantee
22 were conceived in fraud and were
23 essentially entered into by faithless

Page 45

1  agents of the corporation who had no
2  authority to bind HealthSouth. Your
3  Honor, in order to adjudicate that
4  issue if the New York court were
5  going to take that issue on the
6  merits, they would have to adjudicate
7  the very same issues, Your Honor,
8  that are pending in front of you, for
9  example, on the summary judgment
10 motion. So our first argument is New
11 York court, stay your hand, you have
12 no authority to move forward, you
13 should stay your hand to this prior
14 pending Alabama action, but let there
15 be no confusion about what our
16 argument is on the merits. There is
17 a fraud in the conception defense
18 under New York law. I won't pretend
19 to be a New York lawyer, but I have
20 studied the New York law and in
21 working with very capable New York
22 counsel who represent HealthSouth in
23 this action and those are precisely

Page 46

1  the arguments we've made and they are
2  arguments that go to the heart of
3  issues before Your Honor, issues that
4  as you recognized in 2005 and
5  recognized again in this most recent
6  order should not be subverted by a
7  different court going off in another
8  direction. UBS presses in this
9  motion for reconsideration that we
10 have not identified the prejudice to
11 HealthSouth that would result from
12 this. And Your Honor, the prejudice
13 is much more than the fact that we
14 would have to fight a protracted
15 battle with Mr. Giuffra on the
16 personal jurisdiction issues and I'll
17 come back to those. The prejudice is
18 results from the fact that UBS saw a
19 tactical advantage here, saw an
20 opportunity to litigate core issues
21 that are before Your Honor in the New
22 York forum. That is unfair. They
23 should be estopped from taking that

Page 47

1  tactical advantage because they told
2  us more than two years ago that UBS
3  Securities, LLC was the proper party
4  on all matters alleged in the Tucker
5  action including the specific
6  allegations with respect to Med
7  Center Direct. They said they made
8  that loan. Why did it take them over
9  two years to correct it, because
10 there was no tactical advantage to
11 correcting it until they saw that
12 road in the New York action and only
13 then did we get news that we were
14 sitting down here fat, dumb and happy
15 in Alabama waiting --
16    THE COURT: When was -- I
17 may have seen it, but I've forgotten.
18 When was UBS's answer in federal
19 court filed wherein it acknowledged
20 that AG was the lender of the MCDC
21 loan?
22    MS. COOPER: Your Honor, I
23 want to say that was --

Page 48

1    THE COURT: Was it in 2005.
2    MS. COOPER: I want to say
3  it was '05 and I'm just looking for
4  the exact date here.
5    THE COURT: Before or after
6  the answer in this case?
7    MS. COOPER: Your Honor, I
8  believe it was before.
9    THE COURT: I don't
10 remember.
11    MR. GIUFFRA: I'll find the
12 date for you, Your Honor.
13    MS. COOPER: Your Honor, if
14 I may address -- so just to summarize
15 quickly, there can be no doubt what's
16 going to happen in the event this
17 Court backed up from its order. UBS
18 is going to run into New York,
19 attempt to use that to its tactical
20 advantage. That's precisely the
21 result. May I, Your Honor, quickly
22 address these so-called
23 jurisdictional issues. Just to be

Page 49

1  clear, what we have said to Your
2  Honor in our opposition to UBS's
3  motion to reconsideration is not at
4  all that this Court should direct or
5  order --
6    THE COURT: Some issue of
7  personal jurisdiction which is a
8  waivable ground.
9    MS. COOPER: Absolutely,
10 Your Honor. There is no question --
11 the only way there would be a
12 question of subject matter
13 jurisdiction is if Your Honor
14 directed or ordered UBS AG to come
15 into this court and answer, but that,
16 Your Honor, is not what we're saying.
17 What we're saying is that this is a
18 complete tempest entity pot. UBS has
19 the power to solve its own problems
20 and it can do precisely that. Now,
21 if it wants to stand on its current
22 argument that UBS AG was the lender
23 then let UBS AG intervene in this

Page 50

1  court which it has the power to do.
2  It will have to waive personal
3  jurisdiction, Your Honor, no question
4  about that, but a party can always do
5  that and is that fair under these
6  circumstances, absolutely it's fair.
7  It's fair because we relied on
8  representations made by UBS's counsel
9  that the lender was in fact UBS
10  Securities, LLC. It is entirely fair
11  that the cost of the personal
12  jurisdiction battle essentially be
13  born by the party who is now saying
14  contrary to a lot of the evidence in
15  the record that it, in fact, was the
16  lender and not simply an
17  administrative agent. So these
18  jurisdictional issues are, as I said,
19  it's a tempest entity pot. Personal
20  jurisdiction can be waived. There is
21  no question of subject matter
22  jurisdiction, Your Honor, and we ask
23  you in fairness and equity not to

Page 51

1  back up from an order that was
2  entirely appropriate on the facts and
3  the law.
4         THE COURT: Y'all have
5  suggested that an amendment be made
6  to the order which would provide for
7  UBS AG to intervene. Is that really
8  necessary?
9         MS. COOPER: Your Honor, we
10  don't think it's necessary. To the
11  extent, Your Honor, we're concerned
12  that the language of your order is
13  not broad enough to permit that
14  result or if UBS were to take that
15  position we would say there is an
16  easy cure for it but I don't think
17  it's necessary. I think it's clear
18  based on the language of your order
19  that UBS can take that or other
20  action to, as I said, solve its own
21  problem.
22         MR. HALEY: Judge, I'd like
23  to just get back to how this started

Page 52

1  and that is we are in coordination
2  with federal court and with the court
3  up in Delaware so that you understand
4  there have been serious consequences
5  to me and to Wade Tucker as a result
6  of the coordination of efforts.
7  HealthSouth has suffered in excess of
8  two billion dollars in damages as a
9  result of the breach of fiduciary
10  duties by its officers and directors.
11  That's a lot of money. The
12  shareholders have suffered billions
13  of dollars in losses, the bond
14  holders have billions of dollars
15  involved and yet all of us are having
16  to work together in order to
17  coordinate discovery. There are
18  severe time restrictions on
19  depositions. All of these parties
20  with billion dollar claims are having
21  to allocate specific time. Why do we
22  do that, because all the parties and
23  the courts feel that we needed to

Page 53

1  work together to handle this
2  litigation in an efficient manner and
3  that is what we have done. The
4  federal claims over in federal court
5  and all of the state law claims are
6  right here in front of Your Honor and
7  now then UBS doesn't want to
8  participate in that because they see
9  tactical advantages by going to New
10  York. That's just not fair and it's
11  not right, Your Honor, and you got it
12  right the first time. So that when
13  you look at this what they've done
14  and as Your Honor knows what happened
15  up in Delaware has had consequences,
16  what Judge Strine wrote in his
17  orders. What has happened in this
18  court and in the supreme court has
19  had effects on the litigation. And
20  what we do up in New York, what
21  happens on this, there would be
22  consequences that are going to be
23  effected right here in Birmingham,

Page 54

1  Alabama if the case goes forward up
2  in New York. There's just going to
3  be orders entered that will have
4  affect on what we do. So there's
5  been a great effort now going into
6  the sixth year to coordinate
7  everything and there is absolutely no
8  reason that this particular claim
9  cannot be litigated right here in
10 Birmingham, Alabama.
11       MR. GIUFFRA: Your Honor,
12 the HealthSouth fraud caused damage
13 to a lot of people, but the question
14 of who should pay for that damage is
15 something that needs to be decided by
16 facts and law, not who's got a deep
17 pocket. Now, one issue that I think
18 needs to be dealt with right up
19 front, we keep talking about not
20 knowing who the lender was. We've
21 heard not one word from anyone who
22 stood up on the other side that the
23 amendments were not in the files of

Page 55

1  HealthSouth and that HealthSouth was
2  not aware of those amendments. In
3  fact, Your Honor, we put before the
4  Court forms 8K filed by HealthSouth
5  and these were filed -- there's three
6  of them. One is March 22nd, 2005,
7  the second was June 15, 2005 and the
8  third was March 16, 2006. Those
9  documents were Exhibits F, G and H to
10 UBS's opposition to the motion to
11 strike and those were documents that
12 were filed under penalty of potential
13 subject to violations of the
14 securities laws if they were inactive
15 and the folks over at HealthSouth,
16 general counsel's office, whoever
17 their outside securities counsel were
18 who obviously were involved in
19 dealing with the various issues
20 surrounding the HealthSouth fraud,
21 they in those documents, Exhibits F,
22 G and H, March the 22nd, 2005, June
23 15, 2005 and March 16, 2006, all said

Page 56

1  that this loan was made to UBS AG
2  Stamford Branch. No secret, no
3  secret at all and I don't see how
4  that a party that's got the contract
5  in its files that's filed SEC filings
6  where they've identified the lender
7  as UBS AG Stamford Branch can now
8  come in here and say we read a line
9  in an answer and we were confused.
10 It doesn't make any sense.
11       MS. COOPER: Your Honor,
12 HealthSouth 2004 --
13       MR. GIUFFRA: Julia, it's
14 my motion. Let me finish.
15       THE COURT: Let him finish.
16       MR. GIUFFRA: You'll get
17 your rebuttal. But they can't ignore
18 the fact that their own SEC filings
19 identified this loan as being made by
20 UBS AG Stamford Branch. They don't
21 dispute that the amendments were in
22 their files, they don't dispute it.
23 They don't dispute that in the

Page 57

1  federal case the plaintiffs identify
2  UBS AG as the lender. They don't
3  dispute that in the federal action we
4  properly answered the complaint, we
5  filed interrogatories for the federal
6  complaint that didn't have this
7  error. I can see they'd have a
8  better argument if their own SEC
9  filing said one thing and if it were
10 consistent.
11       THE COURT: I have read
12 somewhere that the original credit
13 agreement being dated March the 30th,
14 2001 that the 15 million dollars
15 exchanged hands on that day. I've
16 read that somewhere in some of
17 y'all's papers. Do you know whether
18 that's accurate or not?
19       MR. GIUFFRA: I don't know
20 the answer to that, Your Honor. I do
21 know that ultimately there was 20
22 million dollars paid. The way it
23 works under one of these credit

Page 58

1   agreements -- and I'm actually
2   looking into this issue -- you have a
3   line of credit up to 20 million
4   dollars and then you can draw down on
5   it and we've already been finding
6   documents dealing with the fact that
7   there are requests being made from
8   Med Center to send money down and it
9   was not done in a 15 million dollar
10  increment, it was done in smaller
11  increments and those documents make
12  it clear that the loan was being made
13  by UBS AG Stamford Branch. So they
14  keep talking about being misled.
15  Well, I don't see how you can be --
16  you talk about estoppel and waiver
17  when your own SEC filings make it
18  clear in the middle of when this is
19  all happening with respect to this
20  answer that UBS AG Stamford Branch
21  made the loan. I don't see how you
22  can say you were somehow misled by an
23  answer in a case which is the only

Page 59

1   place where we made this mistake.
2       THE COURT: I don't think
3   they're contending that I was
4   mislead. I think what they're
5   telling me is that if they had known
6   that AG made the loan AG would have
7   been a party to this lawsuit over two
8   years ago.
9       MS. COOPER: That's
10  correct, Your Honor.
11      MR. GIUFFRA: But, Your
12  Honor, they knew. It's in their SEC
13  filings, HealthSouth's SEC filings.
14      THE COURT: Aren't you
15  begging the question, though, Robert,
16  they knew but you represented that
17  what they knew was not correct.
18      MR. GIUFFRA: We made one
19  drafting error. In all the filings
20  we made in this entire case we made
21  one drafting error and so what I'm
22  saying is nobody was misled about
23  anything. I think that the corporate

Page 60

1   lawyers at HealthSouth -- and there
2   was no affidavit being submitted to
3   Your Honor from the general counsel
4   or the folks who actually look at
5   these documents saying I was misled
6   because if they were misled, why
7   would they be filing things with the
8   SEC in 2005 and 2006 saying UBS AG
9   Stamford Branch. These are smart
10  people. They can look at a contract
11  which is in their files and see who
12  the lender is. So that's my first
13  point. My second point is with
14  respect to the New York action which
15  Julia talked about, the law is the
16  following: There's a doctrine called
17  Colorado River Abstention and that's
18  when a federal court abstains in
19  favor of a state court proceeding.
20  The circumstances for that don't
21  apply, we believe. Different
22  parties --
23      THE COURT: Why is that?

Page 61

1       MR. GIUFFRA: Because
2   different parties -- UBS AG Stamford
3   Branch is not a party to this case
4   and in fact their second circuit law
5   which is the federal appeals court
6   for the southern district of New York
7   where this case is pending and
8   there's a case called Sagrbonnet,
9   S-A-G-R-B-O-N-N-E-T, which we think
10  applies. So irrespective of Your
11  Honor's -- whatever happens in
12  Alabama, we don't think that a New
13  York court should abstain. In fact,
14  the case that was brought in New York
15  was originally brought in state court
16  in New York and the state court in
17  New York would not abstain in favor
18  of a state court action in Alabama.
19  So they removed the case in federal
20  court and the law is pretty strong
21  that federal court has to exercise
22  its jurisdiction. So I think the
23  federal court will move forward and

Page 62

1  we'll litigate about that issue, too.
2      But the bottom line, Your
3  Honor, is that they say, for example,
4  this question of conceived and fraud
5  and faithless agents. What they
6  don't say when they make that
7  assertion is that this guarantee was
8  approved by the board of directors of
9  HealthSouth. It wasn't like one of
10 the guys in HealthSouth was off
11 signing documents. It was approved
12 by the board of directors. That's
13 another issue that is being dealt
14 with and that's part of their defense
15 in the New York action.
16     THE COURT: But wouldn't
17 HealthSouth say that the board of
18 directors was misled by the pleading
19 defendants in this case and was
20 responsible for originating the loan.
21     MR. GIUFFRA: They can say
22 that, Your Honor, but the problem is
23 that when you enter into one of these

Page 63

1  absolute and unconditional loan
2  guarantees, New York law is pretty
3  clear that if there's fraud in the
4  inducement of a loan guarantee you
5  still have to pay on the loan
6  guarantee.
7      THE COURT: Which if that's
8  true then you would still be able to
9  have that asserted down here, would
10 you not?
11     MR. GIUFFRA: But, Your
12 Honor, the difference is that the
13 party that has the right to assert
14 that claim is not before Your Honor
15 and that's the party who had the
16 right to pick the New York forum and
17 that's where the case was litigated.
18 And the reason it was litigated there
19 was because New York provides for an
20 expedited procedure and they
21 consented to jurisdiction in New
22 York. And the other point that both
23 plaintiffs, HealthSouth and the

Page 64

1  plaintiff in New York didn't respond
2  to was when I said, look, if they're
3  ordered to pay the 30 million dollars
4  back to UBS and it's sitting in UBS's
5  bank account they can still litigate
6  as part of their claimed damages this
7  Med Center loan. No one is saying
8  they can't as part of this case. The
9  question is whether they have an
10 obligation to do what they agreed to
11 which was to pay the guarantee back
12 unconditionally and absolutely.
13     Another point, Your Honor,
14 they say that this loan guarantee is
15 a core issue in the case before Your
16 Honor. The words loan guarantee do
17 not appear in the complaint filed by
18 plaintiffs. It just doesn't appear.
19 So to say it's a core issue is
20 just -- if it was a core issue I
21 think these smart lawyers would have
22 it somewhere in their multipage
23 complaint. At the end of the day it

Page 65

1  goes back to first principles, you
2  have a contract, there are two
3  parties to the contract, the two
4  parties to the contract can litigate
5  about the contract, you can't have a
6  third party litigate about a contract
7  that's the contract of another party.
8  Alabama is quite clear in an Alabama
9  Supreme Court case which we cite that
10 a subsidiary cannot enforce its
11 parent contracts. And Alabama law is
12 also quite clear that in order to
13 have jurisdiction over a party you've
14 got to serve the party and you've got
15 to litigate about personal
16 jurisdiction. And so, we think under
17 basic first principles of law that
18 Your Honor's order as presently
19 drafted was premised on two errors.
20 First, as to whether AG was in fact
21 the lender. We think we've addressed
22 that by providing you with the
23 amendments, and in the stack of

Page 66

1  papers you got I could see there was
2  a lot of paper in there. They can't
3  ignore their own SEC filings on that
4  point.
5      THE COURT: Well, the June
6  2001 addendum and the March 2002
7  addendum were in the original
8  documents that you provided. The
9  only thing not in there was the
10 affidavits that Mr. --
11     MR. GIUFFRA: Kahal,
12 K-A-H-A-L. So on the first point is,
13 Your Honor, the decision was premised
14 on some -- not who was the lender. I
15 think we've addressed that. The
16 second piece of Your Honor's order is
17 whether Your Honor has the right to
18 enter orders requiring the party
19 before the court to litigate the
20 substantive contract rights of a
21 party that's not before the Court
22 that hasn't been served by which the
23 Court doesn't have personal

Page 67

1  jurisdiction and we think the Court
2  can't do that. And again, they
3  haven't disputed what I said before
4  which is that in terms of the equity
5  and fairness point the money gets
6  paid back in the New York action if
7  the New York law is as strict as I
8  believe it is and we'll disagree
9  about that. They can still assert
10 that as part of their damages in this
11 court to get the money back. And if
12 I'm wrong about the New York law and
13 their New York lawyer is right, well
14 then the case will just sit because
15 we're not going to, as I've said
16 before, start a whole separate set of
17 discovery in the New York case. All
18 we want to have the New York court do
19 is decide the pure question of New
20 York law which is whether fraudulent
21 inducement is a defense to an
22 absolute unconditional loan guarantee
23 decided by our court of appeals which

Page 68

1  is our highest court. And in that
2  case you had a situation where the
3  loan guarantor had put in evidence
4  that the court said it was sufficient
5  to defeat summary judgment and the
6  court -- the New York court of
7  appeals said not withstanding that
8  evidence of fraudulent inducement
9  we're still going to enforce the loan
10 guarantee because it was an absolute
11 and unconditional loan guarantee.
12 That's a pure question of New York
13 law. So, Your Honor, I think the
14 clear way to proceed here is either
15 let them try to bring UBS AG in as a
16 party or everyone should just let the
17 New York court decide what the issue
18 is. They can still litigate the
19 question of damages before Your Honor
20 under conspiracy or aiding and
21 abetting claim, they can try to, but
22 I think to have the court do this
23 very strange procedural two step

Page 69

1  which is essentially say this little
2  thing in an answer suddenly creates a
3  way around personal jurisdiction and
4  subject matter jurisdiction would be
5  error and personal jurisdiction and
6  subject matter jurisdiction are tied
7  together. With no personal
8  jurisdiction the Court has no subject
9  matter. The Court has no subject
10 matter jurisdiction to rule with
11 respect to the contract rights of a
12 nonparty.
13     THE COURT: Julia.
14     MS. COOPER: Very, very
15 briefly, Your Honor. I do want to
16 address Mr. Giuffra's argument that
17 somehow HealthSouth sat on its hands
18 or knew things and didn't act
19 appropriately. Attached as Exhibit 1
20 to the our opposition to the motion
21 for reconsideration is an excerpt
22 from the 2004 form 10K and also the
23 2005 10K. In each of those

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 70

1    HealthSouth stated HealthSouth
2    provided a guarantee for 20 million
3    of Med Center Direct's debt to UBS
4    Warburg. We were clearly under a
5    very serious misimpression about who
6    the lender is if in fact
7    Mr. Giuffra's arguments today are
8    correct. We relied on UBS's
9    statements to the Court, Your Honor.
10   It would be unfair to prejudice us by
11   backing up from that. Your Honor,
12   this is truly a 30 million dollar
13   tail attempting to wag a two billion
14   dollar dog. And it may have been an
15   itty bitty mistake that Mr. Giuffra
16   and his co-counsel made in making
17   that statement to the Court, but
18   there is no question that it is a
19   mistake which if corrected in the way
20   that Mr. Giuffra would like to
21   correct it today would give UBS a
22   tremendous tactical advantage in this
23   litigation. And Your Honor, they

Page 71

1    should not be permitted to do it.
2    We've moved under rule 15A, Your
3    Honor has the power under 15A to --
4    the Alabama courts have consistently
5    ruled that, quote, the grant or
6    denial of a leave to amend under rule
7    15A is within the sound discretion of
8    the trial judge and subject to
9    reversal on appeal only for abuse of
10   discretion. They can take that
11   mandamus but that's not a basis for
12   seeking a mandamus in the Alabama
13   courtroom.
14        MR. GIUFFRA: One quick
15   point. The issue of subject matter
16   jurisdiction and personal
17   jurisdiction is not abuse of
18   discretion, it's whether you can do
19   what they want you to do and we don't
20   believe you can do what they're
21   asking you to do. And if you look at
22   the cases on striking amendment to
23   answers there is not one case that

Page 72

1    they cite that's at all like this and
2    Julia, again, did not --
3         THE COURT: There's a lot
4    in this case that's not like a lot of
5    other litigation that's ever appeared
6    in the court.
7         MR. GIUFFRA: But they
8    didn't dispute what I said which is
9    that they have a remedy. They can
10   get the 30 million dollars back, they
11   can put it on their list of 30
12   million dollars that they're entitled
13   to in the claims against UBS
14   Securities. And so, I think that you
15   should follow the law as opposed to
16   this procedure that is something I've
17   never heard of in any court
18   proceeding where you can effect the
19   substantive contract writing of a
20   nonparty without ever serving them.
21        THE COURT: John.
22        MR. HALEY: The only thing
23   Mr. Giuffra is saying is he wants to

Page 73

1    go before we do. I've been begging
2    for however long I've been in this
3    case to get it set for trial, go
4    forward, let me do discovery. We
5    didn't get any discovery until during
6    the fall after millions of dollars in
7    production of documents and then the
8    depositions started in I believe this
9    year, 2008. So we've been in this
10   lawsuit six years. Wade Tucker has
11   been fighting to get discovery and to
12   get his case so that he can get money
13   on behalf of the corporation and it's
14   just not fair for UBS to say they can
15   take an end run around everything
16   that's taken place and they can get
17   theirs before we get ours. That's
18   just not fair.
19        THE COURT: I appreciate
20   your arguments here this afternoon.
21   I believe you have some papers for me
22   tomorrow.
23        MR. GIUFFRA: Yes, Your

19 (Pages 70 to 73)

Page 74

1  Honor.
2      THE COURT: Since we had
3  our summary judgment argument I have
4  obtained the briefs, Judge King's
5  ruling, the Court of Appeals' ruling
6  and the two opinions of the Alabama
7  Supreme Court, the first of which was
8  withdrawn and the second of which
9  became the definitive. I am advised
10 that the Alabama Supreme Court did
11 not entertain oral argument in the
12 tax refund case. I'm curious as to
13 why the first Alabama Supreme Court
14 opinion did not address the unclean
15 hands issue whereas the second
16 opinion did so. Does any one of
17 y'all have any incite into that?
18     MR. GIUFFRA: The only
19 incite I can draw, Your Honor, is
20 they obviously thought it was an
21 important issue that needed to be
22 included in the opinion because the
23 unclean hands doctrine is something

Page 75

1  that applies in the context of this
2  HealthSouth fraud.
3      THE COURT: Julia.
4      MS. COOPER: Your Honor,
5  it's my understanding that an
6  argument the State pressed the second
7  time around that they did not press
8  the first time around is that the
9  Court need not be concerned that
10 HealthSouth was sort of stuck if the
11 Court ruled against it because, in
12 fact, HealthSouth through derivative
13 counsel or directly had a remedy in
14 precisely this type of litigation.
15 And Your Honor, that's my
16 understanding of why it was addressed
17 the second time around, but all I can
18 say is I am inferring that.
19     THE COURT: The truth of
20 the matter is no one knows.
21     MR. GIUFFRA: Your Honor, I
22 think you can't -- this is just pure
23 speculation.

Page 76

1      MS. COOPER: It's actually
2  not pure speculation.
3      THE COURT: I understand.
4  All right. I enjoyed your arguments
5  this afternoon. I look forward to
6  getting your papers tomorrow, then
7  I'll enter appropriate order in
8  regard to the matter that we've had
9  this afternoon.
10
11     (Whereupon, the hearing
12     was concluded at 3:00 p.m.)
13
14
15
16
17
18
19
20
21
22
23

Page 77

1           C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  COUNTY OF JEFFERSON
5
6      I, Christie L. Williams,
7  hereby certify that the above and
8  foregoing proceeding was taken down
9  by me on Computerized Stenotype, and
10 the questions and answers thereto
11 were transcribed by me, and that the
12 foregoing represents a true and
13 correct transcript of the proceeding
14 given by said counsel upon said
15 hearing.
16     I further certify that I am
17 neither of counsel nor of kin to the
18 parties in the action, nor am I in
19 anywise interested in the result of
20 said cause.
21     _____
22     CHRISTIE L. WILLIAMS
23     COMMISSIONER (ACCR# 372)