UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                              :
UBS AG, STAMFORD BRANCH,      :     07 Civ. 8490 (LAP)
                              :
                  Plaintiff,  :
                              :
        v.                    :
                              :
HEALTHSOUTH CORPORATION,      :
                              :
                  Defendant.  :
                              :
------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/6/08
```

Counsel:

Robert J. Giuffra, Esq.
Marc De Leeuw, Esq.
William H. Wagener, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
212-558-4000


Gregory P. Joseph, Esq.
Peter R. Jerdee, Esq.
Sandra M. Lipsman, Esq.
Gregory P. Joseph Law Offices LLC
485 Lexington Avenue
New York, NY  10017
212-407-1200

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------x
                             :
UBS AG, STAMFORD BRANCH,     :
                             :
            Plaintiff,       :      07 Civ. 8490 (LAP)
                             :
      v.                     :           OPINION
                             :
HEALTHSOUTH CORPORATION,     :
                             :
            Defendant.       :
                             :
----------------------------x
```

LORETTA A. PRESKA, U.S.D.J.

     In 2001 and 2002, Defendant HealthSouth Corporation

("HealthSouth") guaranteed $20 million in loans to

MedCenterDirect.Com, Inc. ("MCDC") under a Credit Agreement (the

"Credit Agreement" or the "Agreement") executed with Plaintiff

UBS AG, Stamford Branch ("UBS AG").  In this action, UBS AG

seeks to enforce that guarantee by way of summary judgment, and

HealthSouth moves that the Court abstain.  For the reasons set

forth below, UBS AG's motion is GRANTED, and HealthSouth's

motion is DENIED.


I.   BACKGROUND

A.   The Credit Agreement & Default

     The loans at issue originated under the terms of a

March 30, 2001, Credit Agreement between UBS AG, acting as

Administrative Agent,[1] and MCDC, the Borrower. (See Kalal Decl.
Ex. A (Credit Agmt.) (hereinafter "Credit Agmt.").)[2]    That
Agreement originally authorized an aggregate of $15 million in
loans (see id. at 1), which MCDC unconditionally promised to
pay, with interest, at maturity (see id. §§ 2.3, 2.4).  The
Credit Agreement was amended twice:  first, on June 12, 2001
(the "June Amendment"), to delay the original Maturity Date from
October 30, 2001, to March 30, 2002 (see Kalal Decl. Ex. F (June
Amdt.)); and second, on March 28, 2002 (the "March Amendment"),
further to delay the Maturity Date to March 28, 2003 and to
increase the aggregate loan authorization to $20 million (see
Kalal Decl. Ex. H (March Amdt.)).

     The Credit Agreement provided that its terms and
obligations would be construed and interpreted in accordance
with New York law. (See Credit Agmt. § 12.11(a).)  Moreover, the
parties "irrevocably and unconditionally" submitted themselves
to "the non-exclusive general jurisdiction" of the New York

---

[1] The Credit Agreement appointed "UBS AG, Stamford Branch" to act
as Administrative Agent and endowed that position with certain
rights and obligations. (See, e.g., Credit Agmt. §§ 2.2-2.4,
10.8.)  Upon default, for example, the Administrative Agent was
required to take such action as was directed by the Lenders.
(See id. § 9.2.)  It could also take action on its own
initiative, including "either by suit in equity or action at law
. . . to enforce the payment of the Obligations or any other
legal or equitable right or remedy." (Id. § 9.2.)

[2] Reference is to the Declaration of David J. Kalal, sworn to on
December 17, 2007.

2

State courts and the District Court for the Southern District of

New York (see id. § 12.11(b)(i)) and waived "any objection to

the venue of . . . any such court or [any argument] that such

action or proceeding was brought in an inconvenient court and

agree[d] not to plead or claim the same" (id. § 12.11(b)(ii)).

"To induce each Lender" to make the loans contemplated

under the Credit Agreement, HealthSouth agreed "unconditionally

and irrevocably" to guarantee payment of MCDC's obligations

under the Credit Agreement. (See Credit Agmt. art. XI

(Guarantee) (hereinafter "the Guarantee").)[3]  In pertinent part,

the Guarantee states:

> This guarantee shall be construed as a continuing
> absolute and unconditional guarantee of payment
> without regard to the validity, regularity or
> enforceability of the Agreement or any Note or any
> guarantee thereof . . . and without regard to . . .
> any other circumstance whatsoever (with or without
> notice to or knowledge of the Borrower or the
> Guarantor) which constitutes, or might be construed to
> constitute, an equitable or legal discharge . . . of
> the Guarantor under the guarantee contained in this
> Article XI in bankruptcy or in any other instance[.]

(Id. § 11.4.)

---

[3] The Credit Agreement did not identify the Lenders. (See, e.g.,
Credit Agmt. § 1.1 (defining "Lender Addendum").)  Instead, the
parties apparently contemplated the execution and delivery, at
closing, of an addendum setting forth a list of Lenders and
their respective commitments. (See id. § 12.17.)  The parties
have not included such an addendum with their submissions, and
the only document presently before the Court that names any
Lender or its respective commitment is the March Amendment,
which names "UBS AG, Stamford Branch" as Lender with a
$20 million commitment. (See Kalal Decl. Ex. H at 8.)

3

As required by the terms of the Credit Agreement (see id. § 5.1(a)(iii)), the HealthSouth Board of Directors (the "Board") adopted a resolution authorizing execution of the Credit Agreement (see Kalal Decl. Ex. C (March 27, 2001 HealthSouth Board Resolution)). That resolution named several officers who were "authorized and directed to execute and deliver, in the name and on behalf of [HealthSouth], that certain Credit Agreement, dated as of March 30, 2001 . . . among [MCDC], as Borrower, [HealthSouth], as Guarantor, [and] UBS AG, Stamford Branch, as Administrative Agent . . . ." (Id.)[4] It also acknowledged and approved the then-contemplated aggregate $15 million indebtedness and "such other terms, conditions and requirements" as HealthSouth's authorized signatories deemed appropriate. (Id.) The Board passed a similar resolution authorizing the March Amendment. (See Kalal Decl. Ex. I (March 15, 2002 HealthSouth Board Resolution).)

As additionally required by the Credit Agreement (see Credit Agmt. § 5.1(a)(ii)), HealthSouth's Corporate Counsel, William W. Horton, authored an opinion letter stating that, in his view, "[t]he execution, delivery and performance of the Loan Documents by the Guarantor: (a) have been duly authorized by

---

[4] Included among the list of authorized agents was Jason Brown, HealthSouth's then-Vice President of Finance, who in fact signed the Credit Agreement on HealthSouth's behalf.

4

all requisite corporate action of the Guarantor, and (b) will

not violate any provision of law [or] the articles or

certificate of incorporation of the Guarantor" (Kalal Decl.

Ex. B (March 30, 2001 Horton Letter) at 2).  Horton further

opined that the loan documents "constitute the legal, valid and

binding obligations of the Guarantor and are enforceable in

accordance with their terms." (Id. at 3.)[5]  Again, Horton

authored a similar opinion letter with respect to the March

Amendment. (See Kalal Decl. Ex. J (March 28, 2002 Horton

Letter).)

Shortly after the amended Maturity Date, UBS AG sent an

invoice to MCDC for $20,190,914.86, reflecting the total

outstanding principal and interest due under the Credit

Agreement at that time. (See Kalal Decl. Ex. K (March 2003

Invoice).)  It sent further invoices to both MCDC and

HealthSouth on April 27, July 2 and October 12, 2004, and on

January 5 and April 6, 2005. (See Kalal Decl. Exs. O-S

_____

[5] Horton's opinion included the qualification that "[t]he
enforceability of the Loan Documents may be limited by laws or
principles affecting, on public policy grounds, the
enforceability of any indemnification agreements or waivers of
rights, notices or defenses contained in the Loan Documents."
(Kalal Decl. Ex. B at 6.)  That qualification, however, only
reflected the laws of the State of New York "insofar as I
[Horton] have assumed them to be identical to the laws of the
State of Alabama, [which assumption] I have made . . . with your
permission, and I have made no review of the laws of the State
of New York." (Id.)

(Invoices).)  On July 12, 2005, UBS AG sent a final letter to

MCDC and HealthSouth stating that UBS AG, in its capacity as

Lender, thereby demanded payment of the outstanding principal

and interest due under the Credit Agreement. (See Kalal Decl.

Ex. T (July 12, 2005 Letter).)  Neither HealthSouth nor MCDC

responded to the invoices, and, as of December 17, 2007, the

total due under the Credit Agreement stood at $29,348,336.04 and

was accruing over $6000 in interest each day. (See Kalal Decl.

¶¶ 22, 24, 27.)  HealthSouth does not dispute this calculation.


B.   Subsequent Litigation

1.   The Alabama Derivative Action

On August 28, 2002, HealthSouth shareholder Wade Tucker

commenced a derivative action against, among others, various

HealthSouth directors and officers (the "Alabama Action"). (See

Hymer Decl. ¶ 2.)[6]  That litigation is currently pending in the

Circuit Court of Jefferson County in the State of Alabama, and

the operative complaint is the Third Amended Complaint (the

"TAC").  (See id.)[7]  In general, the TAC alleges that

---

[6] Reference is to the Declaration of David G. Hymer, sworn to on
January 17, 2008.

[7] The TAC named as defendants:  Richard M. Scrushy; Gerald P.
Scrushy; Michael Martin; C. Sage Givens; William T. Owens;
George H. Strong; Charles W. Newhall, III; John S. Chamberlin;

(continued on next page)

6

HealthSouth's one-time CEO, Richard Scrushy, and the other named defendants, through their domination of HealthSouth's Board, engaged in a widespread and ongoing fraud conspiracy to, among other things, divert corporate money to themselves. (See TAC ¶ 28.) As one element of that fraud, the TAC alleges a pattern and practice of self-dealing among Scrushy and other HealthSouth directors and officers, effected by "establishing exclusive vendor relations with companies in which they own an interest and then benefiting monetarily from such relation." (Id. ¶ 129.)

According to the TAC, HealthSouth's relationship with MCDC was one such self-dealing adventure. It alleges that Scrushy and others were invested in MCDC and, through their manipulation of HealthSouth, inflated the value of MCDC in an effort to increase their anticipated profits from a future MCDC initial public offering (see id. ¶¶ 106-08). This was achieved by the named defendants' allegedly causing HealthSouth to invest in MCDC; although the TAC does not mention the Credit Agreement in

Joel C. Gordon; Larry D. Striplin; Phillip C. Watkins, M.D.; MedCenterDirect.Com; Source Medical Solutions, Inc.; Capstone Capital Corp.; Healthcare Realty Trust; G.G. Enterprises; Ernst & Young, LLP; Weston L. Smith; Larry D. Taylor; Patrick A. Foster; Daniel J. Riviere; UBS Warburg; UBS Group; UBS Investment Bank; and various "Fictitious Individuals." (See Kalal Decl. Ex. V (TAC) (hereinafter ("TAC").)  The Supplemental Complaint and Fourth Amended Verified Complaint removed UBS Warburg as a defendant and added:  UBS Securities, LLC; Aaron Beam, Jr.; Malcolm E. McVay; Emery Harris; and Kenneth K. Livesay. (See Kalal Decl. Ex. W.)

this regard,[8] it does mention an alleged $2 million loan or investment from HealthSouth to MCDC in December 1999 and "many more millions" since that time. (See id. ¶ 105.)  Additionally, the named defendants allegedly caused HealthSouth to enter into a ten-year agreement that made MCDC the "exclusive e-procurement vendor for HealthSouth of medical products and supplies" (id. ¶ 107), a lucrative contract for MCDC whose terms were allegedly unfavorable for HealthSouth (id. ¶¶ 108-09).  With respect to MCDC, the TAC concludes that "[t]he monies paid during 2000 through 2002 to MCDC constitute wrongdoing that has caused injury to [HealthSouth, and] the continued dealings and investment in MCDC constitutes a continuing tort." (Id. ¶ 110.) As a remedy for those alleged wrongs, the TAC demands "[r]epayment of monies advanced and loaned as 'start up costs,' other loans made, and monies owed with respect to Defendants, and other business ventures that were owned and/or controlled by Defendants."

The TAC also alleges malfeasance on the part of UBS bankers amounting to complicity with the alleged fraud scheme at

---

[8] The Credit Agreement and the consequent MCDC loans are mentioned only during the TAC's recitation of demand futility, in an oblique reference to the fact that HealthSouth Director Charles W. Newhall, III, was impaired because "UBS funded and raised investment capital for MCDC, on which Newhall serves as a director . . . ." (TAC ¶ 134(e).)

HealthSouth.[9]  To retain the "enormous fees" generated from
orchestrating over $2 billion in deals for HealthSouth, certain
UBS bankers allegedly falsely touted HealthSouth's stock by
assigning it a higher rating than they thought it merited. (See
id. ¶¶ 84-88.)  According to the TAC, those bankers "well knew
that they were assisting Scrushy [to] falsify the accounting and
achieve his illicit goal of artificially inflating the market
price of HealthSouth stock." (Id. ¶ 88.)  For this conduct, the
TAC concludes that UBS bankers "aided and abetted, and were part
of the civil conspiracy to commit, the broad accounting
misstatements [and] knew or should have known of the financial
accounting improprieties and other wrongdoing [alleged in the
TAC] and breached their duties to HealthSouth by failing to
disclose . . . such conduct." (Id. ¶ 90.)

UBS Securities moved to dismiss or stay the claims against
it in the Alabama Action on various grounds, including for

---

[9] The TAC named three UBS entities as defendants -- "UBS
Warburg," "UBS Group" and "UBS Investment Bank." (TAC ¶ 21.)  On
October 17, 2003, counsel for UBS Securities, LLC ("UBS
Securities") submitted an affidavit clarifying that those terms
do not reference any legal entity, but rather are "used to
reference numerous UBS entities, including UBS Securities
. . . ." (Declaration of Robert J. Giuffra (sworn Feb. 18, 2008)
("Giuffra Decl.") Ex. A (October 2003 Alabama Proceeding
Declaration) ¶ 3.)  Further to those submissions, the Alabama
Plaintiff was allowed to amend the TAC to substitute UBS
Securities for the previously named, nonexistent UBS defendants.
(See Kalal Decl. Ex. W (Supplemental Complaint); see also
Giuffra Decl. ¶ 7.)

failure to state a claim against UBS Securities, and to enforce

outbound forum selection provisions in two other agreements

between UBS Securities and HealthSouth. (See Hymer Decl. ¶ 16;

see id. Ex. 25 (UBS Securities' Memorandum of Law in Support of

Its Motion to Dismiss the Fourth Amended Complaint, or

Alternatively, to Stay the Action) at 4-5, 15-19, 20-21.)  The

Alabama court rejected those arguments and denied the motion in

a March 3, 2005 Order. (See Hymer Decl. Ex. 24 (July 13, 2005

Modified Order Re Motion to Dismiss Brought by UBS).)  It held

that the Alabama plaintiff had adequately stated a claim against

UBS Securities for, inter alia, "aiding and abetting breaches of

fiduciary duty by the director and officer defendants, a

Delaware tort sometimes called 'civil conspiracy.'" (Id. ¶ 5

(footnote omitted).)  Additionally, the court declined to

enforce the outbound forum selection clauses, concluding that

the claims against UBS were "inextricably intertwined" with

other claims against UBS and other parties, "being based on the

same nucleus of operative facts," and that it would be

"seriously inconvenient and unreasonable to send off one smaller

part of this case to New York . . . ." (Id. ¶ 3(a).)  Moreover,

it observed Alabama's strong policy that disfavors splitting

cases and concluded that "[e]nforcing the outbound forum

selection clause would upset the carefully crafted co-ordination

orders in effect in three jurisdictions regarding the case

management of these complex derivative suits" (id. ¶¶ 3(b), 3(c)).

## 2. The Instant Action

On or about September 6, 2007, UBS AG commenced this action by serving on HealthSouth a summons and notice of motion for summary judgment in lieu of complaint, filed in New York State Supreme Court, New York County. See N.Y. C.P.L.R. § 3213 (McKinney 2005).[10] HealthSouth removed the action to federal court based on this Court's diversity jurisdiction and argued that it should be stayed in deference to the first-filed Alabama Action. See Notice of Removal, UBS AG, Stamford Branch v. HealthSouth Corp., 07 Civ. 8490, ¶ 22 (filed Oct. 1, 2007) (hereinafter "HealthSouth Removal Notice"). Currently pending in this Court are the parties' cross-motions.[11] In brief, UBS AG

---

[10] C.P.L.R. § 3213 states in relevant part: "When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint."

[11] The parties have submitted the following briefs: UBS AG's Memorandum in Support of its Motion for Summary Judgment (hereinafter "Pl's Mem."), HealthSouth's Memorandum of Law in Opposition to Motion for Summary Judgment and in Support of Motion to Dismiss or Stay (hereinafter "Def's Opp'n"), UBS AG's Reply Memorandum in Further Support of its Motion for Summary Judgment and in Opposition to HealthSouth's Motion to Dismiss or Stay (hereinafter "Pl's Reply"), HealthSouth's Reply Memorandum

(continued on next page)

11

moves to enforce the Guarantee by summary judgment, and HealthSouth moves to dismiss or stay this action in deference to the pending Alabama Action.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The moving party bears the initial burden of presenting evidence that demonstrates the absence of a genuine dispute of fact on each material element of his claim. See Celotex, 477 U.S. at 323; see also FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994). If the moving party carries his burden, the non-moving party must then "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

In considering a summary judgment motion, a court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. See

(continued from previous page)

of Law in Further Support of its Motion to Dismiss or Stay (hereinafter "Def's Reply"), and UBS AG's Supplemental Submission Responding to New Matters Raised in HealthSouth's Reply Memorandum (hereinafter "Pl's Supp.").

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Nevertheless, a party opposing summary judgment "must 'demonstrate more than some metaphysical doubt as to the material facts' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  Thus, summary judgment shall be granted if no rational fact-finder "could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B.   The Guarantee's Enforceability

In its motion, UBS AG argues that it has discharged its burden on summary judgment by showing valid execution of the Credit Agreement, including HealthSouth's "absolute and unconditional guarantee," and MCDC's subsequent default thereunder. (See Pl's Mem. 12-13.)  In response, HealthSouth advances a defense rooted in agency principles. (See Def's Opp'n 18-22.)  UBS AG counters that, "under settled New York law" -- Citibank v. Plapinger, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985) -- HealthSouth is foreclosed from advancing any such defense. (See Pl's Reply 5.)  Of course, HealthSouth disputes the present

13

application of that "settled New York law," arguing that
Plapinger does not foreclose its defense and that issues of fact
exist as to that defense that preclude summary judgment. (See
Def's Opp'n 9-10, 28-29.)  For the reasons set forth below, the
Court concludes that Plapinger precludes HealthSouth's defense
and that, in any event, that defense lacks merit.


1.  Application of Danann and Plapinger

The "settled New York law" to which UBS AG refers finds its
origin in Danann Realty Corp. v. Harris, where the New York
Court of Appeals held that fraud in the inducement as a defense
to contract will be foreclosed to a party who disclaims, in the
contract itself, reliance on the fraudulent statements allegedly
made to induce him to enter into the contract. See 5 N.Y.2d 317,
323, 184 N.Y.S.2d 599, 604 (1959).  The rule of Danann has been
described as one of notice:  where a contract puts a party on
notice that it should not rely on certain representations, that
party cannot claim thereafter to have relied on those very same
representations. See Lucas v. Oxigene, Inc., 94 Civ. 1691, 1995
WL 520752, at *5 (S.D.N.Y. Aug. 31, 1995).  Not surprisingly,
specificity was the touchstone of the disclaimer in Danann:  the
purchaser in that case could not claim to have relied on the
allegedly fraudulent representations when, in the contract, the
purchaser stated that "'the Purchaser hereby expressly

14

acknowledges that no such representations have been made.'"
Danann, 5 N.Y.2d at 320, 184 N.Y.S.2d at 601; see also Aetna
Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 576
(2d Cir. 2005) (specificity requirement demands that the
"substance of the disclaimer provisions tracks the substance of
the alleged misrepresentations"); Mfrs. Hanover Trust Co. v.
Yanakas, 7 F.3d 310, 316 (2d Cir. 1993). Indeed, to permit
otherwise "would in effect condone [the purchaser's] own fraud"
by allowing him to contradict the language of his own contract.
Plapinger, 66 N.Y.2d at 95, 495 N.Y.S.2d at 312 (citing Danann,
5 N.Y.2d at 323, 184 N.Y.S.2d at 604).

The New York Court of Appeals relaxed Danann's specificity
requirement somewhat in Plapinger. In that case, guarantors
alleged that they were induced to guarantee a loan in reliance
on defendant the bank's oral promise that it would extend a
separate line of credit to the guarantors' corporation. See
Plapinger, 66 N.Y.2d at 92, 495 N.Y.S.2d at 310. When the
borrower defaulted and the bank sought to enforce the guarantee,
the guarantors claimed that, not having received the separate
line of credit, they had been induced to execute the guarantee
by fraudulent representations. See id. at 93-94, 495 N.Y.S.2d at
310-11. Like Danann, the guarantee in Plapinger included a
disclaimer; unlike Danann, it did not specifically identify and
disclaim reliance on statements about the alleged side

15

agreement. See id. at 95, 495 N.Y.S.2d at 312.[12]  The court found
the latter fact to be of no consequence, however, because the
guarantee was executed after "extended negotiations between
sophisticated business people." See id. at 95, 495 N.Y.S.2d at
311-12.  The court stated that it would be "unrealistic in such
circumstances to expect an express stipulation that defendants
were not relying on a separate oral agreement to fund an
additional multimillion dollar line of credit, when they
themselves have denominated their obligation unconditional
. . . ." Id. at 95, 495 N.Y.S.2d at 312.

UBS AG asserts that "HealthSouth's argument simply rehashes
the 'fraud in the inducement' defense . . . squarely rejected in
Plapinger." (Pl's Reply 7.)  That is not precisely accurate.
HealthSouth argues in its papers that the Guarantee is void ab
initio because it was "executed by a faithless agent who had no
actual or apparent authority to sign it" (Def's Opp'n 18), and
counsel reiterated the point at oral argument (see Transcript of
Oral Argument at 29:18-24, UBS AG, Stamford Branch v.
HealthSouth Corp., 07 Civ. 8490 (argued Apr. 11, 2008)
(hereinafter "Trans.")).  Thus, HealthSouth's defense undeniably

---

[12] By its terms, the guarantee was "absolute and unconditional"
and would be valid "irrespective of (i) any lack of validity
. . . of the . . . Restated Loan Agreement . . . or any other
agreement or instrument relating thereto," or "(vii) any other
circumstance which might otherwise constitute a defense" to the
guarantee. See Plapinger, 66 N.Y.2d at 95, 495 N.Y.S.2d at 312.

16

sounds in agency.

UBS AG cites no decision, and research has not disclosed
one, that applies the Danann/Plapinger logic to preclude
defenses sounding in agency. That logic, however, seems
applicable to this case. The Credit Agreement specifically
recited that HealthSouth "has the power and authority . . . to
execute, deliver and perform each of the other Loan Documents to
which it is a party" (Credit Agmt. § 6.1(c)) and that those
documents "have been duly authorized by all requisite corporate
actions (including any required shareholder approval) [of
HealthSouth] required for the lawful execution, delivery and
performance thereof" (id. § 6.2(a)). HealthSouth's Board
clearly authorized "such other terms, conditions and
requirements" as deemed appropriate by its signatory agent (see
Kalal Decl. Ex. C), and its general counsel expressly reiterated
those representations in his letters (see Kalal Decl. Exs. B,
J). In the same way that the Danann defendant's express
representations precluded him from invoking fraud in the
inducement as a defense, see Danann, 5 N.Y.2d at 320, 184
N.Y.S.2d at 601, so also do HealthSouth's express
representations that the Credit Agreement was a "legal, valid
and binding obligation" (see Credit Agmt. § 6.1(d)), that it had
been "duly authorized" and that it constituted a "continuing
absolute and unconditional guarantee of payment without regard

17

to the validity, regularity or enforceability" of the Guarantee
or "any other circumstance whatsoever . . . which constitutes,
or might be construed to constitute, an equitable or legal
discharge" (id. § 11.4) preclude its present argument that the
Agreement is unenforceable because its agent's authorization was
suspect.  This is true a fortiori because the Credit Agreement
was executed after "extended negotiations between sophisticated
business people," Plapinger, 66 N.Y.2d at 95, 495 N.Y.S.2d at
311-12, a circumstance under which New York courts give greater
preclusive effect to the contractual representations of a party.
Thus, while the New York Court of Appeals has yet to address
this particular fact pattern, the logic of its decisions
requires that Danann/Plapinger apply here to preclude
HealthSouth's argument.

2.  HealthSouth's Agency Argument

Even if the Danann/Plapinger logic did not apply here,
however, HealthSouth's agency arguments would fail on the
merits.  Under common law agency principles, a principal will be
bound by the contracts executed by his agent with actual or
apparent authority. See, e.g., FTC v. Verity Int'l, Ltd., 443
F.3d 48, 64 (2d Cir. 2006).  An agent possesses actual authority
"'to do an act or to conduct a transaction on account of the
principal which, with respect to the principal, he is privileged

18

to do because of the principal's manifestation to him.'" Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) (quoting Minskoff v. Am. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996)); see also Restatement (Third) of Agency § 2.01 (2006). Such authority can be express or implied, see Minskoff, 98 F.3d at 708, meaning that it can be created by the principal's explicit instructions or by inference from his words or conduct, see Restatement (Third) of Agency § 2.02(1).

Aside from these principles of attribution, the agency relationship is fiduciary in nature and imposes on an agent, among others, a duty of "utmost good faith." See Elco Shoe Mfrs. v. Sisk, 260 N.Y. 100, 103, 183 N.E. 191, 192 (1932); see also Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936) (agent will be "held to uberrima fides in his dealings with his principal"). That duty is violated where an agent "acts adversely to his employer in any part of the transaction or omits to disclose any interest which would naturally influence his conduct . . . ." Lamdin, 272 N.Y. at 138, 5 N.E.2d at 67; see also TPL Assocs. v. Helmsley-Spear, Inc., 146 A.D.2d 468, 470, 536 N.Y.S.2d 754, 756 (App. Div. 1st Dep't 1989) ("Where a conflict of interest exists, nothing less than full and complete disclosure is required of the agent."). Such a transaction is voidable at the election of the principal.

See Flaum v. Birnbaum, 120 A.D.2d 183, 194, 508 N.Y.S.2d 115, 122 (App. Div. 4th Dep't 1986); see also U.S. v. Dunn, 268 U.S. 121, 131 (1925); Koppel v. 4987 Corp., 96 Civ. 7570, 97 Civ. 1754, 2001 WL 47000, at *8 (S.D.N.Y. Jan. 19, 2001); Restatement (Third) of Agency §§ 8.01 cmt. (d)(1), 8.03 cmt. (d).

The thrust of HealthSouth's argument appears to be that the Guarantee may not be enforced because Brown, HealthSouth's agent who signed the Credit Agreement on HealthSouth's behalf, was aware of or participated in the alleged fraud scheme of which the Credit Agreement and the MCDC loan were a part. (See Def's Opp'n 1, 9-10.) Though HealthSouth draws on concepts from each of the areas of agency law described above, neither provides a basis for avoiding its obligation under the Guarantee.

First, there is no question that the Board resolutions in this case conferred express actual authority on Brown to execute the Credit Agreement, see, e.g., Restatement (Third) of Agency § 3.03 cmt. (c), and HealthSouth offers no legal principle that would void such authority.[13] It cites Hidden Brook Air, 241 F. Supp. 2d at 262, for the proposition that "an agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself, or to have an adverse

---

[13] Finding that Brown possessed actual authority, the Court need not address HealthSouth's arguments as to the absence of apparent authority.

20

interest." (Def's Opp'n 19.)    That statement does not bear on
the presence of actual authority, however, but rather restates
the principle that apparent authority does not exist if a third
party is aware of limitations of an agent's authority. See,
e.g., 2A N.Y. Jur. 2d Agency § 99 (2008).  HealthSouth also
cites the Restatement (Third) of Agency for the proposition that
"[a]n agent does not have actual authority to do an act if the
agent does not reasonably believe that the principal has
consented to its commission." Restatement (Third) of Agency
§ 2.02 cmt. (e).  While true, that principle is inapplicable
because it governs the scope of implied actual authority, not
express actual authority like that which the Board conferred in
this case. See id. § 2.02 cmt. (b) ("This section encompasses
what is often termed 'implied authority,' which is a form of
actual authority.").   Indeed, there is no question whether Brown
possessed implied authority to execute the Credit Agreement
because the Board unambiguously conferred such express
authority.

HealthSouth's argument that it can avoid the Guarantee
because it was executed by an agent with interests adverse to
HealthSouth's, in breach of his duties of good faith and loyalty
to his principal (see Def's Opp'n 19 (citing Wen Kroy Realty Co.
v. Pub. Nat'l Bank & Trust Co. of New York, 260 N.Y. 84, 90-91,
183 N.E. 73, 75 (1932))) also fails.  While certain HealthSouth

directors and officers were interested in the Credit Agreement
by virtue of their equity holdings in MCDC (see Kalal Decl.
Ex. E (HealthSouth 2002/2003 Form 10K) at 150), HealthSouth's
Board was aware of those interests (see Trans. 30:6-14, 32:4-8).
In any event, HealthSouth presents no evidence that Brown
possessed such an interest in MCDC. (See Kalal Decl. Ex. E.)
HealthSouth contends that the Board was not aware of the alleged
underlying fraud scheme (see Trans. 32:4-8), and, indeed, the
perpetration of such a fraud by an agent might well constitute a
grave breach of that agent's fiduciary duty of "utmost good
faith." There is no evidence before this Court, however, to the
effect that Brown knew of or participated in the MCDC fraud
scheme and thus breached this duty. The only evidence presented
by HealthSouth in this regard is certain material relating to
criminal charges to which Brown pleaded guilty. (See Hymer Decl.
Exs. 2 (Brown Criminal Information), 3 (Brown Plea Allocution),
4 (Brown Plea Agreement).) Those documents mention only Brown's
involvement in an accounting scheme to misstate earnings and
defraud HealthSouth shareholders; they do not reveal any
participation in or knowledge of the alleged MCDC fraud.
Moreover, even if the accounting fraud were related to the MCDC
fraud, HealthSouth's own evidence shows that Brown did not even
become aware of the accounting fraud until after execution of
the Credit Agreement. (See Hymer Decl. Ex. 3 at 37:25.) Thus,

HealthSouth's argument that the Court should infer, from Brown's

plea in another criminal conspiracy involving fraud at

HealthSouth, that he was somehow at the center of the alleged

MCDC fraud (see Def's Opp'n 9 ("Jason Brown . . . was steeped in

the fraud at HealthSouth")) is unpersuasive given the absence of

evidence showing any connection between the two.[14]

In sum, even if Danann/Plapinger did not foreclose

HealthSouth's agency defense, which the Court concludes it does,

that defense fails as a matter of law.

## C.  Abstention

HealthSouth argues that this action should be stayed or

dismissed in deference to the Alabama Action, "which has been

actively litigated for years, which is focused on UBS's

involvement in the mammoth, complex fraud at HealthSouth, and in

---

[14] The inference HealthSouth asks the Court to draw is also
contrary to the Company's numerous SEC filings acknowledging the
Guarantee and its failure to pay the amounts due thereunder.
(See, e.g., Kalal Decl. Ex. L (2004 HealthSouth SEC Form 10-K)
at 144 ("In 2001, we provided a guarantee for $20 million of
MCD's debt to UBS Warburg [] but, as of December 31, 2004, we
have not paid the amounts due under the terms of the guarantee
to UBS Warburg.").)  Just as "a party may not, in order to
defeat a summary judgment motion, create a material issue of
fact by submitting an affidavit disputing his own prior sworn
testimony," Trans-Orient Marine Corp. v. Star Trading & Marine,
Inc., 925 F.2d 566, 572 (2d Cir. 1991), so too HealthSouth
cannot now take a position of convenience contrary to its prior
statements to the SEC, see Relational Investors LLC v. Sovereign
Bancorp, Inc., 417 F. Supp. 2d 438, 447-48 (S.D.N.Y. 2006).

23

which the MCDC fraud plays a prominent role." (Def's Opp'n 1.) It argues that such abstention is justified under Colorado River Water Conservation District v. United States, 424 U.S. 800, 813 (1976).[15]

Strictly speaking, the Colorado River Court distinguished between the rule it announced and other "abstention doctrines," which are driven by "considerations of proper constitutional adjudication and regard for federal-state relations . . . ." Id. at 817. To the contrary, the Colorado River Court announced a form of abstention whereby considerations of "[w]ise judicial administration" might warrant abdicating the otherwise "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Id. (alterations in original). The Court called such cases "extreme," however, admonishing lower courts that the grounds for this "judicial economy" abstention were to be "considerably more limited than the circumstances appropriate for abstention." Id. at 818.

---

[15] HealthSouth also argues that this action should be dismissed or stayed based on the "first-filed rule." (Def's Opp'n 11.) Under that rule, "'[w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second.'" Adam v. Jacobs, 950 F.2d 89, 92 (2d Cir. 1991) (quoting First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989)). For the reasons set forth by Judge Scheindlin, however, "[t]he first-to-file doctrine applies to concurrent federal litigation -- not concurrent state/federal litigation." Radioactive, J.V. v. Manson, 153 F. Supp. 2d 462, 473 (S.D.N.Y. 2001).

Six factors guide the Court's decision whether to abstain under Colorado River:   (1) assumption of jurisdiction over a res;[16] (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights. See De Cisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989). No single factor is dispositive, and a court should not apply those factors as "a mechanical checklist," but rather only after "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 16 (1983). Balancing the factors in this action, abstention is not justified.

As an initial matter, the fear of piecemeal litigation central to HealthSouth's abstention argument is not present here for several reasons. First, UBS AG is not a party to the Alabama Action, and the Alabama Plaintiffs are not parties to this action. See Alliance of Am. Insurers v. Cuomo, 854 F.2d 591, 603 (2d Cir. 1988) ("Similarity of parties is not the same as identity of the parties"). Indeed, for this reason alone, "the state and federal proceedings are not 'concurrent' in the

---

[16] Neither court here has assumed jurisdiction over a res.

25

manner required by the Colorado River doctrine." Sheerbonnet,
Ltd. v. Am. Express Bank Ltd., 17 F.3d 46, 49-50 (2d Cir. 1994)
(relying on American Insurers). Second, and more importantly,
the two actions do not present the same issues. See De Cisneros,
871 F.3d at 307-08 (threat of piecemeal litigation exists where
issues are "'inextricably linked'"); Garcia v. Tamir, 99 Civ.
298, 1999 WL 587902, at *3 (S.D.N.Y. Aug. 4, 1999) (same). The
TAC alleges, on behalf of HealthSouth, breach of duties owed by
certain HealthSouth directors and officers and UBS Securities
personnel; it neither includes Brown in this list of HealthSouth
malfeasors nor alleges that the Guarantee is unenforceable
because of Brown's conduct. Indeed, far from "inextricably
linked" with the TAC's allegations of breach of duties, the
question of the Guarantee's enforceability is wholly independent
of the question of whether certain individuals who conceived and
authorized the Credit Agreement may be liable to HealthSouth for
breach of their duties to that company, as alleged in the TAC.[17]
While the two are related in subject matter, there is no
requirement -- through abstention doctrine or otherwise -- that

---

[17] This conclusion does not offend the Rooker/Feldman doctrine
because, among other reasons, UBS AG is not a party to the
Alabama Action. See Lance v. Dennis, 546 U.S. 459, 466 (2006)
(holding that "Rooker/Feldman doctrine does not bar actions by
nonparties to the earlier state-court judgment simply because,
for purposes of preclusion law, they could be considered in
privity with a party to the judgment.").

all factually related matters be decided in a single case. See
Colorado River, 424 U.S. at 816; see also Am. Insurers, 854 F.2d
at 603 ("While there may be some overlap of subject matter, it
is not sufficient to make these actions concurrent.").

HealthSouth resists this point by arguing that the threat
of piecemeal litigation is particularly ominous here because a
ruling for UBS AG "would necessarily determine -- or foreclose
-- a host of issues relating to UBS's participation in that
fraud that gave rise to the [MCDC] loan . . . ." (Def's Opp'n
14.)  That concern, however, is not the policy that drives
Colorado River abstention.  As the Colorado River Court itself
made clear, "the mere potential for conflict in the results of
adjudications, does not, without more, warrant staying exercise
of federal jurisdiction." 424 U.S. at 816.  Rather, the threat
of piecemeal litigation implies the isolation and resolution of
a single element in a complex dispute comprised of many such
interdependent elements. See id. at 819.  As described above,
whether HealthSouth may or may not recover against its faithless
officers or employees is entirely segregable from and
independent of the claims here, and, accordingly, by deciding
the question of the enforceability of the Guarantee now, this
Court is not resolving any question presented in the Alabama
Action.  In short, the "threat of piecemeal litigation," as
HealthSouth conceives it, is not present here.

27

As discussed above, New York law provides the rule of decision. HealthSouth acknowledges that fact (see Def's Opp'n 16) but argues that "the absence of any significant federal interests . . . provides additional grounds for abstention." Radioactive, 153 F. Supp. 2d at 476. That argument, however, turns the heavy presumption in favor of exercising federal jurisdiction on its head. In Colorado River, for instance, abstention was all the more appropriate because a specific federal interest in uniform adjudication of water rights, embodied in federal legislation, favored abstention. See 424 U.S. at 819. Likewise, in Moses H. Cone, the specific federal interest in arbitration of disputes, again embodied in federal legislation, weighed against abstention. See 460 U.S. at 20-21. In each case, the presence of a specific federal interest affected the Court's decision whether to depart from the underlying federal duty to exercise the jurisdiction authorized by the Constitution and conferred by Congress. The absence of such a specific federal statutory interest, however, does not somehow diminish the Court's general obligation to exercise jurisdiction. Instead, that absence is neutral.

Moreover, it is also important to note the "New York public policy favoring the enforcement of loan agreements swiftly and according to their express terms." Gateway, Inc. v. Vitech Am., Inc., 143 F. Supp. 2d 391, 397 (S.D.N.Y. 2001). "The CPLR gives

'greater presumptive merit' to two categories of claims --
actions based on instruments for the payment of money, and
actions based on judgments -- allowing them to be brought on by
'motion-action' for summary judgment, bypassing pleading, motion
and discovery delays." Schulz v. Barrows, 94 N.Y.2d 624, 627,
709 N.Y.S.2d 148, 150 (2000) (discussing C.P.L.R. § 3213);
Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc.,
37 N.Y.2d 151, 154, 371 N.Y.S.2d 675, 679 (1975) ("In the
actions to which it applies, 'a formal complaint is superfluous,
and even the delay incident upon waiting for an answer and then
moving for summary judgment is needless.'" (quoting First
Preliminary Report of Advisory Committee on Practice and
Procedure, p. 91; NY LegisDoc, 1957, No 6(b), p 91.)).  Thus,
while there may be no specific federal interest operating here,
there is a substantial state interest weighing against
abstention, which fact this Court considers particularly
relevant given that this action is in federal court only by way
of removal.  Indeed, protection of the rights of the federal
plaintiff, here, UBS AG, requires recognition of New York
State's policy favoring speedy and predictable resolution of
commercial matters and, thus, weighs against abstention.

    HealthSouth argues that the long pendency of and extensive
discovery in the Alabama Action favor abstention and that
proceeding on UBS's current motion will interfere with various

co-ordination orders relating to the derivative actions. (See Def's Opp'n 15-16.) As noted above, however, a legal issue not presented in the Alabama Action will be resolved here without discovery. Thus, while the discovery in Alabama and apparently in other jurisdictions might well touch upon facts related to the question presented here, the Court fails to perceive how a decision in this summary proceeding will interfere with the orderly progression of discovery in other jurisdictions, with the motion practice now underway in Alabama or with co-ordination of the derivative actions.

Accordingly, having engaged in a "careful balancing of the important factors as they apply in [this] case, with the balance heavily weighted in favor of the exercise of jurisdiction," Moses H. Cone, 460 U.S. at 16, the Court concludes that considerations of "wise judicial administration" do not warrant abdicating the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colorado River, 424 U.S. at 817.

III.   CONCLUSION

For the reasons stated above, UBS AG's motion for summary judgment [dkt. no. 9] is GRANTED, and HealthSouth's motion to dismiss or stay [dkt. no. 14] is DENIED.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED
Dated:     June **06**, 2008
           New York, New York

LORETTA A. PRESKA, U.S.D.J.